IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DISTRICT

```
- - - - - - - - - - - - - - - x
                              :
UNITED STATES OF AMERICA      :    Criminal No. 16-00469-JFM
                              :
     v.                       :
                              :
MARTIN ROBERT HALL,           :
                              :
          Defendant.          :    Baltimore, Maryland
                              :
- - - - - - - - - - - - - - - x    October 14, 2016
```

**HEARING**

BEFORE:  THE HONORABLE J. MARK COULSON, Judge

APPEARANCES:

|  |  |
|--|--|
| | PAUL E. BUDLOW, Esq. |
| | Office of the U.S. Attorney |
| | 36 S. Charles Street |
| | Fourth Floor |
| | Baltimore, Maryland  21202 |
| | On Behalf of the Government |
| | |
| | SCOTT ROSENBLUM, Esq. |
| | MARK JOHNSON, Esq. |
| | Rosenblum Schwartz Rogers |
| | and Glass, P.C. |
| | 120 S. Central Avenue, Suite 130 |
| | St. Louis, Missouri  63105 |
| | On Behalf of the Defendant |

Also Present:            HELEN DONOVAN, PTS

Audio Operator:          Jill Klein

Transcription Company:   CompuScribe
                         5100 Forbes Boulevard, Suite 101
                         Lanham, Maryland  20706

Proceeding recorded by electronic sound recording,
transcript produced by transcription service.

# I N D E X

Page

Preliminary Matters                                               3

On Initial Appearance:
      Court Inquires of Defendant                                 4

On Detention Hearing:
      by Paul E. Budlow, Esq.
      On behalf of the Government                                 7

      by Scott Rosenblum, Esq.
      On behalf of the Defendant                                 23

      by Paul E. Budlow, Esq.
      On behalf of the Government                                38

      by Scott Rosenblum, Esq.
      On behalf of the Defendant                                 39

| WITNESSES<br>For the Defendant: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Belinda Hall | 28 | 34 | -- | -- |

Page

Finding:
      by The Honorable J. Mark Coulson, Judge                    40

On Arraignment:
      by Scott Rosenblum, Esq.
      On behalf of the Defendant                                 44

KEYNOTE:  "---" Indicates inaudible in transcript.

1                    P R O C E E D I N G S

2              (Whereupon, at 2:17 p.m., the proceedings began.)

3              MR. BUDLOW:  Should I call the case?

4              THE COURT:  Yes, please.

5              MR. BUDLOW:  This is the United States of America

6    versus Martin Robert Hall.  It is Criminal No. JFM-16469.

7    This matter is scheduled before Your Honor this afternoon for

8    an arraignment and a detention hearing and potentially an

9    initial appearance, as well.  The Defendant has had an

10   initial appearance on the criminal complaint.

11             THE COURT:  Okay.

12             MR. BUDLOW:  But this would be his first appearance

13   on this Indictment.

14             THE COURT:  All right.  Mr. Rosenblum.

15             MR. ROSENBLUM:  Yes, Your Honor, Scott Rosenblum

16   from St. Louis, Missouri, along with Mark Johnson, here on

17   behalf of Mr. Hall.

18             THE COURT:  Well, welcome.

19             MR. ROSENBLUM:  Thank you, Your Honor.

20             THE COURT:  Mr. Hall --

21             THE DEFENDANT:  Good afternoon, Your Honor.

22             THE COURT:  -- good afternoon, you can be seated.

23             (Pause)

24             THE COURT:  So, do we want to proceed with an

25   initial appearance on the Indictment?

1          MR. BUDLOW:  Yes, Your Honor.

2          THE COURT:  All right.  So, we will start there.

3     All right.  Mr. Hall, you are in court today because a Grand

4     Jury of this Court has returned an Indictment against you.

5     The Indictment alleges certain violations of Federal Law.

6     So, the initial appearance is your opportunity to find out

7     exactly what is being charged, also what the maximum

8     penalties would be if you are convicted of the charges.

9          I am going to talk to you about two important

10    Constitutional Rights that you have and then we are going to

11    go on to address some other matters, including, I believe,

12    having you enter a plea in response to the Indictment in the

13    case, and then also discussing your detention or your release

14    status pending your next court appearance.

15         So, this is obviously not a trial on the charges,

16    but it is your opportunity, first, to find out exactly what

17    you are being charged with and what the maximum penalties

18    would be.  Do you United States so far?

19         THE DEFENDANT:  Yes, Sir.

20         THE COURT:  And are you able to read, write and

21    understand English?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  Today are you under the influence of

24    any substance or do you have any medical condition that

25    would interfere with your ability to understand the

1    proceedings?

2          THE DEFENDANT:  No, Sir.

3          THE COURT:  Have you had the opportunity to review

4    the Indictment with your Counsel?

5          THE DEFENDANT:  Yes, Sir.

6          THE COURT:  So, under the Indictment it appears

7    that you are charged in two counts, Count No. 1 is

8    transportation of child pornography in violation of Title 18

9    of the United States Code Section 2252(a)(1).  That count

10   carries the mandatory minimum sentence of five years and a

11   maximum sentence of 20 years, a $250,000.00 fine and lifetime

12   supervised release.

13         You are also charged in Count 2, possession of

14   child pornography in violation of Title 18 of the United

15   States Code Section 2252(a) -- (a)(5)(b), if convicted under

16   that count that has a maximum penalty of 20 years in prison,

17   a $250,000.00 fine and also lifetime supervised release.

18         So, Mr. Hall, I am not asking you whether you agree

19   with the charges but do you understand what the charges are

20   and what the maximum penalties would be?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Understand, Mr. Hall, those are the

23   maximum penalties.  That is not necessarily the sentence that

24   you would receive if you were convicted, it is the maximum

25   sentence that you could receive.

1          Mr. Hall, you have two important Constitutional

2    Rights.  Under the Fifth Amendment, you have the right to

3    remain silent.  You do not have to make any statement to the

4    Government about the charges.  If you do make a statement

5    then they can use it against you in court.

6          And then under the Sixth Amendment you have the

7    right to be represented by Counsel at all stages of the

8    proceedings from this point forward.  That means that you

9    have the right to have your lawyer with you during any

10   questioning by the Government and also have your lawyer with

11   you for all of your court appearances.

12         So, let us do this, if we could.  Mr. Budlow, is

13   the Government seeking Mr. Hall's detention in the case?

