## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CASE NO:  JFM-16-0469** |
| **MARTIN HALL** | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

The United States of America submits this Response in Opposition to the Defendant's Motions to Suppress Statements.  For the reasons below, this motion should be denied.

## I.    INTRODUCTION

On May 9, 2017, a federal Grand Jury returned a Superseding Indictment charging the defendant with the following:

Count 1:        Transportation of Child Pornography, pursuant to 18 U.S.C. § 2252(a)(1);

Count 2:        Possession of Child Pornography, pursuant to 18 U.S.C. § 2252(a)(4)(B);

Count 3:        Production of Child Pornography with Intent to Transport to the United States, pursuant to 18 U.S.C. §2251(c), (2)(A);

Count 4:        Production of Child Pornography Transported to the United States, pursuant to 18 U.S.C. § 2251(c) (2)(B); and

Count 5:        Sex Tourism, pursuant to 18 U.S.C. § 2423(c).

The production, transportation, and sex tourism counts (Counts 1, 3, 4, and 5) arise out of the defendant's 2016 travel to the Philippines where he used his digital camera to produce a series of images of a minor female engaged in sexually explicit conduct.  The possession count (Count 2) relates to the defendant's collection of child pornography found on an external hard drive in his basement, which was located during the execution of a search warrant on September 7, 2016.

1

On May 9, 2017, the defendant filed the instant motion to suppress defendant's statements to investigators. *See* ECF No. 43 (the "Motion" or "Mot."). The defendant argues that his statements were obtained in violation of his right to remain silent under the Fifth Amendment, claiming that investigators did not scrupulously honor his right to remain silent. First, when questioned by Detective Rees, the defendant was not in custody for Fifth Amendment purposes and therefore *Miranda* warnings were not required. Thus, even if Hall had invoked his "right" to remain silent, he had no such right. Second, in the event he was in custody, the defendant was provided with his *Miranda* rights prior to any questioning. Investigators stopped questioning the defendant when he stated he did not want to answer Detective Rees' question regarding the internet provider in his home. After more than three hours passed, Hall was provided with a fresh set of *Miranda* rights at which time he voluntarily, knowingly, and intelligently waived his rights and answered Detective Rees' questions. Thus, if *Miranda* warnings were required, they were provided to Hall before and after Detective Rees scrupulously honored Hall's decision to remain silent. The motion should therefore be denied.

## II.     FACTUAL BACKGROUND[1]

### A.  The Investigation and Search Warrant

The investigation of this matter originated with the Baltimore County Police Department and the work of Detective Joshua Rees, who investigates computer crimes against children. In August 2016, Detective Rees was conducting an online investigation looking for offenders sharing child pornography on certain "peer-to-peer" networks, including one called

---

[1] The defendant has also moved to suppress evidence obtained during the search warrant. (Document 44). The facts relating to the search warrant will be set forth in detail in the government's response to that motion.

Freenet.[2]

During his online investigation, Detective Rees learned that between 6:07 p.m. and 6:49 p.m. on August 11, 2016, a device at IP address 96.244.150.210 was the likely requestor of 31 files of child pornography using Freenet.  The requested files were known to law enforcement from prior investigations and available to Detective Rees, who viewed the files, which included the following two files, by way of example:

    a.   VID_20150712_143254_1.avi – an approximately 3 and ½ minute video that depicts a nude prepubescent female being sexually assaulted by an adult male.  The video shows the adult male rub his penis against the child's vagina and anus, including slight penetration of the child's vagina, until the male ejaculates on the child's vagina.

    b.   VID_20150527_124900.avi – an approximately 1 minute video that depicts a naked prepubescent female touching and manipulating her vagina, and an adult male performing oral sex and masturbating the child.

Detective Rees learned that the IP address that was requesting these files was assigned to Verizon and, after obtaining Verizon records by subpoena, Detective Rees learned that the IP address was assigned to Belinda Hall, 6 Meadowsweet Ct. Reisterstown, MD 21136, on the date and time of the Freenet activity he observed.  On September 1, 2016, Detective Rees swore out an affidavit in support of a search and seizure warrant for 6 Meadowsweet Court, Reisterstown, Maryland – the defendant's residence.  The warrant was signed by the Honorable Colleen Cavanaugh of the Circuit for Baltimore County.