14         MR. BUDLOW:  Yes, Your Honor.

15         THE COURT:  All right.  So, I guess the question is

16   -- do we want to proceed with the detention hearing now or do

17   we need to schedule another date for the detention hearing.

18         MR. BUDLOW:  Your Honor, I believe that the

19   detention hearing was scheduled for today.  And that --

20         THE COURT:  All right.

21         MR. BUDLOW:  -- Counsel flew in from Missouri.

22         THE COURT:  Very well.  So, we are ready to

23   proceed.

24         MR. ROSENBLUM:  Yes, Your Honor.

25         THE COURT:  All right.  So, Mr. Budlow, I will hear

1  from you first.

2           MR. BUDLOW:  Thank you, Your Honor.  Your Honor,

3  the Government is seeking detention in this case based on

4  both risk of flight and danger to the community.  I would

5  point out that this is a presumption case.  And that the

6  Defendant is presumed detained.  And that the Defendant --

7  either a lack of assurance of the Defendant's appearance or

8  safety to the community, it is sufficient to detain the

9  Defendant.  Not both.  Either is sufficient.

10          Your Honor, I will give the Court a proffer of

11  the facts that are the subject of this investigation that

12  both led to the search warrant of the Defendant's home as

13  well as the Indictment in this case, which you have, and

14  then some additional facts that the Government believes

15  relate to the Defendant's danger to the community and his

16  risk of flight.

17          THE COURT:  All right.

18          MR. BUDLOW:  Your Honor, Baltimore County searched

19  the Defendant's residence after an undercover investigation

20  into what I would call an encrypted file sharing and storing

21  platform, which is known as Pre-Net.  Showed that an IP

22  address from the Defendant's house was transporting child

23  pornography.  Pre-Net is a Peer-to-Peer encrypted platform

24  for storing and delivering data.  It is a highly

25  sophisticated platform, the communication is encrypted, the

1   files are stored in very small encrypted blocks on hundreds

2   or even thousands of various users' computers.

3         The users participate in this file sharing with the

4   understanding that they do not know what files they share

5   bits and pieces of on the various computers that are in an

6   encrypted states, so they would not do them any good to try

7   and look at those encrypted files in any event.

8         In order for one user to obtain a particular file

9   that user needs to obtain a key, which is similar to a

10   password.  That key then sends a message to other users of

11   the program and it tells them to send the encrypted packets

12   or sections of data back to the user, where the program puts

13   all of those packets back together, un-encrypts them if you

14   will and recreates the file or files that have been requested

15   on the beginning user's device.

16         That is essentially the program that the undercover

17   investigator from Baltimore County was investigating when he

18   saw the Defendant's IP address with information that led him

19   to believe that it was connected to a specific packet of

20   files.  And the detective knew based on his experience that

21   that unique information that he obtained from the IP address

22   contained two known videos of child pornography.

23         I am going to describe those videos of child

24   pornography.  This is the -- these are the videos that the

25   detective recognize as linking to the Defendant's IP address.

1  These videos were not downloaded by the detective, nor where

2  they ultimately recovered from the Defendant's residence or

3  from his computers, at least not at this time.  A full

4  forensic exam has not been done.

5         The first video is three and a half minutes long

6  and it depicts a nude prepubescent female lying on a bed with

7  her legs spread, the prepubescent female's face is not seen

8  and the adult male enters the video and penetrates the

9  female's vagina with his penis until he ejaculates on the

10 minor's vagina.

11        The second video is one minute long, approximately.

12 It also depicts a nude prepubescent female masturbating

13 herself and then an adult male digitally penetrates the minor

14 and perform oral sex on her.

15        Those two videos were in data that linked to the

16 Defendant's IP address.  The detective took that information

17 and applied for and obtained a search and seizure warrant,

18 which was executed on the Defendant's house on September 7th,

19 2016.

20        When the detective arrived they observed that the

21 Defendant's computers were all encrypted and you will the

22 Defendant is a fairly sophisticated computer user.  But

23 fortunate for the investigators at the time of the search

24 warrant one of the computers was running and it was connected

25 to an external hard drive.  Which allowed the investigators

1   to do an on-scene forensic exam of those items, at least in

2   part without having to worry about encryption for the short

3   term.

4        What they learned was that on the Defendant's

5   external hard drive was a significant amount of prepubescent

6   and child exploitation appears.  They identified over 8,000

7   files of child erotica, prepubescent and related materials.

8   They noticed that many of the subjects of the subjects of the

9   photographs and videos appeared to be Asian and potentially

10  Filipino.

11       The images included the following three imagines --

12  well, the images included prepubescent minors engaging in sex

13  acts with adults including three that I am going to describe.

14  And they formed the basis of Count 2 of the Indictment in

15  part.

16       The first one is an imagine of an adult penis

17  penetrating a prepubescent female's vagina.  The second one

18  is a prepubescent female performing oral sex on an adult

19  male.  And the third one is an adult male's penis penetrating

20  an Asian prepubescent female's vagina.  Again that is the

21  images and the types of images that form the basis of

22  Count 2.

23       Also located on the Defendant's computer were

24  images of the Defendant engaging in sex acts with a young

25  female of what the detectives determined to be undetermined

1   age.  And these videos or images were produced using a

2   camera, make and model which was the same make and model

3   camera that was found in the Defendant's office where the

4   computers were found.  I say office, I think it was either a

5   basement or office somewhere in his residence.

6          Additionally, there were pornographic images,

7   lascivious display, not sex acts, of photographs using the

8   same type of camera, the same make and model camera as were

9   found -- as the ones that depicted the Defendant engaging in

10  the sex acts with the young female, also the same make and

11  model camera found in the Defendant's home.

12         Those images are as follows.  Seven image files

13  which depicted one individual listed in the Indictment as

14  Jane Doe.  Who is a minor female, she is partially naked,

15  three of which are focused on Jane Doe's vagina.  Again,

16  those images form the basis for Count 1, transportation of

17  child pornography and I will explain a little bit more about

18  additional evidence with the transportation of child

19  pornography charge in the moment.

20         THE COURT:  But there is no charge at this point

21  for production?

22         MR. BUDLOW:  There is not.  There is -- significant

23  amount of evidence indicating production relating to that

24  image, which I will detail, but the Defendant is not

25  currently charged with that.

1          The Defendant gave a statement at the scene.  He

2   stated that the images of him engaging in sex acts with other

3   individuals, he admitted that that was him and that it was

4   one of his Filipino girlfriends, which he had spent time with

5   during his recent trip to the Philippines.  He had been in

6   the Philippines between April and August of 2016.