---

[2] A peer-to-peer (P2P) network enables users of the same or compatible software to share data with other network users.  *See* Affidavit of Detective Rees, Exhibit 1, at 4.  Freenet (referred to in the Affidavit as "*The Network*," is a free, publicly available peer-to-peer network software.  *Id.*, at 5-7.  It uses a decentralized, distributed data store to keep and deliver information.  In Freenet, files are broken up into encrypted parts, which are stored on other users' computers.  A key, or password, is required to send a message on Freenet that requests the encrypted parts of the file from other users, and then assembles the file on the requestor's computer.

### B.  The Execution of the Search Warrant and Interviews

It is anticipated that at the motions hearing the Government will introduce evidence supporting the following facts:

On September 7, 2016 at approximately 5:00 a.m., members of the Baltimore County Police Department executed the search warrant at the defendant's residence.  To initiate the search, Detective Rees knocked on the door and announced his presence.  Martin Hall ("Hall") answered and opened the door, and was told that there was a search warrant and was asked to step outside the home.  Belinda Hall then came to the door and was also told of the search warrant and asked to step outside.

Investigators went inside the home to make sure there were no other occupants present, which took approximately 10-15 minutes.  The Halls were then allowed back into their home and were seated on the couch in their living room.  Detective Rees came back inside the home in street clothes, with his case file and a copy of the search warrant.  Detective Rees entered the living room and introduced himself to the Halls, and explained that he had a search warrant for the residence that was signed by Judge Colleen Cavanaugh of the District Court for Baltimore County.  Detective Reese then read the entire warrant to the Halls, and told them that they would be provided with a copy.

Detective Rees advised Hall and his wife – who were still seated on their living room couch – of their *Miranda* rights.  Hall and his wife verbally stated they understood their rights.  Detective Rees asked the Halls if they had any valuables that they wanted to get before the search began, and they declined. Detective Rees then asked the Halls if they were the only people who lived in the house and they told him that they were.  Detective Rees asked the Halls

4

for the name of their internet service provider and Martin Hall stated, "I don't want to answer that question."

Detective Rees then asked Belinda Hall to speak to him in private and she agreed. Belinda Hall told Detective Rees that her computers were in her first floor office to the left of the front door, and that all of her husband's computers and devices were in his basement office. Belinda Hall advised that her and her husband do not use each other's computers. When asked if she uses "Freenet," Belinda Hall stated that she did not know what that is. Following this brief interview of Mrs. Hall, investigators began their search for computers in the home, as well as their on-scene forensic examination of the computers. During the on-scene forensic examination of Hall's Dell laptop and connected external hard drive, investigators discovered thousands of image files of child pornography. Included in those images was a series of 7 sexually explicit images of Jane Doe, taken with Hall's Canon Rebel digital camera.

### C.  The Defendant's Statements

 When Hall told Detective Rees that he did not want to answer the question about his internet service provider, no further questions were asked at that time. Furthermore, between that time (approximately 5:20 a.m.) and 8:50 a.m., Hall was not asked any questions and no attempts were made to encourage Hall to provide information.

At approximately 8:50 a.m., more than three hours after Detective Rees' last interaction with Hall, Detective Rees entered the living room and asked Hall if he could speak to him. Hall replied that he could, and voluntarily followed Detective Rees and Detective Frank Adamski to a spare bedroom on the second floor. Hall sat closest to bedroom door with his back to the door. Detectives Rees and Adamski sat by the window facing Hall. The interview was audio recorded.

The defendant was not in custody during the interview—he was not handcuffed and not told that he had to accompany the investigators or provide a statement.  Prior to asking questions, Detective Rees again advised the defendant of his *Miranda* rights, which the defendant acknowledged he understood.  Hall did not ask for an attorney nor did he state that he did not want to answer Detective Rees' questions.

The defendant agreed to answer questions and stated in substance that:

 a. He is a Java[3] programmer and that he teaches Java throughout Asia, and the United States.

 b. He used Freenet on and off for the past two years;

 c. He used "Frost," the message board associated with Freenet, and that while using the message board he observed conversations about child pornography;

 d. The computers and devices located in the basement belonged to him and he was the only person who used the Dell laptop and attached external hard drive;

 e. The external hard drive contains photographs that he has taken;

 f. The external hard drive is encrypted, and Hall refused to provide the password;

 g. When told that investigators found child pornography on his devices, he denied intentionally downloading any files of child pornography;

 h. He has multiple girlfriends in the Philippines, and he asks them for their college IDs to make sure they are 18 years old;

 i. He gives money to his girlfriends and their parents;

 j. He admitted to downloading animation depicting adults engaged in sex acts with children, and repeatedly stated in the interview, "fantasy is better than real life;" and

 k. Hall admitted that he knew the young girl depicted in the series of 7 images discussed above, and stated that she was his "girlfriend's" little sister, was about 12 or 13 years old, and was named Sandra.  Hall denied taking any pictures of Sandra.