7          He also admitted that the young girl depicted in

8   the image in Count 1, we just discussed is the basis for the

9   transportation images, was his girlfriend's sister.  But that

10  he denied taking any photos of the sister.  And he did state

11  that he believed that that young sister depicted in the

12  photograph was either age 12 or 13.

13         The Defendant stated that he travels to the

14  Philippines for work where he teaches JAVA code and that

15  the women there in the Philippines like their American

16  boyfriends.  He denied any child pornography or child

17  exploitation related active or possessing the images of

18  child pornography.

19         Defendant and his wife both stated in interviews

20  that only the Defendant uses the devices which were found in

21  his office, which are the devises where all the images that

22  we are discussing are located.  The Defendant also stated

23  that he purchases his computer devices new.

24         THE COURT:  Mr. Budlow, did you say that you --

25  that the investigators had somehow linked the pictures of the

1  minors that you just described with Mr. Hall's camera?

2           MR. BUDLOW:  Correct.  Based on the make and

3  model.  At this point in the forensic exam they have not

4  determined the -- I do not know if there is any information

5  relating to the serial numbers.  It is the same make and

6  model.

7           THE COURT:  Okay.

8           MR. BUDLOW:  Other information found in the

9  Defendant's possession nor on the Defendant's computer and

10  external hard drive that were viewable at the scene,

11  thousands of images of child pornography and erotica.  Which

12  were on his encrypted hard drive.  The Defendant and his wife

13  both stated that he is the user of the device, he stated that

14  he purchased the equipment new.

15           The Defendant's home IP address -- this again is

16  a summary of the evidence related to Count 2, possession --

17  the Defendant's home IP address was observed by the

18  undercover detective sharing or disseminating or some

19  relationship to these bits of image files that are known

20  child pornography.  Based on the number of files on the

21  Defendant's computer and they type of files the Government

22  submits that there is sufficient evidence for the Court to

23  determine that the Defendant has a sexual interest in

24  children.

25           Additionally, there are the photos of the Defendant

1  from the Philippines which show -- there are other photos of

2  the Defendant from his recent trip to the Philippines and

3  earlier trip to the Philippines that show him with various

4  families.  When I say families they typically appear to be a

5  young woman, no adult male, who typically had young female

6  children with them.  What their relationship, of course I do

7  not know.

8          In one of these photographs of sort of a family

9  vacation if you will, where the Defendant is with his family

10  -- with a young woman and a young Filipino children is a

11  photo of a young girl, clearly under the age of ten,

12  prepubescent, going down the slide a couple of times.  The

13  first time she goes down the slide clothed.  Later on in the

14  photograph she goes down the slide, no -- either no underwear

15  or -- her bottom is exposed and her legs are spread exposing

16  her vagina to the camera.

17          Those photographs were also taken with the same

18  camera make and model that was located in the Defendant's

19  office and that was used to take the images -- the Defendant

20  having sex acts with a woman as well as the woman's younger

21  daughter in a lascivious display --

22          THE COURT:  And those photos are from a time frame

23  when Mr. Hall was known to be in the Philippines?

24          MR. BUDLOW:  That is correct.

25          THE COURT:  All right.

1          MR. BUDLOW:  So, the evidence that relates to

2    Count 1, the transportation of child pornography with

3    respect to those seven images of what the Defendant said was

4    12 or 13 old sister of his Filipino girlfriend, are as

5    follows.  And a lot of this you have already heard but just

6    to sort of put it in one place and so that the Court

7    understands the strength of the case against the Defendant

8    for this count.

9          Again, the Defendant had purchased this computer

10   and these hard drives new presumably, without child

11   pornography on them.  The Defendant's computer contained

12   images of a young Filipino girl clothed and then unclothed

13   focused on her vagina.  And these are the Count 1, so that

14   series of seven photos is a series that starts clothed going

15   to unclothed and then going to focusing on the victim's

16   vagina.

17         The images again were taken using the same make

18   and model camera seized from the Defendant's home.  The

19   images were taken during a time when the Defendant can be

20   shown to be in the Philippines.  The admitted that the

21   photos of this girl is the younger sister of his Filipino

22   girlfriend.

23         So, in a nutshell, the Defendant traveled to the

24   Philippines, these photos were taken while he was there,

25   likely by him, he brought the images back with him either on

1    a hard drive or on his camera and that is the evidence of his

2    transportation for Count 1.

3         And as the Court asked me earlier and I responded,

4    he is not currently charged with production but all of those

5    facts are significant evidence of his production.  And

6    whether or not there is probable cause or stronger evidence

7    at this time is not really the point.  I think those are all

8    relevant facts for the Court to consider when determining how

9    much of a danger the Defendant presents.

10        I would point out that in addition to the danger in

11   that the area the Defendant is highly sophisticated and he

12   has conduct that shows that he has attempted to avoid being

13   caught and avoid law enforcement.  And that is that all his

14   computers are encrypted.  His computers did contain wiping

15   software.  And there is a chat that I have just recently

16   received from his Skype account to at least one of the women

17   that he is talking to he had specifically instructs to delete

18   the chats.

19        Additionally there is evidence of the Defendant's

20   travel.  The Defendant has traveled to many countries

21   throughout Europe and Asia including many known to be popular

22   destinations for sex tours and specifically child sex tours,

23   including the Philippines, Thailand, Cambodia, Taiwan and

24   Indonesia.  Other countries as well, but specifically has

25   been to those countries all known for that kind of activity.

1          Your Honor, I this morning received some small

2    amount of the forensic results from different searches on the

3    Defendant's devices, that I think are also relevant on the

4    issue of detention.

5          There is a Yahoo chat and all it is, is one line,

6    that is all that was extracted out of there.  And it is

7    clearly from an account associated with the Defendant, which

8    I think is also relevant.  It is "T-r-a-v underscore M-a-n

9    underscore 1969".  So, Trav Man 1969.  And that is the same

10   or similar name or moniker that he uses for some of his other

11   social media platforms.  And the chat, all we have says, "I

12   want to meet the younger one", "I want to meet the younger

13   one".

14         Additionally within the Google searches that were

15   pulled from the Defendant's computer was the search for "Best

16   Eraser Settings" unquote.

17         And then there is a Fire Fox web history.  And

18   the web history only shows two dates, September 3rd and

19   September 6th of 2016, which were just days before the

20   Defendant's house was search.  And I would indicate that

21   given the evidence of him having search for eraser and

22   having wiping software that he either manually deleted his

23   search history on all of these internet browsers and other

24   computer related activity regularly or he set it up so that

25   his computer would do it automatically.  But in any event it

1   clearly had not deleted these things from just a couple of

2   days before the Defendant -- the Defendant's home was

3   searched.