---

[3] Java is a general-purpose computer programming language.

The audio recording reflects that Detective Rees took the lead in questioning the defendant and maintained a conversational tone of voice throughout the interview.  When speaking to Detective Rees, Hall's demeanor was that of an alert, composed and knowledgeable individual.  Hall appeared to understand all the questions posed by law enforcement and responded appropriately.  At one point during the interview, Hall told detectives he needed to use the restroom.  Hall exited the bedroom, used the restroom alone, and voluntarily returned to the bedroom and continued the interview.  Multiple times during the interview, Hall asked if he was going to be arrested, and each time, he was told by the detectives that they were still trying to figure out what was going on.  At no time during the interview did the detectives threaten to arrest Hall.

The interview lasted approximately 72 minutes and, near the end of the interview, the defendant confirmed that the detectives had treated him fairly and had not threatened or yelled at him.  At no time during the interview was the defendant physically restrained in any way, nor was he told at any time that he must remain and was not free to go.  At no time did the defendant ask for an attorney or ask that the questioning cease.  Towards the end of the interview, Hall was informed he would be arrested.  Hall continued to ask and answer questions and remained cooperative.

III.    **LEGAL ARGUMENT**

The defendant has moved to suppress the statements made during his interviews with law enforcement on September 7, 2016, claiming that they were obtained in violation of the Fifth Amendment of the Constitution because investigators did not scrupulously honor his right to remain silent.  Mot. p. 1.  This argument fails because (1) the defendant was not in custody at the time he made the statements and thus the protections of *Miranda* did not apply; (2) the defendant

did not unequivocally invoke his right to remain silent; (3) nevertheless, investigators honored the defendant's request by ceasing the questioning; and (4) the defendant was subsequently advised of his *Miranda* rights a second time and he voluntarily and knowingly waived those rights.

A.  **The Defendant Was Not In Custody, Thus *Miranda* Was Inapplicable**

The Fifth Amendment privilege against self-incrimination provides that "[n]o Person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege when that defendant is subject to *custodial* interrogation.  Specifically, in *Miranda*, the Supreme Court held that before conducting a custodial interrogation of a suspect, law enforcement officials must inform the suspect, in substance, that he has the right to remain silent, that his statements may be used against him at trial and that he has the right to an attorney during questioning.  *Miranda*, 384 U.S. at 468-71.  Custody, therefore, is a sine qua non for the application for the application of *Miranda*.  *See, e.g.*, *Berkemer v. McCarty*, 468 U.S. 429, 440 (1984) (*Miranda* applies "as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest.") (citation and internal quotation marks omitted).  Consequently, "[t]he procedural safeguards prescribed by *Miranda* only apply "where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Burket v. Angelone*, 208 F.3d 172, 196 (4th Cir. 2000), citing *Oregon v. Mathiason,* 429 U.S. 492, 495  (1977) (*per curiam*).

The question of whether an individual is "in custody" for purposes of *Miranda* is based on a review of the "totality of the circumstances" and the "operative question is whether, viewed objectively, 'a reasonable man in the suspect's position would have understood his situation' to

be one of custody." *United States v. Hargrove*, 625 F.3d 170, 178 (4th Cir. 2010) (quoting

*Berkemer*, 468 U.S. at 442). "In conducting this inquiry it is important to remember that any

interview of one suspected of a crime by a police officer will have coercive aspects to it, simply

by virtue of the fact that the police officer is part of a law enforcement system which ultimately

may cause the suspect to be charged with a crime." *Id.* (citation and internal quotation marks

omitted).