4          And these searches all relate to a web history

5   where the search history on Fire Fox, all relates to a web

6   history for a web site called, "M-r-d-o-u-b-l-e.bz" or

7   Mr. Double dot BZ.  And the case agent who got stuck on a

8   search warrant today or would have been here, but she is

9   still there now, did a little digging and learned that that

10  website, Mr. Double dot BZ, is a site offering 30,000 or more

11  taboo teen incest stories, which are stories about rape and

12  child molestation.

13         So, on September 3rd there is one to hit.  And then

14  on September 6th, 2013 there is a variety of zip files that

15  are seen on the extension of the Defendant's search history

16  all related to the Mr. Double dot BZ website.  And the file

17  names associated with those zips are as follows.

18         I will just give you a preview or the end of it,

19  one is "Tooyoung03.zip", one is "Kidspics.zip", "Angel.zip",

20  "Alicia.zip", "Poollove.zip" and "Marycath.zip".  (All

21  website names are spelled phonetically.)

22         Your Honor, finally there is a Skype log, Skype

23  being a video chat platform but also regular chat through

24  texting and it is clear from the Defendant's Skype log that

25  he was communicating both by video and sending photographs

1    and text chat on Skype.  The log goes from at least January

2    of 2015 until the summer of 2016 and maybe even more recent

3    than that.

4          Now, I will tell, Your Honor, obviously at this

5    state typically the Defense has no discovery.  This case is

6    no exception.  Up until now they have had nothing.  I have

7    provided the Defense this extremely small font summary of

8    these chats.  And so, I am going to try and stay very general

9    in my description and conservative.

10          What -- and the subject to the if the Defense wants

11   to point something out in here if you can read that -- then I

12   will take it back.

13          But what is clear, I think, from these chats is

14   that the Defendant is communicating with women and it is

15   highly sexual talk.  Much of the talk relates to having sex

16   with the person that he is talking to.  The vast majority of

17   the time it is unclear the age of that individual.

18          However, there is a lot of discussion with sort

19   of the target of his conversation about others who are

20   younger, they seem to be younger sisters or younger friends

21   and family members that are there, and there are lots of

22   conversations relating to so-and-so is too young.  And so

23   that would be coming from someone, it appears to be in the

24   Philippines.  The Defendant is saying this individual was

25   too young.

1              To be clear there is no definitive text from the

2      Defendant to which that is responding to.  So, for example,

3      I cannot say the Defendant specifically stated that he

4      wanted to have sex with their sister and she says no, my

5      sister is too young.  It is just that the response is seen

6      and a number of these contain information like that person is

7      too young.  And again the Government puts this in the context

8      of the vast majority of these texts are sexual in nature and

9      explicit.

10             Additionally, there is clearly images that are

11     being shared because you can see that the individual that

12     the Defendant is talking to sends texts, that might just

13     say, ".4-JPEG" and things like that.  And I am just going

14     to read to the Court some of the text message that seem to

15     show the Defendant's activity.  Some of these are messages

16     to him.

17             One time he says, "I like young".  There is another

18     text message where he receives a number of photographs from

19     someone and states, "Who is the cute baby" and cute is

20     spelled C-u-u-u-u-u-t-e baby.

21             There is a sexual explicit conversation with

22     someone who is identified by user name and it is -- at this

23     point I cannot say whether this user name is supplied by

24     Skype from the user or whether the Defendant edited it as

25     somebody he knew, but it is "Nicole Areola" and in

1  parenthesis it says, "Medium Plus Plus Braces 15 Ninth GD

2  Consolation FC 15A" and then there is something else, on

3  something.  There is conversation with this individual where

4  she indicates that she is in the ninth grade.  The text

5  messages are clear that she has a sister, who got pregnant,

6  that sister is 17.

7              So, I think it is a fair reading of this to see

8  that the Defendant is engaging in sexual conversations with

9  someone he believes to be a sixteen year old high

10 school/middle age student in the Philippines.

11             Additionally, there is conversation with the

12 Defendant and this person, Nicole, about potentially getting

13 together.

14             The last text I see or the second to the last text,

15 from this individual, Nicole, says, "I hope so mahal (sic.)

16 only that month is my vacation, in June back to school again.

17 You have to time to think about it if you will not be here,

18 then it's all right".

19             So, it is certainly appears, whether or not they

20 ever saw each other is unclear at this point until there has

21 been a more detailed review, but there is discussion of

22 getting together.

23             Your Honor, in summary, the Government believes

24 that detention is appropriate because the Defendant is a

25 danger.  He is a danger to children wherever they are.  There

1    is a presumption of the danger -- of detention.  The

2    Defendant possessed thousands of images of child pornography,

3    including prepubescent children engaging in sex acts.  He has

4    engaged in extensive sexual chat including exchanging video

5    and images with young women and girls overseas, all who

6    appear to have younger siblings and daughters who seem to be

7    the focus of the conversation.

8            The discussion appears to involve sex of talk with

9    minors.  It clearly talks about involving sex with people for

10   the first time, girls losing their virginity, girls waiting

11   or not waiting until they are 18 to have sex.

12           The Defendant clearly travels extensively to

13   countries know for sex and child sex tours.  He admits in his

14   interview that he has girlfriends in the Philippines that he

15   has sex with, who we know have younger siblings and

16   daughters.

17           He clearly, from his online activity and from his

18   computer activity has a sexual interest in children.  He has

19   on his computer child pornography of a minor girl that he

20   admits is his girlfriend's sister, taken with his camera

21   while he was in the Philippines.  That is strong evidence,

22   that is a strong indication that the Defendant took those

23   photographs and produced those images.

24           The Defendant clearly represents a threat to

25   children wherever he is.  He is highly sophisticated both in

1   computers, he has traveled extensively throughout Europe,

2   North America, South America, Asia.  He clearly is facing

3   mandatory minimum time in this case based on the current

4   Indictment of five to twenty years, potentially more based

5   on some of the information that is seen in this Indictment.

6   There are a variety of other charges that could be brought

7   in the future, all of which carry mandatory minimums of 10

8   to 15 years.  Combined with his travel history, even with

9   him giving up his passport, he clearly represents a flight

10   risk.