The Fourth Circuit has noted certain factors to be considered in the totality of the

circumstances when determining whether a suspect was in custody, such as—"time, place and

purpose of the encounter, the words used by the officer, the officer's tone of voice and general

demeanor, the presence of multiple officers, the potential display of a weapon by an officer, and

whether there was any physical contact between the officer and the defendant." *United States v.*

*Weaver*, 282 F.3d 302, 312 (4th Cir. 2002). The "mere presence of armed law enforcement

officers during the interview is not sufficient to create a custodial interrogation." *Id.* at 179.

Moreover, "although the setting of the interview is not singularly dispositive, an

interview at a suspect's residence tends to be more neutral than one that occurs at a law

enforcement facility. A more relaxed environment usually indicates less formal police control

over the location or the defendant, and thus suggests a setting that is not of the degree typically

associated with formal arrest." *Hargrove*, 625 F.3d at 180 (no custody based on a totality of the

circumstances and where defendant was interviewed at his residence); *see also United States v.*

*Beckwith*, 425 U.S. 341, 348 (1976); *United States v. Parker*, 262 F.3d 415, 419 (4th Cir. 2010).

Indeed, the Fourth Circuit has found that statements given at a police station or office of a

probation officer were not given in custody and that "even a clear statement by an officer that the

person being questioned is a suspect does not alone determine custody, but is only one among

many factors that bear on an assessment of whether a reasonable person would feel free to depart." *United States v. Howard*, 115 F.3d 1151, 1155 (4th Cir. 1997).

*Miranda* was "not intended to hamper the traditional function of police officers in investigating crime," including "[g]eneral on-the-scene questioning as to facts surrounding a crime" asked of persons "not under restraint." *Miranda,* 384 U.S. at 477 (*citing Escobedo v. State of Illinois*, 378 U.S. 478, 492 (1964)).  "'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.'" *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (*quoting Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968)).  "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." *Mathiason*, 429 U.S. at 495.  "But police officers are not required to administer *Miranda* warnings to everyone whom they question." *Id*.  "Nor is the requirement of warnings to be imposed simply … because the questioned person is one whom the police suspect." *Id*.

Hall was not "in custody" or otherwise deprived of his freedom by investigators in any significant way during questioning.  During the interview, the detectives never raised their voices, but used a conversational tone throughout.  The detectives did not have any physical contact with the defendant or threaten him in any way.  Indeed, at the conclusion of the interview, the defendant himself confirmed that the detectives had treated him fairly and that the detectives had not threatened or yelled at him.

Further, Hall's movement in his home was not restricted in any way during the execution of the warrant.  At no time was Hall placed in handcuffs or told he was not free to leave.  Hall voluntarily spoke with investigators in the second floor bedroom of his own home.  During

questioning, Hall's movement was not restricted in any manner.  Although Hall was arrested after law enforcement executed the search warrant, at no time during questioning did investigators threaten to arrest Hall or tell him that he would be arrested.

The fact that the defendant was not physically restricted during the interview was demonstrated when he freely left the bedroom to use the bathroom.  Hall walked unescorted, and in no way was forced or required to return to the interview.  He voluntarily returned to the bedroom and answered questions.  It is evident that the defendant felt free to terminate questioning if he so desired as he told Detective Rees when he first arrived he did not want to answer his question about the internet in the home.  Even during the interview, Hall chose not to answer questions about his encryption password, further demonstrating the non-coercive character of the interview.

Given the circumstances listed above, a reasonable person would have felt at liberty to terminate the questioning by Detective Rees.  The noncustodial situation during the execution of the warrant did not turn into a custodial one simply because Detective Rees suspected Hall of possessing child pornography and questioned him about it.  Detective Rees was not required to read Hall his *Miranda* warnings because he was not in custody at the time of questioning. Because Hall was not in custody when questioned, he cannot invoke the protections provided by *Miranda*.  *Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir. 2000); *see also United States v. Wyatt,* 179 F.3d 532, 537 (7th Cir. 1999)("The Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody."); *United States v. Bautista,* 145 F.3d 1140, 1147 (10th Cir. 1998) ("Thus, in order to implicate the *Miranda-Edwards* right to counsel prophylaxis, both a custodial situation and official interrogation are required.").  Thus, Hall's statements are admissible.