11          And the Government's position is that there is no

12   combination of conditions that would both assure his

13   presence, but really most importantly in this case, assure

14   the safety of the community.

15          THE COURT:  All right.  Thank you, Mr. Budlow.

16   Mr. Rosenblum.

17          MR. ROSENBLUM:  May it please the Court.  Thank

18   you, Your Honor.  Mr. Budlow is correct, obviously we have

19   not had an opportunity to review any of the evidence, so it

20   would be difficult for me to comment on the quality or the

21   content of the evidence other than as Mr. Budlow pointed out

22   he did provide the Skype texts to me just before this

23   hearing.

24          The issue here today, in our view, is whether or

25   not there is a combination of conditions that would assure

1   this Court that Mr. Hall would not only appear and defend

2   himself but he is not a danger to the community.

3          Under 3142 it is certainly the preference if the

4   Court could find a condition or combinations of the

5   conditions that would reasonably appear -- that reasonably

6   assure that Mr. Hall would appear and not be a danger to the

7   community then certainly I think that liberty is the

8   preference, as I read 3142 in the case law.  Liberty is the

9   preference over an individual being detained under, except

10  for limited, careful exceptions.

11         It is our belief, that although this is a

12  presumption case, it is our belief that we can meet that

13  burden and then allow the Government to be again left with

14  the burden of persuasion.

15         What we have here today is an individual that is

16  basically a lifelong citizen of this State, Maryland.  He

17  obviously has no priors and he has incredible family ties

18  and connections not only to the United States but to this

19  area.  This is evidenced by his two children, he maintains

20  close contact with, by his wife of 30 years, Belinda, that

21  I am going to ask her to testify and answer some questions

22  about what she would allow her role to be as a third-party

23  custodian to assure and give this Court assurances that we

24  can satisfy the Bail Reform Act.  She is a stay-at-home

25  mother or a stay-at-home housewife that basically is engaged

1    in charitable activity and you will hear from her.

2            Additionally, she has her parents, Hazel and

3    Michael Griffith, 73 and 74 years of age, that I asked her

4    just before this hearing to reach out to them and see whether

5    they would also assist in the role of custodians.

6            The issue of the travel, I think, can be certainly

7    addressed and alleviated by the fact that Mr. Hall is

8    without a passport.  That had been seized by the Government

9    at the onset of this case.  Additionally, he would be

10   subjected to electronic monitoring, home detention and any

11   other condition that this Court would see necessary to assure

12   that he is completely supervised in a custodial type

13   circumstance.

14           Mr. Hall's pastor came here today and this is

15   gentleman by the name of Pastor Jason Polling (sic.).  He is

16   over my left shoulder.  He is the pastor of the New Hope

17   Church, which the Halls have been congregants of for 15

18   years.  They predated that church for 15 years.

19           Additionally, Belinda's sister is here.  Shirley

20   Viscarello (sic.) -- I am sorry, how do I say that?

21           MS. VISCARELLO:  Viscarello.

22           MR. ROSENBLUM:  Viscarello, Shirley Viscarello.

23   And she traveled here from Stanford, Connecticut.  Shirley --

24   and Rick -- Rick Viscarello is a medical doctor who engages

25   in high risk OB/GYN type of medical practice.  She came here

1   to show her support for Martin and also to show her support

2   for her sister, traveling here from Stanford just to be

3   present at this hearing.

4          The Government points out his sophistication with

5   computers.  To be sure, that is how he -- that is his job,

6   that is his career.  And in the area of Free Net, which is a

7   complicated developing area, Mr. Hall absolutely had a

8   legitimate purpose to be engaged in activities on Free Net.

9   He writes JAVA and JAVA Script, which is basically -- is a --

10  Free Net is a program that uses that particular type of

11  script.

12         Obviously, as the Government pointed out there is

13  illegitimate reasons for being on Free Net, but there are

14  also legitimate reasons that Mr. Hall was, in fact, on Free

15  Net.

16         When the Government maintains the burden of

17  persuasion I think once we meet our burden it would be

18  incumbent upon the Government to show that he is a flight

19  risk and a danger to the community.  I have not seen the

20  evidence.  I have on a quick review of what the Government

21  presented me with here today and I want to be clear that I

22  do not want to overstate anything, so I discussed what I was

23  going to say to the Court with Mr. Budlow, but I think that

24  it is clear looking at this document that there is -- in

25  looking at this they cannot -- the Government cannot state

1  to the Court that this document suggests that there was

2  ever any underage contact on behalf of -- with respect to

3  Mr. Hall.

4          That they cannot look at this document and suggest

5  that actually Mr. Hall engaged in sexual contact with an

6  underage person.  It is certainly not clear and I do not

7  think the Government is going to state at this point anything

8  to the contrary.

9          A quick review of this document, like a lot of

10 these types of documents in cases and chat, everything is

11 subject to context.  A couple of the entries that I looked,

12 my take on that, would be Mr. Hall specifically stating that

13 this particular person is too young, or that he is not

14 interested in engaging in activity with this particular

15 individual because of the young age of that individual.

16         So, I think in one sense where the Government can

17 take away one context, we certainly can take away another

18 context, and that would be left to a more thorough

19 investigation and more thorough cross-examination and as we

20 get down the road in this discovery.

21         So, certainly this is a man that has just

22 incredible contacts to this area and to this region.  I

23 absolutely believe that there is a condition or a combination

24 of the conditions that would reasonably satisfy.  And I think

25 that is one of the key words here.  Reasonably satisfy as the

1   Bail Reform Act requires, this Court that those conditions

2   can be satisfied.

3           And at this point, if the Court please, I would

4   call his wife, Belinda Hall, to the stand.

5           THE COURT:  I am happy to hear from her.

6           MR. ROSENBLUM:  Thank you, Your Honor.

7           THE CLERK:  Ma'am, I need you to come up here,

8   please.  Please raise your right hand.

9   Whereupon,

10                          BELINDA HALL

11  was called as a witness on behalf of the Defendant, having

12  been first duly sworn, was examined and testified as

13  follows:

14          THE CLERK:  Please have a seat.  Pull the

15  microphone close to you and state your first and last name

16  for the record.

17          THE WITNESS:  Belinda Hall.

18          THE CLERK:  Spell your last name, please.

19          THE WITNESS:  H-a-l-l.

20          THE CLERK:  Thank you.

21                       DIRECT EXAMINATION

22          BY MR. ROSENBLUM:

23      Q    Thank you, Ms. Hall.  Would you again please state

24  your name for the record.