**B.  The Defendant Did Not Unambiguously Invoke His Right to Remain Silent**

Assuming that Hall was in custody and *Miranda* warnings were required, *Miranda* was complied with, and Hall did not unambiguously invoke his right to remain silent.  In the context of invoking the *Miranda* right to counsel, the Supreme Court held in *Davis v. United States*, 512 U.S. 452 (1994), that a suspect must invoke his right to counsel "unambiguously."  *Davis*, 512 U.S. at 459.  If an accused makes a statement concerning the right to counsel that is ambiguous, equivocal or makes no statement at all, the police are not required to stop the interrogation or ask clarifying questions.  *Id*. at 461-462.  In *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Supreme Court stated, "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*."  *Thompkins*, 560 U.S. at 381.  The Court stated that "both protect the privilege against compulsory self-incrimination by requiring an interrogation to cease when either right is invoked."  *Id*.  Thus, under *Berghuis* and *Davis*, in order to have invoked his right to remain silent, Hall must have done so *unambiguously*.  He did not.

Regardless of his custodial status, Hall did not unambiguously invoke his right to remain silent.  When Detective Rees asked him about the name of his internet provider, the defendant stated that he did "not want to answer that question."  Hall did not inform Detective Rees that he did not want to answer *any* of Detective Rees' questions.  "There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously."  *Id*.  A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoid[s] difficulties of proof and … provide[s] guidance to officers" on how to proceed in the face of ambiguity."  *Davis*, 512 U.S. at 458-59.  Detective Rees had no reason to believe Hall's statement that he did not want to answer "that" question was an invocation of his constitutional

12

right to remain silent.  The only unambiguous request was that Hall did not want to say who provided the internet service to his house.

Hall's statement that he did not want to answer "that" question is more ambiguous than similar statements that have been rejected as implicating *Miranda* by the Supreme Court and the Fourth Circuit.  In *Davis*, discussed above, the Supreme Court found the defendant's statement, "Maybe I should talk to a lawyer" was ambiguous.  *Davis*, 512 U.S. at 462.  In *Burket,* the defendant alleged that his *Miranda* and *Mosley* rights were violated when police failed to cease the interrogation after the defendant stated, "I just don't think that I should say anything."  *Burket*, 208 F.3d at 200.  In rejecting the defendant's claim, the Fourth Circuit held that the statement "did not constitute an unequivocal request to remain silent.  *Id.*   Hall's comments in this case were far more ambiguous than the defendant in *Burket*.  Accordingly, Hall's right to remain silent was not violated, as he did not unambiguously invoke such right.  Thus, his statements are admissible and the motion should be denied.

### C. Even If Hall Unambiguously Invoked His Right to Remain Silent (While in Custody), Detective Rees Scrupulously Honored His Right to Remain Silent Before Questioning the Defendant a Second Time

Assuming Hall was in custody and assuming he unequivocally invoked his right to remain silent, his statements are nevertheless admissible because Detective Rees scrupulously honored Hall's right to remain silent prior to questioning him a second time.  "The admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored."  *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).  In determining whether law enforcement scrupulously honored an individual's right to remain silent, the court must consider the following factors: (1) whether the police had given the suspect *Miranda* warnings at the first interrogation and the

suspect acknowledged that he understood the warnings; (2) whether the police immediately ceased the interrogation when the suspect indicated that he did not want to answer questions; (3) whether the police resumed questioning the suspect only after the passage of a significant period of time; (4) whether the police provided a fresh set of *Miranda* warnings before the second interrogation; and (5) whether the second interrogation was restricted to a crime that had not been the subject of the earlier interrogation. *See id*. at 104-07. This is not a bright-line test; rather, "the touchstone is whether a 'review of the circumstances' leading up to the suspect's confession reveals that his 'right to cut off questioning was fully respected.'" *Weeks v. Angelone*, 176 F.3d 249, 268 (4th Cir. 1999) (quoting *Mosley*, 423 U.S. at 104). The failure to satisfy one or more of the factors is not dispositive. Applying the factors listed in *Mosley*, if Hall was in custody for Fifth Amendment purposes, and if he unambiguously invoked his right to remain silent (two propositions that the government maintains did not occur), Detective Rees scrupulously honored his right to remain silent.

The defense concedes that the first and second factors are satisfied. Detective Rees read Hall and his wife their *Miranda* rights after entering the home and reading the warrant. Both Hall and his wife acknowledged they understood their rights. After being questioned by Detective Rees about the internet in the home, Hall informed law enforcement he did not want to answer his question. This further demonstrates that Hall understood his rights. After Hall stated he did not want to answer Detective Rees' question about the internet provider in the home, Detective Rees immediately ceased questioning Hall.