25      A    Belinda Hall.

1    Q    And, ma'am, can you tell the Court who your husband

2    is?

3    A    Martin Hall.

4    Q    And obviously he is here to my right in court.

5    A    Yes.

6    Q    And how long have you and Martin been married?

7    A    Thirty years.

8    Q    How would you characterize your marriage up to this

9    event with the Court -- to the Court?

10   A    Um -- I don't know quite how to answer that.  I

11   mean we've been married for 30 years.  We've been happily

12   married for 30 years.

13   Q    So, happily married?

14   A    Sure.

15   Q    Okay.  And obviously these charges came as quite a

16   shock to you, is that fair to say?

17   A    That is fair to say.

18   Q    And you are going through the process of dealing

19   with the allegations day-to-day, also fair to say?

20   A    Yes.

21   Q    You know we have as Martin's lawyers discussed some

22   of the specifics, you are certainly aware of some of the

23   specifics and you just sat here as Mr. Budlow outlined what

24   the Government believes is a summary of the Government's

25   evidence, and you heard that, correct?

1      A      Yes.

2      Q      Anything about what you heard changed the

3  discussions that we have had previous to your testimony about

4  what you are willing to represent to the Court as your role

5  in the event that this Court would admit your husband Martin

6  to bail in this district?

7      A      No.

8      Q      So, we have discussed with you the concept of a

9  third-party custodian?

10     A      Yes.

11     Q      And the concept of a third-party custodian would

12  mean essentially you would be in a position to watch your

13  husband Martin?

14     A      Yes.

15     Q      And if the Court would impose a condition where

16  basically he is relegated to home confinement you would abide

17  by that condition?

18     A      Yes.

19     Q      And if the Court would require electronic

20  monitoring you would do whatever is necessary to establish a

21  land line to allow for that condition to go forward?

22     A      Yes.

23     Q      If Martin, your husband, would violate any

24  condition that this Court would impose on him in the event

25  that he would be admitted to bail, as your role of custodian

1   you would have to report that to his Pretrial Services

2   Officer and the Court if you would see a violation?  Would

3   you do that?

4        A    Yes.

5        Q    Would you do that knowing that that reporting of

6   that potential violation would most likely immediately revoke

7   his bond and require Martin to return to jail pending his

8   trial?

9        A    Yes.

10       Q    The two of you have had -- you have two children,

11  Lindsay and a son whose name is?

12       A    Nathan.

13       Q    And one I know resides in the New York area and one

14  in the California area?

15       A    That's correct.

16       Q    Do they enjoy a close relationship with their

17  father?

18       A    Yes.

19       Q    I know Lindsay is in a -- they both work at Google.

20  So, they are in a similar type of business?

21       A    Yes.

22       Q    And because of that do they have a particularly

23  close relationship?

24       A    Yes.

25       Q    Did you ever image in your wildest imagination that

1    your husband, Martin Hall, would ever leave the jurisdiction

2    and put himself in a position where he could never see his

3    children again?

4         A    No.

5         Q    His children are completely and eminently important

6    to him?

7         A    Yes.

8         Q    Given everything you heard, I know that you are a

9    very religious woman, do you have any intention of -- and I

10   do not want to put you on the spot -- but do you have any

11   intention in the near future to do anything other than to try

12   to work on your marriage and work with Martin?

13        A    No.

14        Q    Your sister is here today and that was a show of

15   support.  I discussed that in my proffer to the Court.  And

16   her name -- restate her name, please, for the Court.

17        A    Shirley Viscarello.

18        Q    And Ms. Viscarello is married to?

19        A    Richard Viscarello.

20        Q    Who is an OB/GYN?

21        A    Yes.

22        Q    They live in Connecticut?

23        A    Yes.

24        Q    And she traveled here today to be supportive of you

25   and Martin?

1      A      Yes.

2      Q      Additionally, your parents, I asked you have a

3  conversation with your parents, the Griffiths, Hazel and

4  Michael, prior to this proceeding?

5      A      Yes.

6      Q      And the conversation was essentially in the event

7  that you would need any assistance as a custodian, for

8  instance if you would have to leave for any significant

9  period of time, would they be willing to fill in for you and

10  assume -- and assume your role in the supervision of your

11  husband, Martin, and report any potential violation to the

12  Pretrial Services Officer as well as to this Court?

13      A      Yes.

14      Q      And based on your conversation with them, were you

15  parents willing to assist you and do that?

16      A      Yes.

17      Q      Looking at your assets -- first of all are you

18  aware that Martin has any other additional passports?

19      A      No.

20      Q      And the passport that he has -- had is in the

21  possession of the United States Government?

22      A      Yes.

23      Q      And that was at the time of his arrest?

24      A      His initial arrest.  Yes.

25      Q      Okay.  The two of you -- most of your assets --

1    first of all, for what it is worth, to seek legal counsel for

2    your -- for Martin, you had to have assistance from your

3    parents and his parents?

4        A    From his parents.

5        Q    From his parents.  Okay.  And most of your assets

6    are tied up in your home, would that be correct?

7        A    Yes.

8        Q    Do you have an estimate as to what the equity in

9    your home is?

10       A    $130,000.00.

11       Q    Would that, other than Martin's retirement, which

12   has certain conditions to obtain it or to reach it, would you

13   say that $130,000.00 is essentially the net worth that the

14   two of you have?

15       A    Yes.

16       Q    Are you willing to -- I have two questions.  Martin

17   has indicated to me, as a further show of -- to alleviate any

18   concern from the Court that he would be willing to transfer

19   any interest that he has in that home completely into your

20   name, you are aware of that?

21       A    Not before you just told me, no.

22       Q    Okay.  Now that I have told you are you aware of

23   that?

24       A    Yes.

25       Q    Okay.  And you are willing to work in that regard

1    with respect to Martin doing that to assure the Court that

2    essentially not only would he not have a passport, but he

3    would have very little means to ever -- means not to appear

4    and defend himself in this matter?

5         A    Yes.

6         Q    And once you receive that transfer by Quit Claim or

7    other measure, would you be willing to post the house, post

8    your home, basically all your net worth, family's net worth

9    with this Court and its equity to assure this Court that

10   Martin would appear and defend himself?  Essentially put it

11   up for bail?

12        A    Right.  I'm not sure I answer -- I mean I think,

13   yes.  But we have also talked about the need to sell our home

14   in order to have financial means to live as this case

15   proceeds.