The third factor – whether the detectives waited a significant period of time after Hall invoked his right to remain silent before questioning him again – also weighs in favor of admissibility. A "significant period of time" between interrogations is a term of art and does not

14

mean the gap in questioning must last a certain period of time.  *Angelone*, 176 F.3d at 268;

*compare United States v. Pettiford,* 295 F. Supp. 2d 552, 563-64 (D. Md. 2003) (holding one

hour was sufficient where there was no credible evidence that during the one-hour interval police

engaged in any acts calculated to wear down the defendant's resistance and force him to change

his mind) and *United States v. Cody*, 114 F.3d 772, 775–76 (8th Cir. 1997) (holding that three

hours was significant amount of time) with *United States v. Barone*, 968 F.2d 1378, 1385 (1st

Cir. 1992) (holding that more than twenty-four hours was insufficient where police repeatedly

pressured suspect to cooperate).  A "significant period of time" is a function of to what degree

the police "persist[ed] in repeated efforts to wear down [the suspect's] resistance and make him

change his mind." *Angelone*, 176 F.3d at 268 (quoting *Mosley*, 423 U.S. at 105-106).  After the

defendant stated that he did not want to answer a specific question, Detective Rees ceased

questioning the defendant.  Detective Rees waited approximately 3 ½ hours[4] before asking Hall

if he would speak with him.  When Hall agreed, Detective Rees advised Hall of his *Miranda*

rights a second time.  As such, Detective Rees waited a significant amount of time before

questioning Hall a second time and the third factor is satisfied.

Additionally, the detectives did not engage in any behavior, let alone "repeated efforts,"

with the intent to wear down Hall's resistance and force him to change his mind during the

interval between questioning him the first and second time.  Hall remained on the couch in his

living room while investigators conducted the on-scene forensic examination of Halls'

computers.  The defense asserts that separating Belinda Hall from the defendant was "likely"

done to undermine the defendant's resolve to remain silent.  This assertion is not supported by

---

[4] The defendant claims in his motion that the interview took place between 90 and 120 minutes following the defendant's refusal to provide the name of his internet service provider.  While the discovery and the evidence at the hearing will conclusively establish that the interview occurred *more than three hours later*, given the totality of the circumstances in this case, 90 to 120 minutes was significant and complied with *Mosely*.

any fact, and flies in the face of standard police procedures.  Investigators regularly separate witnesses and subjects of investigations for a variety of reasons, including preventing them from discussing the case, coordinating their stories, and obstructing justice.  The fact that the defendant sat on own his living room couch alone, as opposed to with his wife, could not have worn down the defendant's resolve to remain silent, nor could it reasonably be interpreted to have intended to wear down his resolve.

The fourth factor is met as Detective Rees provided Hall with a fresh set of *Miranda* warnings before questioning him a second time.  The fifth factor is whether the second interrogation concerned a crime that was the subject of the first interrogation.  In this case, both interrogations concerned offenses relating to child pornography.  Where other factors indicated that a defendant's right to cut off questioning was 'scrupulously honored,' however, the mere fact that a second interrogation involves the same crime as the first interrogation does not necessarily render a confession derived from the second interrogation unconstitutionally invalid under *Mosely*."  *Angelone*, 176 F.3d at 269; s*ee, e.g.*, *United States v. Schwensow*, 151 F.3d 650, 659 (7th Cir. 1998) ("[T]he constitutionality of a subsequent police interview depends not on its subject matter but rather on whether the police, in conducting the interview, sought to undermine the suspect's resolve to remain silent.");  *Hatley v. Lockhart*, 990 F.2d 1070, 1074 (8th Cir. 1993) ( "[A] second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview.");  *United States v. Hsu*, 852 F.2d 407, 410 (9th Cir. 1988) (noting that under a flexible *Mosley* approach, "an identity of subject matter in the first and second interrogations is not sufficient, in and of itself, to render the second interrogation unconstitutional").  Although both interviews related to a child pornography investigation, under the totality of the circumstances when considering all the other factors noted

above, Detective Rees scrupulously honored Hall's right to remain silent.  If Hall was in custody and unambiguously invoked his right to remain silent, his statements to law enforcement are admissible as Detective Rees scrupulously honored his right to remain silent prior to questioning him a second time.