16        Q    Well, allow -- assuming that in the even that money

17   becomes -- such an urgency that we could approach the Court

18   to make arrangement, but in the short term would you --

19        A    Yes.

20        Q    -- would you secure his bail with your home?

21        A    Yes.

22        Q    Additionally, speaking of the issue of needing

23   money to live, certainly in the near term, in the event that

24   -- Martin be admitted to bail and in the event that he would

25   be allowed to work from home, and in the event that the Court

1    would allow him to work in -- and apply his trade, with the

2    need to use a computer if the Court would require software to

3    be installed, which would essentially alert authorities if

4    there was ever a -- a dubious type of search, you would agree

5    to monitor that, as well?

6        A    Yes.

7        Q    Lastly I noticed this -- and I mentioned this in my

8    proffer, I noticed that your pastor has joined you here

9    today?

10       A    He is here today.

11       Q    Right.  And he is over my left shoulder?  I think.

12       A    Yes.

13       Q    And can you describe for the Court the significance

14   of church in your life and the relationship that your family

15   has enjoyed with the Pastor Jason Polling over the last 15

16   years or so?

17       A    Um -- I would say that my faith is the most

18   important thing in my life.  And our involvement in New Hope

19   Community Church, which has for the last 15 years, remained a

20   small community.  Has been -- certainly for me, our lifeline,

21   those 15 years.  It is where we get our close community apart

22   from family.

23       Q    And I know this has been a difficult period of time

24   and certainly is challenging and testing of your faith and

25   your marriage, but has anything that you have heard in court

1    today caused you to waiver at all in your commitment to be

2    with your husband and to act as a third-party custodian and

3    advise this Court and Pretrial Services if there was ever be

4    a violation of any condition that this Court would impose to

5    assure it that Martin would appear and defend himself and not

6    be a danger to the community?

7         A    No.

8         Q    Thank you, ma'am.

9              THE COURT:  Mr. Budlow, any questions?

10             MR. BUDLOW:  Yes.

11                         CROSS EXAMINATION

12             BY MR. BUDLOW:

13        Q    Good afternoon.  I just have a couple of questions

14   for you.  Is it fair to say that when you heard the proffer

15   you were not aware of any of the chats that I discussed on

16   the computer?

17        A    That is fair to say.

18        Q    And is it also fair to say that you were not aware

19   that your husband was taking what I described as family

20   vacations overseas to resorts and amusement parks with other

21   women and children?

22        A    I was not specifically aware of that before today.

23        Q    And you do not know the names of his various

24   contacts throughout the world who have hired him over the

25   past number of years.

```
 1        A    I know some of them but not all of them.  Okay.

 2             MR. BUDLOW:  Okay.  Thank you.

 3             THE WITNESS:  Thank you.

 4             THE COURT:  Anything else?

 5             MR. ROSENBLUM:  Thank you, Your Honor.  Nothing

 6   further.

 7             THE COURT:  All right.  Thank you, ma'am.

 8             (Witness excused.)

 9             THE COURT:  Mr. Rosenblum, anything else from you

10   on behalf of Mr. Hall?

11             MR. ROSENBLUM:  No, Your Honor.  That would

12   conclude our presentation.

13             THE COURT:  All right.  Mr. Budlow, anything from

14   you?

15             MR. BUDLOW:  Very briefly, Your Honor.  The only

16   thing I would add, I neglected to state this earlier, but --

17   the Defense's argument reminded me of it, which is that --

18   what you now see in front of you and that has been

19   highlighted a little bit, is that the Defendant essentially

20   has been living a complete double life.  He spends months

21   at a time overseas.  And nobody realizes that he is -- that

22   it is he is the husband, boyfriend of numerous other

23   families.  That he has taken these family vacations with.

24   Nobody knew.

25             And so he is leading that double life in many, many
```

1    months overseas.  But he is also leading this complete other

2    double life here in his office.  And that all goes to the

3    idea that Your Honor can trust the Defendant when he through

4    his counsel says, you can trust me, I am not going to harm a

5    child, you can trust me, I am going to stay at home on

6    electronic monitoring, you can trust me I am not going to

7    contact my overseas contacts, get a passport, flee the

8    country or do anything like that.

9         And I would say that someone -- not to mention all

10   of the conduct I have talked about earlier, that makes him

11   a danger, but this goes to the heart of his trustworthiness

12   that he was able to successfully lead this incredible other

13   lifestyle that nobody knew about.  Just reinforces the idea

14   that given the danger, I do not think it makes sense for

15   the Court to take that leap of faith to trust this Defendant.

16        THE COURT:  All right.  Mr. Budlow, thank you.

17        MR. ROSENBLUM:  Briefly, Your Honor.

18        THE COURT:  Yes, Mr. Rosenblum.

19        MR. ROSENBLUM:  I would just -- just an additional

20   comment to Mr. Budlow's last comments.  Unfortunately, I

21   think it goes without saying that when somebody is engaging

22   in infidelity there is a certain double life connected with

23   that infidelity.  And certainly -- that is not what the issue

24   is here today.

25        With respect to this overseas travel, every one of

1    those trips had a component of work to.  That is how Mr. Hall

2    made a living.

3          And additionally, at the end of the day, I think

4    the conditions that you can impose are such that you would

5    have no fear, both financially or by passport, Mr. Hall would

6    leave the jurisdiction.  Thank you.

7          THE COURT:  All right.  Thank you, Mr. Rosenblum.

8    Let me first say this, I am certainly very appreciative, I

9    know that Mr. Hall is appreciative of everyone who has shown

10   up today to support him.  And I know it is not an easy day

11   for the family and it probably has not been easy for some

12   period of time now.

13         And I also appreciate the testimony of Ms. Hall.

14   It is difficult to come into court and take questions, even

15   from a friendly lawyer, that is a difficult position to be

16   in.  And that is not lost on me as I consider what I am bound

17   to consider under what we call the Bail Reform Act, which is

18   what Congress has passed to guide my decision here.

19         As you have heard the lawyers speak, there are two

20   criteria that I look at.  One is risk of flight and one is

21   danger to the community.

22         You have also heard from both lawyers this

23   notation of a presumption.  So, there are certain crimes

24   that Congress has deemed to be such that the normal

25   presumption that Mr. Rosenblum described, which is in favor

1   of release, essentially reverses itself and it becomes a

2   presumption in favor of detention because we have minors

3   involved and the allegations in the case.  So, again that is

4   set forth in the Bail Reform Act.  So, we have that issue to

5   contend with.