**D.  <u>If Hall Was in Custody for Fifth Amendment Purposes, He Voluntarily, Knowingly and Intelligently Waived his Right to Remain Silent</u>**

The defendant's statements to Detective Rees were made after a knowing, intelligent and voluntarily waiver of his *Miranda* rights.  In order for a confession obtained during a custodial interrogation to be admissible, an individual's waiver of *Miranda* rights must be voluntary, knowing, and intelligent.  *See Miranda*, 384 U.S. at 479.  An inquiry into whether an individual waived their *Miranda* rights is twofold.  *See Moran v. Burbine*, 475 U.S. 412, 421 (1986).  First, a "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'"  *Thompkins*, 560 U.S. at 382; *citing Burbine*, 475 U.S. at 421.  Second, it must be "'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'"  *Id.*

The Government does not need to show that a waiver of *Miranda* rights was express. *Thompkins*, 560 U.S. at 384.  "An implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence."  *Id.*  A waiver may be "implied" through a "defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver."  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *see Burket*, 208 F.3d at 198 (to effectuate a waiver of one's *Miranda* rights, a suspect need not utter any particular words); *Taylor v. Riddle*, 563 F.2d 133, 136 (4th Cir. 1977) (silence by the defendant after being read his *Miranda* rights twice was a valid waiver).  The Supreme Court has stated that "[t]he question is not one of form, but rather whether the defendant in fact knowingly and voluntarily

17

waived the rights delineated in the *Miranda* case." *Butler*, 441 U.S. at 373.  A valid waiver

depends upon the totality of the circumstances, including the background, experience, and

conduct of the defendant.  *See id.* at 374-75.

In this case, Hall impliedly waived his right to remain silent.  Martin Hall is a highly

accomplished computer programmer instructor who has been teaching graduate level computer

science at Johns Hopkins University, as well as numerous other programs throughout the U.S.

and the world, including the University of Michigan and the University of the Philippines.

According to the website for his consulting business, coreservlets.com, the defendant

> is president of coreservlets.com, Inc., a training and consulting company focusing
> on Java EE, Rich Internet Apps with Ajax and jQuery, and Android development.
> He was formerly a Principal Computer Scientist at the Johns Hopkins University
> Applied Physics Lab, where he designed and developed distributed applications
> (mostly for government clients) in the Research and Technology Development
> Center.[5]

Without doubt, the defendant's intelligence and sophistication reflect that he fully

understood his rights and waived those rights when he agreed to speak to investigators.

Additionally, the defendant's participation during the recorded interview reflects that he was an

alert, composed and knowledgeable individual, and that he was fully aware of his circumstances.

The defendant clearly understood the questions posed by the detectives – often better than the

detectives themselves – and his responses were appropriate.  It was clear after being read his

rights twice, Hall understood his rights and how to invoke his rights had he wanted to.  Although

Hall did not expressly waive his right to remain silent through a written or oral statement, his

cooperation and desire to speak to the detectives, coupled with his acknowledgement that he

understood his *Miranda* rights, constituted an implied waiver of his right to remain silent.  Thus,

based on the totality of the circumstances his waiver was voluntary, knowing and intelligent.

---

[5] http://courses.coreservlets.com/about-instructor.html

IV.    **CONCLUSION**

Hall was not in custody when questioned by investigators and thus could not invoke a right that he was not entitled to.  Even if Hall was in custody, he did not unambiguously invoke his right to remain silent when he told Detective Rees he did not want to answer a particular question about the internet provider.  Furthermore, even if Hall unambiguously invoked his right to remain silent, Detective Rees scrupulously honored Hall's rights before questioning him a second time.  Finally, Hall voluntarily, intelligently and knowingly waived his right to remain silent and answered law enforcement's questions.  Accordingly, the government respectfully requests that this Court deny the defendant's motion to suppress the statements made on September 7, 2016.

Respectfully submitted,

Stephen M. Schenning
Acting United States Attorney

/ss/

By: _____
Kaylynn Shoop
Trial Attorney, Criminal Division
Paul E. Budlow
Assistant United States Attorney

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 1st day of June, 2017, that a copy of the foregoing

Government's Response to Defense's Motion to Suppress Statements was served electronically

through the Clerk of the United States District Court using CM/ECF, to counsel of record.


/s/
_____
Paul E. Budlow
Assistant United States Attorney