6           We also have a recommendation from the folks that

7   I rely on, the Pretrial Services folks, who have the task of

8   supervising many people in the community.  So, they have vast

9   experience, certainly much more extensive experience than

10  mine in trying to predict who can do well on conditions of

11  release and where there might be some danger or risk of

12  flight.  Their recommendation in this case is to detain, as

13  well, to go along with that presumption.

14          The issue that we have, and I understand the

15  Defense is always at a disadvantage because the Prosecution

16  has been working on their case for some time before the

17  Defense is ever put on notice.  And there is always some

18  disadvantage to that.

19          At the same time when I look at the proffer of the

20  evidence from the Government, admittedly some is open to

21  interpretation, and I agree with Mr. Rosenblum on that.  On

22  the other hand there is what I would call more objective

23  evidence described by Mr. Budlow that really is not subject

24  to much interpretation, including many thousands of files of

25  child pornography found in Mr. Hall's possession on computers

1   that he controlled.

2        We also have the pictures that include, some of

3   which I think include Mr. Hall, include people that he has

4   had contact with overseas, taken -- that are in his

5   possession, taken with a camera similar -- well, exactly the

6   same in make and model during a time when we know he was in

7   these locations.  So, that is not really open to as much

8   interpretation.  And some of these photos are minors and

9   having been classified as child pornography.

10        So, we have that evidence in the case.  So, what I

11   am left with is we have evidence both of -- the suggestion of

12   some direct victimization.  We also have extensive evidence

13   of what I would call indirect victimization, because for all

14   of these 8,000 files someone's child was victimized to

15   produce, to produce that image.

16        We also have Mr. Hall's sophistication with

17   computers, given his background and certainly given what the

18   Government found on the computers in terms of encrypted, et

19   cetera, suggests a very sophisticated user and by contrast my

20   sense from what I have read in the Pretrial Report and from

21   Ms. Hall's testimony is that she is not a computer expert.

22   Maybe she is the one person in the family who does not have

23   that expertise.

24        So, the notion that there could be effective

25   policing of this, I got some reason to doubt that.  You know,

 1   all of this activity happened at the family home, during --

 2   you know, at least according to what we found in the last few

 3   years, of the family relationship, notwithstanding the

 4   children being, you know, in close relationship with their

 5   father, notwithstanding his faith community and his

 6   participation in that.  That is not at all passing blame on

 7   anyone or suggesting that anyone should have discovered any

 8   of this.  That is not it at all.  But it does go to Mr.

 9   Budlow's point really of a double life.

10           The other issue is -- so, I think we have a high

11   degree of potential danger here.  In terms of the risk of

12   flight, we have a Defendant who has means, we have a

13   Defendant with extensive foreign travel, we have a Defendant

14   with extensive ties suggested by what I will call family

15   relationships with people overseas, and that to me creates

16   more than the usual risk that perhaps there is another living

17   situation that Mr. Hall would be just as comfortable with

18   overseas.

19           So, I certainly have that issue in a case where he

20   is likely if convicted facing significant time in prison so

21   he would have every motivation to start over, if you will,

22   given the opportunity to do so.

23           So, for all those reasons I am going to detain

24   Mr. Hall in this case.  I will enter a written order into

25   the record that lists these reasons, but they will -- that

 1   will essentially be a summary of what I have said here

 2   today.

 3              Are we going to go on to an arraignment in the

 4   case?

 5              MR. ROSENBLUM:  Yes, Your Honor.

 6              THE COURT:  All right.  Mr. Rosenblum, have you had

 7   the opportunity to review the Indictment with Mr. Hall?

 8              MR. ROSENBLUM:  We have, Your Honor.  And we will

 9   waive the formal reading and enter a plea of not guilty on

10   behalf of Mr. Hall.

11              THE COURT:  Okay.  Well, let us -- we will do that

12   formally with Mr. Hall.  So, Mr. Hall, if you could please

13   stand, the courtroom Deputy will have some questions for

14   you.

15              THE CLERK:  Mr. Hall, please state your full name

16   for the record.

17              THE DEFENDANT:  Martin Robert Hall.

18              THE CLERK:  What is your age?

19              THE DEFENDANT:  Fifty-four.

20              THE CLERK:  What year, just the year, were you

21   born?

22              THE DEFENDANT:  1962.

23              THE CLERK:  Have you read or reviewed a copy of the

24   Indictment by the U.S. Attorney or has a copy been read to

25   you?

1              THE DEFENDANT:  Yes.

2              THE CLERK:  Do you understand the charges?

3              THE DEFENDANT:  Yes.

4              THE CLERK:  Mr. Rosenblum, are you satisfied that

5    the Defendant understands the charges against him?

6              MR. ROSENBLUM:  I am, Your Honor -- I am.

7              THE CLERK:  Mr. Hall, you have been charged in

8    Counts 1 and 2 of the Indictment, what is your plea?

9              THE DEFENDANT:  Not guilty.

10             THE CLERK:  Thank you.  The plea is not guilty.

11             THE COURT:  And, Mr. Rosenblum, you reserve a jury

12   trial?

13             MR. ROSENBLUM:  Yes, Your Honor.

14             THE COURT:  Mr. Budlow, the estimated length of the

15   trial?

16             MR. BUDLOW:  Three days, Your Honor.

17             THE COURT:  All right.  Have you -- do you have a

18   discovery agreement in place?

19             MR. ROSENBLUM:  I believe we do.

20             MR. BUDLOW:  Yes, we do, Your Honor.  And I have

21   tendered discovery to Defense this morning.

22             THE COURT:  All right.

23             MR. ROSENBLUM:  There is a letter -- an e-mail

24   letter to me that I have not reviewed but we have discussed

25   it, the contents and I think we do have a discovery agreement

1   in place.

2          THE COURT:  All right.  And you will stay in

3   contact with Judge Motz's chambers on schedule?

4          MR. BUDLOW:  Yes, Your Honor.  We will reach out to

5   them beginning of next week.

6          THE COURT:  All right.  Anything else then this

7   afternoon?

8          MR. BUDLOW:  Nothing from the Government.  Thank

9   you.

10          THE COURT:  All right.  Thank you.

11          (Whereupon, at 3:11 p.m., the proceedings

12   concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

I certify that the foregoing is correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_Karen Morganelli_   11-22-2016
_____
Karen Morganelli                Date
Certified Transcriber
Certificate No.:  CET**D-577