1

```
1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
2                      NORTHERN DIVISION

3


4
     UNITED STATES OF AMERICA
5
            v.                         CRIMINAL CASE NO.
6                                          JFM-16-469

     MARTIN ROBERT HALL,
7
            Defendant
8    _____/

9

10                    (Motions Hearing)
                   Wednesday, August 30, 2017
11                   Baltimore, Maryland

12

     Before:  Honorable J. Frederick Motz, Judge
13


14


15   Appearances:

16        On Behalf of the Government:
           Paul E. Budlow, Esquire
17         Kaylynn Shoop, Esquire

18        On Behalf of the Defendant:
           Adam D. Fein, Esquire
19         Marc Johnson, Esquire

20


21


22   Reported by:
     Mary M. Zajac, RPR, FCRR
23   Fourth Floor, U.S. Courthouse
     101 West Lombard Street
24   Baltimore, Maryland 21201

25
```

1          (Proceedings at 9:43 a.m.)

2          MR. BUDLOW:  Your Honor, this is United States of

3  America versus Martin Robert Hall.  It is Criminal Number

4  JFM-16-469.  This matter is scheduled before Your Honor this

5  morning for a motions hearing.

6          I'm Paul Budlow on behalf of the government.  Joining

7  me at counsel table is trial attorney Kaylynn Shoop from the

8  Trial Division, from the Criminal Division of the Department of

9  Justice, and also FBI Special Agent Rachel Corn.

10         MR. FEIN:  Adam Fein on behalf of defendant Martin

11  Hall, Your Honor.  Marc Johnson is present with me, but he

12  stepped out of the courtroom for just a moment.

13         THE COURT:  Okay.  Please be seated.  I think the first

14  issue to take up is my granting of the motion to quash.  There

15  was very little time to respond to the motion, and it seemed to

16  me to be well founded.  And, Mr. Fein, anything, you can move to

17  reconsider the motion, my granting the motion, whatever.

18         MR. FEIN:  Thank you, Your Honor.  As you indicated,

19  there was just a small amount of time.  I received the motions

20  from the government the day before yesterday.  Yesterday was a

21  travel day for me.  I received a phone call or, rather, Mr.

22  Johnson informed me at some point that the Court had granted the

23  government's motion to quash.  The subpoena, just to be clear, is

24  for a state court judge, Colleen Cavanaugh, who is the judge that

25  signed off on the warrant authorizing the search of Mr. Hall's

1    home and the seizure of items therein related to the

2    investigation in this case.

3         So the government filed a motion in limine, and that

4    motion in limine cited a number of cases in what I would describe

5    as a string-cite fashion, not descriptions of the cases, the

6    facts of those cases, the holdings of those cases.  So if I could

7    address this relatively briefly.

8         In this particular case, the issue that I wish to

9    address with Judge Cavanaugh and the issue that was before this

10   Court would be whether or not the judge abdicated her role as a

11   neutral and detached magistrate.  As the Court knows, in Leon,

12   the Supreme Court case, the courts established a good faith

13   exception to the exclusionary rule.

14        To that exception, there were four exemptions.  One of

15   those exemptions, that is one of the scenarios under which the

16   good faith exception would not apply, is when a magistrate judge

17   or a search warrant issuing judge abdicates their role as a

18   neutral and detached magistrate.  In that instance, the good

19   faith exception to the exclusionary rule would not apply.

20        In its motion, the government cites several cases.  One

21   of those cases is called Wellman, which is a Fourth Circuit case,

22   suggests that in some cases when the statements in an affidavit

23   are non-conclusory, but still are insufficient to support a

24   finding of probable cause, that it is perhaps best in those cases

25   to look at the various scenarios laid out in Leon, that is the

1    four scenarios under which the good faith exception would not

2    apply, and to consider that rather than the neutral and detached

3    magistrate exemption, that the exemption for officers who are

4    reasonably well-trained would not recognize, should recognize

5    that there's a deficiency in the warrant which would not support

6    a finding of probable cause.

7          The Fourth Circuit, though, has also noted in other

8    cases other occasions where it is appropriate to make a

9    determination about whether or not a neutral and detached

10   magistrate judge has failed to fulfill his or her role.  So, for

11   example, another case cited by the government, a case called

12   Wilhelm, 80 F.3d 116, Fourth Circuit, '96 case.  In that case,

13   the Fourth Circuit affirmed that the affidavit was too conclusory

14   and the judge, in signing off on that affidavit, abdicated his

15   role as a neutral and detached magistrate by simply accepting the

16   conclusions of officers; as a result, affirmed the suppression of

17   the material seized in reliance on the warrant under that third

18   prong of the Leon good faith rule, the exception to the Leon good

19   faith rule.

20         So sometimes the neutral and detached magistrate

21   exemption is best construed as a different form of exemption, as

22   in Wellman.  Sometimes it is not.  And it's appropriate to

23   consider whether or not the judge did or did not abdicate his or

24   her role.

25         Sometimes there are different facts that might lead to

1    a conclusion that the judge abdicated his or her role as a

2    neutral and detached magistrate.  So, for example, in an Eighth

3    Circuit case, <u>Decker</u>, which is at 956 F.3d 773, and at Pages 776

4    to 78, the Eighth Circuit, 1992, the judge in that particular

5    case, that is the issuing judge, was alleged to have failed to

6    read the affidavit filed in support of the warrant.  To determine

7    whether or not that was so, the judge was called as a witness.

8    The judge testified.  The judge testified that he had read the

9    warrant, but perhaps in a cursory manner.  The magistrate in that

10   particular case found the judge did not read the warrant.  The

11   magistrate made that finding because the warrant had multiple

12   errors in it.  Those errors would have been relatively obvious to

13   somebody who read the warrant with some degree of care.

14          Based on that, based on those errors, based on the

15   judge's statement that he relied largely on the conclusions of

16   the officers, the court, the magistrate court, the federal

17   magistrate court, suppressed the evidence seized in reliance on

18   the search warrant issued by the state court judge.  The district

19   court affirmed the magistrate.  The Eighth Circuit affirmed the

20   district court.

21          That was only possible because of the testimony of the

22   issuing judge in that case.  There would be no way to know if the

23   judge had read the warrant.  The judge had simply relied on the

24   conclusions of the officers, unless those facts were testified to

25   by somebody.  And the only person in possession of those facts

1    would have been the issuing judge in that particular case.

2              In another case, United States v. Dickerman, which is

3    at 416-CR-258, currently pending in the Eastern District of

4    Missouri, that case involves a Freenet investigation, much like

5    this investigation.  I'm the attorney of record in that case.  I

6    subpoenaed a state court judge.  That state court judge is the

7    judge who had signed off on the warrant authorizing the search

8    and seizure in that case.

9              The government objected to the testimony of the judge.

10   The magistrate in federal court permitted the judge to testify.

11   And I simply asked factual questions of that judge.  For example,

12   I asked that judge if he understood the affidavit that he read.

13   In a candid bit of testimony, he admitted that he did not.  And

14   he, in fact, stated that it appeared as Greek to him.

15             So nobody would have had possession of those facts but

16   that judge.  The only way to get that information from the judge

17   was to ask him.  He might have well come in and testified and

18   said that he understood the affidavit perfectly.  But he did not.

19   He was candid about that and said he did not.  So another case in

20   which the only person in possession of factual matters that were

21   relevant to the issue before the court was the judge, and the

22   judge was permitted to testify, and he did.

23             In addition, there are cases from within the circuit,

24   from district courts that are sisters to this particular district

25   court, where judges have testified in the same setting in the

1    same context.  So, for example, in United States v. Clyburn,

2    C-L-Y-B-U-R-N, at 806 F.Supp. 1247, the defendant moved to

3    suppress evidence seized in reliance on a warrant on multiple

4    grounds.  One of the grounds was that the state court judge who

5    signed off on the warrant had abdicated his role as a neutral and

6    detached magistrate.  That case involved a drug investigation.

7         The judge was called as a witness by the defense to

8    testify.  The judge was a William Sanders, a Sumter County

9    magistrate.  That judge did testify in the case and was permitted

10   to do so.

11        In United States v. Gary, 420 F.Supp. 2d, at 470,

12   another narcotics investigation in which the defendant moved to

13   suppress evidence seized in reliance on a warrant, again arguing

14   that the judge had abdicated his role as a neutral and detached

15   magistrate, the allegation was the judge didn't read the warrant

16   affidavit or read it in too cursory a manner.  The judge was

17   called to testify and did so testify.

18        Another case is United States v. Jarvis, 2009 Westlaw

19   2707563.  That's from the Northern District of West Virginia.  In

20   that particular case, also a drug investigation, there was an

21   allegation that the judge abdicated her role as a neutral and

22   detached magistrate.  The judge was called to testify.  The judge

23   did testify.  In Jarvis the allegation was that the state court

24   judge was a relative of one of the task force officers working on

25   the case, and that is the mother of a task force officer.  She

1    testified that though she was the mother, she was unaware of it

2    at the time that she was involved in issuing the warrant.

3         And just to be clear, in United States v. Clyburn, the

4    allegation was that the office, that the judge was too involved

5    in the ongoing investigation, was alleged that he had admitted to

6    bail a cooperating individual so he could assist in the

7    government's prosecution, among others things.  He testified to

8    the facts in that case.

9         And in United States v. Gary, as I said, the issue was

10   whether or not the judge had read the affidavit.

11        In each and all of those case, just as in Decker, the

12   Eighth Circuit case, and in Dickerman, the Eastern District of

13   Missouri case, the allegations centered on factual matters

14   surrounding the issuing judge and whether or not the facts

15   suggested that the judge had abdicated his or her role as a

16   neutral and detached magistrate.

17        Now, the government cites several cases to suggest that

18   it's inappropriate to call a judge as a witness.  None of those

19   cases take place in the context of Leon.  More specifically, none

20   of those cases take place in the context of which there's an

21   allegation that the judge has abandoned his or her role as a

22   neutral and detached magistrate.

23        Moreover, all of those cases discuss whether or not

24   it's appropriate for a judge to be called to testify regarding

25   their mental processes, their decisionmaking process, as opposed

1    to the facts that might be relevant to a, as opposed to the facts

2    that might be relevant to a reviewing court's determination.

3          So, for example, the court cites a case called Roth

4    from the Southern District of New York, a 2004 case.  In that

5    case, it was a federal matter.  A state court judge was called as

6    a witness.  And the issue there that the defense hoped to explore

7    was why the decisionmaking process of a judge in a state case

8    accepted a plea in a matter that was then before the state court

9    judge.  So in that particular case, as the Roth court noted, what

10   the defense hoped to explore was the mental processes, the

11   decisionmaking process of the state court judge in accepting a

12   plea agreement.  It was a plea that reduced a charge of the

13   defendant's from second-degree murder to manslaughter.

14         A second case that's cited along with Roth is called

15   St. John, which simply affirmed the holding in Roth.

16         Another case the government cites is a case called

17   Morgan, a Supreme Court case from 1941.  That was a very involved

18   matter that involved the Secretary of Agriculture.  It was an

19   11-year-long matter.  The Secretary of Agriculture was deposed on

20   all sorts of matters relating to the decisionmaking process and

21   the mental processes of the Agriculture Department in issuing

22   some rule.  Notably, that case predates Leon by -- what -- 43

23   years?  So the scenario that's before the court today in which

24   judges have been permitted to testify to facts would not even

25   have been contemplated by the court in Morgan simply because

1  Leon, the good faith exception, the exemption that's at issue

2  here, were not even contemplated by the Supreme Court at that

3  time.

4         Fayerweather v. Ritch, which is another case cited by

5  the government in its string cite, is from 1904.  That involved a

6  rather complicated will contest where the judge that originally

7  resolved the will disputes was asked to testify in a subsequent

8  matter about how and why he came to decisions that he did.  That

9  case not only pre-dates Leon by about 80 years, but it pre-dated

10  Mapp by 61, by about 50-some-odd years, and pre-dated Weeks by

11  about 10 years.

12        So again, the situation that's before this court today

13  could not have even been contemplated by the Supreme Court at

14  that time.

15        The government also cites a case of Grant v. Shalala.

16  That is, again, a rather complicated Social Security disability

17  matter.  In that particular case, there was a suit by a

18  beneficiary to disability benefits who not only wanted to

19  question the judge in the case based on an alleged amount of bias

20  that that judge harbored towards disability beneficiaries, not

21  only the particular plaintiff in that case, Grant, but a series

22  of others, Grant sought to have a class recreated which would

23  challenge the judge's neutrality in disability determinations.

24  They sought to explore the Social Security judge's decisionmaking

25  process, his work habits, his private communications.  They

1    deposed an assistant of his, maybe two, and went into all sorts

2    of matters that are simply not at issue here.  I have no interest

3    in the decisionmaking process why this judge made the decision

4    she made, what degree of weight she gave to any particular factor

5    or factors.  Simply some factual questions that I'll get to in a

6    moment.

7            Another case the government cites, which I think is

8    interesting, is a case out of the Middle District of Georgia,

9    called <u>Cross</u>.  And this is cited at 516 F.Supp. 700.  And that

10   case involved a claim by a defendant in a criminal case that the

11   grand jury selection or, rather, the selection process for the

12   foreman of a grand jury was discriminatory in that particular

13   jurisdiction and had been over time.  That defendant sought to

14   call the judge involved in the foreperson selection process to

15   testify.

16           That case went up on appeal to the 11th Circuit.  And

17   the 11th Circuit noted that, in these cases, both within the 11th

18   Circuit and outside the 11th Circuit, there have been no

19   difficulties in calling judges to the stand to testify about the

20   facts underlying their decisions and determining who would be the

21   foreperson for a grand jury.

22           So, for example, in <u>Cross</u> at the 11th Circuit, which is

23   reported at 708 F.3d 631, Pages 638 to 39, the 11th Circuit noted

24   that in the Southern District of Florida, in an analogous

25   situation, eight judges testified.

1           We note that in the Middle District of Florida in a

2     similar case challenging the selection of a grand jury

3     foreperson, one judge testified.

4           In the Northern District of Georgia, another case, the

5     government itself called nine judges to testify about their

6     selection process.  That case was called Breland.  It's reported

7     at 522 F.Supp. 468.  And the relevant discussion is at 471

8     through 474.

9           In a fourth case cited in the 11th Circuit's

10    cross-opinion, the 11th Circuit noted that judges in another case

11    had voluntarily testified as to the process they go through in

12    selecting forepersons for the grand jury.

13          Now, the Supreme Court subsequently reversed and

14    vacated that case, but on different grounds.  It reversed and

15    vacated solely on the ground that errors in the selection process

16    for a foreperson of the grand jury are not sufficient to lead to

17    reversal.  It did not speak, that is the Supreme Court did not in

18    any way speak to the proprietary of calling the judges to testify

19    in those cases.

20          So I think what the Court can glean from all of this is

21    the following.  There was a series of cases that suggest it is

22    improper to have a judge testify to their mental processes and

23    decisionmaking process.  It is appropriate for a judge to be

24    called to testify about factual matters.

25          In this case, all I am curious about are factual

1      matters.  Those factual matters are relevant to whether or not

2      the judge abdicated her role as a neutral and detached magistrate

3      or not.  So, for example, is the judge familiar with the Freenet

4      software's operation?  Is the judge familiar with the law

5      enforcement investigation of Freenet?  Did the judge understand

6      the facts of the investigation described in the affidavit that

7      was supplied to her?  Those are simple factual questions.  It

8      does not explore her thought processes.  I'm asking her to tell

9      me why she granted the warrant, what weight she assigned to any

10     particular fact in the warrant.  They're simply factual

11     questions.  Did you understand what you read?  Did you read it?

12     And are you familiar with it?  That is all.

13          She may answer that she is perfectly familiar with it,

14     that she understood it all, and I'll have gained nothing by that.

15     She might answer more candidly, as did the judge in the Eastern

16     District of Missouri case.  I have no idea what she will answer.

17     But there is only one person who has that information.  That

18     would be the state court judge.

19          In the absence of my ability to ask her those

20     questions, there would be no way for this court to make a

21     determination as to whether or not that judge did or did not

22     abdicate her role.  So this Court will foreclose to Mr. Hall the

23     opportunity to explore those facts if it continues or maintains

24     its position that the warrant, that the subpoena was

25     inappropriately issued, and quashes it.

1              It will deprive him of the ability to pursue his Fourth

2     Amendment claim, which the Supreme Court has said is an

3     appropriate claim.  And that is that the warrant may well be

4     insufficient because of the judge's abdication for a neutral and

5     detached role.

6              So she is the only one in possession of those facts,

7     essentially factual matters, and Mr. Hall should have the right

8     to explore that if he is to make his claim.

9              The government's cases have merits, but on a different

10    issue, and that is if I were exploring the mental processes and

11    the decisionmaking process of the judge, that is Judge Cavanaugh,

12    and I am not and have no decision to do so.

13             THE COURT:  Thank you.  I realize I did not invite

14    anybody from the Attorney General's Office to be here.  Is

15    anybody from the Attorney General's Office here?

16             MR. BUDLOW:  No.  I spoke to Assistant Attorney General

17    Michele McDonald yesterday evening, Your Honor.  She said that

18    her day was completely booked already.  It was her understanding

19    that this motion --

20             THE COURT:  Do you want to be heard, Mr. Budlow?

21             MR. BUDLOW:  Very briefly, Your Honor.  Mr. Fein just

22    spoke for, I don't know, roughly 20 minutes.  But at the very end

23    we heard a very quick synopsis of exactly what this is all about,

24    which is he wants to put the issuing magistrate judge on the

25    stand to ask this question:  Did you understand the affidavit?

1    That's the question.  He just admitted it again.

2              Now, first of all, we can take issue with that is not a

3    factual question.  That is exactly a mental processes question.

4    Did you understand?

5              But leaving that as an aside for a minute, there is not

6    one case that he cited, not one case that I could find, not one

7    case that Ms. McDonald could find, that hold that under these

8    circumstances a defense attorney can call the judge who signed a

9    search warrant affidavit, who authorized a search, to ask

10   questions about whether or not the judge understood the nature of

11   the words written on a piece of paper.  In fact, the cases that

12   we cited clearly indicate the opposite.

13             Your Honor, a lot of the cases that Mr. Fein cited deal

14   with completely different factual scenarios, but not one of them

15   appeared to contest the issue of whether or not it was

16   appropriate for the judge to testify.  So just because Mr. Fein

17   called a judge and the judge the testified doesn't mean it was

18   right.

19             And I'll give you an example, Your Honor.  I'm very

20   familiar with Mr. Fein's case in St. Louis where he called the

21   judge to testify.  I have the transcript of that testimony.  And

22   I'll tell you two things.  I don't see where the judge admitted

23   to not having read the warrant.  But more importantly, nobody was

24   given any warning.  The judge the received the subpoena, showed

25   up, did not get counsel.  The government had no idea the judge

1   was going to be testifying until the moment Mr. Fein called that

2   judge as a witness.  So that case, to say it wasn't fully

3   litigate on this issue, just like all of the other cases that Mr.

4   Fein cited where judges testified, but that wasn't the issue on

5   appeal, is an understatement.

6          Additionally, Mr. Fein is conflating various issues

7   relating to how a court should analyze a search warrant.  Leon is

8   the exceptions to the good faith exception.  Leon lists the

9   various times when the court would not apply good faith.  But you

10  don't get to Leon until you've already found that there is no

11  probable cause.

12         What Mr. Fein is trying to do is take one of the

13  exceptions to good faith and use it as a bootstrap to establish

14  that there is no probable cause.  But that's just not the

15  analysis.  The analysis in this case, and in every case where

16  there's a search warrant, is looking at the four corners of the

17  warrant, whether there's sufficient basis for that magistrate

18  judge, in this case a Circuit Court judge in Baltimore County, to

19  issue the warrant.

20         And the last thing on the Leon issue is that he's also

21  using the wrong prong of Leon.  So Leon and the cases that have

22  dealt with Mr. Fein's allegation somehow that the search warrant

23  in this case is insufficient say that you don't then analyze the

24  exception typically on whether or not the judge was not neutral

25  and detached or acted as a rubberstamp, but instead look at

1   whether or not a reasonable detective, a reasonable investigator

2   would nevertheless believe that that search warrant was properly

3   authorized.  And that's where the focus should be with respect to

4   Leon, which, again, you would not get to until there was a

5   finding of probable cause.

6          To be clear, in this case the government's going to ask

7   the court down the road this morning or this afternoon to find

8   that there was probable cause, but also to find that, in the

9   event there wasn't probable cause, that there was good faith on

10  behalf or by Detective Rees.

11         But I think what's clear here is that Mr. Fein is

12  trying to couch the allegations that he wants to discuss with the

13  circuit court judge, the allegations that he's made in his motion

14  as anything other than a mental process, and that's just simply

15  not the fact.

16         When you boil it down, what are the facts that he's

17  alleged?  In his motion, he's saying there isn't probable cause

18  and he's saying that a reasonable magistrate judge, an appointed

19  circuit court judge, couldn't understand it.  That's what his

20  claim comes down to.  That's the facts that he wants to address

21  with the judge.  And that's not appropriate.

22         So in addition to the cases and the canons of judicial

23  ethics that say that the judge shouldn't be called as a witness,

24  there's really no relevance in this case whatsoever.

25         Court's indulgence for one moment.

1          Your Honor, the last thing I'd add is if, under these

2    circumstances, the defense is allowed to call a judge to say, the

3    issuing judge to say, did you understand the words printed on a

4    piece of paper, that's essentially giving the defense attorney

5    carte blanche in every case to go on a fishing expedition to ask

6    questions about everything that's in the search warrant.  Do you

7    understand DNA evidence?  Do you understand what it means when a

8    detective or a special agent says I believe that the images that

9    I have viewed portray sexually explicit conduct involving a

10   minor?  Do you understand money laundering terms?

11          This is, the purpose of the affidavit is for the

12   affiant to set forth in the plain English language, that a

13   reasonable magistrate can understand, probable cause.  That's a

14   decision we'll get to later today.  But that is where the danger

15   in what Mr. Fein wants to do would really open the doors to

16   having every search warrant affidavit later be subject to the

17   testimony of the magistrate.

18          MR. FEIN:  If I may, Your Honor.

19          THE COURT:  Yes.

20          MR. FEIN:  So I don't think it's for the government to

21   determine what I want to address.  I simply want to explore some

22   factual matters with the judge that will take but a moment.  And

23   I think the real danger is this; that our government expects

24   transparency from the citizenry, it expects us all to expose

25   ourselves to its questions when it wants, when it likes, like Mr.

1   Hall, but it seeks to insulate from any scrutiny the judges who

2   preside over matters.  That they are somehow untouchable, as if a

3   king or a queen presiding over a fiefdom, that they are not

4   susceptible to scrutiny by those who are charged by the

5   government.

6            These are simple factual matters.  To ask if somebody

7   understood something isn't to ask her why she came to a

8   particular conclusion, which are the issues at stake in all the

9   cases the government recited string cites for.  It's simply to

10  ask, did you understand, are you familiar with this?  She may say

11  yes, she may say no, but that would be the end of the matter.

12           If Mr. Hall is not allowed to explore these kinds of

13  matters, the judge can't make the determination that the law

14  requires him to make.  And that is, did the judge engage in a

15  neutral and detached contemplation of the facts that were

16  contained in the affidavit that was submitted to her in support

17  of the search warrant.

18           I don't know if the court has had the chance to take a

19  look at the cases that the government cited, but they are far

20  afield.  As I said, those from the Supreme Court simply far

21  predate the issue that's before the court today.  The Supreme

22  Court could not have contemplated these issues that arise from

23  the Leon analysis in 1940 or 1904 because Leon and the good faith

24  exceptions and the four exemptions to that rule had not been

25  established at that point in time.

1          So the Court will make its ruling, to be sure.  If it

2     rules against me, I'll object.  But I think that in a court of

3     law where a judge makes a determination that impacts citizens

4     through the search warrant process, and a defendant seeks in a

5     complicated, unusual matter -- not a typical drug investigation,

6     not a small money launder -- I'll retract that.  Money laundering

7     matters aren't small, but they're not as factually complicated as

8     are internet-based, computer-based searches and seizures.  So

9     these are unusual.

10          The cases I've cited, it's true that there wasn't --

11     you can't tell from the opinions -- it doesn't appear that there

12     was a ruling from the court that it's entirely proper to call the

13     judge or entirely improper to call the judge.  It's not just my

14     case.  There are cases from sister circuits within the Fourth

15     Circuit where judges were called to testify.

16          In addition, the cross-case cited by the government

17     indicates for factual matters it was entirely appropriate to have

18     judges testify in open court about the decisionmaking process of

19     selecting a foreperson for the grand jury.  It's difficult for me

20     to determine how that would have been appropriate, but it's

21     inappropriate here.

22          My questions may go nowhere.  They may yield nothing

23     that's of help to Mr. Hall.  But he has every right to put them

24     to a judge as long as they simply explore facts.  That's all they

25     do.

1          Mr. Budlow would have you think that everything is a

2     mental process.  To some degree, that's true.  Any time I speak,

3     I am engaging in a mental process.  Any time anybody puts a

4     question to me and I answer, I am engaging in a mental process.

5     But those mental processes may go to facts and they may go to

6     decisionmaking.  The questions I have to put to the judge simply

7     relate to facts, not the decisionmaking process.

8          So I'd ask the Court to reconsider its ruling, allow me

9     to put these simple questions to the judge, and attempt to assist

10    Mr. Hall in his defense in the process.

11          Thank you, Your Honor.

12          THE COURT:  Thank you.  I'm going to deny the motion to

13    reconsider my ruling.  I think Mr. Fein inevitably is going to

14    get into the mental state of the judge, and I think that the

15    affidavit in support of the warrant speaks for itself.  And I

16    will so rule one way or the other later in these proceedings.

17    Okay.  Mr. Budlow.

18          MR. BUDLOW:  Yes, Your Honor.  I was wondering, if,

19    Court's indulgence, I can provide maybe you with a little bit of

20    an outline as to where I see things going today.

21          THE COURT:  Sure.

22          MR. BUDLOW:  There's two motions pending before the

23    Court.  The first one is a motion to suppress evidence obtained

24    by way of a search warrant and a law enforcement investigation.

25    That's Document 44 filed by the defense.  And the second one is a

1    motion to suppress statements filed by the defense, relating to a

2    defendant's recorded statement that he provided the day the

3    search warrant was executed.  That's Document 43.

4         With respect to the motion to suppress the search

5    warrant, which the government would request to go first, there's

6    essentially three issues.  I'm not going to necessarily address

7    them, but I want to explain to the Court what the witnesses that

8    the government proposes are going to testify to.

9         Very generally, the three issues the defense raises

10   are, one, that the pre-search warrant investigation by law

11   enforcement was improper because, one, it was searched, and two,

12   it was a violation of the Electronics Communication Act, by

13   intercepting wire communications.

14        The third issue that the defense raises, more relevant

15   to what we just discussed, relates to the validity of the search

16   warrant, whether or not there's probable cause.

17        With respect to that overall motion relating to the

18   evidence, the government plans to call one witness, which is

19   Adam -- Brian Levine.  Brian Levine, not Adam.  And he's going to

20   testify relating to the workings of Freenet and whether or not it

21   is, in fact, a search at all, and whether or not it intercepts

22   any content, and various factors relating to that.

23        With respect -- and that's the only witness the

24   government plans to call on that issue.

25        With respect to the third issue relating to the

1   affidavit, the government does not plan on calling any witnesses

2   whatsoever.  The government believes that no witnesses would be

3   appropriate.  We're going to argue that, based on the four

4   corners of the warrant, the search warrant affidavit is

5   sufficient.

6          With respect to that issue, my understanding is that

7   the defendant wishes to call the affiant relating to the search

8   warrant affidavit.  Just so we're clear -- we can deal with it

9   later -- the government objects to that.  That's essentially

10  asking for a <u>Franks</u> hearing.  The government does not believe

11  that a <u>Franks</u> hearing is appropriate in this case.

12         Then there's the second motion that the defense filed,

13  which is the statement that was given by the defendant on the day

14  of the search warrant.  The individual who took the statement and

15  provided the <u>Miranda</u> rights is Detective Joshua Rees.  He's here

16  and the government is planning on calling him only on the issue

17  of providing of <u>Miranda</u> and voluntariness and other issues

18  relating to the statement.

19         And you've dealt with the third issue that I had, which

20  is the motion to quash.  So that's sort of how we see things

21  moving forward from here, Your Honor.

22         With respect to the testimony, I think there's maybe

23  two hours of direct testimony between those two witnesses.

24              THE COURT:  Okay.

25              MR. FEIN:  Just quickly, if I may.  With respect to the

1    Court's ruling on the subpoena, I just want to, for the record,

2    formally object to the Court's factual finding that my efforts

3    will explore the mental processes of Judge Cavanaugh, as opposed

4    to factual matters.  And secondly, object to the Court's

5    conclusion that the subpoena was therefore improperly issued.

6              MR. BUDLOW:  Your Honor, moving forward with respect to

7    the motion to suppress evidence, Ms. Shoop is going to be taking

8    the lead for the government on that matter.  I'll let her address

9    the Court at this time.

10             THE COURT:  Okay.  Let's go.

11             MS. SHOOP:  Yes, Your Honor.  Good morning.  The

12   government is going to call one witness, and that's going to be

13   Dr. Brian Levine.

14             THE COURT:  Okay.

15             THE CLERK:  Doctor, you may step up to the witness

16   stand.  Please face me and raise your right hand.

17             DR. BRIAN LEVINE, GOVERNMENT'S WITNESS, SWORN

18             THE WITNESS:  Yes, I do.

19             THE CLERK:  Thank you.  You may have a seat.  You may

20   pull your chair up to the table, adjust that microphone down in

21   front of you.  Please state and spell your full name for the

22   court.

23             THE WITNESS:  My name is Brian Levine.  L-E-V, or

24   B-R-I-A-N.  L-E-V-I-N-E.

25             THE CLERK:  Thank you.  And there's water behind you if

1    you need it.

2                    DIRECT EXAMINATION

3    BY MS. SHOOP:

4    Q    Good morning, Dr. Levine.

5    A    Good morning.

6    Q    Where do you currently work?

7    A    Currently I'm a professor of, I'm a professor in the College

8    of Information and Computer Sciences at the University of

9    Massachusetts Amherst.

10   Q    And how long have you been a professor?

11   A    I've been a professor there since 1999.  So I'll start my

12   19th year in a couple days.

13   Q    And are you tenured at the university?

14   A    Yes.  I received tenure in 2005.  At that time, I was also

15   promoted to associate professor.  Then in 2010, I was promoted to

16   full professor.

17   Q    And you mentioned you were a member of the College of

18   Information and Computer Sciences.  What is that?

19   A    It's a collection of faculty at the university that

20   specialize in information and computer sciences.

21   Q    Dr. Levine, what type of classes do you teach at the

22   university?

23   A    I teach a variety of classes over the years.  They are, they

24   are largely focused on networking the internet, peer-to-peer

25   networks, and computer network security.

1    Q    And do you have any publications?

2    A    Yes.  One of my main jobs at the university is to produce

3    peer-reviewed public research.  So since before then, while I was

4    a graduate student, I've been producing those publications.

5    Currently, I have somewhere north of 80 or 90 peer-reviewed

6    publications.

7    Q    And how about publications specifically regarding

8    peer-to-peer networks?

9    A    That is one of my main, that's probably the main focus of my

10   research.  So the majority, if not the vast majority, of those

11   publications are on peer-to-peer networks.

12   Q    And the peer-to-peer network that we're going to discuss

13   today is called Freenet.  Have you published anything in

14   particular regarding Freenet?

15   A    Yes.  Earlier this year, I published a paper in a

16   peer-reviewed workshop on Freenet, including a method of

17   investigating child pornography trafficking on Freenet.

18   Q    I have Government Exhibit Number M-2, which was also

19   attached to the government's motion response.  I'm going to put

20   it on the ELMO.  Can you see that, Dr. Levine?

21   A    I can.

22   Q    This is an eight-page document.  I can briefly go through

23   the pages.  Do you recognize this?

24   A    Yes.  That's the article I just referred to.

25   Q    Is that the entire article?

1    A    It appears to be.  Yes.  As you flip through it, I can see

2    it.  It's all eight pages.

3    Q    Okay.  Now, has your publications on Freenet, has that been

4    peer-reviewed?

5    A    Yes.  It was peer-reviewed in IEEE workshop, IEEE

6    international workshop on privacy engineering.  IEEE is one of

7    the two professional societies for my scientific field.  That

8    particular workshop went through what I consider a strong

9    peer-review process.  Before I submitted the paper, they retained

10   a collection of experts in this field -- professors,

11   professionals with doctorates, and so on.  My paper which I

12   wrote, of course, as you saw with co-authors, it was submitted

13   without our names on the paper.  I'm unaware of which members of

14   that what's called the Program Committee, the set of reviewers,

15   which three of them reviewed the paper.  But I did receive their

16   comments.  And as part of their commentary, the paper was

17   accepted by them.  And then subsequently, the paper's been

18   publicly available on the workshop's website.

19   Q    And when was that peer-reviewed?

20   A    It was earlier this year.  I don't remember the exact month

21   that we submitted it.  But the workshop itself was in May, May

22   24th, I believe, of this year.

23   Q    Dr. Levine, do you have a CV?

24   A    I do.

25   Q    And did you provide that to the government?

1    A    I did.

2    Q    I'm going to show you what has been marked as Government

3    Exhibit Number M-6.  Your Honor, this has not been attached to

4    the government's motion.  Do you recognize this document, Dr.

5    Levine?

6    A    Yes.  That's my CV.

7    Q    It is a -- briefly review this -- a nine-page document.  Is

8    that an accurate representation of your training and experience?

9    A    Yes.

10   Q    Your Honor, at this time the government would offer this

11   exhibit, Government Exhibit Number M-6, into evidence for the

12   motions hearing.

13              THE COURT:  It's already in.

14              MS. SHOOP:  Perfect.  Your Honor, the government would

15   also move to qualify Dr. Levine as an expert in the field of

16   peer-to-peer networking and network security.

17              THE COURT:  Any questions about qualifications?

18              MR. FEIN:  No objection.

19              THE COURT:  Okay.

20   BY MS. SHOOP:

21   Q    Yes, sir.  Dr. Levine, what are peer-to-peer networks used

22   for?

23   A    Peer-to-peer networks are used by persons on the internet to

24   trade files, such an images, movies, and so on.  They are

25   different than other applications on the internet in that it's a

1    set of volunteers who have essentially banded together to provide

2    their internet service that they've acquired, their home

3    computers.  And through this banding together they're able to

4    provide services such as the trading of files and documents.

5    Q    And I think -- yes.  I think you mentioned videos.  What

6    other type of files can people trade on peer-to-peer networks?

7    A    Really, anything that can be stored on a computer.  As you

8    say, videos, images.  You could trade whole websites if they're

9    simple enough.  Anything, really anything you could store on a

10   computer, generally.

11   Q    Now, Freenet, which is at issue in this motions hearing

12   today, is that a type of peer-to-peer network?

13   A    Absolutely.

14   Q    When was Freenet developed?

15   A    Well, it was developed first in, I think it started in 1999,

16   but I think the first publication was in 2000.  There was a more

17   major -- maybe that was more of a tech report.  But I know there

18   was a peer-reviewed publication in 2001.  There's been a number

19   of subsequent publications by the original developers, as well as

20   other academics.  I'm not sure when they first implemented the

21   network, but I think it was largely around 2001 as well.

22   "Implemented" meaning available for third parties to use and

23   trade files.  And it's been under development ever since and

24   continues today.

25   Q    Now, when did you first become aware of Freenet?

1    A    It was a long time ago.  But my recollection is that I

2    became aware of it around 2001 with that peer-reviewed article

3    because that is, peer-to-peer networks is, as I said, one of the

4    main focuses of my research.

5          And so I've been following it loosely, along with other

6    peer-to-peer networks, as part of my research.  And then I became

7    much more interested in it in the last few years, resulting in

8    the article, as I said.

9    Q    And would you say, Dr. Levine, that you've really studied

10   Freenet for the past five, maybe so, six years?

11   A    Yes, that's correct.

12   Q    So let's talk about how a user gets on Freenet.  So if I'm a

13   user, I want to use Freenet on my computer, let's talk about how

14   that happens.  How does someone actually get Freenet on to their

15   computer?

16   A    Well, the first step would be to download the software.  So

17   ahead of that, you have to go to a website to download the

18   Freenet software.  And so, as common today, you would go to, say,

19   Google, type in the search term "Freenet", and if not the top

20   result, among the top couple of results that Google would return

21   would be the Freenet website.  And then simply clicking on that

22   Google result, for example, would bring you to the Freenet

23   website.  And then from there you would be able to download the

24   Freenet software.

25   Q    I'm going to show you Page 1 of 21 of Government Exhibit

1    Number M-1.  What is that?

2    A    That's the Freenet website.  A capture of it, certainly.

3    Q    And so you mentioned that if, for example, you went to

4    Google, you looked up Freenet, is this something someone may see?

5    A    Yes.

6    Q    You mentioned that they click on "download."  If you look to

7    the left of that page, is that what you were referring to?

8    A    Yeah.  That little cloud icon with the arrow below it, right

9    below that it says "download", and that's what you would click

10   on.  And then your browser would start to download the software.

11   Q    So right -- give me one second.  Is that what we're

12   referring to right there?

13   A    Exactly.

14   Q    Now, you said that after you click on "download", what would

15   happen?

16   A    Your browser would automatically download the software.

17   Depending on how your browser's configured, that installation

18   program would start to run.  And then Freenet would provide you

19   with some information during the installation, typical software

20   questions such as where would you like this application stored.

21   Basic questions like that.

22   Q    I'm going to show you Pages 2 through 8 of 21.  You can take

23   a look at the screen.  Now, you mentioned that the user would

24   have to go through those series of questions and click things to

25   actually install, is that correct?

1    A    Yes.  And I should clarify that.  When I said you click on

2    the cloud icon, your computer would start to download.  In fact,

3    on the Freenet website, it brings you to this page.  And from

4    here there's a large blue box that says "download Freenet for

5    Windows."  So that's actually what you would click to start the

6    download.  If you turn the page, perhaps we'll see the next.

7    Q    And one thing I want to ask you about on this page.  In

8    middle of the page right here, what is this?

9    A    So that's that -- it's a little blurry.  But it says:

10   Freenet is free and open-source software.  And it also tells you

11   where the source code is available.  So one thing I didn't say is

12   there's no request for money.  It's not something you purchase.

13   So that's what it means to be free.  It's just a simple download

14   anyone can have.

15        What it means to be open-source software is that the

16   programming code that is used to build software to run this

17   little program is available for anyone to inspect, to read, to

18   modify, as well anyone with knowledge of this particular program

19   language, which is Java.

20        It also provides a link directly to that source code.

21   It says the source code is on GitHub.  So GitHub is very popular,

22   if not the most popular, place, I'm not sure, but among the most

23   popular places for individuals ranging from myself to

24   professional programmers, to projects such as Freenet.  It's the

25   place, the popular place to store your open source software code

1   for people to read.  It provides a nice set of wonderful

2   resources for programmers.

3            So once you have this open source software, once you

4   have the programming code, as I mentioned, you can read it, you

5   can modify it.  It's analogous to if I gave you the architectural

6   and instructions for building my house, you could then recreate

7   my house and make another copy of it, modify it how you wish, and

8   so on.

9   Q    We were trying to make the screen just a little clearer.  I

10  know it's a little blurry.  And so, Dr. Levine, after you click

11  on "download", I'm going to show you a few slides.

12  A    That's a lot better.

13  Q    Okay.  Let me ask you this question first.  You said that

14  the programming, Java, right?  You mentioned Java?

15  A    Yes.

16  Q    That's the program that the Freenet developers used?

17  A    Yes.

18  Q    What is Java?

19  A    Java is a programming language.  It's very common.  It's,

20  for example, in my, at my university, in my college, it's the

21  programming language that we teach to incoming freshman.  It's

22  the programming language you use in most of our classes, the vast

23  majority of them.  It's very, it's designed to be very verbose

24  and as understandable as these things are.  It's very common,

25  very useful.

1    Q    I'm going to show you the next few pages.  You just take a

2    look at these and then we can talk about them.  That's a

3    duplicate.  I apologize.  Now, this series of slides that I just

4    showed you, Dr. Levine, what did those represent?

5    A    That is the typical process that a user would see upon

6    downloading the Freenet Install program and then launching it.

7    As I said, these are typical questions asked of the user about

8    the program.  Where would you like it installed?  If it was added

9    to your start menu for this Windows computer, what would you like

10   the name to be?

11           And then this final slide we see, it says we're done,

12   essentially.  Right?  The application may be launched by

13   selecting the installed shortcuts.  And then we can see it says

14   click finish to exit.  With that click box, Freenet would start

15   right away.  So this is, I imagine, very typical of what users

16   would see upon running the Install program for Freenet.

17   Q    Now I'm going to show you Page 9 of 21 of that same exhibit.

18   After you click that "finish" button, is this what a user would

19   see?

20   A    I'm waiting for it to focus.  Yes.  This is the very first

21   screen you would see when using Freenet, upon its installation

22   and launch.

23   Q    What is this?

24   A    So we can see there are three options.  Two of them are

25   really the main options I'll talk about first.

1          This is the program asking you to finish setting up

2     Freenet.  That the previous windows we saw were just the

3     operating system Windows installing the program.  So now we're

4     really here using Freenet for the first time.

5          So on left here, we can see this first option.  It

6     says:  Connect to any Freenet user.  Exactly what you're

7     circling.  Connect to any Freenet user, low security.  And then

8     the middle, we see there's the second option of high security.

9     And the third one is really just some custom settings for

10    advanced users.  It's really still about these two options.

11         So the user has to click through one of those two

12    options, low security or high security, to continue to use the

13    software.

14    Q    Now, what does Freenet refer to those two options as?

15    A    So the left option, low security, is referred to as open

16    net.  And that's what I believe I'm here to talk about today.

17         The second option, high security, is called darknet.

18    And that's a, that's a different setting.

19    Q    And so the user, when downloading Freenet, they get to

20    choose which setting they want to use?

21    A    That's right.

22    Q    I'm going to show you Page 10 of 21, which is a close-up

23    view of the block on the left.  Which operational mode or setting

24    is this?

25    A    This is the low security, or open net setting.

1  Q    Does Freenet warn its users if they click on the low

2  security setting about anything?

3  A    Yes.  So you can see this right in front of me on this open

4  net or low security setting, it's a warning that says while

5  Freenet is safer than traditional P-to-P software, an attacker

6  with moderate resources may be able to trace your activity on

7  Freenet back to you.  And then it asks you basically to use the

8  other high security mode.  It says:  If you have friends who are

9  also on Freenet, you can improve security by adding them as

10 friends and then connecting to only them.

11              So that's not the option here.  The option is let's use

12 low security even though it may be that someone's able to trace

13 your activity.  So this is a choice, this or the other option has

14 to be made before you run Freenet for the first time.

15 Q    And we're going to put 9 and 21 back on the screen.  Now,

16 the middle option, if the user selected high security, does

17 Freenet still warn its user anything about that?

18 A    Yeah.  We can see right here.  It says -- thank you for

19 zooming in.  It says:  The high security or darknet mode.  It

20 says this setting allows you to create your own Freenet darknet

21 for vastly improved security.  But as I read that, that's still

22 no guarantee.  It's just vastly better.

23 Q    In your experience, Dr. Levine, why might a user click on

24 the low security if they could click on the high security?

25 A    Well, as we just read in the low security --

1          MR. FEIN:  I'm going to object, Your Honor, to

2    relevance.

3          THE COURT:  Overruled.

4    A    As we just read in the box -- actually, do you mind putting

5    the zoomed-in version in?

6    Q    Sure.  Absolutely.  And I'm placing --

7    A    The low security mode.  So, basically, it says right there,

8    why might you choose low security?  If you don't have any, quote,

9    "friends" who also run Freenet, then you're out of luck and you'd

10   have to choose the low security mode.

11   Q    What does that mean if you don't have any friends that are

12   also on Freenet?  What does that mean?

13   A    If you haven't met someone personally who's also running

14   Freenet, where you could exchange some details, then you're out

15   of luck.  If you don't know anyone either online, personally,

16   things like that.

17   Q    Now, that warning page where a user has to click low

18   security or high security, how long has Freenet given those

19   warnings to its users?

20   A    Well, as I mentioned earlier, Freenet is an open source

21   project.  And so I mentioned that its programming code is stored

22   on GitHub.  Because they are an open source project put together

23   by a set of volunteers, their website is also stored on GitHub.

24   And one of the features offered by this third party site is that

25   it keeps track of changes to the program and to the website.  So

1    any third party can go in and look at when was any particular

2    line of text in the program or the website last changed.  And

3    that warning has been there for years, the install.  It's been

4    there, I believe, six years, that same warning that we just read.

5    Q    Now, Dr. Levine, what if someone clicks on low security and

6    they then later want to change it to high security?  Is that a

7    possibility?

8    A    That's an option.  So the whole time you're using Freenet,

9    it will tell you at the bottom exactly which mode you're in.  And

10   then in the configuration menu, if you click it, you'll see that

11   you can switch between the two modes.

12   Q    And I'm going to place Page 11 of 21 on the screen.  You

13   spoke of a configuration menu.  Is this what you're referring to?

14   A    That's what I'm referring to.  So I'll just wait for it to

15   focus.  So one thing I'll point out at the very bottom, it says

16   security levels low.  So that's the warning I'm talking about,

17   that while you're using Freenet in the browser like this --

18   exactly what you circled -- it's telling you that you're

19   currently in the low mode.

20   Q    So does Freenet continuously provide its users with these

21   warnings that they're in the low security mode?

22   A    That's correct.  Up at the top we can see that this page is

23   about strangers on the Internet.  And then in this paragraph it

24   asks you if you know at least three people who already use

25   Freenet -- exactly what you're circling -- you can enable darknet

1    mode.  So Freenet will only collect your friends, greatly

2    improving your security.  Still again, no guarantee.

3          Then it says:  However, if you don't know anyone

4    already on Freenet or if you want maximum performance -- which is

5    another answer to your question about why you might instead

6    choose the low security mode -- if you want maximum performance,

7    you should enable open net mode and Freenet will automatically

8    connect to other Freenet modes run by strangers.

9    Q    So, Dr. Levine, is this also another place where Freenet

10   warns its users about using the open net mode compared to the

11   darknet mode?

12   A    That's right.  And we can see further warnings down the

13   page.  If you, maybe if you clear the red.  Thank you.  Right

14   below the paragraph you circled, it says open net mode, connect

15   to strangers and friends if you have them.  Here we see this low

16   mode, which is the open net mode.  It says:  I do not care about

17   monitoring by third parties.  And in italicized it says:  It

18   might be quite easy for other to discover your identity!

19   Exclamation point.  Yes.  Exactly what you underlined.

20         Even further down, in darknet mode, we see this warning

21   again very near the bottom.  Even under maximum security.  It

22   says:  I understand that Freenet is experimental and cannot

23   ensure security against certain known attacks, but I accept the

24   risks, compared to the alternatives.  Below that it says, even in

25   this darknet mode, it says your real identity should be

1    relatively safe provided you only connect to people you trust.

2    But again, no guarantee at all.  And then there's an option to

3    see more information on the website, or in some other archive.

4    Q     Dr. Levine, how long has Freenet provided its users with

5    this set of warnings?

6    A     So as I mentioned, these warnings are part of the source

7    code and the source code is available for anyone publicly to

8    view, which I did on the GitHub website.  And because GitHub

9    records changes to the software, I was able to determine that

10   each of these sentences hasn't been changed in, no earlier than

11   the last seven years.

12   Q     Now, Dr. Levine, once a user selects the open net

13   operational mode, low security, how do they connect to other

14   users or peers on this Freenet network?

15   A     Well, so once the software's running, it handles this

16   connection to other peers, strangers, for the user.  It really

17   happens behind the scenes, although a lot of that information is

18   available to the user to see as it happens, to get some notion of

19   progress as it happens.

20   Q     How are those connections selected?  Does the, does a user

21   select them himself or does the program select them?

22   A     The programs selects them and it happens because of signals

23   between computers that are each running Freenet over the

24   internet.

25   Q     Now, once a user connects to other users or peers through

1   the system -- although you mentioned those are strangers,

2   correct?

3   A    That's right.

4   Q    They don't know those individuals.  Is there anything they

5   can learn about their identity?

6   A    Of those strangers?

7   Q    Yes.

8   A    Yes.  As I said, Freenet, the software manages connections

9   to these strangers, really their computers.  This information is

10  actually displayed in the Freenet program.  And you can, for

11  example, learn the IP address of every stranger that you're

12  connected to.  It's made available in the program itself.

13  Q    I'm putting on Page 15 of 21 on the screen.  And this one is

14  printed a little blurry so I cannot make it clear.  But what do

15  we see in this image?

16  A    So this is the Freenet software itself telling the user, we

17  see here it says "my open net peers."  And it tells the user

18  again, it's another warning, these are untrusted peers added by

19  Freenet in low or normal network security level.  And then we can

20  see IP addresses there.  Right?  It's a little hard to see it

21  reproduced here.  But I can see 185.57.31.15 it looks like on the

22  third line, for example.  That is the IP address of the stranger

23  that this person is connected to.

24  Q    So a user, if I'm on Freenet and I'm connected to all of

25  these other people, Freenet, if I understand you correctly, it

1    does not make any attempt to hide their IP address at all?

2                  MR. FEIN:  I'm going to object, Your Honor.  I think

3    there's some unclarity.  If I may, I think what she means is

4    users to which you are directly connected, you can see the IP

5    address.  Former users to which you've been directly connected,

6    you can see the IP address, but not others.

7                  THE COURT:  Overruled.

8                  THE WITNESS:  I'm sorry, sir.  I didn't hear what you

9    said.

10                 THE COURT:  I overruled the objection.

11                 THE WITNESS:  Okay.

12   BY MS. SHOOP:

13   Q    Okay.  Now I'll ask it again.  So if I'm on Freenet and I'm

14   currently connected to these individuals where on the left it

15   says connected, I can see their IP address, is that correct?

16   A    Yes.

17   Q    Does Freenet make any attempt to hide a user's identity with

18   their IP address?

19   A    No.  We can see it right here on the screen.

20   Q    Now, does a user, for example, if I'm connected to 10 other

21   users, can that change over time the number or the folks that I'm

22   actually connected to?

23   A    Yes.  Users can come and go.  If I'm running Freenet, I may

24   simply turn off my computer.  The strangers that I'm connected to

25   will, their software will go out and find another person to

1    replace me with.  It's a natural churn of the network, this

2    coming and going.

3    Q    When might someone come and go off the network?

4    A    As I said, they may turn off their computer.  They may turn

5    off the application.  Anything like that, for example.

6    Q    Now let's talk about if I'm a user on Freenet and I want to

7    upload a file into the network.  What type of files can someone

8    upload into this Freenet network?

9    A    Typically, images, movies.  You could upload sound files.

10   Anything that generally can be stored on your computer.

11   Collections of images, collections of movies.  You can actually

12   upload very simple websites into Freenet to be downloaded by

13   others.  Not very advanced websites, but very simple websites can

14   definitely be supported by Freenet.

15        People have built applications essentially on top of

16   Freenet.  So there are types of bulletin boards and messaging

17   systems, e-mail like systems, kind of group, group bulletin board

18   systems, things like that.

19   Q    How does a user upload one of those files into Freenet?

20   A    So if I have a particular file on my computer that I'd like

21   to upload into Freenet, the program tries to make this as easy as

22   possible.  I would essentially click on the right button, locate

23   the file I'm trying to upload on my computer.  Freenet does a lot

24   of the work behind the scenes.  And then what's returned to the

25   user is a kind of receipt, a password.  And later, with that

1    password in hand, they or another user could retrieve the same

2    file that was inserted.

3    Q    So you said after you insert a file, you receive a

4    password-type thing.  Give me an example.  Like what does that

5    look like?

6    A    It's a long string, a long collection of numbers and letters

7    and punctuation.  It's not very readable.  It's not

8    pronounceable.  But it's very recognizable.  It might be, say, 80

9    to 100 characters long.  And it looks like a random series of

10   letters and numbers.  Really, it's an identifier for the content

11   that you've provided.  It's a password that anyone who possesses

12   it could download the same file.  Very similar to a URL for a

13   website.

14         I can tell you about GitHub, but if you really want to

15   go there, I have to give you the URL address.  So Freenet is

16   analogously working in that way.  It's just not as user-friendly.

17   Q    Now, you had mentioned kind of some things happen behind the

18   scenes after the user clicks on "upload."  What's actually

19   happening behind the scenes with that file?

20   A    So what the software will do when I, for example, give it a

21   file to insert into the network, behind the scenes it will take

22   the file -- and this is very different than many other parts of

23   the internet -- but it takes the file and it breaks it into very

24   small pieces or blocks, they're called.  These pieces are

25   essentially randomly distributed around the network.  It's, each

1    piece is given to a randomly selected internet peer running

2    Freenet somewhere around the world.

3           So I might take a file and, for example -- or I should

4    say Freenet might take a file and break it into a thousand

5    smaller pieces and then place those pieces randomly among the

6    people who are running Freenet on their own computer.

7           I should add a detail, that after it breaks up the

8    file, it encrypts each little piece so that when it's given to

9    this remote person, they actually don't know what they have.

10   They just have this little encrypted piece of it.

11          What the password enables someone to do is to

12   re-collect those pieces, decrypt them, and reconstitute the

13   original file.

14   Q    Now, you said that the little pieces are stored out there on

15   other people's hard drives.  When you download Freenet -- and I'm

16   going to show you Page 13 of 21 -- do the users have to agree to

17   offer a portion of their hard drive to do that?

18   A    Yes.  This is the configuration screen that you would see

19   upon installing and running Freenet for the first time.  And it's

20   asking you -- this is part of the peer-to-peer aspect of Freenet

21   -- as a peer, please select a size for your data store.  And it's

22   telling you we recommend between 1 gigabyte and 20 gigabytes of

23   your hard drive be used to store parts of files, pieces of files

24   that were inserted by other people into the network.

25   Q    Now, you mentioned that if you have that password, a user

1    could retrieve a file, is that correct?

2    A    That's correct.

3    Q    Let's talk about retrieving files.  What are some ways that

4    individuals can locate these passwords?

5    A    Well, the password, although, as I said, it's not easily

6    pronounceable, it's this long string of, long series of numbers

7    and letters, it's not that long.  It's something you can post to

8    a bulletin board.  You can e-mail it to a friend.  There's a

9    number of ways that you could locate these passwords, publicly

10   posted by other people.  And with the software running and the

11   password in hand, you can download those files.

12   Q    Now, you had mentioned earlier that there could be like a

13   message board feature or websites within Freenet.  Can you find

14   passwords on those as well?

15   A    If they're publicly posted, yes.

16   Q    I'd like to show you an example.  This is Page 14 of 21.

17   Let's talk about if you would like to find one of these passwords

18   on a website within Freenet.  What are we looking at here?

19   A    So previously we've seen, we started with screenshots of

20   what windows shows you while you, while you install Freenet.

21   Then we saw this launching of Freenet.  And the first thing we

22   saw is we had to choose a security mode.  Then we saw that, for

23   instance, you would configure the amount of data that you're

24   volunteering to Freenet.  And then you're ready to go.

25   Eventually, you would get to this screen right here.

1          So this is the top of, of what Freenet shows you.  And

2     it looks like an old '80s style website.  Right?  Not very fancy.

3     But those are all clickable links.

4          So we can see right at top, for example, it's offering

5     you right away go to Enzo's index, or the filtered index, or

6     nerdageddon again.  Exactly what you're circling.  And those

7     underlines are links that you can click and Freenet would show

8     you another site that would list other places to go in Freenet.

9     There's no -- the reason it looks this way, there's no access to

10    Google.  You can't go to Google and make use of Google.

11    Everything's internal to Freenet.  It's its only little community

12    of files that have been placed there by other people.  It's like

13    a little library, community library, and you can only borrow

14    books from that library, even though other libraries exist.

15    Q    I'm going to show you Page 16 of 21.  If we clicked on one

16    of the links you just mentioned, is this what we would see?

17    A    Yes.  Again, Freenet's a little different.  It's a bit, I

18    almost would say, a lot slower than the typical internet.  It's

19    so slow that it actually will tell the user right at the top

20    there, it says Freenet is downloading the page you requested.  In

21    a way it's saying, don't worry, I know I'm slow, this is what's

22    going on.

23         So we can see here that it's been 13 -- no.  In fact,

24    28 seconds so far.  It says time elapsed.  28 seconds.  It

25    estimates 13 seconds to go.  And there's a progress bar there in

1    green.  If this was a live demonstration, that progress bar which

2    currently says 15, then in parentheses it says 68%, it would be

3    marching all the way to the right.  Then once that happened, we

4    would see the next, we would see what we were trying to download.

5    In this case, we clicked on one of those index sites.

6    Q    And I just want to draw your attention to the bottom of this

7    page that I'm circling.  Again, is this an example that you

8    discussed before, how Freenet is constantly warning its users

9    about being on a low security on the open net?

10   A    That's exactly what I referred to before.  So here you can

11   see we're up and running Freenet.  We're waiting for something to

12   download.  Freenet is helpful enough to tell us that we're still

13   in this low security mode.

14   Q    Now, let's say, for example, we successfully download the

15   website page.  Is this an example of that?

16   A    Yes.  That's an example.  And so we can see a list of, of

17   home pages.  In other words, websites that are internal to

18   Freenet of different people.  Some of these are the developers.

19   As I scan down to the bottom, we can see near the bottom it says

20   little angels, photos of nude minors.  Right below that, Lolita's

21   heaven, again, photos of nude minors.  This is one of the, this

22   is once click away after you install Freenet, essentially.

23   Q    Let's say we click on Lolita's heaven.  Okay?

24   A    Okay.

25   Q    Is this an example of the actual website that would come up?

1    A    Yes.  So this is what you would see using Freenet.  Looks

2    like a typical website.  Not very fancy, but definitely a

3    website.  And so some of this is, those black bars are obviously

4    not part of Freenet.  Those were put there as part of the

5    exhibit.

6    Q    Now, I'm going to show you Page 19 to 21, which would be the

7    bottom portion of that website if you were to scroll down.  What

8    do we see here?

9    A    Could you perhaps zoom in a little bit on the bottom?

10   That's a little better.

11        So at the bottom of the website, the website developer

12   has sort of, for convenience, provided these passwords that I

13   spoke of before.  So this is perhaps a more -- these examples

14   make it easier to understand what I was referring to before.

15        So we can see, in this case, they all start with a

16   C-H-K, and then the "at" symbol.  Then we can see the long

17   sequence of numbers, letters, and some punctuation.  And then a

18   comma, and then another long sequence of numbers, letters and

19   punctuation.  And then some text we can finally read at the end

20   there.  It says:  Lolita's heaven dash Abigail.RAR.

21        An RAR file is a collection of images that have been,

22   well, it's a collection of images that are -- it becomes just a

23   single file.

24        So you may have heard of a zip file.  That's a

25   collection of documents or images.  An RAR file is just the same

1    thing.  I'm sorry.  Go ahead.

2    Q    So let's say, for example, I take that key and I want to, I

3    want to retrieve that file from Freenet.  How do I go about doing

4    that?

5    A    Well, so what, the easiest way to do it, or one of the ways

6    to do it, anyway, is to, with your mouse highlight that long

7    sentence.  And that's what we saw in the last exhibit.  That blue

8    is because the mouse had highlighted that.  Then you could copy

9    it, as in copy and paste.  You can copy it into your computer's

10   memory.

11         Then there's another screen available on Freenet where

12   you could paste that unpronounceable, long password, give it to

13   Freenet, and then it will start to download the file for you if

14   you were to click the right button.

15   Q    I'm showing you Page 20 of 21.  Is this what you are

16   referring to, where you could cut and paste that password to

17   download the file?

18   A    Exactly.  So it's a little hard to read.  But we can see, we

19   can see it's the same key that was highlighted in the previous

20   slide.  CHK at, a large number of numbers, letters and

21   punctuation.  Then at the end there we see, again, Lolita's

22   heaven dash Abigail dash RAR.  And then the download button at

23   the very bottom.

24   Q    If a user clicked "download", which you see at the bottom

25   left -- I'm going to show you Page 21 of 21 -- is this the next

1    screen that they would see?

2    A     Yes.  We can see that Freenet is attempting to locate this

3    file and make some progress on it.  It's been about 30 seconds.

4    It's quite slow.  And you would wait.  And then eventually, if

5    successful, the file would be available on your computer

6    unencrypted and available for viewing.

7    Q     And you had mentioned there may be other ways to download

8    these passwords as well.  What's another way you can download a

9    password on Freenet?

10   A     Well, in the site we were looking at, presumably the little

11   pictures, little thumbnails were clickable.  Possibly, you could

12   also be, as I mentioned before, e-mailed one of these passwords.

13   There could be a bulletin board where someone would see, hey,

14   here's a password that I like.  Maybe you'll like it, too.

15         You could request these passwords from other users who

16   might say, oh, I know that one, let me give it to you.

17         So any sort of communication makes this relatively

18   easy.

19   Q     And then, of course, once the download is completed, can the

20   user open the file and see whatever it was they were trying to

21   retrieve?

22   A     Yes.  There's no other, typically, there's no other

23   decryption or things like that that are required.

24   Q     Your Honor, at this time I was informed that the defense may

25   need a restroom break.  Can we break a break?

1        THE COURT:  Yes.  We can take a break.

2        (Recess at 11:00 a.m.  Resume at 11:13 a.m.)

3        THE COURT:  Okay.

4   BY MS. SHOOP:

5   Q    Now, Dr. Levine, we just went through the process of when a

6   user downloads a file.  I want to talk about what actually

7   happens behind the scenes after the user clicks "download."

8   Okay?

9   A    Okay.

10  Q    Can you describe what takes place?

11  A    So behind the scenes, after the user tells Freenet it would

12  like the file associated with a particular password that we

13  discussed before, a few things are going to happen.  So the first

14  thing that's going to happen is that software is going to get,

15  it's going to retrieve from the network the list of pieces that

16  were previously inserted and essentially scattered around the

17  network.  So with that in hand, the software will then try to

18  then retrieve each of those pieces.

19        So for each, each piece, the computer's going to send a

20  signal to its stranger that it's connected to.  It's going to say

21  do you have this piece?  And that stranger is going to say either

22  I have it or I'm going to ask the strangers that I'm connected

23  to.

24        Now, to be clear, there's no user typing anything.

25  These aren't messages that go back and forth between the two

Case 1:16-cr-00469-ELH Document 61 Filed 09/21/17 Page 53 of 242

1    users of the computers.  It's just signals between the pieces of

2    software that are running on the two computers.

3            Again, we have -- the software has this list of pieces

4    it needs to retrieve for each piece.  The software has an

5    algorithm that lets it decide which of my strangers is the best

6    to start with.  Let me ask this one stranger next to me via this

7    signal.  If they have it, they're the intended recipient.  If

8    they've it, they'll reply with it.  And if not, they'll ask their

9    friends and they'll ask their friends.

10           Now, at some point this asking of strangers upon

11   stranger upon stranger, hop upon hop upon hop, will stop because

12   it's crazy to keep going on forever.  And if nothing is found, a

13   not-found message will be sent, a not-found signal will be sent

14   to the computer that made the original request.  But if it is

15   found, then the computer can reassemble the inserted file, first

16   decrypting each piece, reassembling the original file, and then

17   presenting it to the user.

18   Q    Now, you mentioned when the signal goes out from the user to

19   these strangers.  Is there any information connected to that

20   signal?

21   A    Yes.  So we saw already that when we're connected to these

22   strangers, they know our IP address.  We know their IP address.

23   When the request goes out, the signal contains the exact piece or

24   block that we're looking for.  The signal also gives a notion of

25   how far this request has traveled so far.  We know the time and

1    date.  Those are the essential bits of information that are

2    included with the request.

3    Q    Now, when a user tries to retrieve all of these little

4    pieces, are there times where that, that's not possible?

5    A    Yes.  Your computer is sending a signal to the stranger next

6    to you saying do you have this piece?  Again, no typing.  It's

7    just a computer signal.  If they don't have it, they'll ask their

8    stranger peers, and so on.  And eventually, no one might have it,

9    at which point a not-found message would be sent back to the

10   original requester.

11   Q    So now let's turn our attention from the process to the law

12   enforcement investigation into this peer-to-peer software.  While

13   studying Freenet, did you become aware that people were using

14   Freenet to trade child pornography?

15   A    Yes.

16   Q    How did you become aware of that, Dr. Levine?

17   A    I believe law enforcement first told me about it.  But it's,

18   I've been studying peer-to-peer file sharing networks for over a

19   decade, and they all contain child pornography trafficking.  So

20   it was of no surprise to me.

21   Q    And when law enforcement reached out to you, did you attempt

22   to assist them in any way?

23   A    Yes.

24   Q    Can you tell us what you did to assist law enforcement?

25   A    So in summary, there were two outcomes of our, of our

1    assistance to law enforcement.  I say "our."  As I said, I'm a

2    professor and I have research staff that work with me.

3           The first outcome was a tool to be used by law

4    enforcement for the forensically sound investigation of child

5    pornography trafficking on Freenet.  This tool has a number of

6    important characteristics.  It's a simple modification of the

7    Freenet software, which, as I mentioned before, is open source,

8    freely available for anyone to read and modify and make changes,

9    assuming they know Java.

10          The changes we made were limited in a very particular

11   way.  The changes essentially write down for an investigator the

12   information that the software already has in its normal

13   execution.  So there is no extra messages.  There's no extra

14   signaling.  There's no, there's no probing of the network.

15   There's no special features.  It's just information that anyone

16   running the Freenet software has already, their computer has

17   already, and we simply write it down.

18          We only write down information that's contained in

19   messages for which we are the intended recipients.

20   Q    So let's talk about that.  So let's say, for example, I am

21   on Freenet and I'm connected to 10 strangers.  One of those

22   strangers happened to be a law enforcement computer that's

23   running this modified version of Freenet.  And I want to download

24   a file.  And I send a signal from my computer to their computer.

25   What information does this acquire?

1    A    So since you're connected to a stranger who happens to be

2    law enforcement, you, in the process of requesting, taking a

3    password and then the software you're running requests the pieces

4    that are associated with that password, some of the requests will

5    go to each of the strangers you're connected to.  And so,

6    therefore, some of the requests will go to law enforcement.  And

7    what they'll contain is the exact piece that you're looking

8    for -- uniquely identifiable, better than DNA -- the exact piece

9    you're looking for, the current date and time, of course, your

10   current IP address, and this notion of about how far you've,

11   about how many hops of strangers you've traveled to locate this

12   information.  That information's required because at some point

13   we want to stop looking.  But that's the information that would

14   be there.

15        Another critical part of this law enforcement tool is

16   that it has already a list of blocks that are of interest to law

17   enforcement.  So at some point law enforcement visited, say, one

18   of the bulletin boards on Freenet that are, that are labeled as

19   discussing child pornography, toddlers and infants, Lolitas and

20   so on, named Lolitas and so on.  So they'll visit these boards.

21   They'll see publicly, just like anyone else, these passwords.  We

22   saw an example of that in the exhibit.

23        What they can do ahead of time is learn the exact

24   pieces that are associated with that password that are on the

25   network.  And so with that in hand, running the software as each

1    request comes from you as a requester of the pieces for this

2    password of interest, the software can say, aha, that's a piece

3    that I can uniquely identify as being part of this list of files

4    of interest that I'm aware of previously as being associated with

5    child pornography trafficking.

6              At that point, the software would record the

7    information that I mentioned before.  And, essentially, at the

8    end of the day, the investigator is left with a nice record of

9    the requests that, since you said "you" before, you as the

10   requester have sent to me, the law enforcement known.

11             I know that they're associated with the particular

12   password.  I know that these blocks are -- I mean, I know that

13   for sure.  I know the number that I've received.  I know the time

14   frame start and last time that these requests were sent.  I know

15   that they're intended only for me.

16             And then the next stage of the investigative process

17   would be for law enforcement to then retrieve that file

18   themselves because they should visually confirm that, in fact,

19   it's not only a file of interest, it's, it is child pornography

20   that was requested by the stranger next to me.

21             And then using an algorithm, they can determine next

22   stops.

23   Q    Before we talk about the algorithm, let me ask you this, Dr.

24   Levine.  You mentioned that, in the beginning of your testimony,

25   this is open source software so anyone can modify it, is that

1   correct?

2   A    That's correct.

3   Q    It's all publicly available?

4   A    I'm publicly available and intended for volunteers to join

5   and modify.  It's a volunteer project.

6   Q    And let's say I sent a request to a peer that was not

7   running this modified version.  The information that you just

8   described, would that same information go to that individual as

9   well?

10  A    Yes.  This is only information that is already sent to every

11  peer all running Freenet.  Some of it we saw is displayed in the

12  previous exhibit.  Some of it is displayed already to the user.

13  Others is not displayed, but is held and used by the software.

14  Our version for law enforcement simply writes it down,

15  essentially.

16  Q    And let me ask you this.  You originally, you had stated

17  that when you connect to these strangers as a user, that's

18  random, and the software does that automatically?

19  A    That's correct.

20  Q    Does the modified version also do that the same exact way?

21  A    It does not modify the existing process that Freenet has for

22  connecting to strangers.  So the software doesn't, it's not an

23  option in the software to target a particular individual.

24  Whoever the -- for law enforcement, when they're running that

25  software, whoever the software happens to connect to, what

1    other -- sorry -- whatever remote strangers the software happens

2    to connect to, whatever remote strangers happen to connect to law

3    enforcement, that's whose information is recorded, is logged

4    about.

5    Q    Now, which -- we had talked about two operational modes:

6    The open net, which is low security; the darknet, which is high

7    security.  Which mode --

8              MR. FEIN:  I'm going to object, Your Honor.  That

9    wasn't quite the evidence.  There are various security methods

10   for open net and there are various security settings for darknet.

11   Darknet is generally more secure.  But the evidence wasn't that

12   one is low and one is high.

13             THE COURT:  Overruled.

14             THE WITNESS:  Can you rephrase the question, please?

15   BY MS. SHOOP:

16   Q    Yes, sir.  We talked about, there's two operational modes,

17   open net, darknet, which I believe is labeled low security, high

18   security.  Which one of those modes do you run this modified

19   version on?

20   A    The modified version recording this information that's

21   available, anyway?  Our modified version runs only on the low

22   security, open net mode.

23   Q    Now, with that information that you just described that the

24   modified version is collecting, does Freenet warn its users that

25   someone may do that?

1    A    Yes.  There's several examples of that.  We saw already in

2    the exhibits that were put on the screen previously, that upon

3    install, there's the warning.  We saw that the bottom of the

4    browser screen, it reminds the user that they're low security

5    mode.  The Freenet website has a lot of documentation.  There's a

6    help page available for users that contains an enormous amount of

7    information.  There's a large and detailed section on

8    vulnerabilities to Freenet.  In particular, one of the paragraphs

9    is labeled correlation techniques.  And what it says is that if

10   you're connected to a stranger, if that stranger knows ahead of

11   time the password, the file, the password that you're requesting,

12   if they receive, just by being your stranger, by recording the

13   proportion of requests, the number of requests you receive, and

14   they know which key you're looking for and how many, how many

15   hops, which Freenet tells you, anyway, how many hops the messages

16   have traveled, then that third party can detect that you are the

17   requester of these files.

18           It's been up there for at least three years.  It

19   exactly describes the technique that we've been doing.

20   Q    And is that publicly available?

21   A    That's publicly available on the website.  As I said, been

22   available for at least three years.  In fact, that's not the only

23   vulnerability they list.  I mean, it goes on for a while.

24   Q    So let's talk about the next step that you mentioned, an

25   algorithm.  So you said that you assisted law enforcement in two

1   ways.  We talked about the first one.  Let's talk about the

2   second one.

3           When law enforcement has that information, what can

4   they do with it?

5   A    Okay.  So as I mentioned, there were two outcomes of our

6   participation with law enforcement.  The first was this law

7   enforcement version of Freenet.  The second was a paper that I

8   mentioned before that was peer-reviewed and is now publicly

9   available, that describes a method for taking that information

10  that the software writes down and then using it to determine

11  whether the stranger next to you is indeed the requester of a

12  particular file or -- there's only one other option -- they're

13  merely relaying the request of some other user.

14          And just as the Freenet website describes, with the

15  information in hand it can make that determination.

16          A really critical part of that peer-reviewed

17  publication is that there's an evaluation of the technique.  So

18  we evaluate both its true positive rate and it's false positive

19  rate.  It is, it has a very high true positive rate, as we found

20  in simulations of Freenet.  And we found it has a very low false

21  positive rate in an evaluation of using six weeks of real Freenet

22  traffic.

23  Q    And so this method that you've assisted law enforcement

24  with, is it, is it a way for law enforcement to take that

25  information and determine if somebody is likely that original

1    requester versus the person passing on the request?

2    A    Yes.

3    Q    Did you have this technique evaluated?

4    A    Yes.  I mean, we evaluated it.  That's the main point of the

5    paper, is to provide publicly our method of evaluation for others

6    to view.

7    Q    And how do you know that the method works?

8    A    Well, so we, as I said, we used two different methods to

9    evaluate our investigative approach.  We constructed a simulation

10   of Freenet, recreating its routing algorithm and other aspects of

11   how Freenet works.  This is very standard in my field.  It's how

12   I've been doing things, and everyone else in my field, for

13   decades.

14          Then we used that to evaluate its true positive rate.

15   Then we took actual traffic from Freenet, as I said, for six

16   weeks, and we evaluated its false positive rate.  And so, and so

17   that's what the paper details.

18   Q    And, Dr. Levine, you said that that's a very standard method

19   of evaluating techniques in your field?

20   A    Both are standard methods I've used for decades, as have

21   other people in my field.

22          MS. SHOOP:  Your Honor, may I have one moment?

23          THE COURT:  Yes.

24          MS. SHOOP:  Your Honor, that is all we have at this

25   time.

1          THE COURT:  Okay.  Cross.

2          CROSS EXAMINATION

3    BY MR. FEIN:

4    Q    Thank you, Your Honor.  Good afternoon, Doctor.

5    A    Good afternoon.

6          THE COURT:  I think it's still morning.  I think it's

7    still morning.

8    Q    I think that depends where you are.  Correct, Your Honor.

9    I'd like to go over some of the matters you testified on direct.

10   Can you see the exhibit that is displayed?

11   A    Yes, I can.

12   Q    And this is part of Government's Exhibit M-1, is that

13   correct?

14   A    I'm not familiar with the exhibit numbers.  But it's the

15   slide I saw before.

16   Q    Fair enough.  And it's -- do you remember being asked about

17   various security settings?

18   A    I do.

19   Q    Okay.  And if I understood your testimony correctly, you

20   said that the security settings, or the warnings that you're

21   viewing right now on Government's Exhibit M-1, have been in place

22   since 2012?

23   A    I believe I said three, I believe I said three years.

24   Q    I thought you said about six years.

25   A    Did I say six?  Yes, six years.

1   Q    But I don't know what the answer is so I'm asking you.  Is

2   it six or three?

3   A    I believe it's six.

4   Q    And how long has Freenet been available?

5   A    I'm not sure of the exact date when they first made the

6   software available for users to use.

7   Q    Do you know which version Mr. Hall was using?

8   A    I do not.

9   Q    So you don't know if this was the security display that was

10  available at the time that Mr. Hall downloaded and used Freenet,

11  correct?

12  A    Well, I do know that Freenet auto-updates its version for

13  users so it's very likely that his version was one of the more

14  recent ones because of the auto-update.  But you're right, I

15  don't know for sure.

16  Q    So the question is you don't -- the answer is you don't

17  know, correct?

18  A    I don't know.

19  Q    What I'm showing you now is also a part of Government's

20  Exhibit M-1 and it's titled Protection Against a Stranger

21  Attacking You Over the Internet.  Do you recognize this exhibit?

22  A    I do.

23  Q    Do you recall your testimony earlier today about this

24  exhibit?

25  A    I do.

1    Q    I believe you said that the warnings displayed here have

2    been in place since 2011, is that correct?

3    A    They've been in place for seven to nine years, each of the

4    warnings.

5    Q    Okay.  So earlier you said seven.  So now it's seven to nine

6    years?

7    A    I said at least seven earlier, I believe.

8    Q    Very good.  And again, you have no idea if this was in place

9    at the time Mr. Hall downloaded the version of Freenet that he

10   uses, correct?

11   A    I don't have firsthand knowledge of that, no.

12   Q    Also, I'd like to ask you a couple of questions about this

13   document.  Earlier you testified that there's a setting that's

14   denoted low.  Correct?

15   A    Yes.  I can see it on the screen.

16   Q    Okay.  And beneath that it says:  It may be quite easy for

17   others to discover your identity, exclamation point, correct?

18   A    I see that.

19   Q    And below that, though, it says normal, correct?

20   A    I see that.

21   Q    And normal's also available to open net users, correct?

22   A    Yes.

23   Q    And normal says:  I live in a relatively free country but I

24   would like to make it more difficult for others to monitor my

25   communications.  Correct?

1    A    I see that.

2    Q    I understand you see it.  But am I right?  I mean, is that

3    correct that it says that?

4    A    Yes.

5    Q    Okay.  So an open net user could choose low or choose

6    normal, correct?

7    A    Correct.

8    Q    You don't happen to know what Mr. Hall's settings were, how

9    he had arranged his Freenet on his computer, correct?

10   A    Among these two options within open net?  No, I don't know.

11   Q    So on the display now is also part of the Government's

12   Exhibit M-1.  And this is labeled A New Stable Version of Freenet

13   is Available.  My Open Net Peers.  Do you recognize this exhibit

14   from earlier today?

15   A    I do.  Actually, that's an example of the auto-updating

16   feature.  I recognize it.

17   Q    Very good.  And one of the reasons I believe the government

18   or the primary reason the government displayed this to you was to

19   visualize for the Court how IP addresses of individuals to whom

20   you're connected are exposed.  Is that correct?

21   A    Yes.

22   Q    That may have been phrased poorly.  Forgive me.

23   A    Yeah.

24   Q    Yeah.  A user of Freenet can see the IP address of those

25   individuals to whom he's directly connected, correct?

1    A    Correct.

2    Q    And if there's an individual to whom that user was formerly

3    connected, they might have access to that IP address, too,

4    correct?

5    A    They might.

6    Q    But individuals to whom a user has never been connected,

7    those IP addresses are not available, correct?

8    A    I don't believe so.

9    Q    So, and we'll return to this later.  But in the retrieval

10   process, I may be retrieving files that connect to users that I'm

11   not directly in contact with, correct?

12   A    You mean you may be retrieving files, pieces from users

13   you're not connected to?  Is that the question?

14   Q    Yeah.  That's much better phrased.

15   A    Yes.

16   Q    The individuals returning blocks to me as a user, if I'm

17   trying to download a file, may be individuals who are far removed

18   from the users I'm directly connected to?

19   A    Yes.

20   Q    And the IP addresses of those individuals I will not have

21   access to?

22   A    If you have not connected to them, that's correct.

23   Q    I'd like to go over the processes that you discussed with

24   the government a bit more slowly.  You talked about the upload

25   process and you mentioned various ways to upload files.  And you

1    indicated that once somebody uploads a file, there's a password

2    that's assigned to a file, correct?

3    A    I've been calling it a password.

4    Q    And Freenet refers to that as a key, correct?

5    A    That's correct.  It's the same, the same term.

6    Q    Same concept that's being denoted?

7    A    Yes.

8    Q    And a key, a key operates like a table of contents, is that

9    fair to say?

10   A    The key can retrieve a table of contents for you, yes.

11   Q    That would be a manifest key?

12   A    That would be a manifest key would return that manifest.

13   Q    Okay.  So you have your key, which is kind of what you would

14   call a password?

15   A    That's correct.

16   Q    And that key, in turn, relates to what's called a manifest

17   key, correct?

18   A    Yes.

19   Q    Is there a better word to use?

20   A    That's fine.  I'm following you.

21   Q    Okay.  And the manifest key can operate as a table of

22   contents you indicated, correct?

23   A    Correct.

24   Q    And that table of contents list the blocks that comprise the

25   entire file, correct?

1    A    That can be used to recreate the entire file, yes.

2    Q    And the blocks themselves are encrypted?

3    A    Yes.

4    Q    Okay.  And they also have hash values assigned to them,

5    correct?

6    A    Yes.

7    Q    What is a hash value?

8    A    It's a unique fingerprint of a, of a portion of data.

9    That's an informal way to describe it.

10   Q    So each block has its unique identifier, correct?

11   A    Yes.

12   Q    And so if I'm uploading a file, I'll get a key or a

13   password.  And then there will be an automated process that takes

14   over, is that right?

15   A    That's fair to say.

16   Q    Okay.  And that automated process will break that file up

17   into component parts?

18   A    Um-hum.  Yes.

19   Q    And those component parts would be blocks?

20   A    Yes.

21   Q    And those blocks would be encrypted?

22   A    Yes.

23   Q    And they'd be hashed?

24   A    Yeah.  They can be hashed, yes.

25   Q    And every block does have a hash value assigned to it,

1   right?

2   A    All data has a hash value, yes.

3   Q    I'm sorry?

4   A    Yes.  The answer's yes.

5   Q    I think you indicated those are stored diffusely throughout

6   the system, correct?

7   A    Yes.

8   Q    There is no central server?

9   A    There is no central server.

10  Q    And the individuals who are storing blocks, whether it's one

11  or more blocks, don't even know that they're storing those

12  particular blocks, correct?

13  A    They don't know -- they know they're storing blocks but they

14  don't know the, they don't know the data stored -- sorry.  The

15  blocks they're storing are encrypted.  And so since they don't

16  have the decryption key, they can't decrypt what they're storing.

17  Q    So particular blocks --

18  A    Particular blocks they're storing, yes.

19  Q    And those are randomly distributed throughout the system,

20  correct, the blocks?

21  A    Yes.

22  Q    Let's talk about downloading for a moment.  So if I

23  download, I will need a key, correct?

24  A    Yes.

25  Q    And if I have the key, I can enter the key into the

1    software, the Freenet system software, correct?

2    A    Correct.

3    Q    Then through an automated process the software will try to

4    retrieve the file that corresponds to the key, is that correct?

5    A    Yes.

6    Q    And it will do so by sending out data streams, right?  In

7    other words, my software will send out a communication, right?

8    A    The software will send signals to your strangers you're

9    connected to.

10   Q    And it will send out -- right -- it will send out a

11   communication to the strangers to whom I'm connected.  Fair

12   enough?

13   A    Fair enough.

14   Q    Those communications will request the blocks that are

15   associated with the larger file, correct?

16   A    Those signals are the requests for the blocks needed to

17   reconstruct the file.

18   Q    And if there's anyone that I'm connected to that doesn't

19   have one of the blocks, a message, a communication will be sent

20   back to my computer indicating so, and my original message will

21   continue out through the system further to people I'm not

22   directly connected to?

23   A    I don't believe the error message comes back until they've

24   also searched their strangers.  But eventually, if it's not

25   found, a message would be sent back to the original requester.

1    Q    Fair enough.  So if I send out my original communication and

2    it goes to individuals I'm connected to, looking for blocks, and

3    some of those individuals whom I'm connected to do not have a

4    block, the message continues out through the system looking for

5    the blocks that comprise the file?

6    A    The signal would continue to propagate, yes, for a time.

7    Q    Right.  To people I'm not directly connected to?

8    A    That's correct.

9    Q    The idea is that that communication continues to go out

10   until it can locate the blocks to bring them back to my computer,

11   where the file would be reconstituted?

12   A    Correct.

13   Q    And the way that the system, the way the software of the

14   recipient of my communication determines whether or not it has

15   that block is through the hash value associated with the block?

16   A    I'm sorry.  Say that again.  I didn't hear you totally.

17   Q    So the way that a recipient of my communication requesting

18   the file, the way that their computer determines and software

19   determines whether or not they have a block that corresponds to

20   the key or the file for which I'm looking is through the hash

21   value that's assigned to the block?

22   A    Yes.

23   Q    Okay.  If it has, if it recognizes that hash value and has

24   it, it will return the block to me?

25   A    Correct.

1   Q    And that process, as I said, is an automated process,

2   correct?

3   A    It's signals between two computers running Freenet.

4   Q    Any individual who is operating Freenet, they don't have to

5   be doing anything at their computer to do this other than the

6   downloader or the uploader has to put in the key.  Other than

7   that the entire system is automated?

8   A    Yes.

9   Q    The communication as a user, if I'm trying to download a

10  file, the communication I send out has various component parts to

11  it, correct?

12  A    Yes.  The signal does.

13  Q    Okay.  The signal includes, as you said, my IP address in

14  there, correct?

15  A    That's standard for all messages on the internet, correct.

16  Q    And if I'm requesting a file, it will include the hash value

17  of the various blocks that I'm looking for, correct?

18  A    Well, each signal, each request contains one block at a

19  time.  So yes.  If you said it in the signal, in the singular, I

20  would agree.

21  Q    Forgive me.  So each communication I send out will have a

22  hash value associated with respect to the blocks that comprise

23  the file I'm looking for?

24  A    Each request is for a particular block, you know, identified

25  by its hash value, as you said.

1    Q    Correct.  Each will also have, each communication will also

2    have an indication of the number of hops to live, that is the

3    travel distance that occurred to date so far, in the message

4    process?

5    A    No.  In fact, it has a count of the number of hops that it

6    can, that it can continue to go to.  It's not the number that

7    have passed so far.  It's the number that are allowed remaining.

8    Q    To be?

9    A    Yeah.

10   Q    Very good.  And it will also have a date stamp or a date of

11   the communication?

12   A    I'm not sure if the actual signal contains a date stamp.

13   But the receiving, the intended recipient, the stranger you're

14   connected to certainly has a clock by which it can mark the

15   current time.

16   Q    Very good.  And the same would be true for the time? So the

17   date and time?

18   A    Yeah, the date and time together.

19   Q    Okay.  So the communication itself would have the IP address

20   embedded in it, it would have the hash value of the block

21   embedded in it, it would denote the number of hops to live left,

22   and then on the recipient end, there might be a date and time

23   that are part of that computer's system?

24   A    Yeah, at the intended recipient, yes.

25   Q    Okay.  And one last.  Do you know how many people use

1    Freenet in the United States?

2    A    Well, in our experiments, we found, we connected to roughly

3    say about 4,000 a day.  And that number aligns with estimates of

4    various other researchers.  And even the developers of Freenet

5    make estimates.  So let's say who knows on any particular day

6    like today, something on the order of 3 to 6000.

7    Q    So but my question isn't an estimate.  My question is do you

8    know how many people in the United States are using Freenet?

9    A    No.

10   Q    Okay.  Do you know how many people worldwide use Freenet?

11   A    Yes.  In our experiments, in our observations, we found

12   about 4,000 nodes running software in the world on Freenet at the

13   time that we ran it.

14   Q    At the time you ran it.  When was that?

15   A    November -- November, December and January of this, November

16   of 2016 through January of 2017.

17   Q    Okay.  And was that a count or an estimate?

18   A    That was a count.  But I'm giving you a rough number.  I

19   don't remember the exact, 4,217, 4,218.  I'm estimating, you

20   know, about 4,000.

21   Q    Very good.

22   A    It's written in the paper that I referenced earlier.

23   Q    Okay.

24   A    That's what I'm referring to.

25   Q    Okay.  You indicated at some point law enforcement contacted

1  you about assistance that you might be able to provide in terms

2  of Freenet investigations, is that correct?

3  A    That's correct.

4  Q    When was that?

5  A    I believe that was 2014.

6  Q    And you indicated that you made a patch or a modification to

7  existing Freenet, correct?

8  A    Not me.  Someone who works for me.  But my research group.

9  Q    Okay.  Do you prefer me to refer to them as your research

10  group or the University of Massachusetts?

11  A    If you say University of Massachusetts, I'll understand that

12  you mean my research group.

13  Q    So the University of Massachusetts created a patch or a

14  modification for the existing Freenet software that's available

15  publicly on the internet, correct?

16  A    That's correct.

17  Q    And this particular patch or modification was created to be

18  open source code that's available to the public?

19  A    Yes.

20  Q    And it was created using Java language, correct?

21  A    Yes.

22  Q    And the patch allowed for recordation of certain

23  information, correct?

24  A    Information received as the intended recipient, yes.

25  Q    So the patch or the modification allows a recipient of a

1    communication to record, for example, the IP address of a relayer

2    of information?

3    A     The sender of that signal that was received, yes.

4    Q     Is it wrong to call that person a relayer?

5    A     You don't know if they're the originator or a relayer.

6    Q     Correct.  You have no idea, right?

7    A     That's correct.  So they might be, they might not be.

8    Q     Precisely.  So the IP address of that -- and I should stop

9    referring to -- they're not individuals.  These are all

10   computers.  It's all a computerized system.

11   A     Computers run by individuals.

12   Q     Right.  Well, but as you said, it's an automated process.

13   An individual doesn't have to be sitting there, doing anything,

14   other than request to upload a file, correct?

15   A     That's true.

16   Q     So this patch, this modification will record for a recipient

17   of the communication the IP address of the computer that sent the

18   communication, correct?

19   A     Correct.

20   Q     The hash, and in our, with respect to what we're concerned

21   about today, the hash value of a block that's requested, correct?

22   A     Correct.

23   Q     The hops to live that remain in the communication, correct?

24   A     Correct.

25   Q     And the date and time of the communication?

1    A    Correct.

2    Q    Ordinarily, as constructed, Freenet doesn't do that?

3    A    Well, as we showed before, it does display the IP address of

4    the strangers you're connected to.  Ordinarily, even though this

5    information was received by your computer, it's not displayed to

6    the user.

7    Q    Okay.  So I'm assuming the work you did wasn't for no

8    reason.  It was gathering information that makes it possible for

9    you to do this.  So if ordinary Freenet did exactly what you did,

10   your work would be fairly valueless, correct?

11   A    It would be redundant.

12   Q    My point is simply, my point is simply you modified Freenet

13   to do something it ordinarily doesn't do, correct?

14   A    Correct.

15   Q    All right.  And you have an advanced degree, correct?

16   A    I do.

17   Q    You've been doing this for, I think you said now you've been

18   a professor for 19 years?

19   A    That's correct.

20   Q    So you have a --

21   A    Start of my 19th year.

22   Q    I'm sorry?

23   A    Start of my 19th year.  So 18 years.

24   Q    You have a fairly high degree of sophistication with respect

25   to computer matters and software engineering, I would imagine?

1    A     I like to think so.

2    Q     That seems a reasonable conclusion.  In the data you

3    collected about Freenet and its prevalence, have you collected

4    information about ordinary Freenet users?

5    A     In what sense?

6    Q     Who they are, what the demographic makeup is?

7    A     No.

8    Q     So some people like myself are fairly unsophisticated

9    technologically.  Is it fair to say that there are groups of

10   people in the populous who have a high degree of sophistication

11   like yourself, some with a moderate degree of sophistication, and

12   some with no sophistication whatsoever?

13   A     In regard to computers?

14   Q     Yes.  And in order to create the modification that you

15   created, and like modification requires some degree of

16   sophistication?

17   A     Requires familiarity with Java.

18   Q     Right.  So somebody who's not familiar with Java couldn't do

19   this, correct?

20   A     I agree.

21   Q     And somebody could be familiar with Java simply by knowing

22   the name "Java", right?  You say familiarity, it's a fairly vague

23   comment, correct?

24   A     Yeah.  What I mean is that they have to know, they have to

25   be, they have to be a Java programmer.

1    Q    Right.  They have to be a Java programmer.  And they have to

2    know how to manipulate source code, correct?

3    A    How to modify source code, yes.

4    Q    Right.  So individuals who don't know how to modify source

5    code and individuals who don't know how to operate the Java

6    language, could not duplicate what you did, correct?

7    A    Most likely, yes.

8    Q    Do you have any idea of the general population of Freenet

9    users who have that level of sophistication?

10   A    I wouldn't know.

11   Q    Your Honor, would it be okay if we took -- I don't know what

12   time the Court was thinking of breaking.

13            THE COURT:  1:00.

14            MR. FEIN:  That sounds fine.  Thank you so much.

15            THE COURT:  Or a little before.

16            MR. FEIN:  Did you say -- what time?

17            THE COURT:  1:00 or a little before.

18   BY MR. FEIN:

19   Q    Okay.  So this process of using the patch to record this

20   data, that's part of the, part of the assistance that you

21   provided to law enforcement, correct?

22   A    My group, yes.

23   Q    Forgive me.  At the University of Massachusetts?

24   A    Yes.

25   Q    Without that data, there would be no way to assist law

1  enforcement.  They have to have something they're looking at to

2  further an investigation?

3  A    Yes.

4  Q    Where is that data recorded?

5  A    Well, I'm not law enforcement so it's not something that I

6  record.  So there's a law enforcement machine that keeps track of

7  that data.

8  Q    Is it one machine?

9  A    I'm not familiar with that.  Let's call it one machine.

10 Q    When you say it's a machine, what do you mean a machine?  A

11 computer?

12 A    It's a computer, yes.

13 Q    Do you know where it's located?

14 A    Pennsylvania, I believe.

15 Q    Is it, so is it a single system in Pennsylvania that's

16 operating?

17 A    I've never visited the location so I'm just speculating your

18 answer.  So I don't know.

19 Q    Does this particular computer or system of computers operate

20 simply nationally or does it operate internationally?

21 A    I'm speculating.  But because Freenet is international, in

22 that sense -- I really don't know.  I'm speculating.  So, for

23 example, I know it's typical for law enforcement to do a

24 jurisdictional restriction and focus on --

25 Q    Let me see if I can help you.

1  A    You're asking me things about law enforcement procedure that

2  I don't, can't tell you.

3  Q    But I'm not.  I'm really trying to ask you about the

4  computer system.

5  A    That I don't own or run, so --

6  Q    So who designed, so who designed that, who designed the

7  method of recordation of the components we discussed for that

8  computer system?

9  A    Recording the actual information that was received?  That's

10  the patch that we provided.

11  Q    Okay.  So ordinarily Freenet communications can be collected

12  from anywhere in the world, correct?

13  A    Your Freenet peer can be located anywhere in the world.

14  Q    So if, had the modifications you designed, do they exclude

15  communications from outside the United States?

16  A    They might.  I'm not sure because when they're -- when I

17  said before they are essentially written down, what I meant is

18  they are relayed to this server in Pennsylvania.  And because

19  that's not in my system, I'm unaware if they are filtering out,

20  for example, information outside of certain jurisdictions.  I

21  really don't know.

22  Q    Are there other things about that -- so, have you ever

23  visited that system?

24  A    I've never been there.

25  Q    Do you know if it's modified your particular version of

1    Freenet in any other way?

2    A    No.  To be clear, we wrote a patch to Freenet that allows a

3    local investigator to, let's say for now, write down information

4    that it's received, the information we described --

5    Q    Let's not say write down.  I don't think anyone's writing

6    anything down.

7    A    Let's just say that there's a collection of information

8    that's received.  Right?  As operating our -- so it has it.  And

9    then what it does is it relays it to the server in Pennsylvania.

10   So that server can either keep the information or further filter

11   it.  But it could not collect additional information.  Does that

12   answer your question?

13   Q    I think it does.  I think if I understand your correctly, in

14   Pennsylvania there is a large computer system, is that right?

15   A    I'm told.

16   Q    Okay.  And that computer system collects data from

17   individual law enforcement members throughout the United States,

18   is that correct?

19   A    I assume.

20   Q    Well, you tell, you tell me.  I'm asking you.

21   A    I'm told.  I don't have firsthand knowledge of it.

22            MS. SHOOP:  Objection, Your Honor.  I believe this

23   witness is not the right person to answer these questions.  He

24   doesn't know.  Speculation.

25            THE COURT:  He can answer.

1          THE WITNESS:  I can answer, Your Honor?

2          THE COURT:  Yeah.

3          THE WITNESS:  I'm told that's the case.  I don't

4     personally operate it.  I don't have, I'm not the administrator

5     of it.  I'm not law enforcement.

6     BY MR. FEIN:

7     Q    Forgive me.  I'm sorry.  I didn't mean to speak over you.

8     When a law enforcement officer wants to make use of modified

9     Freenet, who do they contact to do so?

10    A    They can contact ICAC, which I believe stands for the

11    Internet Crimes Against Children task force.  ICAC.  They can

12    contact, there's a group that does technical assistance and

13    training.  I believe they have, I don't know, private or public

14    funding to do that.  Probably both.  And they can receive Freenet

15    training on how to operate an investigation properly.

16         We also, my research group assists with that training

17    but we don't, it's not us who you would contact.

18    Q    So you would not provide the software patch itself?  You

19    would not provide the modified Freenet itself to a particular law

20    enforcement officer?

21    A    If they asked?

22    Q    Correct.

23    A    No.  They'd have to go through training.

24    Q    And you provide some of that training, or your group?

25    A    My group provides, assists with that training.

1   Q    Okay.  How many officers have you provided training to since

2   2016?

3   A    I don't know since I personally haven't provided -- well,

4   let me follow up with one further comment.  I don't provide --

5   I'm not the person that provides that training when law

6   enforcement take the classes.  So since I'm not the trainer, I

7   don't know how many do it.  I'm also, we're not the group that

8   organizes the training.  So I have no roster, I have no numbers

9   of how many people have been trained.  I've been provided with no

10  figures.  I have done presentations on Freenet but I wouldn't

11  call that training.

12  Q    All right.

13  A    That's my follow-up.

14  Q    Okay.  So you don't know if they've been trained, if the

15  individual officers who received training, you do not know what

16  training they received, correct?

17  A    I don't know who has received the training.  I'm generally

18  familiar with how they're trained.

19  Q    Well, forgive me.  You're not the one training them, right?

20  A    I'm not the one training them.

21  Q    And you haven't been there while they're trained, correct?

22  A    That's right.

23  Q    That's what you just told me when I asked you questions

24  about this, correct?

25  A    I'm sorry.  You asked me -- I'm sorry.  What's your question

1   exactly?

2   Q    So at this point, you don't know the training they're

3   actually receiving?  You've been told by others what kind of

4   training and what the training comprises of, but you haven't

5   trained anybody yourself, correct?

6   A    I'm familiar with the training materials but I myself have

7   not provided the training.

8   Q    Right.  So you wouldn't know how anybody has, in fact,

9   trained themselves, any law enforcement officer?

10  A    I'm familiar with the training materials, but I myself have

11  not provided the training.

12  Q    Okay.  So let me just rephrase it and I'll move on.

13  A    Okay.

14  Q    You don't know if their training has been consistent with

15  the materials you've looked at?

16  A    Sure.

17  Q    Because you weren't there, correct?

18  A    I've asked the person who did the training how it went.

19  Q    I understand.  But you weren't there, right?

20  A    I was not there.

21  Q    Okay.  That's all I'm getting at.  Lots of things I don't

22  know, too.  There's no shame.

23       Do you know how many officers are using Freenet

24  nationally right now?

25  A    I don't know.

1    Q    Okay.  When an officer -- since you're familiar with the

2    training, let me ask you this.  And you've run some simulations.

3    When an individual is running Freenet, modified Freenet, so law

4    enforcement officer, someone from the university, they run it, I

5    take it the simulations you run are designed to simulate what law

6    enforcement would see if they were running modified Freenet, is

7    that correct?

8    A    That's more or less correct.

9    Q    Okay.  So when you do your simulations, you're running one

10   version of modified Freenet at the time or more than one modified

11   version of Freenet at the time?

12   A    That's not how it works.

13   Q    Okay.  So tell me how it works.

14   A    In our simulations, we run what we pretend -- what the

15   simulation does is it, is it, it's a computer simulation.  So in

16   the computer simulation there's, say, 5000 nodes that are running

17   Freenet.  We don't actually put up 5000 actual computers that are

18   running Freenet.  That's an extraordinary number of resources

19   that we'd have to cobble together.  I don't have access to 5000

20   computers.

21        So we write a program that presents itself as 5000

22   Freenet users.  And we take the essential parts of Freenet's,

23   we're adding algorithm that would affect the efficacy of our

24   algorithm.  And we run that on a computer simulation.  We have

25   requests go out.  They follow Freenet's, you know, internal

1    routing algorithms and other details.  And then we pretend to be

2    a law enforcement officer.  The computer pretends to be a law

3    enforcement officer.  And it tries to determine that if a

4    requester in the simulation is the requester, it also then tries

5    to determine if a relayer is a requester.  So, in that sense,

6    it's running the tests tens of thousands of times.

7    Q    So that's getting to the second part, the algorithm or the

8    statistical analysis that you have that tries to make

9    determinations about who's a requester and who's a relayer,

10   correct?

11   A    Correct.

12   Q    I'm still trying to focus really on the first part.  And

13   that is the recordation of information.  The IP address, the date

14   and time, the hash value of the block, and the hops to live that

15   remain.  So if an officer is running a modified law enforcement

16   version of Freenet on a computer, how much data will that record

17   in the course of a day?

18   A    I don't, I don't know for sure.  I'd have to speculate.

19   Q    Well, you seem to be comfortable giving me your ideas on

20   your version of software generally.  What would be your estimate?

21   A    Well, so for the, they join the network and they get a

22   certain number of peers.  Let's say they have something like 30

23   or 40 peers.  Some number of requests would come through those

24   strangers.  And there's some filtering on when something is

25   testable.  And so I don't know.  I couldn't guess.

1  Q    So how many -- so if --

2  A    Depends on a lot --

3  Q    I'm sorry?

4  A    No.  I'm sorry to talk over you.  Go ahead.

5  Q    No.  That's quite all right.  If you're running a modified

6  version of Freenet, how many requests generally are being sent

7  per second by various users that might -- let me rephrase that.

8  If I'm up and running, I'm a user and I'm on Freenet, how many

9  requests in a given minute might be transmitted through my

10 computer system?

11 A    I've never looked at that so I really don't know.  I would

12 just be completely speculating.

13 Q    So in the tests and simulations you've run, how many come

14 through?

15 A    So in our tests and simulations -- that's a different story.

16 So there, the details are in the paper.  So my recollection is

17 that we ran something like 10,000 simulations.  So we generated

18 10,000 Internet topologies.  So we created 5000 people.  We

19 connected them over a fake internet.  Each one of those

20 topologies that we generated, we ran 5000 tests of our algorithm

21 and then we did that 5000 times.  And I think the numbers are, in

22 fact, a little bit greater in the paper.  So we tested it 10,000

23 times or more.

24 Q    Yeah.  So I'm clearly not making myself clear.

25 A    I'm sorry for misunderstanding you.

1    Q    No. It's quite all right.  So what I'm trying to get at is

2    if I've got a modified version of Freenet and I'm a law

3    enforcement officer, and I'm recording data, right?  I'm

4    recording data every day because that's what the law enforcement

5    investigation does.  How much data am I recording?

6    A    I don't know.  I have never looked at that.  I can't answer

7    your question.

8    Q    So you have no idea how Freenet actually functions in terms

9    of how many IP addresses I may come in contact with a day?

10   A    I know that.  So the answer to your question depends on a

11   number of factors and I don't have access to them all so I can't

12   answer your question accurately, as much as I'd like to.

13   Q    No.  I understand.  So that one you said you know.  So how

14   many IP addresses might it come into contact with in a day?

15   A    Well, so as we talked about before, there's maybe 4,000

16   users per day.  So at most 4,000.  However, you probably, you

17   definitely have between 10 and, let's say, over a hundred peers.

18   Those strangers will come and go.  So, you know, in the low

19   hundreds.  I'm just estimating here off the cuff.

20   Q    So maybe the low hundreds of IP addresses.  But, so that's,

21   if I'm running, if I'm a single law enforcement officer on a

22   single computer using one version of modified Freenet, right?

23   A    Yeah.  Depending on the number of neighbors they have

24   between, say, 30 and 50.  So maybe up to hundred.  Maybe 200.

25   Who knows?

1    Q    Did pending on what?  I'm sorry.

2    A    Depending on the number of peers that you have.

3    Q    Right.  Okay.  And if I'm running more than one computer,

4    right, so if there's, I could multiply that number out.  So if

5    it's, let's say, 200 IP addresses a day.  If there's multiple

6    computers running nationally, then I would multiply that number

7    out by the number of computers running, correct?

8    A    Correct, although there would be some overlap.

9    Q    Right.  But I'm just concerned about just raw numbers.

10   A    Let's say at most that.

11   Q    Okay.  But you have no idea how many law enforcement

12   officers are using Freenet right now?

13   A    I've been told it's between 30 and 40.  It goes up and down

14   depending on training and the interest of the trained officer

15   after, afterwards.

16   Q    Fair enough.  So if we just said -- let's pick the low

17   number.  Let's say there's 30 officers a day running modified law

18   enforcement Freenet.  Fair enough?

19   A    Fair enough.

20   Q    Okay.  And the number of IP addresses they would pick up

21   would be that multiplied by maybe anywhere from 1 to 300,

22   correct?

23   A    At most 300.  I think I said more closer to 1 or 200, but

24   sure.  Ballpark numbers, those are good.

25   Q    Okay.  So maybe in the course of a day, maybe 3000, 3500 IP

1    addresses?

2    A    Minus the overlap.  But sure.

3    Q    Minus the overlap, which is an unknown, correct?

4    A    Yep.

5    Q    Okay.  And that would be 3,500 date and timestamps, correct?

6    A    Yeah.

7    Q    Same with the hash values?

8    A    Um-hum.

9    Q    Okay.  So that material would then be recorded, right?

10   That's saved.  It's copied?

11   A    If it's related to files of interest.

12   Q    We'll get to that in a second.  So that data is copied,

13   right?

14   A    Yes, if it's related to files of interest.

15   Q    And we'll get to that in a moment.

16   A    Okay.  I mean, it's an important --

17   Q    I understand.  But that's, but we were saying -- so forgive

18   me.  Let me just take a step back then.  You said if I'm an

19   officer, I've got that many IP addresses coming through.  Forgive

20   me.  So I see what you're saying.  One of the important pieces of

21   information would be the hash value, correct?

22   A    Um-hum.

23   Q    And the hash value is an indicator that this piece of this

24   request that's coming through this communication is or is not

25   related in some way to a known item of child pornography?

1   A    Yes.  That's one of the conditions.  There's others.

2   Q    Okay.  And that's because the hash value is a unique

3   identifier, correct?

4   A    Correct.

5   Q    It's telling you this is the content that's at issue that

6   we're interested in?

7   A    It's telling you it's seeking this content.

8   Q    Correct.  Okay.  So out of those 3000, maybe 3500, data

9   streams of communications, the information we've discussed is

10  there:  Date, time, hops to live, hash value, and so on.  A

11  certain portion of that is recorded because it's determined to be

12  of interest to law enforcement because of the hash value

13  associated with the request?

14  A    Yes.

15  Q    What that number is we don't know?

16  A    I don't know personally.

17  Q    But that information is recorded, right?

18  A    Um-hum.

19  Q    Where is it recorded?

20  A    It's recorded in one of these computers we discussed before.

21  Q    Like the Internet Crimes Against Child task force, or just

22  an individual law enforcement officer, or maybe both?

23  A    It's definitely recorded at ICAC.  I expect it's remaining

24  at the individual law enforcement, but I don't know for sure,

25  actually.

1    Q    Okay.  And then at some point somebody will review that

2    copied data, correct?

3    A    Um-hum.  Yes.

4    Q    Will somebody review it personally or through an automated

5    process?

6    A    Well, we're already talking about an automated process,

7    right?  The check of the requested block against files of

8    interest is automated.  There's a further check that, you know --

9    for instance, one request alone is, is not a test, is not

10   sufficient to run the test.  Two requests separated by three days

11   is not sufficient to run the test. So there's other filters.

12        But after the end of the automated process, someone

13   would review that information.

14   Q    Okay.  So just to get this straight.  So there is a process

15   that you've used to modify Freenet or -- forgive me.  There's a

16   process the University of Massachusetts used to modify Freenet?

17   A    Um-hum.

18   Q    That process will copy data from Freenet, correct?

19   A    For which it's the intended recipient, correct.

20   Q    I will get to that.  But it does copy information from

21   Freenet, correct?

22   A    Correct.

23   Q    But it only copies information if it's got a hash value

24   that's connected to a known piece of child pornography, if it's

25   got the -- and it includes with that the date, the time, and the

1    hops to live?

2    A    Correct.

3    Q    Who developed the process that distinguishes between the

4    hash values that relate to content related to child pornography

5    and the hash values that do not?

6    A    Well, I think a number of people.  I mean, that's one of the

7    main functions of law enforcement.  It's not something that I can

8    do.

9    Q    But there's a piece of software that is running that, doing

10   that function, doing that work, correct?

11   A    Um-hum.

12   Q    You didn't develop that?

13   A    Not personally.

14   Q    Okay.  So let's take one step back.  I'm sorry.  I know this

15   get tedious.  But it's so hard for me to understand that I want

16   to make sure it's clear on the record.

17          Users out -- Freenet users are sending communications

18   to one another, correct?

19   A    Signals to one another, correct.

20   Q    Signals.  Law enforcement has a modified version of Freenet

21   that's inserted into the Freenet software system network?

22   A    Joined, yeah.  Yes.

23   Q    The signals that come through are gathered by law

24   enforcement?

25   A    Some of the signals, yes.

1    Q    These signals could be coming from anywhere in the world or

2    the United States.  Who knows where they're coming from?

3    A    It's possible, yes.

4    Q    There's maybe 3,000 signals a day coming through?

5    A    Maybe.

6    Q    Those signals are separated into two groups, we'll say,

7    those that have hash values that relate to child pornography,

8    those that do not?

9    A    Yeah.  Those that are of interest and those that do not.

10   Q    And those are based on the hash values associated with the

11   blocks that are part of the Freenet system, that are out there --

12   A    Yes.

13   Q    -- stored on data store.  The communication -- there's a

14   piece of software that someone has designed, you don't know who,

15   that separates out those two classes of data, correct?

16   A    I don't know exactly who wrote that line of code, no.

17   Q    Right.  The class of data that includes the hash values that

18   relate to child pornography, that is recorded?

19   A    Yes.

20   Q    That's recorded using a modified version of Freenet that you

21   helped create?  Or your, the University of Massachusetts, someone

22   there created?

23   A    Yeah.  Only reason, the only reason I'm hesitating is

24   there's two pieces to this.  There's the local law enforcement

25   piece, and then it gets sent to a server.  And there it gets

1    muddier who wrote that.  I mean, it's an ICAC server.  I don't

2    own it.  So in general, yes.  But there's some --

3    Q    Either way, this data is recorded?

4    A    Yes.

5    Q    One is it's a subject of interest by virtue of the hash

6    value, which is an indicator of the authenticity of the block,

7    the content.  Then that's recorded.  That data's recorded?

8    A    Yes.

9    Q    And it's recorded in realtime?

10   A    Yeah.  Yes.

11   Q    Subsequent to that recordation, somebody reviews this

12   material either through an automated process or manually?  I'm

13   assume it's an automated process.

14   A    Well, at some point, there's a human involved.

15   Q    Okay.  So what would that next step of review be?

16   A    Well, so as part of the -- this relates to what I said

17   before.  So as a law enforcement officer, you would look at some

18   of these results.  Maybe some of them you did yourself.  Some of

19   them you might consider tips from out-of-state law enforcement to

20   your own state and so on.  And then you would follow the rest of

21   the investigative process.

22           So it includes, for example, downloading the original

23   file yourself to visually inspect it and ensure that, before I

24   said file of interest, but now you need to know particularly that

25   it's child pornography, for example.

1    Q    Let me, because I think I, something else I need to clarify,

2    too.  So the class of data that you've recorded -- the class of

3    data that's recorded, that is the class of data with hash values

4    that relate to child pornography, that entire class, we'll

5    assume, 3000, 3500 various requests, include people who are

6    simply relayers of information and requesters of information,

7    correct?

8    A    I'm not sure.  I mean, the whole purpose of the system is to

9    focus on those who are requesters.

10   Q    Right.  But at some point you don't know who the requester

11   is, right?

12   A    Yes.  It is a statistical test.

13   Q    So at the time the data is recorded, the data consists of a

14   class of individuals who comprise relayers and requesters.  And

15   subsequently, you're going to try to determine out of that class

16   who are the requesters?

17   A    No.  That's part of the automated process.

18   Q    Correct.  So the recordation, in the first instance, is just

19   a recorder of class of people whose communications contain hash

20   values related to child pornography?

21   A    Um-hum.

22   Q    Some of those people may be innocently relaying that

23   information, some of those people may be nefariously requesting

24   it?

25   A    Yes.

1    Q    At that point it's not known, right.  You've just got the

2    pool of data?

3    A    Yes.

4    Q    Subsequent to that, there will be a search of that data

5    using the software to determine statistically on a probabilistic

6    determination who the requester is?

7    A    Yes.

8    Q    Okay.  But right now we've got this pool of data.  Okay.  Do

9    you know how often that data is reviewed?

10   A    No.

11   Q    Okay.  Do you know how often it's collected?

12   A    I don't personally.

13   Q    Okay.  Do you presume that's a daily basis?

14   A    I presume.

15   Q    Right.  Okay.  So I think we have some idea of how that data

16   is collected and recorded.  And you say it's either stored with

17   the law enforcement officer's computer system or it's stored

18   perhaps at the Internet Crimes Against Children task force in

19   Pennsylvania, and all that data is just sitting there stored?

20   A    Um-hum.  Yes.

21   Q    And that at some point, someone has to or some system has to

22   analyze that data to make a determination, some statistical

23   probabilistic determination about which of those IP addresses

24   really relate to requesters and which simply relate to relayers?

25   A    Yes.

1   Q    Okay.  So let's talk about this.  How's that process

2   function?

3   A    I'm sorry.  Which aspect of it?

4   Q    From the very beginning.  So let's suppose I'm an officer

5   and I'm sitting at a computer and I've just got this recorded

6   data.  I came in.  It was recorded yesterday.  And here's all

7   this data.  And I want to try to run the algorithm on it.  What

8   do I do?

9   A    Well, there's a number of things they could do.  But there's

10  a spreadsheet that's made available where the officers would

11  essentially rerun the statistical tests themselves.

12  Q    How's the spreadsheet made?

13  A    I didn't make it.

14  Q    So you don't know anything about the spreadsheet?

15  A    I've seen it.  I mean, I know that it -- so the data that's

16  presented to law enforcement already runs the algorithm that we

17  presented in the paper.  And then law enforcement -- so only if

18  it satisfies that algorithm will it be presented to law

19  enforcement.  And then they rerun it themselves.

20  Q    Well, you say there's a spreadsheet.  Is the spreadsheet

21  self-generating?  Does it make itself?  I mean, where's it come

22  from?

23  A    Law enforcement.  A law enforcement officer made that

24  spreadsheet.

25  Q    How would a law enforcement officer make the spreadsheet?

1   A    By opening Excel, for example, and then adding entries to

2   the Excel spreadsheet in a way that mirrors or, you know,

3   correctly represents the algorithm that's in the paper.

4   Q    So the data that's in the spreadsheet, where is that data

5   coming from?

6   A    It comes from this computer in Pennsylvania.

7   Q    Okay.  And is it the data that we talked about being

8   recorded?

9   A    Yes.

10  Q    The hash value, the date and time?

11  A    Yes.

12  Q    And that's all it is?

13  A    Yeah.  All the pieces of information that are required to

14  run the algorithm.

15  Q    Okay.  So you've got these bits of information.  But you

16  still have to run the algorithm, right?

17  A    Well, as I said, ahead of time the algorithm is run.  And

18  it's essentially only presented to the officer if the algorithm

19  would return the result that it's likely or significantly likely

20  that this is the requester.  And then the algorithm is run again

21  by the officer manually with the spreadsheet.

22  Q    Okay.  So let's first to the first step, the algorithm being

23  run in an automated fashion, like it sounds like, is that

24  correct?

25  A    Um-hum.

1    Q    Okay.  So step number one, modify version of Freenet

2    separates out two -- collects all this data:  Time stamp, date,

3    hash value of the block, hops to live.  It then segregates two

4    classes of information:  That information which contains hash

5    values related to blocks of interest; that information which does

6    not contain hash values of interest.  Correct?

7    A    Correct.

8    Q    Okay.  It then, in an automated fashion, runs an algorithm

9    over the data that's of interest; that is, the data that contains

10   hash values of interest to law enforcement?

11   A    Yes.

12   Q    What is that algorithm?

13   A    That's the algorithm that I published in the paper I

14   referenced earlier.

15   Q    Okay.  So what's the information, what's it doing?  Let

16   me -- so the algorithm is making a statistical, is determining a

17   statistical probability, correct?

18   A    Correct.

19   Q    A statistical probability of who the requester is?

20   A    Well, whether the stranger who's related to the request is

21   the originator of the request or whether they are a relayer.

22   Q    When you stay "stranger", you mean relayer, requester, or

23   stranger -- we're talking about a computer, right?

24   A    I'm talking about the computer next to you.

25   Q    Right.  So you're trying to determine if the -- we know

1    this.  The algorithm is trying to determine whether or not a

2    computer is a relayer computer or a requester computer?

3    A    Correct.

4    Q    Right?  And it's going to run over the data that we've

5    already discussed, which I apologize for endlessly.

6            So the algorithm, to make a statistical, a

7    determination about statistical probability, is going to need to

8    rely on some variables, I assume?

9    A    Yes.

10   Q    What are the variables that are of importance?

11   A    Well, so there's four significant variables.  So I'm

12   assuming that we're starting with a collection of data that, in

13   the first place, was filtered correctly.  And, for example, I

14   gave this example of it can't be one request one day, another

15   request five days later.  So let's just start with some, some

16   amount, some number, some sequence of requests.  Right?

17           So the critical pieces of information for the algorithm

18   are the -- well, we talked about when files are inserted, it's

19   broken up into blocks.

20   Q    Correct.

21   A    Okay.  So it's the number of blocks that have been inserted

22   into the network.

23   Q    Let me just stop you there.

24   A    Sure.

25   Q    So when you say that, so you've got this recorded data.

1    Part of that recorded data consists of the hash values that

2    relate to blocks of interest because they're known child

3    pornography.

4    A    Um-hum.

5    Q    So what's the difference between those blocks you've got

6    there and the block that's inserted into the system?

7    A    So what we have is a list of requests for those blocks and

8    we also know, as you said, that these blocks relate to a

9    particular password or manifest.  Right?  That manifest can be

10   downloaded, has already been downloaded by law enforcement.

11   That's why it's a manifest of interest.  That's why it's a

12   password of interest, a file of interest.

13          So what I mean by that is the total number of blocks

14   that were originally inserted into the network is -- I mean,

15   that's what a table of contents is, right?  If you have a table

16   of contents of a book and there's 18 chapters, you know there's

17   18 chapters.  Here we have a table of contents of blocks that

18   have been inserted.  It could be a thousand blocks.

19          So we know the total number of blocks that were

20   inserted originally.  We know the number of requests that were

21   made by this stranger next to you.  We know the number of peers,

22   the number of strangers that that requester has themselves.  And

23   then we make an assumption about if this person, if this stranger

24   was a relayer, how many neighbors, how many strangers the

25   original requester has.  We can't see that.

1          So we set that value to something very conservative

2     that favors coming to the conclusion that this person's a

3     relayer.  So we sort of hedge on the side of assuming they're a

4     relayer.

5     Q     Okay.

6     A     So those are the four essential pieces to the algorithm.

7     Q     So one very important part is the number of blocks relayed

8     or requested?

9     A     Yeah.  The number of requests is one.

10    Q     And when you say number of requests, number of requests for

11    a block, correct?

12    A     The number -- yeah.  The number of requests made to retrieve

13    this -- the number of requests made.  Some of them are duplicate

14    requests.  I'm not sure what you're saying.

15    Q     Well, aren't requests only for blocks?  That is, aren't the

16    communications only requesting a block that comprises part of a

17    total file?

18    A     Right.  So the number of unique blocks requested.

19    Q     Right.  I would think you need to know the number of blocks

20    and the number of total blocks that complies a file.

21    A     To run the algorithm?

22    Q     Right.

23    A     Yes.

24    Q     So if you don't, for example, if someone's requesting one

25    block and the file consists of three blocks, that might tell you

1    something.  But if someone's requesting one block and it consists

2    of one million blocks, it wouldn't seem to tell you much at all.

3    A    If you wanted to run the algorithm, yes, you would need that

4    information.

5    Q    Okay.  So the statistical significance, that probability

6    determination would be, could not even be determined unless you

7    know the total number of blocks?

8    A    If you wanted to run it yourself, you would need that

9    information.

10   Q    Well, if you want to run the algorithm at all, right?  I

11   mean, if you want to make it a valuable algorithm?

12   A    Yeah.  To run the algorithm yourself, you would need that.

13   Q    Do you need anything about the timing or the frequency of

14   these requests?

15   A    No.  You just need to know that.  The timing is really part

16   of this filtering process.  Like I said, if it's one block and

17   then five days later another block, that's unreasonable.  So the

18   timing of the request really refers to the window of duration

19   that they appeared in.  So you don't, you don't technically need

20   that to run the algorithm.  It's just sort of part of the

21   filtering process.

22   Q    Okay.  All right.  But you would need to know, A, number of

23   blocks requested, B, total number of blocks that comprise the

24   file?

25   A    To run the algorithm yourself, yes.

1    Q    And to make any degree, any type of, any determination about

2    the statistical significance of the probability that you're

3    trying to attach to distinguish requesters from relayers?

4    A    If you wanted to do it yourself, yes.

5    Q    Well, I don't understand the difference between -- so when

6    you say if you wanted to do it yourself and you modified, what do

7    you mean?

8    A    If you wanted to reproduce the results yourself, that's what

9    you would require.

10   Q    Right.

11   A    You asked me what's required for the algorithm.  And I'm

12   telling you, to run the algorithm yourself, you would require

13   this information.  So yes, if you want to just say yes.

14   Q    I'm sorry.  Forgive me.  That's on my end.  So I'm just not

15   understanding.

16   A    Yes.

17   Q    The answer is yes?

18   A    The answer is yes.

19   Q    It doesn't have any real significance without that

20   information?  The algorithm doesn't have significance without

21   that information?

22   A    Well, no.  The algorithm's been tested and evaluated.  If

23   you want to rerun the algorithm yourself --

24   Q    Right.

25   A    -- you need all the values.  But the algorithm, you know,

1    includes the paper, for example, that's been evaluated.  I'm here

2    to tell you, say I did it myself.

3    Q    Understand.  What I'm getting at each time there's an

4    investigation that's ongoing, in order for law enforcement to

5    make these probabilistic determinations on any given

6    investigation with respect to any given file, they need to know

7    the number of blocks in the file and the number of requests for

8    the blocks?

9    A    Yes.

10   Q    Okay.  Forgive me on that.

11   A    I'm doing my best.  I apologize.

12   Q    Not your fault.  So a different topic, mercifully.  To know

13   if a hash value is of significance, I would presumably need some

14   type of database of known hash values?

15   A    Of hash values of interest, yes.

16   Q    Right.  So how was that created and stored and collected?

17   A    Someone who have to visit public forums.  Right?  We

18   mentioned before that Freenet has these websites that has these

19   bulletin boards.  You would visit those public forums.  We saw an

20   example in the exhibit of how these manifest keys, what we call

21   passwords, were listed at the bottom of the website.  And then

22   you can, you can quite easily -- anyone who's running Freenet,

23   the very first part of retrieving a file that's been inserted,

24   given the password, is to get this list of blocks.  So, but you

25   can really just ask about the passwords.  You'd have to visit

1    these particular websites or forums.

2    Q    But if I have a key or if I have a password or if I have a

3    hash value or whatever I have, I don't know if it relates to

4    anything until I know the file that it's attached to, right?

5    A    I wouldn't say that.  For example, if -- if I may.  If it's

6    been posted to a forum that's related to child pornography, that

7    certainly predicates your conclusion or your interest in that

8    file.

9    Q    Sure.  But it might not tell you what the file really is?

10   A    No.

11   Q    So --

12   A    Context is important.

13   Q    Right.  So I'm assuming at some point databases have to be

14   built to files of actual child pornography?

15   A    Yes.

16   Q    And files of hash values?

17   A    Yes.

18   Q    Okay.  Have you, do these vast databases or libraries exist?

19   A    Yeah, to my knowledge, they do.

20   Q    Okay.  Where are they?

21   A    They're with law enforcement.

22   Q    Okay.  They're with the internet --

23   A    I'm not --

24   Q    Forgive me.

25   A    Yeah.  I'm not law enforcement, so I have no special ability

1    to collect child pornography.

2    Q    Right.  It would be unlawful for you to do that?

3    A    That's right.

4    Q    So you couldn't build that kind of database, right?

5    A    Well, I can, I can handle --

6    Q    It makes --

7    A    -- the hash values.

8              THE COURT REPORTER:  One at a time, please.

9    Q    Forgive me.

10   A    I apologize.

11   Q    That's my fault.

12   A    Do you want to start?  I can't build a database of images.

13   I could be involved in a collection of hash values since those

14   are just texts.

15   Q    Hash values, not illegal?  Images and files are?

16   A    Exactly.

17   Q    You could not have a database of files or images?

18   A    Not me personally, no.

19   Q    You don't know who's -- you know that there's a database of

20   images and files that exist but you don't know who constructed

21   it?

22   A    I know generally, you know.  I know of law enforcement who

23   have told me they do that.  But I'm not involved in that.

24   Q    And you weren't involved in the construction of the database

25   of hash values, either?

1    A    No, not me personally.

2    Q    Okay.  Have you reviewed the search warrant affidavit in

3    this case?

4    A    Just briefly.

5    Q    Does it look accurate to you?

6    A    Looked accurate to me?  I don't know.  In what way are you

7    asking?

8    Q    Well, I'm asking your independent evaluation.  Did the

9    information look accurate?  I don't know how else to phrase that.

10   A    It was, it was a search warrant for things that I didn't

11   observe so I have no basis to say whether it was an inaccurate

12   description of what the officer found.

13   Q    No.  I'm asking you about the description of the way in

14   which Freenet functions.

15   A    I didn't review that part extremely carefully, but the part

16   that I reviewed looked accurate to me.

17   Q    Who asked you to review it?

18   A    It was given to me as part of the materials for this case by

19   the prosecutors.

20   Q    Okay.  But you didn't review it carefully?

21   A    I can't recall it from memory, but I did read through it

22   once.

23   Q    When did you review it?

24   A    You know, some number of months ago.  Maybe a month ago.

25   Q    Not recently?

1    A    Not recently.

2    Q    Recent being within the last couple of days.  Forgive me.

3    A    I flipped through it in the last couple of days, but I

4    didn't reread it carefully.  If you have it, we can look at it.

5    Q    I do.  I was just curious, though.  So you have no

6    independent -- you can't say whether it accurately describes

7    Freenet or not?

8    A    It looked accurate to me, as I recall it.  Nothing stuck out

9    to me as incorrect.

10   Q    Okay.  So that's all I was asking.

11   A    Okay.  Sorry.

12   Q    It looks like an accurate description of the Freenet process

13   to you?

14   A    Um-hum.

15   Q    Earlier on direct you testified to some vulnerabilities that

16   are discussed on Freenet, on Freenet.  Do you recall that

17   conversation with the prosecutor?

18   A    Yes, I was referring to the Freenet website.

19   Q    You have no idea if Mr. Hall ever saw those or not, correct?

20   A    I do not.  I do know that he saw the Freenet website,

21   though.

22   Q    I understand, but that's a separate question.  My question

23   was whether or not Mr. Hall has seen them, correct?

24   A    I don't know.

25   Q    Do you know how often that statistical analysis, the

1    algorithm, is run by law enforcement on a given day?

2    A    I don't know.

3    Q    Do you know if it's run each day?

4    A    I presume, but I don't know.

5    Q    Your Honor, if it would be okay with the Court, if we could

6    take our break now?  I'd just like --

7              THE COURT:  No.  I have a 1:00 meeting so we can't take

8    it.

9    Q    I see.  Okay.

10              (Pause while Mr. Fein confers with the defendant.)

11   Q    The current version of the algorithm that you're using, when

12   was that perfected?

13   A    I don't remember the exact month.  But, you know, within the

14   last year or two.

15   Q    And --

16   A    Before, before August 2016.  I know that.

17   Q    Okay.  Fair enough.  When were the simulations run for that

18   particular version?

19   A    Probably fall -- well, I would say fall of 2016.

20   Q    Okay.  So September, October, November?  Technically, that

21   would be fall, correct?

22   A    Well, hold on.  We ran some initial simulations in the

23   spring and then we ran a great deal more, number of simulations

24   for the paper.  So really, a part of perfecting the algorithm is

25   really the evaluation.  So we're going back a bit here.  But

1    before the summer of 2016.

2    Q    Okay.  In any given case that law enforcement investigates,

3    they use this process that we've tried to discuss today, once law

4    enforcement has the information, that's the output from the

5    algorithm, from the database, the bits of information that are

6    collected, you don't know what they do with that, correct?

7    A    I'm not there to personally observe it.

8    Q    Right.  So for all you know, the officer looks at that data

9    and go gets a warrant, correct?  You don't know?  Not asking you

10   idea.  I'm asking you, you don't know what the individual officer

11   does?

12   A    I don't know what they do with the data we had given them.

13   I don't know what they do with the data we had given them.

14   Q    I have no further questions, Your Honor.

15        THE COURT:  Any redirect?

16        REDIRECT EXAMINATION

17   BY MS. SHOOP:

18   Q    Very briefly, sir.  Dr. Levine, if an individual is sending

19   requests and they are identified in this modified version, we can

20   say for sure one thing, that they're using the open-net mode, is

21   that correct?

22   A    That's correct, because the modified version only connects

23   to the open-net mode of the software.

24   Q    And when the defense counsel showed you the slide that

25   discussed the low and normal and then the maximum for open and

1    darknet -- do you know what I'm talking about?

2    A    Um-hum.

3    Q    So you may not be able to state which one Mr. Hall used, but

4    we know for sure he was on the open-net mode of Freenet?

5    A    Yes.

6    Q    The information that the modified version records, is it

7    accurate to say that information that they record is only from

8    requests that are sent intentionally and directly to it?

9    A    Yes.  Only, it's only information --

10             MR. FEIN:  I'm going to object simply because the use

11   of the phrase "intent", right, and "intended", suggests there's

12   an individual who's sending a communication from one communicant,

13   from one computer to another intentionally.  It is an automated

14   system that's relaying a communication.  No objection to his

15   answer.  But I think we ought to speak in terms that reflect

16   what's factually happening.

17             THE COURT:  Overruled.

18             THE WITNESS:  Yes.

19   BY MS. SHOOP:

20   Q    Dr. Levine, the modified version that you created or

21   assisted in creating, it only logs the information that already

22   exists within a request, is that right?

23   A    It only logs information that any other user of Freenet with

24   an unmodified version would already have.

25   Q    And I think you had mentioned this.  But in order for law

1    enforcement officers to utilize this modified version, they have

2    to go through training?

3    A    Yes.

4    Q    And there was some discussion about, it seemed the defense

5    used the word "versions" of this.  Are there multiple different

6    versions of this modified software or one version?

7    A    I don't believe the defense was referring to versions of our

8    software.

9    Q    Okay.  I just want to make sure that that's clear.  So is

10   there only one version of this modified software?

11   A    Well, we update the software occasionally.  But I don't, I

12   don't know how many versions -- I'm not the person that makes

13   these small modifications.  There's been no significant

14   modification of the software in terms of the basic algorithm.

15   Sometimes things are made easier or streamlined, things like

16   that.  It's not something that I do personally.  We've never made

17   a modification to the algorithm that I've described today.

18   Q    Okay.  And that was my next question.  And then you had

19   briefly mentioned that the passwords that law enforcement, that

20   they collect, those are all publicly available, is that right?

21   A    Yes.  That's my understanding.

22   Q    That's all.

23              THE COURT:  Any recross?

24              MR. FEIN:  No, Your Honor.

25              THE COURT:  Thank you very much, Dr. Levine.

1            THE WITNESS:  Thank you, Your Honor.

2            MS. SHOOP:  And then, Your Honor, at this time we have

3  -- I think most of the exhibits were attached to the motion.  But

4  there was one additional exhibit that was not.  And that's

5  portions of the transcript from Mr. Hall's interview, that I

6  would like to offer at this time.

7            THE COURT:  Okay.

8            MS. SHOOP:  And that's marked as M-7.  Your Honor, I

9  actually have a copy for you.  Would you like a copy?

10            THE COURT:  You can give it to the clerk.

11            MS. SHOOP:  Yes, sir.  Your Honor, what that contains,

12  just so I can briefly describe it to the Court.  Mr. Hall was

13  interviewed on the day the residential search warrant was

14  executed.  And those are portions of his trans, his interview.

15  They're just transcribed.

16            Those relate directly to this motion where Mr. Hall

17  discusses with law enforcement that he's actually a Java

18  programmer for a living.  He teaches Java programming.  He's

19  familiar with Freenet.  He knows how Freenet works.  And he goes

20  through a bunch of other information to show his computer

21  sophistication in those portions of the transcript.

22            And then, lastly, he relays to law enforcement that he

23  understands that his IP address on Freenet was not hidden, and he

24  did not make any additional efforts to cloak or hide his IP

25  address.

1          THE COURT:  Yes, Mr. Fein?

2          MR. FEIN:  I have no objection.

3          MS. SHOOP:  And that's all we have on this motion.

4          MR. FEIN:  I have no objection.

5          THE COURT:  Well, do you want to call the other

6    witness, even though it's a separate issue?

7          MR. BUDLOW:  Your Honor, actually, I was hoping that we

8    would be able to resolve this issue first.  But I do think that

9    there might be a way that we can productively use the next few

10   minutes.  My understanding is that the defense intends to call

11   two witnesses on the issue of the search warrant.  And I would

12   ask for the Court at this time to require some proffer as to the

13   subject matter of both of them because the government does

14   believe that there's a likelihood that we'd object to both of

15   those witnesses.

16          Certainly, one I mentioned earlier is Detective Rees

17   that they intend to call.  So I think it would be the right time

18   for them to make that proffer.  And we can discuss whether or not

19   a Franks hearing is appropriate.  And the other witness, I'll let

20   them speak for.  But I have requested a proffer as to what the

21   subject areas that they would be asking that witness about with

22   respect to this motion, and I still haven't received a response.

23          MR. FEIN:  So, Your Honor, I mainly have one witness

24   I'm interested in at this point, and that would be Detective

25   Rees.  So we heard earlier from Dr. Levine about the modified

1   version of Freenet developed by the University of Amherst, how

2   that modified version of Freenet operates in theory, how the

3   algorithm developed operates in theory, how that algorithm is

4   used to analyze data, to yield results in a, of a statistical

5   probability.  But what we didn't hear is how, in this particular

6   case, data was recorded, how much data was recorded, who recorded

7   that data, and what was done with that data.

8           The affidavit suggests that Detective Rees is the

9   individual that was running, in this case, the modified version

10  of Freenet.

11          I have a theory -- and it should be no surprise to the

12  government because they've looked at prior transcripts of another

13  case -- and I haven't pursued it yet, but I'll give you the

14  outlines of it.

15          You heard from Dr. Levine that the way modified Freenet

16  works in this case is to record data.  It records, among other

17  things, date stamps, timestamps, a hops-to-live value, a hash

18  value, and an IP address.  Perhaps as many as 3,000 replicants,

19  replications of that information are collected a day.  And that

20  is data recorded.  And that data is stored by the government.

21  And that data belongs to Freenet users who may be requesters of

22  information, who may be relayers of information.  It's unknown to

23  the government at the time that data is collected and stored who

24  those people are.  And, in fact, that data is previously

25  separated out by the government in the course of its

1   investigation, according to hash values that are associated with

2   blocks.  Those hash values associated with blocks that are not of

3   interest to the government are moved to one side.  And those that

4   are, are recorded.

5          Subsequent to that, the government runs an analysis of

6   that data and tries, through that analysis, to determine who are

7   the statistically probable requesters of information.  That

8   process Mr. Levine can speak in part to, but not completely.

9   He's not the officer who ran the modified law enforcement known

10  computer software in this case.  Mr. Rees is.  This in some way

11  gets back to what we addressed earlier when I discussed calling

12  Judge Cavanaugh as a potential witness.

13         So if the Court had any doubt earlier, it can see now

14  how complicated and confusing and atypical this kind of

15  investigation is from an ordinary computer-based investigation.

16  One from like the Gnutella network, LimeWire, as was discussed on

17  direct.

18         The government wants, it seems to me very much, to

19  subject as few people to cross examination as is humanly

20  possible.  That's fine.  They have a job to do and I don't

21  begrudge them that.  So they move to keep the judge from taking

22  the stand.  If you have any doubt earlier that that judge might

23  not really have understand that warrant, you might not have that

24  doubt now because you can see how complicated this matter is.

25  This isn't my first case on it.  I'm still trying to get my head

1        around it.

2              But Detective Rees ran the investigation in this case.

3        The government suggests I shouldn't be able to subject him to any

4        cross examination about the investigation he ran.  Why would

5        there be no transparency on that matter?  It relates to Fourth

6        Amendment interests of Mr. Hall.  It relates to whether or not

7        there was a search and seizure here that was conducted perhaps

8        warrantless from the outset of the investigation.  And some of

9        the information that relates to that is held by Mr. Rees.

10             So I would ask the Court to let me question him.  If it

11       thinks I'm going too far afield, that's there's nothing of merit

12       to ask him, it can stop me and explain why.  But why should I not

13       at least have the opportunity to discuss with him the

14       investigation in this case he ran using the modified Freenet

15       software to determine what he did, how many requests were coming

16       through, and what he did with that information?

17             THE COURT:  Mr. Budlow.

18             MR. BUDLOW:  He may not like Franks, he may not like

19       that the government wants the Court to uphold the law, but that's

20       the law.  The law is you don't get to call on a motions hearing

21       witnesses because you want to cross examine them based on the

22       investigation, and you don't get to proffer things like "I have a

23       theory" as a factual basis for something that you want to pursue

24       with a witness.  "I have a theory" is not proof.  "I have a

25       theory" is not evidence.  It's fishing.

1          He hasn't explained anything that he might ask

2     Detective Rees that isn't completely covered in two places that

3     the Court's already seen.  One is you have an understanding of

4     Freenet, which may have been extremely complicated on cross

5     examination.  It was a lot clearer during direct.  You have an

6     understanding of how that works, and that goes to whether or not

7     the law enforcement version of which there's only one,

8     essentially the same version that's existed for years, how that

9     version works.

10          You have an affidavit from Detective Rees that says I

11    used the law enforcement version of the network, as he described

12    it, and used and discussed what it recorded, how it recorded it,

13    who recorded it.  The information is in the four corners of the

14    affidavit.

15          The defense has articulated nothing more than fishing

16    in this case and cloaked it in the idea of open courts.  There

17    will be an open court, an open opportunity for them to cross

18    examine the detectives's investigation at the trial.  But at a

19    motions hearing where they're alleging information relating to

20    the affidavit or information relating to the search, they have to

21    have a proffer of real evidence, of something that makes the

22    testimony relevant.  And in this case, there's truly nothing that

23    they've stated that relates in any way to the issues that they

24    raised in the search warrant.

25          THE COURT:  No, I'm not going to allow the cross

1      examination.  It does not seem to me to rise to a <u>Franks</u> level.

2              Okay.  We'll break and resume at 2:00.

3              (Luncheon recess at 12:48 p.m.  Resume at 2:10 p.m.)

4              THE COURT:  All right.  Where do we stand?

5              MS. SHOOP:  Yes, Your Honor.  The government is ready

6      to argue this motion.

7              THE COURT:  Okay.  Okay.  Go ahead.

8              MS. SHOOP:  Yes, sir.  Your Honor, what the, what the

9      defense is alleging in this case is essentially three different

10     arguments within one motion.  And the first is that Mr. Hall had

11     this expectation of privacy in these requests that he

12     intentionally and voluntarily sent to all of his peers, all of

13     those strangers.  And that is simply not the case.

14             And there's two things for the Court to look at.  And

15     one is did he have an actual, subjective expectation of privacy

16     in the request that he sent to these strangers, and is that

17     objectively reasonable?  And the answer to both of those is no.

18             THE COURT:  Well, wasn't a search warrant necessary?

19             MS. SHOOP:  Absolutely not, Your Honor.  And the only

20     time that a search warrant is necessary is if there is a search

21     that occurred.  And in this case no search occurred because Mr.

22     Hall did not have an expectation of privacy in the requests that

23     he sent, not to any of his peers, to include the one to law

24     enforcement.  And this is why.

25             He certainly, you know, at this stage, he's now

1    alleging that he truly believed that these requests on this

2    peer-to-peer site would remain private.  But that's not the case

3    every day that he sat behind his computer and actually utilized

4    the Freenet peer-to-peer software.  And that's for two reasons.

5    And the Court should consider first this defendant's computer

6    sophistication.

7         We do not have a user that's on a peer-to-peer network

8    just kind of passively, you know, logging on and checking things

9    out.  As you can see from his interview, Mr. Hall himself is a

10   Java programmer.  This language --

11        THE COURT:  So you don't need a search warrant if the

12   person is, is knowledgeable in computers?

13        MS. SHOOP:  No, sir.  That's not what I'm saying.  I'm

14   saying that you don't need a search warrant if -- the only time

15   you need a search warrant is if an individual has an expectation

16   of privacy in those requests.  But he didn't.  And that analysis

17   is twofold, the subjective and objective.

18        THE COURT:  But he has, he has an interest of privacy

19   in his home.

20        MS. SHOOP:  I would agree with you, Your Honor.  There

21   are situations, for example, in United States v. Kyllo, where

22   they have a privacy interest inside of their home.  But that is

23   completely distinguishable from the facts at hand in this case

24   when you're dealing with a peer-to-peer network, which many

25   courts have held that defendants do not have expectations of

1    privacy when they utilize peer-to-peer networks.

2              MR. BUDLOW:  Your Honor, may I have a moment?  Sorry

3    for the interruption.

4              (Pause in proceedings.)

5              MS. SHOOP:  And, Your Honor, and I just want to make

6    sure that this is, the situation that we're talking about here is

7    not the residential search warrant, but the original sending

8    requests on the peer-to-peer network for files.

9              THE COURT:  Okay.

10             MS. SHOOP:  Yes.  So this is the original action by the

11   user on Freenet.  So when Mr. Hall signed on to Freenet and he

12   tried to download images of child pornography, he, of course, had

13   to send these requests out to his peers.  And that collection of

14   information, when the law enforcement computers collected that

15   information, they would not need a warrant to do that.  So that's

16   the situation I'm talking about for the first point.

17             THE COURT:  Okay.

18             MS. SHOOP:  If for some reason that was not clear, I

19   apologize.

20             And so when law enforcement collected the information

21   about his request that he intentionally sent to them, they didn't

22   need a warrant because he did not have an expectation of privacy.

23   And that, Your Honor, is for a few reasons.

24             He certainly didn't have a subjective expectation of

25   privacy because of his computer sophistication and because of the

1    fact that he was warned by Freenet, by the software, multiple,

2    multiple times, and multiple different places, that his activity,

3    sending those requests, would not remain private.

4         And if you look at the transcript that the government

5    provided Your Honor from his interview, he talks about the fact

6    that he's a computer programmer.  He teaches other computer

7    programmers.  And he admits that he knew what Freenet was, he

8    knew how it worked, and he knew that Freenet did not hide his IP

9    address.

10        You saw and you listened to Dr. Levine testify about

11   all of those warnings that Freenet provided him.  And we know

12   when you looked at this exhibit, Your Honor, we know that he was

13   faced with an option, to choose low security or high security.

14   And we know he chose the one that's labeled low security.

15        MR. FEIN:  Your Honor, I'm going to object because it's

16   misstating the evidence.  Dr. Levine testified this had been up

17   on Freenet from 2012, maybe 2011, but he had no idea when Mr.

18   Hall had actually downloaded the Freenet software on his

19   computer.

20        THE COURT:  You can make that argument.  Go ahead.

21        MS. SHOOP:  In fact, Your Honor, what's important about

22   that argument by the defense is what's also in the transcript in

23   front of you is that Mr. Hall admitted that he had been running

24   the Freenet software for the prior two years from when the search

25   warrant, the residential search warrant, was executed in

1    September of 2016, and he installed and uninstalled the program

2    10 different times.  Ten times.  Every time he reinstalled it, he

3    was faced with this choice.  And so he clicked "choose low

4    security" because that's the only one that law enforcement

5    investigates, is the open net low security.

6         So for Mr. Hall today, Your Honor, to claim that he

7    truly believed that those requests that he sent out on this

8    peer-to-peer network would remain private is completely

9    unreasonable.

10         And it's objectively unreasonable, even if he did have

11   a subjective expectation of privacy in light of way the program

12   actually works.  When you're on Freenet, if you want to rebuild a

13   file or you want to retrieve child pornography, like Mr. Hall

14   wanted to, you have to actually send requests to all of those

15   strangers that you're connected to.  And then you can get enough

16   pieces of the file to reboot it.  And the user sees it on his

17   computer.

18         So in doing that, you intentionally send out these

19   signals to other people's computers.  And those signals have

20   information attached to it.  So you intentionally send that

21   information to third parties.  And the Supreme Court, in a long

22   line of case law, has stated that when you voluntarily turn

23   information over to third parties, it's not protected.

24         And that's exactly what Mr. Hall was doing in this

25   case.  Every time he sent out one of those requests and when he

1    sent out the request to the law enforcement computer, he

2    voluntarily turned over the information connected to that request

3    because he intended for all of his peers to accept the request so

4    he could rebuild a file.

5            So, Your Honor, the defense's argument that when Mr.

6    Hall sent those requests for pieces of files of child

7    pornography, he certainly did not have an expectation of privacy.

8    And because he didn't have an expectation of privacy, the

9    government did not conduct a search.  And they did not need a

10   warrant to take that information and analyze it.

11           So that's --

12           THE COURT:  Okay.  You want to discuss the search

13   warrant generally, too?

14           MS. SHOOP:  I do, yes, Your Honor.  That's the third

15   issue.  I can certainly address the second issue by the

16   defense --

17           THE COURT:  Why don't you address that?

18           MS. SHOOP:  The search warrant, sir?

19           THE COURT:  Yes.

20           MS. SHOOP:  Yes, sir.

21           THE COURT:  I'm a bit confused by the government's

22   letter of July 10 since it conflates the two.

23           MR. BUDLOW:  Your Honor, if I could just address the

24   letter of July 10.

25           THE COURT:  Yes.

1          MR. BUDLOW:  The first section dealing with the search

2     warrant is explaining to Your Honor that Dr. Levine would be

3     testifying with respect to their motion about the search warrant.

4     Issues, what we've called issues one and two is the defendant is

5     saying that the search warrant's invalid because of the

6     pre-search warrant activities.  So Dr. Levine testified about --

7          THE COURT:  Okay.  Do you want address the search

8     warrant?

9          MR. BUDLOW:  Yes.  I think Ms. Shoop's going to do that

10    now.

11         MS. SHOOP:  Yes, sir, I do.  Thank you.  So the

12    residential search warrant, so the defense is making the argument

13    that the search warrant was not supported by probable cause.

14    Your Honor, you have a copy of the search warrant in front of

15    you.  In looking at the four corners of the search warrant, it is

16    certainly supported by probable cause.  This is not a search

17    warrant that's bare bones.  It's not a search warrant that

18    doesn't have any supporting facts, background information about

19    the investigation.

20         Probable cause doesn't require absolute certainty.  It

21    requires only a fair probability that contraband or evidence will

22    be found in a particular place.

23         The affiant in this case, which is an individual by the

24    name of Detective Rees, he put tons of information in his search

25    warrant.  He gave the magistrate information about his

1    background, his training as a law enforcement officer.  He told

2    the magistrate information about the fact that he works child

3    pornography cases.  He laid out the multiple courses that he's

4    attended relating to child pornography, to include a law

5    enforcement course on Freenet.  It's the very first one listed in

6    the affidavit.

7         He set forth a thorough explanation of searches and

8    seizures of computer systems, of wireless systems, because that's

9    what we have in this case.

10        He provided the magistrate with an explanation of this

11   software.  He explained about peer-to-peer software.  He

12   explained that Freenet was a type of peer-to-peer software.  And

13   he explained how Freenet worked.  He even has a section in the

14   affidavit dedicated to definitions regarding the software so that

15   can assist the magistrate in making that probable cause

16   determination.

17        He told the magistrate that law enforcement is using a

18   modified version of Freenet to conduct these investigations.  He

19   explained to the magistrate the information that law enforcement

20   collected about the requests.  He listed that.

21        The affiant even explained that there was this method,

22   when they had that information, that they could use to analyze

23   the information.  In fact, it says he explained that there are

24   streams of requests for pieces of files from an IP address that

25   can be evaluated to determine if that IP address was the likely

1    requester of the file of child pornography.

2            Further, the magistrate -- excuse me -- the affiant

3    explained that the information that's collected has been

4    calculated using the algorithm that Dr. Levine testified about,

5    which he then, in turn, can determine which user is the likely

6    requester of child pornography.

7            He explained what the goal of the investigation was,

8    and that was to target the original requesters of child

9    pornography.

10           And then not only did he give all of this background

11   information on Freenet, the method, the modified version, he then

12   has an entire section set out for the specific probable cause in

13   this case relating to Mr. Hall.  And within that, Your Honor, he

14   didn't lay out just one file.  He listed seven different files

15   for the magistrate to consider.  He described the contents of the

16   file because this law enforcement officer, he didn't just rely on

17   the algorithm, like Dr. Levine testified.  He went back and he

18   even downloaded all seven files himself to ensure that they

19   contained child pornography, which they did.

20           He told the magistrate that they use the method, and

21   these are the files that they located.  And by using the method

22   in the algorithm, they determined that Mr. Hall was the likely

23   requester of these child pornography files.

24           He then connected the IP address that was downloading

25   these files to Mr. Hall.  He went out, he subpoenaed the

1    information.  It came back to his wife and to that residence,

2    which is the residence that's listed in the search warrant.

3          Your Honor, the law enforcement agent, the affiant in

4    this case, laid out plenty of information for the magistrate to

5    make a determination of probable cause that child pornography

6    would be located on the digital devices at this residence at this

7    IP address.  And so it's the government's position that the

8    warrant was supported by ample probable cause.  But even if the

9    Court were to find that it wasn't, Detective Rees certainly

10   reasonably relied on that.  And we'd ask that the Court apply the

11   good faith exception.

12         As you know, Your Honor, if you have an agent that

13   reasonably relies on a signed warrant, which Detective Rees did,

14   there are four situations where you could still suppress the

15   evidence.  None of those situations apply in this case.

16         First, the magistrate was not misled by anything in

17   the, anything in the search warrant that the affiant knew was

18   false or would have none was false except for his reckless

19   disregard.  There's no allegation that there's any false

20   information contained in the affidavit.

21         The magistrate, she did not act as rubber stamp and

22   abandon her role.  Just because the magistrate may not be an

23   expert in every single field out there, as the defense suggests

24   in their motion, does not mean she acts as a rubber stamp, not at

25   all.  In fact, the government could not find any case law to

1   support that proposition.  It's a common sense decision.  And so

2   the magistrate read the entire warrant in its entirety and made

3   the determination that probable cause did exist.

4         The third is that the affidavit was not so lacking in

5   an indicia of probable cause to render Detective Rees's reliance

6   on it entirely unreasonable.  You have it in front of you, Your

7   Honor.  You can see from the four corners there is a ton of

8   information in there supporting probable cause.

9         And then lastly, this is not a warrant that was

10  facially deficient.  It's not a warrant that didn't state the

11  places to be searched or things to be seized.

12        So, Your Honor, the warrant is supported by probable

13  cause.  But should the Court find that it's not, the good faith

14  exception would absolutely apply in this case.

15        Subject to any additional questions about the warrant,

16  Your Honor, just the last argument made by the defense is that

17  the government violated the Wiretap Act and the ECPA, the

18  Electronic Communication and Privacy Act, by obtaining that

19  information from the request.  And I'm certainly happy to address

20  that issue as well.

21        THE COURT:  No.  I'll hear from Mr. Fein.

22        MS. SHOOP:  Yes, sir.

23        MR. FEIN:  Your Honor, what I'd like to do is ask the

24  Court for a bit of time to file a memorandum on the evidence that

25  was offered today to the testimony of Dr. Levine.  I didn't know

1    what he would testify to prior to today.  The testimony links to

2    the issues that I've raised preliminarily before the Court, but I

3    couldn't develop those arguments in full because I simply didn't

4    know what he would testify to.

5        I don't think things are quite as simple as the

6    government suggests.  Maybe at the end of the day you'll find

7    that there was no problem with the original investigation

8    conducted by the government.  Maybe you'll find otherwise.  But I

9    think I need a chance to actually develop that argument for you

10   in a meaningful way.  To discuss it here in 10 minutes without

11   the benefit of providing you with something more meaningful in

12   writing would seem to me to serve Mr. Hall not quite so well.

13       I do believe there's something meaningful I can provide

14   this Court.  So I'm simply going to ask the Court to give me time

15   to file a post-hearing memorandum so I can give you something in

16   detail that links to the transcript testimony and the testimony

17   of Mr. Levine today to support the argument that there was a

18   warrant indeed needed from the outset.

19       I have just two comments because I don't want them to

20   go without passing, for purposes of the record.  Whether or not

21   there's anything misleading in the affidavit we would never know

22   because I've not been allowed to cross examine Mr. Rees.

23       Whether or not the judge read the affidavit in whole,

24   in part, or not at all, we would also never know because I've not

25   been allowed to cross examine the judge at the state level.

1            Those two matters aside, I would ask the Court today to

2      give me 30 to 40 days to provide this Court with a written

3      memorandum --

4            THE COURT:  Let me ask you.  Why --

5            MR. FEIN:  Yes.

6            THE COURT:  -- why isn't it in every case that, under

7      your theory, you wouldn't call the judge?

8            MR. FEIN:  Well, here's why.  So let me give you an

9      example, Your Honor.  So this will be a pretty straightforward

10     one.

11           Take your average narcotics investigation that many

12     officers work on on a daily basis.  Suppose I am a magistrate

13     judge.  An officer comes to me with a warrant and the officer

14     says to me, Judge, I've got a confidential source and this source

15     has told me about drug activity taking place at home number one

16     on A Street.  And the informant has told me that he's purchased

17     narcotics, marijuana, from the occupant of home number one on A

18     Street on multiple occasions, and this informant returned to the

19     home yesterday and purchased more marijuana from the occupant of

20     home number one on A Street.  In addition, while the individual

21     was there, they saw marijuana in the home.  This was in the last

22     24 hours.

23           Now, the officer tells me I'm not so sure about this

24     informant, he has been somewhat reliable in the past, not

25     perfectly reliable in the past.  So to corroborate the

1    information he gave me, I surveilled the home.  And when I saw,

2    when I surveilled the home, I saw people coming and going.  And I

3    saw them coming and going in times, maybe every ten minutes.

4    They'd stay for two minutes and leave.  It was consistent with,

5    consistent with my experience about how quickly people come and

6    go during drug investigations, that they're simply meeting

7    someone at a home to buy drugs.

8         Those facts are all facts that would be within the

9    common understanding of any individual.  We all know what it's

10    like to watch a home, to see people come and go, to notice

11    whether or not the frequency with which they come and go is

12    consistent with a visitor.  They're there to perhaps have dinner

13    or perhaps consistent with something different.

14         Those facts are not facts that would be difficult for

15    anyone with --

16         THE COURT:  But I thought you just said that -- I mean,

17    suppose the magistrate didn't read it?

18         MR. FEIN:  I'm sorry?

19         THE COURT:  Suppose the magistrate didn't read it?

20         MR. FEIN:  Suppose the magistrate didn't read it.

21    Right.  So if the magistrate didn't read it, then you're right.

22    So I would want some -- so in my argument in my case, it wouldn't

23    have been that the judge didn't read it.  Right?  So my point was

24    simply there's case law where judges have been alleged not to

25    have read warrants and judges have been called to the stand to

1    testify and have, in fact, testified.  So, for example, if --

2           THE COURT:  But why wouldn't you be able to call the

3    judge in every case?

4           MR. FEIN:  Well, I think maybe you could.  But I think

5    there are institutional pressures that work against doing so.

6    So, for example, I practiced law for several years.  I may not be

7    the finest lawyer.  But I don't call judges on every occasion to

8    testify in every case because I simply believe that there's no

9    reason to do so.  There's nothing atypical, nothing unusual that

10   I want to question that judge about.  I certainly am not in the

11   business of wasting the time of judges or the time of any

12   witness.

13          What I want to do is try to protect the constitutional

14   rights of the individuals that I represent.  So if it seems like

15   there's a reasonable, a reasonable basis to call somebody, I do

16   so.  If there doesn't seem like there's any reasonable basis,

17   nothing of fruitfulness that will come from it, I don't.

18          So is there a reason why I wouldn't call a judge in

19   every case?  Yes.  Because there would seem to be no reason to do

20   so.

21          But if your point is simply I could do it, I guess

22   that's true.  I'm assuming the Court's point there is, well, that

23   seems ridiculous that you can call people in any case.  But

24   people are called every day, Your Honor.  Ordinary people, too.

25   There's nothing special about a judge except insofar as the case

1   law indicates that you should not probe their mental

2   decisionmaking process.

3            But in terms of the facts they hold, there's nothing

4   special.  They are ordinary people who put their pants on in the

5   morning like the rest of us, who dress themselves like the rest

6   of us.  And if there's something relevant to testify to that is

7   material, they ought to be questioned.  Simply because they don a

8   robe in the afternoon or the morning doesn't mean they have to be

9   insulated from scrutiny, at least not in a government that's

10  structured like ours.

11           So could that happen?  Yes.  Do I think it would?  No.

12  Number one, for institutional reasons.  But, two, even if it did,

13  that would not in and of itself be the greatest reason to say no,

14  the citizens who are accused of crimes in our country may not

15  question judges, even if it's limited to the facts that they want

16  to probe.  That would not seem like the kind of system that we

17  have designed.

18           THE COURT:  That's a good answer.

19           MR. FEIN:  So that aside, I'm simply trying to do the

20  best I can for Mr. Hall.  And I will ask, I don't think this case

21  is quite as simple as the government would like you to think it

22  is.  And, in fact, I shouldn't even say that.  I don't what the

23  government wants you to think.  That's their business.

24           All I can tell you is I don't think things are quite as

25  simple as they seem.  And I'd like to provide the Court some

1  written material to further the arguments I have that a warrant

2  was needed from the beginning.

3        Now, I will agree there's not a lot of case law on

4  that, but there is some.  And that case law is relevant.  There

5  are also Law Reviews written by very bright, intelligent

6  academics on this same matter.  There are also cases that relate

7  to this that are analogous that I have constructed an argument

8  on, but that argument needs to be presented to this Court in a

9  written format for it to make sense and for it to be evaluated in

10  a meaningful way.  And all I would like the Court to do is to

11  evaluate that argument in a meaningful way.

12        THE COURT:  No, I don't think so.  I think, I mean,

13  today was the motions hearing and that's the way the system

14  works.

15        MR. FEIN:  Well, the system doesn't always work that

16  way.  So, for example, when matters are slightly complicated, it

17  is not uncommon at all for a judge to give the defendant time to

18  file a post-hearing memorandum.

19        THE COURT:  No, it's not uncommon but I'm not going to

20  do it in this case.

21        MR. FEIN:  Okay.  Well, then, here's what I will do.  I

22  will make an argument to you now and I will file a motion to

23  reconsider and the Court can do with it what it will.  But I'll

24  file that motion to reconsider because I have an inclination of

25  where we're going.

1          So here's what I would say, Your Honor.  According to

2     the testimony -- so, a couple of things.

3          Let's start at the outset.  The government has an

4     investigation.  That investigation includes copying of data, that

5     is data that belongs to Freenet users.  That data consists of

6     some metadata.  The metadata would be the date and the timestamp.

7     It would also be the IP address.  And I have no quarrel with the

8     argument that individuals don't necessarily have a reasonable

9     expectation of privacy or subjective or objective in their IP

10    addresses.

11         But the investigation in this case goes beyond that

12    because it's looking at the hash values that are involved in

13    these cases.  So if I won't have the opportunity to make a

14    written submission, it will take a little bit of time.

15         So the hash values are important for a couple of

16    reasons.  So let's take a look at the warrant.  Give me one

17    moment with my notes, Your Honor.

18         (Pause in proceedings.)

19         MR. FEIN:  Forgive me, Your Honor.  Okay.  So if you

20    look at Page 4, Paragraph 8.  So the hash values are described

21    there by Detective Rees as a, largely an alphanumeric expression

22    that is the unique identifier of a particular, a particular block

23    in these cases.  So what is authenticating is the content of the

24    communication; that is, the block that relates to the total

25    files.  And, in fact, detective -- detective -- Dr. Levine

1    testified that the block, the hash value associated with the

2    block is giving you content.

3         So it is true from all sorts of cases that individuals

4    do not have a reasonable expectation of privacy in metadata that

5    is non-content.  But in content, they do have a reasonable

6    expectation of privacy.  And, in fact, if you take a look at the

7    definition of the word "content" in the Electronic Communications

8    Protection Act, which I don't have with me, but would be happy to

9    provide the Court in a memorandum I'd like to file, you will see

10   that it sweeps within this ambit easily the definition, easily

11   the functions of a hash value in terms of equating that with

12   content.

13        You know that it means content, moreover, from other

14   aspects of the affidavit.  So, for example, if you look at Page

15   8, these are the words of the author of the affidavit, which I

16   presume is Detective Rees.  So it says, quote:  "Your affiant has

17   previously downloaded the file with the above-referenced Shaw

18   hash 1 value from the network and knows it to be a video file

19   approximately 28 minutes and 12 seconds in length."

20        So he previously -- not as the government indicated,

21   subsequently to the investigation downloaded -- but previously.

22   So in the communication that's recorded by the government, before

23   there's a warrant, this data is recorded and set aside.  That

24   data includes the hash value.  The hash value is a proxy for the

25   content and reveals the content of the file, according to the

1    words of Detective Rees himself.

2          So not only is the recorded data from the modified

3    version of Freenet setting aside metadata, but is also setting

4    aside content.  So if you think of that in terms of a letter

5    that's been sent through the mail, the metadata would be the

6    address, perhaps the postal division it went through, the address

7    of the sender on the back.  What it would not include would be

8    the content of the file.  Here, the content of the file is being

9    recorded by the government and set aside without a warrant.

10          Subsequent to that -- so, first, the data is recorded.

11   That data recordation, that copying of data and setting aside

12   without viewing it first, but moving it to the side and later

13   reviewing it, that, in my estimation, is a seizure of that data.

14   That's data that's being sent by ordinary citizens across an

15   entire system.  The government is sweeping up that data.  It is

16   distinguishing that data based on hash values.  Setting aside the

17   content streams that do not have hash values that relate to known

18   child pornography, the content of it, keeping and recording the

19   data that does, setting it aside for another search on down the

20   road.

21          So, first, they gather that data.  They search it and

22   they separate it based on hash values.  That data is copied.

23   Right?  So there's a seizure of that data.  That data is then

24   searched.  It's searched with an algorithm that's designed by Dr.

25   Levine -- right -- who did a remarkable job, no doubt, in the

1    work that he did.  But that algorithm is taking that data and it

2    is analyzing that data.

3           I would ask the Court how you analyze something without

4    searching it.  You certainly can't analyze a warrant affidavit

5    without searching it.  You have to search it for its meaning in

6    order to determine if it establishes probable cause.

7           In this case, one has to search the data to make a

8    determination.  That determination is who, in all statistical

9    probability, is the requester, as opposed to the relayer, of that

10   particular piece of information?  That algorithm has to conduct a

11   search to do that.

12          So there is a seizure of data.  There is a search of

13   that data.

14          The first search separates the data into two classes of

15   individuals, those with hash values that relate to child

16   pornography, those with hash values who do not.  That second

17   class of information of data is then searched again by an

18   algorithm.  That algorithm is designed to tell you, within some

19   degree of statistical probability, who is the requester, as

20   opposed to a relayer of that information.  Once that information

21   is known, the government goes and applies for a warrant.

22          My suggestion to the Court is that by virtue of copying

23   that data, setting aside that data, there is a seizure of that

24   data.  By virtue of running, by virtue of that original

25   demarcation or separation, there is a search of that data.  There

1      is a subsequent more refined, more, much more highly refined

2      search of that data by the algorithm.  Only then does the

3      government get a warrant.

4             To me, that's too late in the day.  Right?  There's

5      been a search, there's been a seizure of data that belongs to

6      private individuals in which they have a reasonable expectation

7      of privacy because it is related to content, not simply just

8      metadata.  So that's number one.

9             Number two.  Let's take a look at the warrant, which I

10     would have liked to question someone about, but I understand

11     we'll just look at what we have here.  So Dr. Levine testified

12     about two things.  It is critical to know how many blocks are

13     involved in a given file, that is how many blocks comprise the

14     total file, and how many blocks -- forgive me -- how many blocks

15     comprise the total file and how many blocks were requested by a

16     given individual to help determine, through the algorithm,

17     whether or not that individual is a relayer or a requester.  So

18     let's take a look at the affidavit.

19            So if the Court turns to Page 7, it says, quote:  "Your

20     affiant observed that, on a particular date, a computer running

21     the network software at IP address X requested from the network,

22     law enforcement notes, 84 parts or blocks of the file named" and

23     there's a file name with the hash tag.

24            Okay.  So I ask you, Your Honor, where does it tell me

25     in there the total number of blocks involved in that file?  All I

1    have are the number of blocks that were requested.  Dr. Levine

2    said there would be no way to make the probable cause, to make a

3    determination about who the requester is unless you knew the

4    total number of files.

5          Now, that same language is repeated on Paragraphs 7, 8,

6    and 9, in each and every one of the paragraphs that the

7    government says relate to specific probable cause.  So if this is

8    specific probable cause, it's omitting some rather important

9    information.

10          Now, the point is this.  A judge in a case, when they

11   issue a warrant, isn't supposed to simply say, well, could there

12   be probable cause?  A judge is supposed to make an independent

13   evaluation as to whether or not probable cause exists.  To make

14   an independent evaluation, a judge must know the information on

15   which probable cause is based.

16          Probable cause, in cases like this, where Freenet is at

17   use and the algorithm is being used, depend upon the number of

18   blocks requested in part, and the total number of blocks involved

19   in a given file.  If you only know one part of that information,

20   you cannot independently evaluate whether or not probable cause

21   exists.  You can say I will trust the officer, but that is not an

22   independent evaluation of probable cause.  That's trusting an

23   officer.  That is not the purpose of a search warrant.

24          So, for example -- well, I'll save this for a moment.

25          Now, another problem with the warrant that would, in my

1    estimation, according to Dr. Levine again, these agents are

2    trained in how to use modified Freenet.  There's a program they

3    go through.  They know what they're doing.  Presumably he would

4    know, that is Officer Rees would know, that to make the

5    determination as to whether or not an individual is a requester,

6    as opposed to relayer, you need to know the total number of

7    blocks.  By not providing that number to the judge, the judge

8    cannot make that particular determination.

9         Detective Rees should know, also, based on his training

10   and experience, that without that number, that determination

11   can't be made.  If that determination can't be made by the

12   officer, then a reasonable officer in his position should know

13   that the warrant is not sufficient on its face because the

14   probable cause determination cannot be made without that number,

15   without that figure.

16        That brings me to another point in the affidavit.  So

17   we look again, also on Page 7.  And this is the first paragraph,

18   Paragraph Number 1.  While reviewing requests received by

19   undercover law enforcement knows your affiant's observed IP

20   address, X, routing and/or requesting -- not sure which --

21   suspected child pornography file blocks.  And here is a critical

22   phrase -- forgive me -- sentence.  The number and timing of the

23   request was significant enough to indicate that the IP address

24   was the apparent original requester of the file.

25        Now, for it to be significant enough, you again not

1   only need to know the number of blocks requested, but the total

2   number of blocks that comprise the file, material that is

3   completely absent from the affidavit and which would make it

4   impossible for a judge to make an independent determination as to

5   whether or not probable cause existed in this particular case.

6          Number two.  Look at that sentence carefully.  The

7   number and timing of the request was significant enough.

8   Significant enough for whom?  Significant enough for the officer

9   who applied?  Because a judge can't make any determination about

10  what "significant enough" means.

11         Let's go back to my little example about the drug case

12  with the magistrate who is listening to an officer who applies

13  for a warrant.  And the officer says I've been camped out in

14  front of individual A's home, who lives on One Street, and I saw

15  people coming and going from that home.  And the rate at which

16  they were coming and going was significant enough for me to

17  determine that probable cause exists drugs are being sold from

18  the home.

19         Okay.  How many people is significant enough?  That

20  would not be information on which a judge could rely to determine

21  that the traffic to and from that home was, in fact, indicative

22  of drug activity.  It would be sufficient for the judge to

23  determine that it was enough for the officer, but certainly not

24  enough for the judge to make that independent evaluation that the

25  Fourth Amendment requires.

1          A judge is interposed between the officer and the

2   warrant because officers are engaged in a competitive event, and

3   that is to ferret out crime.  And you want to have a neutral and

4   detached magistrate to place themselves between them to make a

5   reasoned decision about whether or not probable cause exists.

6          Significant enough for whom?  That can't be sufficient

7   for a judge because a judge wouldn't know what "significant

8   enough" means.  I don't know what "significant enough" means.

9          Moreover, it can't mean much here because what leads to

10  a significant probabilistic outcome is knowing both the number of

11  blocks requested and the total number of blocks that comprise the

12  file.  And nowhere for any of the five, six, seven files that are

13  cited are the total number of blocks listed.  So how could

14  somebody make the determination based on just the information of

15  the blocks requested, but not the total number of blocks, that

16  this was sufficient enough or significant enough to establish

17  probable cause unless the judge was simply relying on the word of

18  the officer?

19          Now, I will grant you this is pretty long.  This has

20  got a lot of words in it.  But the number of words doesn't tell

21  you anything about what it actually says and whether or not it

22  conveys information that is significant to the probable cause

23  determination.  So, for example, the government notes that if you

24  look at Page 4, there are definitions.  Well, indeed there were

25  definitions.  They tell me something about what words mean.  That

1    is helpful.

2           On Page 5, there is some background.  That background

3    can be helpful, too.  It tells me about how the network

4    functions.  Largely functions in accord with what Dr. Levine had

5    to say earlier.

6           So, okay, we know something about how it functions.

7    What we don't know is how, really, the algorithm functions in any

8    particular way.  But what we do know from the testimony is that

9    the algorithm is useful only when you have certain data.  And to

10   evaluate whether or not probable cause in a case exists to

11   distinguish between a relayer and requester, you need a certain

12   amount of information to make that independent evaluation.  And

13   the information that's required to make that determination is

14   absent from this warrant.

15          So I think this warrant is complicated and I think the

16   issue is complicated.  And I think it would have been reasonable

17   for me to ask the judge, Cavanaugh, from the state if she truly

18   had understood what she read.  It's a factual question.  Maybe

19   she would have said yes.  Maybe she would have said no.  I'm not

20   allowed to ask that question, I understand.

21          But at this point we're left with the affidavit.  The

22   affidavit doesn't contain enough information.  The affidavit

23   tells you that it was significant enough for Officer Rees, but it

24   doesn't tell you why it was because it doesn't contain the

25   information Dr. Levine says you would need.

1          If the government wants to engage in search and

2     seizures that are somewhat complicated, they're certainly free to

3     do so.  I have no quarrel with that.  But what they need to do is

4     when they to supply a warrant or an affidavit to a judge to

5     obtain a warrant, they need to give the judge sufficient

6     information to make the determination.

7          All it would have needed to say was, here are the

8     number of blocks requested.  Here were the total number of blocks

9     in the file.  Based on an algorithm that determines a statistical

10    probability, we believe more likely than not that this is the

11    person who requested those files.  It doesn't say that.

12         It doesn't require some very technical, difficult

13    language.  Some very basic English would do.  But it's not in

14    there.  It needs to be for a judge to make an independent

15    probable cause determination.  That is the point of the Fourth

16    Amendment.

17         So I understand the Court isn't going to give me an

18    opportunity to write about my first argument, which is simply

19    that I do believe there was a search and seizure, at least

20    arguably, from the outset, that the government needed a warrant

21    to conduct.  We still live in a country governed by rules,

22    governed by laws.  The Fourth Amendment says before there's a

23    search and seizure of somebody's effects, papers, that a warrant

24    should issue.

25         I believe that effects and papers were seized and I

1    believe they were searched, and I believe they were done so

2    without a warrant.

3           Subsequent to that, a warrant was, a warrant was issued

4    by a state court judge, but that warrant as issued on an

5    affidavit that did not contain sufficient information for her to

6    make a probable cause determination.  And just as importantly, it

7    didn't have enough information for an officer who's trained in a

8    Freenet investigation -- did have enough information that he

9    should have understood that was lacking in probable cause on its

10   face because it didn't contain the information related to the

11   variables that are most important.  Only had half of the

12   equation -- the number of blocks requested, not the total number

13   of blocks.  And told the judge basically, rely on me, it was

14   significant enough.

15          Now, I'll make another point about this.  This has to

16   do with some of the cases the government pointed out in its

17   motion to, in limine to exclude Judge Cavanaugh.  There was a

18   conclusory statement.  To say that the, to say that the timing

19   and frequency was significant enough to make this determination

20   is a conclusory statement.

21          In Wilhelm, one of the cases pointed out by the court,

22   by the government in its motion in limine, the Fourth Circuit

23   upheld suppression of a warrant because the warrant was too

24   conclusory.  The court said the judge abdicated her role or his

25   role, in that case, as a neutral and detached magistrate because

1    the judge simply relied on conclusory statements.

2            If there are 10,000 statements in here, it matters not

3    if the statements that are important to the probable cause

4    determination are insufficient.  And the statements that are

5    important here for the probable cause determination are

6    insufficient and conclusory.  Significant enough to determine who

7    the likely requester was.  It doesn't -- I don't want to get

8    overly repetitive.  I'm afraid I'm already there.

9            I don't know how a judge can say I'm making an

10   independent evaluation based on this person telling me that it

11   was significant enough.  How is a judge to independently evaluate

12   that something is sufficient when all they know is someone else

13   says it's significant enough?

14           So --

15           THE COURT:  Mr. Johnson, do you want to say something?

16           MR. JOHNSON:  No, Your Honor.

17           MR. FEIN:  Forgive me, Your Honor.  One moment.

18           (Pause while Mr. Fein confers with the defendant.)

19           MR. FEIN:  So Mr. Hall reminded me of something

20   important, too.  So forgive me.  This is why I really wanted to

21   provide something in writing to the Court, because I think

22   there's a lot to say about these issues that really can't be,

23   that territory can't be meaningfully covered in 20 or 30 minutes.

24   And I don't want to take the Court's whole day.

25           I would like to provide the Court something in writing

1    about this because I think it's a meaningful and important issue.

2          If you take a look at the -- well, I can barely read

3    that.  Forgive me.  Okay.  So forgive me.  It's just the first

4    page of Government's Exhibit M-1.  And it's the first page of

5    Freenet.  Right on there it says that Freenet, browse Freenet

6    user with heightened security, with significant security.

7          But again, if you go over to the warrant -- this is

8    going back to different issue.  I guess this is going back to the

9    government's claim that because Mr. Hall is a sophisticated man

10   when it comes to computers, he would forego any subjective

11   expectation of privacy which, to me, I don't think there's any

12   case law that would support that.

13         But if you look at Page 5, Paragraph B, it says the

14   network is distributed in an internet peer-to-peer network, which

15   attempts to let a user anonymously share files.  Communications

16   between computers.  The very communications that are intercepted

17   by the modified Freenet are encrypted and routed through other

18   networks, making it difficult to determine who the requester is.

19         The whole point of Freenet is to provide an anonymous

20   system by which individuals can share information.  Was developed

21   by a gentleman in Ireland.  And the point was for people in

22   political repressed societies to be able to share information

23   without necessarily having the government know what they're

24   sharing.

25         In any event, you can see from the affidavit and the

1    writing I'll file to reconsider later, I guess, I'll point out in

2    the affidavit where it talks about the anonymity that is expected

3    by its users, like Mr. Hall and all others, and the encryption

4    that is involved, that Dr. Levine testified to.

5            In any event, Your Honor.  I think it's a complicated

6    matter.  I think it's a serious matter.  I think a warrant was

7    needed from the outset.  I think the affidavit is insufficient,

8    insufficient for a judge to make the probable cause determination

9    based on the language.  I think that a reasonable, reasonably

10   objective officer in the position of Detective Rees, who's been

11   trained in, presumably, in the modified Freenet investigation

12   technique, should have known that it would be important for a

13   judge to make an independent evaluation based on the number of

14   blocks requested and the total number of blocks in the file since

15   that is a critical piece of the information.

16           So for today, I'll leave it at that, Your Honor.  I'll

17   ask the judge to recognize that a warrant should have been issued

18   at the outset.  I will ask the judge to recognize that the

19   warrant is, affidavit from the perspective, the affidavit is

20   insufficient from the perspective of an objectively reasonable

21   officer.  I'll ask the judge to recognize that the ultimate

22   language relates, was conclusory and rendered it impossible for

23   the judge to make an independent evaluation of probable cause.

24           THE COURT:  Well, I'm going to deny the motion to

25   suppress.  To the extent that there's an allegation that the,

1    that the pre-warrant investigation was improper, I credit Dr.

2    Levine's testimony that Freenet, in terms of what it warns,

3    makes, makes the information not private, and there's no

4    expectation of privacy.

5              In terms of the affidavit, it's fully sufficient to

6    satisfy the elements of probable cause.  I will say that even if

7    it weren't, the issuance of the warrant would be sufficient under

8    Leon.

9              Pages 7 to 10 of the affidavit are replete with

10   probable cause to believe that child pornography was involved.  I

11   am not persuaded that the judge had to understand or get into the

12   number of blocks that were involved.  I mean, it's, it's there in

13   the affidavit.  And the judge could rely upon it to establish

14   probable cause.

15             So I deny the defendant's motion to suppress evidence.

16             MR. BUDLOW:  Thank you, Your Honor.  Move on to the

17   next motion, which is the defendant's motion to suppress the

18   defendant's statement.  The government calls Detective Joshua

19   Rees.

20             MR. FEIN:  If I may, just for the record, Your Honor,

21   just to object to the Court's ruling.

22             THE COURT:  Of course.

23             MR. FEIN:  In addition, would it be okay with the

24   Court, I would like to file a motion to reconsider.  May I have

25   time to do so?

1          THE COURT:  You can may file a motion to reconsider.

2          MR. FEIN:  Thank you, Your Honor.

3          THE CLERK:  Good afternoon, sir.  Please raise your

4     right hand.

5          DETECTIVE JOSHUA REES, GOVERNMENT'S WITNESS, SWORN

6          THE WITNESS:  Yes, I do.

7          THE CLERK:  Thank you.  You may have a seat.  Please

8     state and spell your full name for the record.

9          THE WITNESS:  Detective Joshua Rees.  J-O-S-H-U-A.

10    R-E-E-S.

11         THE CLERK:  Thank you.

12         MR. BUDLOW:  Your Honor, I apologize for the bad

13    timing.  But if you were planning on an afternoon recess, now

14    would be a pretty good time.

15         THE COURT:  You want to take a recess?

16         MR. BUDLOW:  Yes, please.

17         (Recess at 3:04 p.m. Resume at 3:13 p.m.)

18         THE COURT:  Yes, Mr. Budlow.

19         DIRECT EXAMINATION

20    BY MR. BUDLOW:

21    Q    Detective Rees, good afternoon.

22    A    Yes, sir.

23    Q    Tell us how you're employed.

24    A    I'm employed by the Baltimore County Police Department.

25    Q    And tell us how long you've been employed by the Baltimore

1    County Police Department, and just an overview of the different

2    assignments you've had since you've been there.

3    A    Yes, sir.  I've been employed with the Baltimore County

4    Police Department since March of 2001.  I worked uniform patrol

5    until June of 2007.  June of 2007, I was assigned to the Violent

6    Crimes Unit until March of 2008.  I was assigned to the Crimes

7    Against Children's Unit, which is where I still currently work.

8    Q    And what did you do before you were in the Baltimore County

9    Police Department?

10   A    I was a minor league baseball umpire.

11   Q    I want to ask you if you were the lead detective into the

12   investigation that led to the search warrant at ▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮  in Reisterstown, Maryland?

14   A    Yes, sir, I was.

15   Q    And that occurred on September the 7th, 2016, the execution

16   of that warrant?

17   A    Yes, sir.

18   Q    And when you executed the search warrant, was an individual

19   named Martin Hall present in the residence?

20   A    Yes, sir.

21   Q    Did you ultimately conduct an interview of Mr. Hall during

22   that execution of that search warrant?

23   A    Yes, I did.

24   Q    Do you see Martin Hall here in the courtroom today?

25   A    Yes, I do.

1    Q    Could you point to him and identify him for the record?

2    A    He is seated in the middle of that table, wearing a maroon

3    jumpsuit.

4    Q    For the record, identifying the defendant, Your Honor.  Can

5    you tell His Honor about when and how the search warrant was

6    initially executed?

7    A    Yes, sir.  The search warrant was a knock and announce

8    warrant.  It was executed at approximately 5:00 on the morning on

9    September 7th of 2016.  Myself and other members from my unit

10   were present for the service of the search warrant, along with a

11   uniformed police officer and a marked police car.

12            I knocked and announced on the door at ▓▓▓▓▓▓▓▓

13   and announced, "Police, search warrant."

14   Q    It's 5 a.m., you knocked on the door, "Police, search

15   warrant."  I'm assuming you didn't say it in the same tone of

16   voice you just said it now?

17   A    No, sir, I did not.

18   Q    What tone of voice did you use?

19   A    Very loud.

20   Q    What happened?

21   A    Eventually, we got an answer at the door from Mr. Hall.

22   Q    And can you describe how many people were at the door, what

23   they were wearing, the status of their weapons, things like that?

24   A    Sure.  At the door would approximately be five or six

25   people.  The marked police car was parked in the driveway of the

1    home with its red and blue light flashing to make sure they knew

2    we were the police department.

3              At the time that I knocked and announced, my weapon's

4    holstered.  Behind me would be two detectives with shields and

5    their weapons would be unholstered.

6    Q    And in what position?

7    A    In like a low ready position.

8    Q    What does that mean?

9    A    Kind of held down by their leg.  Not pointed at anybody in

10   particular.

11   Q    And is what you've described so far in terms of the knock

12   and announce and the way the house was approached and status of

13   weapons routine procedure for the execution of a search warrant

14   in Baltimore County?

15   A    Yes, sir.

16   Q    What happened when the defendant came to the door?

17   A    He was asked to step outside.

18   Q    And did he do so?

19   A    Yes, he did.

20   Q    Make any comments at that time?

21   A    Just asked what we were there for.  We said we have a search

22   warrant and asked him to step outside.

23   Q    What happened next?

24   A    His wife came down the stairs behind him and she was asked

25   to step outside.

1    Q    And then what?

2    A    We asked him if there's anyone else in the home before we

3    enter the home and clear it.

4    Q    What does it mean to enter the home and clear it?

5    A    To search the home for other people.

6    Q    And did that occur?

7    A    Yes, it did.

8    Q    Roughly how long did that take?

9    A    It took approximately 15 minutes.  It's a larger home.

10   Q    Can you describe the home?

11   A    A colonial style home.  You enter into a foyer with stairs

12   that go straight up to the second level.  There was a living room

13   to the right, an office to the left as you entered the home.  On

14   the other side of the living room, if you went past the living

15   room, was a dining room.  And that would all be on the right side

16   of the first floor.  If you go into the house to the left past

17   the stairs, you come into the kitchen, where there was a family

18   room and then like a breakfast or eat-in kitchen area behind the

19   kitchen.

20        Upstairs were several bedrooms.  The master bedroom was

21   the furthest bedroom to the left upstairs.  Before you got to the

22   master bedroom was a smaller guest bedroom.  And then I believe

23   there were two other bedrooms upstairs, one kind of straight

24   ahead and one to the right.

25   Q    Four bedrooms upstairs?

1    A    I believe there were four.  I could refer to the sketch to

2    give you an exact number.

3    Q    That's okay.  Was there a basement?

4    A    Yes, there was a basement, a finished basement.

5    Q    You said finished or unfinished?

6    A    It was completely finished.

7    Q    This was a large home?

8    A    Yes, it is, in my opinion.

9    Q    And what size plot of land was it on?

10   A    A rough guess for me would be three-quarters of an acre.

11   Maybe there's more because I believe there's a wood line in the

12   back.

13   Q    So when the house was cleared, meaning the officers went in

14   to make sure there was nobody else present, in fact, that's what

15   they found out?  That nobody else other than the defendant and

16   his wife were present?

17   A    That's correct.

18   Q    Where did they remain during the time of the house being

19   cleared?

20   A    They were out front.

21   Q    So after that 10 to 15 minutes of clearing the house, what

22   occurred next, specifically with respect to the defendant and his

23   wife?

24   A    They were asked to come back in and asked to have a seat on

25   the red couch in the living room.

1   Q    Other than being asked to step outside the home, when they

2   were outside the home were they restrained in any way?

3   A    No, sir.

4   Q    Were they physically handled in any way?

5   A    No, sir.

6   Q    And what about in terms of how they got from outside back

7   inside the home?

8   A    They were asked come back inside.

9   Q    And did they?

10  A    Yes, they did.

11  Q    And again, were they restrained in any way, handcuffs or any

12  other forms of restraint?

13  A    No, sir.  At no time was anyone handcuffed.

14  Q    And did they agree to come inside the home?

15  A    Yes, they did.

16  Q    Where did they go?

17  A    To the living room.

18  Q    What did they do there?

19  A    They sat on the couch.

20  Q    And what did you do?

21  A    I went, after that home was cleared, I went back outside to

22  my vehicle, took my vest off, and got my case folder.

23  Q    And did you go back inside?

24  A    Yes, I did.

25  Q    Can you describe the scene, what it was like inside when you

1   went back in?

2   A     I went back inside.  The other members of our squad had

3   their vests off.  And the beginnings of the search warrant

4   procedure were taking place.  Pictures were being taken.  There

5   were people doing assigned duties at the beginning of a search

6   warrant.

7   Q     And specifically what was going on inside the living room

8   where the defendant and his wife were seated?

9   A     I was talking to them.  I read them the search warrant.

10  Q     But as you first walk in, before you're reading the search

11  warrant at the scene, hectic because there's a lot going on?  Is

12  it more calm, more loud?

13  A     It's more calm.  It's not loud.

14  Q     Can you tell us again what you did?

15  A     I read them the search warrant out loud.

16  Q     Meaning the entire affidavit or just the part that

17  authorized the search?

18  A     Just the part that authorized the search.

19  Q     And how many pages is that?

20  A     Three.

21  Q     Did you introduce yourself first?

22  A     Yes, I did.

23  Q     Who did you tell them you were?

24  A     Detective Rees from Baltimore County Police Department.

25  Q     Did you tell them which division you were in or what types

1    of cases you handled?

2    A     Not at that time.  I did not tell them I was from Crimes

3    Against Children.

4    Q     Then you read the entire search warrant itself.  How many

5    pages did you say that was?

6    A     Three pages.

7    Q     All right.  Does it include the types of crime or types of

8    evidence that you would be looking for in the search?

9    A     Yes, it does.

10   Q     What did you do after you read the search warrant out loud?

11   A     I asked them if they had any valuables or large sums of

12   money that they wished to have brought out and set before them,

13   before we search.

14   Q     And what did they say?

15   A     They said that they did not.

16   Q     What was your tone of voice during this time when you read

17   the search warrant and asked them about valuables?

18   A     It was conversational.

19   Q     What did you do next?

20   A     I advised them of their rights per Miranda.

21   Q     When you say you advised them of their rights per Miranda,

22   first of all, do you know those rights by heart?

23   A     I do know them by heart, but I read them from a card.

24   Q     And do you carry the card with you in your wallet or your

25   identification whenever you're on duty?

1    A    In my case folder.

2    Q    And so in this case, did you pull the card out and literally

3    read from the card?

4    A    Yes, I did.

5    Q    And do you have it with you?

6    A    Yes, I do.

7    Q    Could you read it for us now the way you read it to them on

8    September the 7th, 2016?

9    A    Yes.  You have the absolute right to remain silent.

10   Anything you say can and will be used against you in a court of

11   law.  You have the right to talk with a lawyer at any time before

12   and during any questioning.  If you want a lawyer and cannot

13   afford one, you can request the Court to appoint a lawyer prior

14   to any questioning.  If you agree to answer questions, you may

15   stop at any time and no further questions will be asked of you.

16   Q    And what happened after you read those rights to the

17   defendant and his wife?

18   A    I asked them both if they understood their rights.

19   Q    You asked them together as a group or individually?

20   A    Together as a group, but I looked at each one of them for

21   acknowledgement.

22   Q    Do you remember what you said to, how you asked them if they

23   understood their rights?

24   A    Do you understand your rights?

25   Q    And did the defendant respond?

1   A     He said yes.

2   Q     And did his wife respond?

3   A     Yes, she did.

4   Q     What did she say?

5   A     She said yes.

6   Q     During that period of time, did anybody mention an attorney

7   or desire to see an attorney or talk to an attorney?

8   A     No, sir.

9   Q     What happened next?

10  A     I asked them if there's anyone else that resides in the home

11  that was not there at that time.

12  Q     Did you get a response?

13  A     Yes.

14  Q     What was the response?

15  A     That there is not.

16  Q     And then?

17  A     I asked them who their internet service provider is.

18  Q     And what, if anything, did the defendant -- well, first of

19  all, how did you ask that question?

20  A     Who is your internet service provider.

21  Q     And did the defendant provide a response?

22  A     Yes, he did.

23  Q     What did he say?

24  A     I do not want to answer that question.

25  Q     I do not want to answer that question.  That was his

1    response?

2    A    Yes, sir.

3    Q    Did he say anything to you else other than that at that

4    moment in time?

5    A    No, sir.

6    Q    Did his wife say anything to you in response to that

7    question, who is your internet service provider?

8    A    No, sir.

9    Q    Is that a question -- so far, what you've described, is this

10   a routine that you do -- this is a bad question.  I have to

11   rephrase that.  Is this the procedure that you do regularly when

12   you execute a search warrant?

13   A    Yes, sir.

14   Q    What happened next?

15   A    Next we asked Mrs. Hall to come to the kitchen area.

16   Q    And can you describe how you asked her and what happened?

17   A    Could you please come to the kitchen with me?  And she did.

18   Q    Did she respond verbally or did she just get up and follow

19   you to the kitchen?

20   A    She got up and followed me.

21   Q    And then where is the kitchen in relation to the living room

22   where Mr. Hall was, the defendant?

23   A    You go back to a room, to the dining room, and then I

24   believe left was the kitchen.  And I think we went in past the

25   kitchen, eat-in kitchen area.

1   Q    Without telling us the substance of it, what occurred when

2   you were with the defendant's wife in the kitchen?

3   A    I had spoke to her about the internet in the home, the

4   computers in the home, who uses what computer, where the

5   computers are.  And I explained what we call the triage process.

6   Q    Did she answer your questions?

7   A    Yes, she did.

8   Q    And roughly how long were you with her?  And this would have

9   been outside the defendant's presence?

10  A    Yes, sir.  At that, that interview, maybe 10 minutes at the

11  most.

12  Q    And where was the defendant during those at the most 10

13  minutes?

14  A    In the living room on the couch.

15  Q    Was anybody with him?

16  A    Lieutenant Wiedeck.

17  Q    When did the initial interaction with the defendant and his

18  wife take place in terms of you advising them of their Miranda

19  rights?  Roughly what time was that?

20  A    That would be approximately 5:15 in the morning.

21  Q    When you finished talking to Mrs. Hall sometime a little bit

22  after that, I think you said up to ten minutes after that, where

23  did she go?

24  A    She went with Detective Keaton.  I don't know where exactly

25  she went.  I turned my focus to other things.

1    Q    Do you know if the defendant remained in the living room

2    where he was?

3    A    Yes, he did.

4    Q    Generally, can you describe just an overview of what

5    occurred from roughly 5:20 or 5:25 in the morning, for the next

6    three hours?

7    A    The, what we call the forensic triage process and the

8    search.

9    Q    And did your search and forensic triage focus on a

10   particular area of the house?

11   A    Yes.  It ended up focusing on the office in the basement.

12   Q    And what were you doing during those three hours?

13   A    Conducting forensic triage of a laptop computer with a hard

14   drive attached to it, as well as other computers.  There were

15   multiple computers and devices in that office.  So I was

16   assisting Detective Raut and Forensic Supervisor Coleman with the

17   forensic triage.

18   Q    Did you remain in the basement the entire time or were you

19   walking in other places throughout the home?

20   A    I think I went back upstairs maybe once or twice, but

21   essentially remained in the basement.

22   Q    And when you went upstairs, did you see the defendant?  If

23   so, can you tell us what he was and what he was doing?

24   A    He was seated in the living room on the couch.

25   Q    As far as you know, was he free to leave?

1    A    As far as I know, he was free to leave, yes.

2    Q    Was he restrained in any way?

3    A    No, sir.

4    Q    Did you notice any handcuffs on him?

5    A    No.

6    Q    Were any of the officers that you saw in his presence

7    displaying firearms or other weapons?

8    A    No, sir.

9    Q    And if they had them, do you know where they were?

10   A    If -- I'm sorry.  The question?

11   Q    Do you know if they were armed?

12   A    All the officers were armed, yes.

13   Q    Do you know how they displayed, how they carried their

14   firearms at that time?

15   A    Our, the people I work with in my squad, we wear jeans and

16   T-shirts, essentially.  So our guns are covered by T-shirt or

17   whatever shirt we're wearing.

18   Q    And is that a conscious decision to cover the firearms?

19   A    Yes.

20   Q    Did you notice if, during that period of time, any time

21   during the three hours that we're referring to after you spoke to

22   the defendant's wife, if anybody was speaking to the defendant?

23   A    I'm not aware if anyone was.

24   Q    And did you see him speaking to anyone else?

25   A    I did not see him speaking to anyone else.

1    Q    Did there come a time when you asked the defendant to speak

2    to you?

3    A    Yes.

4    Q    And approximately what time was that?

5    A    It was approximately three hours later.  Sometime around

6    8:30 in the morning.  I don't know the exact time off.  I think

7    it would be maybe documented.

8    Q    Do you have a record that would, do you have any documents

9    with you that would refresh your recollection as to when it was

10   that you, approximately when it was that you initiated the

11   conversation?

12   A    I don't think I have a document that I have with me at the

13   moment that says that.  I know it was sometime around 8:30 in the

14   morning.

15   Q    And where was the defendant at the time that you initiated

16   this conversation?

17   A    In the living room on the couch.

18   Q    Tell us what you did.

19   A    I asked him if I could speak with him.

20   Q    And then?

21   A    He said yes.  And then we went upstairs to the first bedroom

22   on the left.

23   Q    How did you manage that?  Did you ask him to follow you?

24   Did you tell him where to go?

25   A    I don't remember my exact words, but I know I went up first.

1    Maybe I asked him to follow me.  I asked him to come upstairs.

2    Q    And who were you with, if anyone, other than the defendant?

3    A    Detective Adamski at the beginning of that.

4    Q    All right.  When you asked him if he would speak with you,

5    what did he say, if anything?

6    A    He said he would.

7    Q    And then he followed you upstairs?

8    A    Yes, sir.

9    Q    Where did you go upstairs?

10   A    The first bedroom on the left.

11   Q    Did the defendant display any hesitation to speak with you

12   or to follow you upstairs into the bedroom?

13   A    No, sir.

14   Q    And can you describe the bedroom where the interview took

15   place?

16   A    There was a bed on the right up against the wall.  At the

17   foot of that bed there was a space and then a closet.  The wall

18   that the bed was up against, at the far end of the room, there

19   was a window and a chair.  I sat in that chair there by the

20   window.

21   Q    Where was the other detective?

22   A    Detective Adamski, I believe, was over on the side where the

23   bed was.

24   Q    And where did the defendant sit?

25   A    He sat in a chair closest to the door.

1   Q    And was the door open or closed?

2   A    It was closed.

3   Q    And do you know if the door had a lock on it?

4   A    I don't know if it had a lock.

5   Q    Was the door locked?

6   A    Not that I was aware of.

7   Q    And how did you decide who sat where?

8   A    I don't know how I made that decision.  I think because I

9   walked in the room first, I sat in the furthest chair.

10  Q    And was the defendant in custody in any way during the

11  interview?

12  A    No, he was not.

13  Q    Was he told that he had to participate in the interview or

14  told that he had to answer your questions?

15  A    No.

16  Q    Was the interview recorded?

17  A    Yes, it was.

18  Q    Was the defendant advised of his Miranda rights again at the

19  beginning of this interview?

20  A    Yes, he was.

21  Q    And why is that?

22  A    That's our standard procedure, is to advise everyone of

23  their rights before we interview them.

24  Q    Even after, it's also your standard procedure to advise them

25  initially as a group?

1    A    Yes, sir.

2    Q    When you advised him of his rights a second time, did he

3    appear to understand you?

4    A    Yes, he did.

5    Q    Did he agree to speak with you even after being advised of

6    his Miranda rights?

7    A    Yes.

8    Q    Madam Clerk, could we switch to the government's computer?

9    Detective Rees, have you had an opportunity to listen to the

10   recording of this interview?

11   A    Yes, I have.

12   Q    Is it consistent with your memory of the activity?

13   A    Yes, sir.

14   Q    So, Detective, I want to reference this file that you're

15   looking at on the computer right now, which is a VLC file.  First

16   of all, are you familiar with video files such as VLC media

17   files?

18   A    Yes.

19   Q    And have you listened to this recording that, at least on

20   this computer, is named Martin Hall?

21   A    Yes, I have.

22   Q    And do you know generally, have you noticed if, when you

23   take the recordings and put them on to the computer, if the time

24   and date stamp on the file is generally accurate?

25   A    Yes, because my audio recorder, I set the date and time and

1    I make sure that that's accurate.

2    Q    In looking at this screen in front of you, does that reflect

3    the same date that the search warrant was executed in this case?

4    A    Yes, it does.

5    Q    And what is the time that you see indicated as the date of

6    this file?

7    A    8:56 a.m.

8    Q    Do you know if that's the beginning or the end of the

9    recording?

10   A    That would be the beginning.

11   Q    And how do you know that's the beginning?  Is that based on

12   the length of the interview?

13   A    Because that's when the file was created.

14   Q    And your experience is the file names on these reflect the

15   correct date and the correct start date of the recording?

16   A    Yes.

17   Q    Court's indulgence.  Your Honor, at this time I would ask

18   Ms. Shoop to play the first minute-47 of this.  Before she hits

19   play, I would point out to the Court that in Government's Exhibit

20   M-7 that Your Honor has, and I can provide another copy if you

21   need it, it has a transcript, it is a transcript that includes

22   this first roughly minute and 47 seconds --

23              THE COURT:  Okay.

24              MR. BUDLOW:  -- that we will be playing.  Go ahead.

25   Thank you.

1          (Audio playing.)

2     BY MR. BUDLOW:

3     Q    Detective, you heard the recording, right?

4     A    Yes, sir.

5     Q    In the introduction, you confirmed that you had previously

6     read the defendant his rights?

7     A    Yes, sir.

8     Q    You also said that you had asked him about the internet

9     provider, right?

10    A    Yes, sir.

11    Q    And on the recording, you said that Hall had told you that

12    he didn't want to answer any more of your questions.  That's what

13    you said, right?

14    A    Yes, sir.

15    Q    But you testified just a few moments ago that you, that he

16    told you that he didn't want to answer "that question."  Can you

17    explain the difference, why the recording says "you didn't want

18    to answer any of my questions", but you've testified that it says

19    "you didn't want to answer that question relating to the internet

20    service provider?"

21    A    Yes, sir.  And it's also documented in my police report and

22    the statement of charges exactly what was said.  At that point I

23    think we were roughly four hours into this search warrant.  We

24    had encountered some complex situations with the hard drives and

25    the data there, and the investigation was evolving from a child

1   pornography possession to possibly international travel and

2   sexual abuse of children.

3          At that point, I made a generalized statement to Mr.

4   Hall in an effort to engage him.  I wasn't focused on quoting

5   what he had said earlier.  I was just more focused on

6   generalizing what had happened prior, making sure that he

7   understood everything that happened prior that led up to where we

8   were, and going from there.

9   Q   And is there any doubt in your mind sitting here today as to

10  what his response to your question of who the internet provider

11  was?

12  A   There is no doubt in my mind.

13  Q   And what was that response?

14  A   That he did not want to answer that question.

15  Q   And you mentioned in your answer a moment ago that you had

16  documented it in the police report and the Statement of Charges,

17  which is an application for Statement of Charges.  You filed it

18  the same day?

19  A   Yes, sir.

20  Q   Under oath?

21  A   Yes.

22  Q   And how did you --

23  A   It was later that day.

24  Q   I'm sorry for cutting you off.  How did you describe his

25  response to your question in those documents?

1    A    I wrote that he stated that he did not want to answer that

2    question.

3    Q    How long did this interview last?

4    A    This particular interview here was approximately an hour and

5    11 minutes.

6    Q    Can you just describe generally how the interview proceeded

7    in terms of the format and the topics?  We don't need to go

8    through everything that was said.

9    A    The format was a very conversational dialogue, mutual

10   dialogue where Mr. Hall was asked about, obviously, Freenet and

11   some technical things about his computers and hard drives.  He

12   was asked about his travel.  He was asked about his child

13   pornography activity.  He was asked, you know, a multitude of

14   topics based on things that we had seen during the forensic exam

15   on scene.  And he engaged me as well in his computer knowledge

16   and things like that.

17   Q    Did he ask you questions, also?

18   A    I think he did ask me some questions, yes.

19   Q    During this roughly hour and 11 minutes, did, were any

20   breaks taken?

21   A    Yes.

22   Q    Can you explain why that was and what happened?

23   A    Mr. Hall asked to go to the bathroom.

24   Q    Did he go to the bathroom?

25   A    Yes.

1    Q    And how did he get there and where's the bathroom in

2    relation to the bedroom where the interview was taking place?

3    A    If I remember correctly, the bathroom was across the hall.

4    And he was told he could go in and go to the bathroom.

5    Q    And who, if anyone, escorted him to the bathroom?

6    A    I did not escort him.  I think at that point Detective

7    Adamski was still in the interview.  He probably walked Mr. Hall

8    out.  No one went into the bathroom with him.  We don't go into

9    the bathroom with people.  We make sure the bathroom's been

10   searched, there's nothing in there.  We let them go in.  So no

11   one stands guard inside the bathroom or anything like that.

12   Q    He was allowed to close the door when he was in the

13   bathroom?

14   A    Yes.

15   Q    Did anyone else enter the room during the interview?

16   A    Yes.  At that break, I believe Detective Adamski had to

17   leave for court and Lieutenant Wiedeck came into the interview.

18   Q    And during this interview, did the defendant appear to

19   understand that the interview was voluntary?

20   A    Yes.

21   Q    And that he didn't have to answer your questions?

22   A    Yes.

23        MR. FEIN:  I object, Your Honor.  That calls for a

24   conclusion.

25        THE COURT:  Overruled.

1   BY MR. BUDLOW:

2   Q    Did there come a time specifically where he demonstrated his

3   understanding that he didn't have to answer your questions?

4   A    Yes, there did.

5   Q    Describe it.  Go ahead.  You describe it first.

6   A    I asked Mr. Hall for the encryption password for his

7   external hard drive.

8   Q    Your Honor, I draw your attention to the last two pages of

9   the Exhibit M-7, which is, although it's not this long of an

10  exhibit, it's marked as Pages 36 and 37 of the transcript.  And

11  specifically, it's going to pick up probably three lines from the

12  bottom.  If you could play -- roughly, this is one -- I'm sorry.

13  It's at timestamp 4739, is what we're going to play.

14          (Audio playing.)

15  BY MR. BUDLOW:

16  Q    Did he ever provide you with that password?

17  A    No, sir.

18  Q    Can you describe the defendant's demeanor throughout the

19  interview?

20  A    He was conversational, appeared to understand everything

21  that was going on.

22  Q    Can you describe his physical appearance at the time?

23  A    His physical appearance at the time?  He appeared alert.  He

24  did not appear to be under the influence of any alcohol or drugs.

25  He appeared to be in a normal state.

1    Q    Now, this was early morning.  You said you entered roughly 5

2    a.m., is that right?

3    A    Yes, sir.

4    Q    This was a few hours later, maybe four hours later.  Did he

5    seem to have woken up enough that he could understand what was

6    going on?

7    A    Yes, sir.

8    Q    Do you know how old he was at the time?

9    A    Do I know what, sir?

10   Q    Do you know how old the defendant was at the time of this

11   interview?

12   A    I believe he was in his early fifties.  I could look at the

13   date I have to see the exact age.

14   Q    Close enough.  Did he tell you how he was employed or what

15   he did for a living?

16   A    Yes, he did.

17   Q    What did he say?

18   A    He told me that he travels the world teaching Java,

19   predominantly in India and the Philippines.  He also teaches Java

20   and computer programming here in America as well.

21   Q    Detective, can you describe your demeanor and the other two

22   detectives' demeanors throughout the interview?

23   A    It was relaxed and conversational.

24   Q    At any time during the interview did the defendant ever ask

25   to have the interview ended or stop the interview?

1    A    No, he did not.

2    Q    What would you have done if he had asked?

3    A    I would have stopped the interview.

4    Q    Other than this one question relating to the encryption

5    password and the one that you told us about at the beginning of

6    the morning, did he refuse to answer any other questions?

7    A    No.

8    Q    Would you have described him as cooperative throughout the

9    interview?

10   A    Yes.

11   Q    Was his freedom to move restrained in any way from the time

12   you entered until the end of the interview?

13   A    No.

14   Q    Was he ever told that he could not leave?

15   A    No.

16   Q    Did you or the other detectives, other than entry into the

17   house at the execution of the search warrant, ever display your

18   firearms?

19   A    No, sir.

20   Q    At any time throughout this morning did the defendant ever

21   request to speak to an attorney?

22   A    No, sir.

23   Q    Did he ever ask anything about an attorney?

24   A    No, sir.

25   Q    Was the defendant threatened in any way to get him to

1    provide information?

2    A    No, sir.

3    Q    We're he made any promises so that he was promised something

4    in exchange for providing this interview?

5    A    No, sir.

6    Q    How did the interview end?

7    A    The interview came to a conclusion where I think I was done

8    asking him questions.  I explained the items that we were going

9    to seize.  I explained that he was going to be arrested and what

10   the arrest process was.  And then he asked some questions about

11   contacting a place that he was supposed to be teaching soon

12   thereafter, and wanted an e-mail address to try to let them know

13   he wouldn't be there.

14   Q    And at the end of the interview, around the time that you've

15   just described, did you ask the defendant how he thought he was

16   treated by you and the other detectives?

17   A    Yes, I did.

18   Q    What did he say?

19   A    I asked him if he thought he had been treated fairly and he

20   said yes.

21   Q    After the interview concluded, what did you do next?  I

22   guess, let me ask it another way.  Was the search still ongoing?

23   Was the search completed at that time?

24   A    The search was still ongoing.

25   Q    Did you continue to participate in the search?

1    A    Yes, sir.

2    Q    At some point around there was the defendant, was he

3    immediately arrested at the end of the interview?

4    A    He was not immediately arrested at the end of the interview.

5    Q    What happened to him after the interview?

6    A    He went back downstairs to the living room.

7    Q    In cuffs?  Not in cuffs?

8    A    Not in cuffs.

9    Q    You did say --

10   A    He was not handcuffed until a uniformed police officer came

11   to transport him to the precinct.

12   Q    Thank you, Detective Rees.  Your Honor, that's all I have at

13   this time.

14            THE COURT:  Mr. Fein.

15            CROSS EXAMINATION

16   BY MR. FEIN:

17   Q    Thank you, Your Honor.  The search warrant execution, that

18   was a planned event, correct?

19   A    Yes, sir.

20   Q    And prior to the 7th, I assume there was a team that

21   gathered in preparation for execution of the search warrant?

22   A    Yes, sir.

23   Q    How many members belonged to that team?

24   A    There are four detectives on my squad and a sergeant.  For a

25   typical search warrant, we think we take eight people.

1    Q    How many people came on this occasion?

2    A    I have to refer to my report and count the amount of people,

3    if that's okay.

4    Q    Of course.

5    A    There were eight detectives from my unit, a civilian

6    forensic supervisor, and one uniformed police officer at the

7    entry.

8    Q    That would be 10 people in all?

9    A    Yes, sir.

10   Q    And prior to the 7th or on the morning of the 7th, you

11   didn't go to the home unprepared, correct?

12   A    Correct.

13   Q    You had a diagram of the house?

14   A    No, sir, I did not have a diagram.

15   Q    Did you have an idea how many people may live in that house?

16   A    Yes.

17   Q    Did you, in fact, have photographs of the people who live in

18   the house, correct?

19   A    Yes.

20   Q    And that would be Mr. Hall's wife, correct?

21   A    Yes.

22   Q    An adult son?

23   A    I did have a photograph of him, yes.

24   Q    And an adult daughter?

25   A    Yes.

1   Q    Okay.  Did you have a general idea of the layout of the

2   house?

3   A    No.

4   Q    Did you have a plan about how people would maybe enter the

5   home, or no?

6   A    How we would enter the home?

7   Q    Um-hum.

8   A    Yes.

9   Q    Yes.  Forgive me.  And you arrived at, did you say 5:30

10   a.m.?

11   A    5:00 a.m.

12   Q    Five a.m.  And there's a reason you show up at 5 a.m.,

13   correct?  There's a -- A, the person might be home but, B,

14   there's a surprise element there, correct?

15   A    The first question you asked me was is there a reason that

16   we show up at 5 a.m.  The answer is yes.  And the second question

17   you asked me was is there, is there a surprise element?

18   Q    Well, there's two points.  One is a person's likely to be

19   home at that hour, correct?

20   A    Yes.

21   Q    But there's also a surprise element if you come at an early

22   hour like that, correct?

23   A    I think most people are surprised any time the police come

24   to their home with a search warrant.

25   Q    That's a fair enough statement.  Right?  Particularly people

1    who've never been exposed to that type of event before.  Correct?

2    A    Yes.

3    Q    It could be unsettling, correct?

4    A    I can't speak for them.  We treat people very fairly and I

5    don't know if they're unsettled.

6    Q    I'm not asking you about your treatment to them.  I'm asking

7    that would be a fairly shocking event for somebody.  Fair enough?

8    A    For some people it might be.

9    Q    For having 10 officers come into their home?

10   A    Yes.

11   Q    Yeah.  And I think you indicated you were wearing a vest,

12   correct?

13   A    Yes, sir.

14   Q    How many others were wearing vests?

15   A    The police officers at the door would have been wearing

16   vests.

17   Q    That's eight people, including yourself?

18   A    Would be eight detectives and one uniformed police officer.

19   Q    So just you wearing a vest?

20   A    No, I just said all the police at the door would be wearing

21   a vest.

22   Q    Forgive me.  Would they have been, would some people have

23   been in uniform?

24   A    Yes, the uniformed patrol officer would be in uniform.

25   Q    They have firearms with them?

1   A    Yes.  He's a uniformed police officer.

2   Q    And do you have a firearm with you?

3   A    Yes, sir.

4   Q    Okay.  So the 10 of you went to the home.  Some of you in

5   uniform.  Most in vests.  Those vests are marked with what word?

6   A    It would not be 10 of us that entered the home because the

7   one person there was a civilian, the forensic supervisor.  He

8   would not be entering the home at that time.

9   Q    So I stand corrected.  Nine people entered the home?

10  A    Yes, sir.

11  Q    Okay.

12  A    Actually, the uniformed patrol officer stays outside at the

13  front door and at least one or two detectives stay outside

14  because we bring the people outside.

15  Q    Okay.  And we'll come back to that in a moment.  So seven

16  people perhaps entered the home?

17  A    Possibly, yes.

18  Q    Right?  Was it dark out?

19  A    Yes.

20  Q    Did you have flashlights on?

21  A    Yes.

22  Q    Do you remember Ms. Hall coming down the stairs in a state

23  of surprise and perhaps alarmed at what was happening?

24  A    Yes.

25  Q    So again, that would just go to this is kind of a shocking

1    event for some people, correct?

2    A    Yes.

3    Q    And you said that you typically bring people outside, right?

4    A    Yes.

5    Q    Okay.

6    A    We ask them to come outside.

7    Q    Well, you said you bring them outside.  I mean, do you ask

8    them kindly to step outside?  Do you tell them, let's go outside?

9    A    When I knock and announce on the door and someone answers

10   it, I ask them to step outside.

11   Q    So you don't bring them out?  You ask them out nicely?

12   A    "Bring" is a word I'm using as a verb to just say that

13   they're asked to come outside.

14   Q    Fair enough.  And in any kind of investigation when you

15   arrive and you're likely to make an arrest, one thing that could

16   be helpful is getting a statement from somebody, correct?

17   A    Yes.

18   Q    And these can be, statements can be helpful in all cases,

19   correct?

20   A    Yes.  You made a statement that we're likely to make an

21   arrest.  I wouldn't preface a search warrant service that we're

22   there likely to make an arrest.

23   Q    Fair enough.  Sometimes you search for evidence and no one's

24   arrested, correct?

25   A    Correct.

1    Q    You might still seize evidence but nobody's arrested?

2    A    Yes, sir.

3    Q    But in child pornography investigations, often, often there

4    is an arrest at the time of a search warrant execution, right?

5    A    Sometimes, yes.

6    Q    And in these computer-based investigations, particularly

7    child pornography investigations, statements can be extra

8    helpful, correct?

9    A    Yes.

10   Q    And that's because often there are to be multiple people

11   perhaps using a computer, right?

12   A    Correct.

13   Q    And you want to exclude some of the people from the universe

14   of potential users?

15   A    Yes.

16   Q    That can help you narrow down a target who may be the

17   suspect or the individual you want to arrest, correct?

18   A    Yes.

19   Q    That would be no different in this case, right?  In this

20   case you'd want to do that?

21   A    Yes, sir.

22   Q    And to that end, you actually brought an audio recording

23   device with you, right?

24   A    Yes, sir.

25   Q    That was to record somebody's statement hopefully, right?

1    A    Yes, sir.

2    Q    But the initial interaction with Mr. Hall inside the home

3    when you say you first read him his rights, you did not record

4    that, did you?

5    A    No, sir.

6    Q    Why is that?

7    A    We don't record that.  We record the individual interviews.

8    Q    Why don't you record that?

9    A    We don't.

10   Q    And at some point, did you say it was you that moved Ms.

11   Hall to the kitchen?

12   A    I asked her to come to the kitchen, yes.

13   Q    And you spoke with her separate and apart from Mr. Hall?

14   A    Yes, sir.

15   Q    Why separate and apart from him?

16   A    When you have a criminal investigation, you don't want

17   potential witnesses or people that are corroborating to commit

18   that crime together to be able to talk to each other, develop a

19   story, come up with lies.  So it's essential to a criminal

20   investigation to keep witness accounts separate so that they're

21   not tainted.

22   Q    Basically, so you get a statement that you need from each of

23   them?

24   A    Yes, sir.

25   Q    Not going to develop the story right in front of you

1   together when you're right there, correct?

2   A    Hopefully not.

3   Q    And when you first came in, you asked him to sit on the

4   couch, is that right?

5   A    Yes.

6   Q    Okay.  And at the same time there are a number of

7   individuals that are searching the home; is that fair to say?

8   A    When they come back into the house, we have not started

9   searching.

10  Q    Okay.  So where are the other officers at this time, if

11  they're not searching?

12  A    They're starting to label rooms with letters, take pictures.

13  There's a detective that's going to draw a sketch of the house.

14  Like I said before, there's lots of different jobs that are

15  starting to get done.

16  Q    Sure.  So there's officers fanning out through the home,

17  correct?

18  A    Yes.

19  Q    And the Halls on a couch?

20  A    Yes.

21  Q    And you're there with them?

22  A    Yes.

23  Q    And are there still officers outside?

24  A    I don't know if there was anyone outside.  At some point

25  there's coming and going.

1   Q   Maybe yes, maybe no?

2   A   Yes.

3   Q   But at that time if Mr. Hall wanted to get up and run an

4   errand, that would have been okay with you?

5   A   He was free to leave.

6   Q   You would have let him leave the house had he wanted to?

7   A   Yes.

8   Q   And same is true with Ms. Hall, correct?

9   A   Correct.

10  Q   And in the audiotape, as the Assistant U.S. Attorney

11  indicated out, you said to Mr. Hall, "You don't want to answer

12  any more questions, right?"

13  A   Yes.

14  Q   And that's the one objective piece of evidence we have

15  that's recorded, correct?

16  A   Yes.

17  Q   Your claim that earlier Mr. Hall had just said he didn't

18  want to answer a specific question, that's not recorded, correct?

19  A   Correct.

20  Q   And you've already testified to this.  You were the officer

21  that met with them on the couch and read him his rights in the

22  first instance?

23  A   Yes, sir.

24  Q   And you were the one who sought to question him at that

25  point and ceased, correct?

1    A    Yes, sir.

2    Q    Okay.  And you're the same officer that later took him

3    upstairs, correct?

4    A    Yes, sir.

5    Q    Okay.  And when you took him upstairs, you indicated that

6    you needed to talk to him further, correct?

7    A    I did.  I asked him if I could speak with him.

8    Q    Yes.  He didn't ask you to go upstairs, right?

9    A    No, sir.

10   Q    It wasn't his idea to go upstairs?

11   A    No, sir.

12   Q    It wasn't his idea to answer any questions, right?

13   A    I did advise him of his Miranda rights and he decided to

14   answer questions.

15   Q    To take him upstairs and ask him further questions?

16   A    You asked me that.  It was my decision to ask him to go

17   upstairs.

18   Q    Fair enough.  That's when you turned on the tape, correct,

19   when you're upstairs?

20   A    Yes, sir.

21   Q    Okay.  And you did read him his rights?  That's obvious from

22   the audio transcript.

23   A    Yes, sir.

24   Q    And it's equally obvious that he said he understood those

25   rights.  There's no doubt about that.  Did you stay with Mr. Hall

1    throughout the -- from the time he was seated on the couch to the

2    time he was taken upstairs, were you with him for the duration?

3    A    No, sir.

4    Q    For how much time did you leave him?

5    A    The majority of that three-plus hours.

6    Q    Do you know if anybody else questioned him during that time?

7    A    No one else questioned him during that time.

8    Q    How do you know that?

9    A    Because Lieutenant Wiedeck was with him and he told me he

10   did not ask him any questions.

11   Q    So a member of your law enforcement team told you that?

12   A    Yes, sir.

13   Q    Okay.  And the questions you asked him when you were

14   upstairs, those were likely to elicit incriminating responses,

15   correct?

16   A    Yes, sir.

17   Q    And at that point, is it your claim that he was still just

18   free to go?  He could have left and gone to run an appointment to

19   that point in time?

20   A    Yes, sir.

21   Q    And how long had you been there at that point?  About three

22   hours?

23   A    At that point it was approximately four.

24   Q    I have no further questions, Your Honor.

25                REDIRECT EXAMINATION

1  BY MR. BUDLOW:

2  Q    Just a couple, Your Honor.  Typically when people from a

3  search warrant are sitting on a couch and you're doing other

4  things, don't you normally, you or other agents kind of chat them

5  up about non-substantive matters to keep and make them

6  comfortable?

7  A    Lieutenant Wiedeck is the one that stays with people and,

8  yes, he'll do that sometimes.

9  Q    But it didn't occur in this case because you said he told

10  you that he didn't talk to him at all?

11  A    He told me he didn't ask him any questions.

12  Q    Do you know why that is?

13  A    Because he was standing there and heard Mr. Hall state that

14  he didn't want to answer that question.

15  Q    And in terms of trying to determine at the time of the

16  search warrant who might use the computers, because, obviously,

17  it's the computers that led you to do this kind of a search

18  warrant, in this case -- actually, I withdraw that question.

19  That's all I have, Your Honor.

20          THE COURT:  Okay.  Thank you, Detective.

21          THE WITNESS:  Thank you, sir.

22          THE COURT:  Any other evidence on this motion?

23          MR. BUDLOW:  No other evidence on the motion, Your

24  Honor.

25          MR. FEIN:  One moment, Your Honor.

1           (Pause in proceedings.)

2           MR. FEIN:  One witness, Your Honor.  I'd call Belinda

3    Hall to the stand.

4           THE COURT:  Okay.

5           THE CLERK:  You may turn around and face me, and please

6    raise your right hand.

7             BELINDA HALL, DEFENDANT'S WITNESS, SWORN

8           THE WITNESS:  Yes.

9           THE CLERK:  Thank you.  You may have a seat.  You may

10   slide your chair up to the table, adjust that microphone down in

11   front of you.  Please state and spell your full name for the

12   court.

13          THE WITNESS:  Belinda Jane Hall.  B-E-L-I-N-D-A.

14   J-A-N-E.  H-A-L-L.

15          THE CLERK:  Thank you.

16          DIRECT EXAMINATION

17   BY MR. FEIN:

18   Q    Ms. Hall, were you present at your home on the morning of

19   September 7th, 2016?

20   A    Yes.

21   Q    Can you tell us what happened in the -- did there come a

22   time where law enforcement came to your home?

23   A    Yes.

24   Q    Can you explain to me what happened when they entered the

25   home and the atmosphere that prevailed?

1    A    It was very scary because there was pounding at the door and

2    yelling.  And I didn't understand what was going on.  To be

3    honest, it sounded like it was coming from the back deck area.

4    And I thought maybe the house was on fire or something and they

5    were trying to warn us to get out.

6    Q    Was it dark out?

7    A    Yes.

8    Q    Did you come down?

9    A    Yes.  My husband went down first and then there were voices.

10   And then he called me to come down.  And I had to sort of shield

11   my eyes because there were big flashlights and -- but, yes, I

12   came downstairs.

13   Q    When you came in, were there officers inside the home at

14   that point or no?

15   A    Yes.

16   Q    How many, if you recall?

17   A    I don't recall.

18   Q    Did it seem like a lot, a few, or very few?

19   A    It was more than one, but I don't remember how many.

20   Q    What was -- was that a shocking event for you?

21   A    Yes.

22   Q    Okay.  And what happened from there?

23   A    They told me to come outside.  And they told me to stand

24   apart from where my husband was standing.

25   Q    Who's "they?"

1   A    Some officer.  I don't, I don't specifically remember who it

2   was.

3   Q    Did they ask you or did they tell you?

4   A    I do not remember being asked.  I don't know the exact words

5   that were used, but it was told as a directive.

6   Q    Did you feel like you had a choice in the matter?

7   A    None.

8   Q    What happened next?

9   A    I remember, and the reason I remember that they kept us

10  separate is because I was scared to death and I said "I am going

11  to go over to my husband, I'm scared."  And so I did that.  And

12  no one stopped me from doing it, but I was clearly taking

13  initiative that was not encouraged.

14  Q    What happened next?

15  A    We remained outside for a while.  And then they said Let's

16  go back inside, and why don't we sit down in the living room.

17  Q    And did you?

18  A    Yes.

19  Q    Okay.  During any of those first few moments, the time they

20  entered till moment, did you feel like you could pick up and

21  leave the house if you wanted?

22  A    Never.

23  Q    Did you -- were you under the impression that your husband

24  could leave the house if he wanted?

25  A    I was never under that impression.

1    Q    Do you think that you were compelled to stay there?

2    A    Yes.  I, I remember the phone ringing at some point during

3    the morning because we had actually been expecting the plumber to

4    come by that morning.  And I didn't even feel like we were

5    allowed to go and answer the phone.  We obviously had to have

6    permission to go use the bathroom and had to be escorted.  So

7    there was definitely an atmosphere of we have to sit here.

8    Q    Did there come a time where you did have to use the

9    bathroom?

10   A    I think me, at least once.  Certainly my husband, yes.

11   Q    Did you ask for permission?

12   A    Yes, I asked for permission.

13   Q    Were you escorted?

14   A    Yes.

15   Q    Did there come a time where your husband had to use the

16   bathroom?

17   A    Yes.

18   Q    Did he ask for permission?

19   A    Yes.

20   Q    Was he escorted?

21   A    Yes.

22   Q    Did you feel like you could do so without asking for

23   permission?

24   A    Never.

25   Q    Did that atmosphere as you interpreted it prevail throughout

1    the day?

2    A    Yes.

3    Q    Was there any time in those hours before the officers left

4    that you felt like you were free to leave and go about your

5    business as you so chose?

6    A    Never.

7    Q    I have no further questions, Your Honor.

8                 CROSS EXAMINATION

9    BY MR. BUDLOW:

10   Q    SO nothing like this had ever happened before?

11   A    Never.

12   Q    And when your -- you were scared, so you didn't go

13   downstairs when your husband went down, right?

14   A    That's correct.

15   Q    But then when he asked you to come down, then you came down?

16   A    My best recollection -- I don't remember exactly how it

17   worked out.  But I do remember hearing his voice and him

18   essentially saying, I don't remember exactly how he said it, but

19   like my sense was it was okay to come downstairs, like.

20   Q    So somehow --

21   A    Right.

22   Q    -- your husband said to you --

23   A    Yes.

24   Q    -- you may come down?

25   A    Yes.

1    Q    And then you went down?

2    A    Yes.

3    Q    Because you trust him?

4    A    Yes.

5    Q    And you trust his judgment?

6    A    Yes.

7    Q    And he was telling you it was okay to come down?

8    A    Yes.

9    Q    And then -- you were here when just moments ago when

10   Detective Rees testified?

11   A    I was.

12   Q    And you heard him testify that when you and your husband

13   were allowed back in the house, after a few moments he came in

14   and the scene was more calm?

15   A    Yes.

16   Q    That's an accurate statement, isn't it?

17   A    That is an accurate statement.

18   Q    A little bit of noise and things going on at the initial

19   execution of the warrant.  But within 10 or 15 minutes when you

20   went back inside, things had noticeably calmed down?

21   A    Yes.  He spoke in a normal inside voice.

22   Q    No pounding on the doors or no --

23   A    Right.

24   Q    Is that right?

25   A    That's correct.

1  Q    And at that point you understood it wasn't a fire?

2  A    Correct.

3  Q    And it wasn't sort of a burglary or some sort of criminal

4  activity?

5  A    Right.

6  Q    You knew it was a law enforcement investigation?

7  A    That is correct.

8  Q    And, in fact, Detective Rees came in and in a calm voice

9  read to you the three or four-page search warrant so that you

10 understood that he was authorized to be there and actually why as

11 well?

12 A    Right.

13 Q    And did you appreciate that he was telling you that

14 information?

15 A    Yes.

16 Q    And at no time while you were, while the police were in your

17 home did they tell you you could not leave, did they?

18 A    That is correct.

19 Q    And they also never told you that you could not answer your

20 phone?

21 A    That -- I don't remember.

22 Q    I thought you testified earlier that you didn't answer it

23 because you didn't think you could answer the phone?

24 A    Right.  I don't specifically remember whether I asked, can I

25 answer that, or whether I just assumed I would not be allowed to.

1    Q    And same thing with the bathroom.  You asked for permission

2    because you say you thought you had to?

3    A    Yes.

4    Q    But they never said to you you had to ask permission before

5    you do so?

6    A    I don't remember them saying I have to ask permission to do

7    anything.

8    Q    Is it fair to say that while they were in your home, while

9    you were there with them, that the police officers present

10   treated you respectfully?

11   A    Yes.

12   Q    And that when Detective Rees came back in the home and read

13   you the warrant, then he also read you your Miranda rights?  You

14   may not know they were Miranda rights.  But your right to remain

15   silent.

16   A    I understand.

17   Q    The kind of thing you hear on TV, right?

18   A    Yes.

19   Q    He did, he did all those things?

20   A    He did.

21   Q    And you, when he asked you if you understood it, you said

22   that you did?

23   A    I did.

24   Q    And when he asked your husband if he understood it, he said

25   that he did?

1    A    He did.

2    Q    Going back to the more difficult time when you were outside

3    of your home, you said -- well, you testified earlier you were

4    scared, right?

5    A    Yes.

6    Q    And you said to the police officers, "I'm going over to my

7    husband because I'm scared?"

8    A    Yes.

9    Q    You didn't think they wanted you to do that, did you?  In

10   fact, they told you otherwise?

11   A    Right.

12   Q    But they didn't stop you?

13   A    They didn't stop me.

14   Q    And they didn't yell at you or tell you that you shouldn't

15   do that, they just let you go?

16   A    They did.

17   Q    That's all I have.  Thank you.

18        THE COURT:  Thank you very much.  That's all?  Any

19   argument?

20        MR. BUDLOW:  Oh, any argument?  I'm sorry.  I thought

21   you were asking for additional witnesses.

22        THE COURT:  I actually was looking at Mr. Fein.

23        MR. BUDLOW:  I'm happy to let him go first.  It is my

24   burden.  I'm happy to go first as well.

25        MR. FEIN:  Your Honor, all I will say is, first, the

1    test for whether an individual's in custody is whether or not an

2    objectively reasonable person would feel free to leave.  I think

3    there's little doubt that an objectively reasonable person in the

4    position of Ms. Hall would not have felt free to leave.

5              It matters not whether the officers told --

6              THE COURT:  Well, is that the question or is the

7    question whether, if they're not free to leave, they're advised

8    of their Miranda rights?

9              MR. FEIN:  So you have to be advised of your Miranda

10   rights if you're in custody and interrogated.  So the threshold

11   question would be, is there custody?

12             THE COURT:  Right.

13             MR. FEIN:  So my point is, yes, there was custody

14   because an objectively reasonable person in the position of the

15   Halls would not have felt free to leave.

16             Eight officers entered the home, maybe seven.  Ms. Hall

17   testified that it was a shocking experience, that she did not

18   feel free to go anywhere, that she felt like she was disobeying

19   or acting in contrast to directives simply by walking to her

20   husband.

21             So I think as a threshold matter, it's a fairly easy

22   determination that a reasonable person in the position of the

23   Halls would have felt in custody.  They're in their home.

24   There's eight officers.  They have vests.  They have firearms.

25   They're being directed in whatever terms to step outside, to step

1   back inside.  And the testimony of Ms. Hall was that not only was

2   it a frightening event at five in the morning in the dark, but

3   that she did not feel free to leave and she could sense the same

4   was true of her husband.  So I think the custody determination is

5   not a difficult one to make.

6          Was there an interrogation?  So the first interview by

7   Detective Rees was not audiotaped.  When I asked him why, he said

8   because they don't.  Why they don't remains a bit unclear.  If

9   there's a point to having an audio recorder, I submit it would be

10  best to record all interactions with all citizens simply for

11  purposes of transparency.

12         But in any event, he read Mr. Hall his rights at that

13  point, so one would assume that he was preparing to interrogate

14  him.  So it's custody and a likely interrogation.  To Detective

15  Rees's credit, he didn't question Mr. Hall further when Mr. Hall

16  either said "I don't want to answer that question" or "I don't

17  want to answer any more questions", or "I don't want to speak

18  with you."  So Detective Rees ceased questioning at that point.

19         Detective Rees was there, obviously, to question him

20  about the investigation.  Three hours later, maybe four hours

21  later, Detective Rees determines it might be wise to speak with

22  Mr. Hall again.  So he takes Mr. Hall upstairs, and again reads

23  Mr. Hall his rights.  And Mr. Hall, on audiotape this time,

24  waives his rights and agrees to make the statement.

25         So here's what I would say.  There was custody.  There

1    was an interrogation.  That is, there were questions put to Mr.

2    Hall that were likely to elicit incriminating responses.  Miranda

3    rights were read to him.  However, earlier in the morning he

4    indicated that he did not want to answer any more questions, so

5    he invoked sufficiently his right to remain silent.  At that

6    point the officer should have cut off all questioning and should

7    have scrupulously honored Mr. Hall's right.  He did not

8    scrupulously honor that right when at his own, that is Detective

9    Rees's own, determination, he brought Mr. Hall upstairs to a

10    bedroom, separate and apart from his wife, with a recorder,

11    ostensibly to get a statement from Mr. Hall, and reinitiated

12    contact with Mr. Hall for the purpose of getting a statement.

13          So while it's true that Mr. Hall waived his right, he

14    did so only under the following circumstances:  Where he was in

15    custody, where he was being interrogated by an officer who had

16    interrogated or tried to interrogate him earlier in the morning

17    in the same home on the same topic, and this is simply three

18    hours later.

19          So I would submit to the Court that that second

20    interrogation was violative of Mr. Hall's Fifth Amendment rights

21    for those reasons.

22          MR. BUDLOW:  Your Honor, if I could, I'd like to

23    address the three issues that I see.  First one is that I'd ask

24    the Court ultimately to find that the defendant was not in

25    custody.  Mr. Fein has accurately stated the standard, but

1    there's little more information about the standard that I think

2    is important to remember, which is what is custody.

3          And under Berkemer v. McCarty, a Supreme Court case, it

4    says that under the totality of the circumstances, the suspect's

5    freedom of actions curtailed to a degree associated with a formal

6    arrest.  And the facts in this case are that a standard search

7    warrant was executed.  Nothing unusual was done.  And this really

8    presents to the Court a fairly routine scenario where the

9    officers -- of course it's scary for anybody at first who has

10   never been the subject of a search warrant.  Things calm down.

11   They discuss everything in a conversational tone.  Nobody's under

12   arrest.  Nobody's told they can't leave.

13         There's literally no evidence of any restrictions on

14   their movement whatsoever.  The defendant went to the bathroom.

15   He went inside and closed the door.  No threats, promises or

16   force.  And he displayed multiple times that he knew that he

17   didn't have to answer the questions.

18         So a reasonable person under those circumstances would

19   not have felt like they were in custody and they would have felt

20   at liberty to terminate the interview at any time which, of

21   course, the defendant demonstrated.

22         Because there's no custody, then there's no Miranda.

23   And because there's no Miranda necessary, then there's no reason

24   to address the issues of the rights under Miranda, which is where

25   the defendant wants you to go here.  So there is no right to

1    remain silent that must be scrupulously honored.  And I'd ask the

2    Court to make that as factual finding, that the defendant was not

3    in custody.

4         But, also, I'd ask to ask the Court to address if

5    Miranda did apply, that the defendant did not unequivocally

6    invoke his right to remain silent because what Detective Rees is

7    clear in what he said is that he's not going to answer that

8    question, which interestingly is an unambiguous statement.  It's

9    just not invoking his right to remain silent, it's invoking his

10   right not to answer a specific question.

11        Without a doubt there is a recording that was done four

12   hours later where it seems to be a very casual reference to him

13   refusing to answer questions generally.  Detective Rees has not

14   only explained in an incredible way, but has indicated he wrote

15   the exact wording that he testified to, that he didn't want to

16   answer that question, the same day on an application for

17   statement of charges and a police report, at least one of which

18   was filed under oath.

19        So just saying that he didn't want to answer one

20   question is not an unambiguous invocation of the right to remain

21   silent.  But even if it were, so Miranda had been given.  The

22   defendant had voluntarily waived Miranda.  And then he refused to

23   answer that one question.  If the Court were to interpret that as

24   an unambiguous invocation of his right to remain silent, that

25   invocation was scrupulously honored.

1          There's cases that held that, under similar

2   circumstances, police officers can reinitiate one hour later.

3   Here, the defendant remained on his couch.  Nobody spoke a word

4   to him.  They consciously didn't speak a word to him, unlike

5   normally where they would try to make people comfortable, engage

6   them in routine conversation.  He sat there in silence because he

7   had made this unusual comment earlier on, so they left him alone.

8          Then four hours later, not two and a half, not 90

9   minutes, but closer to four hours later, Detective Rees asked the

10  defendant if he wanted to go upstairs and speak.  Defendant

11  agreed.  He went on tape.  He voluntarily agreed to waive his

12  Miranda rights.  During the interview, he understood that he

13  didn't have to answer them all and demonstrated that by saying

14  I'm not giving you the encryption to, I'm not giving you the key

15  to my encrypted hard drive.  So he voluntarily waived.

16          And the five factors that determine whether or not if

17  someone is, under Miranda, and if they've invoked unambiguously,

18  whether or not law enforcement can reinitiate, four of the five

19  factors weigh clearly and heavily in favor of admissibility.  And

20  the case law is that not all five factors, there's no formula as

21  to how many of them must weigh.

22          Those five factors are the defendant acknowledged that

23  he understood his rights; that questioning ceased immediately,

24  which it did; that a significant period of time, which the cases

25  have held can be as little as one hour, passed, during which no

1   attempt was made to wear down or repeated questioning or attempts

2   to question the defendant.  The officer didn't display contraband

3   in front of him in a subtle way to try to get him to explain

4   things.  They didn't engage in any trickery.  They just left him

5   sitting there for four hours.  A fresh set of Miranda is the

6   fourth.  All four of those way heavily in favor of admissibility.

7          And the last one is whether or not the defendant was

8   questioned about a completely different substantive crime.  The

9   government concedes, they were there for one reason, which was to

10  ask him about child pornography trafficking.  He made a comment

11  about not wanting to answer who his internet service provider is.

12  Certainly shows a certain degree of savvy, especially in light of

13  the investigation.  And later on they asked him the same

14  question.  So that one of the five factors clearly does not weigh

15  in the government's favor, but the other four clearly do.

16         I would ask the Court, in denying this motion, to find

17  that the defendant was not in custody, that he did not

18  unambiguously invoke his right to remain silent, and that even if

19  he did, that invocation was scrupulously honored.

20         Thank you.

21         THE COURT:  Anything further?

22         MR. FEIN:  No, Your Honor.

23         THE COURT:  I'm going to deny the motion.  I mean, I

24  don't think that Mr. and Mrs. Hall were in custody.  But I will

25  reach the Miranda issue.  And Mr. Hall was twice told his Miranda

1    rights.  I credit the detective, Detective Rees, as to what was

2    said.  And it was only one of the questions that Mr. Hall

3    declined to answer.  Four hours had passed.  He was re-advised of

4    his rights.  I don't think that there was any violation.  So I

5    deny the motion to suppress statements.

6              Now, is that it?

7              MR. BUDLOW:  I believe that's all the motions that are

8    Pending, Your Honor.

9              MR. FEIN:  That's it, Your Honor.

10             THE COURT:  And we have a trial date?

11             MR. BUDLOW:  We do not have a trial date, Your Honor.

12   I would ask that we contact chambers, unless you wanted to try to

13   find something while we're here.

14             THE COURT:  Okay.  Contact chambers.

15             MR. BUDLOW:  Very well.  Thank you.

16             MR. FEIN:  Just for the record, I object to the Court's

17   ruling on the motion and I will file a motion to reconsider with

18   respect to the motion to suppress evidence, but not the motion to

19   suppress statements.  Thank you, Your Honor.

20             THE COURT:  Thank you.

21             (Conclusion of Proceedings at 4:17 p.m.)

22

23

24

25

1                                  INDEX

2

3                                                              PAGE

4    WITNESS: DR. BRIAN LEVINE
     DIRECT EXAMINATION BY MS. SHOOP                  25
5    CROSS EXAMINATION BY MR. FEIN                    63
     REDIRECT EXAMINATION BY MS. SHOOP               114
6
     WITNESS: DETECTIVE JOSHUA REES
7    DIRECT EXAMINATION BY MR. BUDLOW                156
     CROSS EXAMINATION BY MR. FEIN                   184
8    REDIRECT EXAMINATION BY MR. BUDLOW              195

9    WITNESS: BELINDA HALL
     DIRECT EXAMINATION BY MR. FEIN                  197
10   CROSS EXAMINATION BY MR. BUDLOW                 201

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2


3          I, Mary M. Zajac, do hereby certify that I recorded

4    stenographically the proceedings in the matter of USA v. Martin

5    Robert Hall, Case Number(s) JFM-16-469, on August 30, 2017.

6          I further certify that the foregoing pages constitute

7    the official transcript of proceedings as transcribed by me to

8    the within matter in a complete and accurate manner.

9          In Witness Whereof, I have hereunto affixed my

10   signature this _____ day of _____, 2017.

11

12

13

14
                        Mary M. Zajac,
15                      Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**'**

**'80s** [1] - 47:2
**'96** [1] - 4:12

**1**

**1** [6] - 30:25, 45:22, 91:21, 91:23, 141:18, 146:18
**10** [18] - 10:11, 35:22, 42:20, 55:21, 90:17, 127:2, 128:22, 128:24, 134:10, 155:9, 161:21, 168:10, 168:12, 185:8, 187:9, 188:4, 188:6, 202:19
**10,000** [4] - 89:17, 89:18, 89:22, 152:2
**100** [1] - 44:9
**101** [1] - 1:23
**11** [3] - 38:12, 178:5, 178:19
**11-year-long** [1] - 9:19
**114** [1] - 214:5
**116** [1] - 4:12
**11:00** [1] - 52:2
**11:13** [1] - 52:2
**11th** [8] - 11:16, 11:17, 11:18, 11:22, 11:23, 12:9, 12:10
**12** [1] - 141:19
**1247** [1] - 7:2
**12:48** [1] - 123:3
**13** [3] - 45:16, 47:23, 47:25
**14** [1] - 46:16
**15** [5] - 41:13, 48:2, 160:9, 161:21, 202:19
**156** [1] - 214:7
**16** [1] - 47:15
**18** [3] - 78:23, 104:16, 104:17
**184** [1] - 214:7
**185.57.31.15** [1] - 41:21
**19** [2] - 49:6, 78:18
**1904** [2] - 10:5, 19:23
**1940** [1] - 19:23
**1941** [1] - 9:17
**195** [1] - 214:8
**197** [1] - 214:9
**1992** [1] - 5:4
**1999** [2] - 25:11, 29:15
**19th** [3] - 25:12, 78:21, 78:23
**1:00** [3] - 80:13, 80:17, 113:7

**2**

**2** [1] - 31:22
**20** [4] - 14:22, 45:22, 50:15, 152:23
**200** [3] - 90:24, 91:5, 91:23
**2000** [1] - 29:16
**2001** [4] - 29:18, 29:21, 30:2, 157:4
**2004** [1] - 9:4
**2005** [1] - 25:14
**2007** [1] - 157:5
**2008** [1] - 157:6
**2009** [1] - 7:18
**201** [1] - 214:10
**2010** [1] - 25:15
**2011** [2] - 65:2, 126:17
**2012** [2] - 63:22, 126:17
**2014** [1] - 76:5
**2016** [10] - 75:16, 85:2, 113:16, 113:19, 114:1, 127:1, 157:15, 158:9, 165:8, 197:19
**2017** [4] - 1:10, 75:16, 215:5, 215:10
**21** [14] - 30:25, 31:22, 34:17, 35:22, 36:15, 38:12, 41:13, 45:16, 46:16, 47:15, 49:6, 50:15, 50:25
**21201** [1] - 1:24
**24** [1] - 135:22
**24th** [1] - 27:22
**25** [1] - 214:4
**2707563** [1] - 7:19
**28** [3] - 47:24, 141:19
**2:00** [1] - 123:2
**2:10** [1] - 123:3
**2d** [1] - 7:11

**3**

**3** [1] - 75:6
**3,000** [2] - 96:4, 119:18
**3,500** [1] - 92:5
**30** [9] - 1:10, 51:3, 88:22, 90:24, 91:13, 91:17, 135:2, 152:23, 215:5
**300** [2] - 91:21, 91:23
**3000** [3] - 91:25, 93:8, 98:5
**3500** [3] - 91:25, 93:8, 98:5
**36** [1] - 180:10
**37** [1] - 180:10
**39** [1] - 11:23

**3:04** [1] - 156:17
**3:13** [1] - 156:17

**4**

**4** [2] - 140:20, 148:24
**4,000** [5] - 75:3, 75:12, 75:20, 90:15, 90:16
**4,217** [1] - 75:19
**4,218** [1] - 75:19
**40** [3] - 88:23, 91:13, 135:2
**416-CR-258** [1] - 6:3
**420** [1] - 7:11
**43** [2] - 9:22, 22:3
**44** [1] - 21:25
**468** [1] - 12:7
**47** [1] - 175:22
**470** [1] - 7:11
**471** [1] - 12:7
**4739** [1] - 180:13
**474** [1] - 12:8
**4:17** [1] - 213:21

**5**

**5** [6] - 149:2, 153:13, 158:14, 181:1, 186:12, 186:16
**50** [1] - 90:24
**50-some-odd** [1] - 10:10
**5000** [7] - 87:16, 87:17, 87:19, 87:21, 89:18, 89:20, 89:21
**516** [1] - 11:9
**522** [1] - 12:7
**5:00** [2] - 158:8, 186:11
**5:15** [1] - 168:20
**5:20** [1] - 169:5
**5:25** [1] - 169:5
**5:30** [1] - 186:9

**6**

**6000** [1] - 75:6
**61** [1] - 10:10
**63** [1] - 214:5
**631** [1] - 11:23
**638** [1] - 11:23
**68%** [1] - 48:2

**7**

**7** [4] - 144:19, 145:5, 146:17, 155:9
**700** [1] - 11:9

**708** [1] - 11:23
**773** [1] - 5:3
**776** [1] - 5:3
**78** [1] - 5:4
**7th** [7] - 157:15, 158:9, 165:8, 184:20, 185:10, 197:19

**8**

**8** [4] - 31:22, 140:20, 141:15, 145:5
**80** [4] - 4:12, 10:9, 26:5, 44:8
**806** [1] - 7:2
**84** [1] - 144:22
**8:30** [2] - 171:6, 171:13
**8:56** [1] - 175:7

**9**

**9** [3] - 34:17, 36:15, 145:6
**90** [2] - 26:5, 211:8
**956** [1] - 5:3
**9:43** [1] - 2:1

**A**

**A's** [1] - 147:14
**a.m** [2] - 2:1, 52:2, 158:14, 175:7, 181:2, 186:10, 186:11, 186:12, 186:16
**abandon** [1] - 132:2
**abandoned** [1] - 8:21
**abdicate** [2] - 4:23, 13:22
**abdicated** [9] - 3:10, 4:14, 5:1, 7:5, 7:14, 7:21, 8:15, 13:2, 151:24
**abdicates** [1] - 3:17
**abdication** [1] - 14:4
**Abigail** [1] - 50:22
**Abigail.RAR** [1] - 49:20
**ability** [3] - 13:19, 14:1, 109:25
**able** [12] - 29:3, 30:23, 36:6, 36:12, 40:9, 76:1, 115:3, 118:8, 121:3, 137:2, 153:22, 191:18
**above-referenced** [1] - 141:17
**absence** [1] - 13:19
**absent** [2] - 147:3, 149:14
**absolute** [2] - 129:20, 165:9

**absolutely** [4] - 29:13, 37:6, 123:19, 133:14
**abuse** [1] - 177:2
**academics** [2] - 29:20, 139:6
**accept** [2] - 39:23, 128:3
**accepted** [2] - 9:8, 27:17
**accepting** [2] - 4:15, 9:11
**access** [5] - 47:9, 67:3, 67:21, 87:19, 90:11
**accord** [1] - 149:4
**according** [4] - 120:1, 140:1, 141:25, 146:1
**accounts** [1] - 191:20
**accurate** [13] - 28:8, 111:5, 111:6, 111:9, 111:16, 112:8, 112:12, 115:7, 174:24, 175:1, 202:16, 202:17, 215:8
**accurately** [2] - 90:12, 112:6, 208:25
**accused** [1] - 138:14
**acknowledged** [1] - 211:22
**acknowledgement** [1] - 165:21
**acquire** [1] - 55:25
**acquired** [1] - 29:2
**acre** [1] - 161:10
**act** [1] - 132:21
**Act** [4] - 22:12, 133:17, 133:18, 141:8
**acted** [1] - 16:25
**acting** [1] - 206:19
**action** [1] - 125:10
**actions** [1] - 209:5
**activities** [1] - 129:6
**activity** [8] - 36:6, 36:13, 126:2, 135:15, 147:22, 174:12, 178:13, 203:4
**acts** [1] - 132:24
**actual** [4] - 48:25, 62:15, 74:12, 82:9, 87:17, 109:14, 123:15
**Adam** [4] - 1:18, 2:10, 22:19
**Adamski** [4] - 172:3, 172:22, 179:7, 179:16
**add** [2] - 18:1, 45:7
**added** [2] - 34:8, 41:18
**adding** [3] - 36:9, 87:23, 101:1
**addition** [5] - 6:23, 17:22, 20:16, 135:20, 155:23
**additional** [5] - 83:11,

117:4, 117:24, 133:15, 205:21
**additionally** [1] - 16:6
**address** [49] - 3:7, 3:9, 17:20, 18:21, 22:6, 24:8, 41:11, 41:22, 42:1, 42:5, 42:6, 42:15, 42:18, 44:15, 53:22, 56:10, 66:24, 67:3, 73:13, 74:19, 77:1, 77:8, 77:17, 78:3, 88:13, 117:23, 117:25, 119:18, 126:9, 128:15, 128:17, 128:23, 129:7, 130:24, 130:25, 131:24, 132:7, 133:19, 140:7, 142:6, 144:21, 146:20, 146:23, 183:12, 208:23, 209:24, 210:4
**addressed** [1] - 120:11
**addresses** [13] - 41:20, 66:19, 67:7, 67:20, 90:9, 90:14, 90:20, 91:5, 91:20, 92:1, 92:19, 99:23, 140:10
**adjust** [2] - 24:20, 197:10
**administrator** [1] - 84:4
**admissibility** [2] - 211:19, 212:6
**admits** [1] - 126:7
**admitted** [5] - 6:13, 8:5, 15:1, 15:22, 126:23
**adult** [2] - 185:22, 185:24
**advanced** [3] - 35:10, 43:13, 78:15
**advise** [3] - 173:22, 173:24, 194:13
**advised** [8] - 164:20, 164:21, 173:18, 174:2, 174:5, 206:7, 206:9, 213:3
**advising** [1] - 168:18
**affect** [1] - 87:23
**affiant** [9] - 18:12, 23:7, 129:23, 130:21, 131:2, 132:3, 132:17, 141:16, 144:20
**affiant's** [1] - 146:19
**affidavit** [49] - 3:22, 4:13, 4:14, 5:6, 6:12, 6:18, 7:16, 8:10, 13:6, 14:25, 15:9, 18:11, 18:16, 19:16, 21:15, 23:1, 23:4, 23:8, 111:2, 119:8, 122:10, 122:14, 122:20, 130:6, 130:14, 132:20, 133:4, 134:21, 134:23, 141:14, 141:15, 143:4, 148:18, 146:16,

147:3, 149:21, 149:22, 150:4, 151:5, 153:25, 154:2, 154:7, 154:19, 155:5, 155:9, 155:13, 163:16
**affirmed** [5] - 4:13, 4:16, 5:19, 9:15
**affixed** [1] - 215:9
**afford** [1] - 165:13
**afield** [2] - 19:20, 121:11
**afraid** [1] - 152:8
**afternoon** [7] - 17:7, 63:4, 63:5, 138:8, 156:3, 156:13, 156:21
**afterwards** [1] - 91:15
**age** [1] - 181:13
**agent** [3] - 18:8, 132:3, 132:12
**Agent** [1] - 2:9
**agents** [2] - 146:1, 196:4
**ago** [6] - 30:1, 111:24, 176:15, 177:15, 202:9
**agree** [8] - 45:16, 73:20, 79:20, 124:20, 139:3, 162:14, 165:14, 174:5
**agreed** [2] - 211:11
**agreement** [1] - 9:12
**agrees** [1] - 207:24
**Agriculture** [3] - 9:18, 9:19, 9:21
**aha** [1] - 57:2
**ahead** [11] - 30:17, 50:1, 56:23, 60:10, 89:4, 101:17, 123:7, 126:20, 160:24, 175:24, 180:5
**alarmed** [1] - 188:23
**alcohol** [1] - 180:24
**alert** [1] - 180:23
**algorithm** [61] - 53:5, 57:21, 57:23, 60:25, 62:10, 87:23, 87:24, 88:7, 89:20, 100:7, 100:16, 100:18, 101:3, 101:14, 101:16, 101:17, 101:18, 101:20, 101:22, 102:8, 102:12, 102:13, 102:16, 103:1, 103:6, 103:17, 105:6, 105:21, 106:3, 106:10, 106:11, 106:12, 106:20, 106:25, 107:11, 107:12, 107:20, 107:23, 107:25, 113:1, 113:11, 113:24, 114:5, 116:14, 116:17, 119:3, 131:4, 131:17, 131:22, 142:24, 143:1, 143:10, 143:18, 144:2, 144:16, 145:17, 149:7, 149:9,

150:9
**algorithm's** [1] - 107:22
**algorithms** [1] - 88:1
**aligns** [1] - 75:3
**allegation** [8] - 7:15, 7:21, 7:23, 8:4, 8:21, 16:22, 132:19, 154:25
**allegations** [3] - 8:13, 17:12, 17:13
**alleged** [5] - 5:5, 8:5, 10:19, 17:17, 136:24
**alleging** [3] - 122:19, 123:9, 124:1
**allow** [2] - 21:8, 122:25
**allowed** [11] - 18:2, 19:12, 74:7, 76:22, 134:22, 134:25, 149:20, 179:12, 200:5, 202:13, 203:25
**allows** [3] - 36:20, 76:25, 83:2
**almost** [1] - 47:18
**alone** [2] - 94:9, 211:7
**alphanumeric** [1] - 140:21
**alternatives** [1] - 39:24
**ambit** [1] - 141:10
**Amendment** [6] - 14:2, 121:6, 147:25, 150:16, 150:22, 208:20
**AMERICA** [1] - 1:4
**America** [2] - 2:3, 181:20
**Amherst** [2] - 25:9, 119:1
**amount** [7] - 2:19, 10:19, 46:23, 60:6, 103:16, 149:12, 185:2
**ample** [1] - 132:8
**analogous** [3] - 11:24, 33:5, 139:7
**analogously** [1] - 44:16
**analysis** [8] - 16:15, 19:23, 88:8, 112:25, 120:5, 120:6, 124:16
**analyze** [8] - 16:7, 16:23, 99:22, 119:4, 128:10, 130:22, 143:3, 143:4
**analyzing** [1] - 143:2
**angels** [1] - 48:20
**announce** [2] - 158:7, 159:12, 189:9
**announced** [3] - 158:12, 158:13, 159:3
**anonymity** [1] - 154:2
**anonymous** [1] - 153:19
**anonymously** [1] - 153:15

**answer** [60] - 13:13, 13:15, 13:16, 21:4, 39:5, 64:1, 64:16, 81:18, 83:12, 83:23, 83:25, 84:1, 90:6, 90:10, 90:12, 107:17, 107:18, 115:15, 123:17, 138:18, 158:21, 165:14, 166:24, 166:25, 168:6, 173:14, 176:12, 176:16, 176:18, 176:19, 177:14, 177:15, 178:1, 179:21, 180:3, 182:6, 186:16, 193:11, 193:18, 194:12, 194:14, 196:14, 200:5, 203:19, 203:22, 203:23, 203:25, 207:16, 207:17, 208:4, 209:17, 210:7, 210:10, 210:13, 210:16, 210:19, 210:23, 211:13, 212:11, 213:3
**answer's** [1] - 70:4
**answers** [1] - 189:9
**anyway** [3] - 50:6, 59:21, 60:15
**apart** [4] - 191:13, 191:15, 198:24, 208:10
**apologize** [6] - 34:3, 103:5, 108:11, 110:10, 125:19, 156:12
**apparent** [1] - 146:24
**appeal** [2] - 11:16, 16:5
**appear** [4] - 20:11, 174:3, 179:18, 180:24
**appearance** [2] - 180:22, 180:23
**Appearances** [1] - 1:15
**appeared** [6] - 6:14, 15:15, 106:19, 180:20, 180:23, 180:25
**application** [5] - 31:20, 34:12, 43:5, 177:17, 210:16
**applications** [2] - 28:25, 43:15
**applied** [1] - 147:9
**applies** [2] - 143:21, 147:12
**apply** [8] - 3:16, 3:19, 4:2, 16:9, 132:10, 132:15, 133:14, 210:5
**appoint** [1] - 165:13
**appointed** [1] - 17:18
**appointment** [1] - 195:18
**appreciate** [1] - 203:13
**approach** [1] - 62:9
**approached** [1] - 159:12
**appropriate** [12] - 4:8, 4:22, 8:24, 12:23, 14:3,

15:16, 17:21, 20:17, 20:20, 23:3, 23:11, 118:19
**architectural** [1] - 33:5
**archive** [1] - 40:3
**area** [5] - 160:18, 167:15, 167:25, 169:10, 198:3
**areas** [1] - 118:21
**arguably** [1] - 150:20
**argue** [2] - 23:3, 123:6
**arguing** [1] - 7:13
**argument** [16] - 126:20, 126:22, 128:5, 129:12, 133:16, 134:9, 134:17, 136:22, 139:7, 139:8, 139:11, 139:22, 140:8, 150:18, 205:19, 205:20
**arguments** [2] - 123:10, 134:3, 139:1
**arise** [1] - 19:22
**armed** [2] - 170:11, 170:12
**arranged** [1] - 66:9
**arrest** [8] - 183:10, 189:15, 189:21, 189:22, 190:4, 190:17, 209:6, 209:12
**arrested** [5] - 183:9, 184:3, 184:4, 189:24, 190:1
**arrive** [1] - 189:15
**arrived** [1] - 186:9
**arrow** [1] - 31:8
**article** [4] - 26:24, 26:25, 30:2, 30:8
**articulated** [1] - 122:15
**aside** [11] - 15:5, 135:1, 138:19, 141:23, 142:3, 142:4, 142:9, 142:11, 142:16, 142:19, 143:23
**aspect** [2] - 45:20, 100:3
**aspects** [2] - 62:10, 141:14
**assigned** [8] - 13:9, 68:2, 69:4, 69:25, 72:21, 157:5, 157:6, 163:5
**assignments** [1] - 157:2
**assist** [6] - 8:6, 21:9, 54:22, 54:24, 80:25, 130:15
**assistance** [4] - 55:1, 76:1, 80:20, 84:12
**assistant** [1] - 11:1
**Assistant** [2] - 14:16, 193:10
**assisted** [3] - 60:25, 61:23, 115:21

**assisting** [1] - 169:16
**assists** [2] - 84:16, 84:25
**associate** [1] - 25:15
**associated** [14] - 52:12, 56:4, 56:24, 57:4, 57:11, 71:15, 72:15, 73:22, 93:13, 96:10, 120:1, 120:2, 141:1, 209:5
**assume** [6] - 83:19, 97:13, 98:5, 103:8, 184:20, 207:13
**assumed** [1] - 203:24
**assuming** [7] - 55:9, 78:7, 103:12, 105:3, 109:13, 137:22, 158:15
**assumption** [1] - 104:23
**atmosphere** [3] - 197:25, 200:7, 200:25
**attach** [1] - 107:3
**attached** [6] - 26:19, 28:3, 109:4, 117:3, 127:20, 169:14
**attacker** [1] - 36:5
**Attacking** [1] - 64:21
**attacks** [1] - 39:23
**attempt** [5] - 21:9, 42:1, 42:17, 54:21, 212:1
**attempting** [1] - 51:2
**attempts** [2] - 153:15, 212:1
**attended** [1] - 130:4
**attention** [4] - 48:6, 54:11, 180:8
**attorney** [9] - 2:7, 6:5, 15:8, 18:4, 166:6, 166:7, 182:21, 182:23
**Attorney** [4] - 14:14, 14:15, 14:16, 193:10
**atypical** [2] - 120:14, 137:9
**audio** [6] - 174:25, 176:1, 180:14, 190:22, 194:22, 207:9
**audiotape** [2] - 193:10, 207:23
**audiotaped** [1] - 207:7
**August** [3] - 1:10, 113:16, 215:5
**authenticating** [1] - 140:23
**authenticity** [1] - 97:6
**author** [1] - 141:15
**authorized** [5] - 15:9, 17:3, 163:17, 163:18, 203:10
**authorizing** [2] - 2:25, 6:7
**authors** [1] - 27:12

**auto** [3] - 64:12, 64:14, 66:15
**auto-update** [1] - 64:14
**auto-updates** [1] - 64:12
**auto-updating** [1] - 66:15
**automated** [16] - 69:13, 69:16, 71:3, 73:1, 73:7, 77:12, 94:4, 94:6, 94:8, 94:12, 97:12, 97:13, 98:17, 101:23, 102:8, 115:13
**automatically** [3] - 31:16, 39:7, 58:18
**available** [28] - 27:18, 29:22, 32:11, 32:17, 40:7, 40:18, 41:12, 50:11, 51:5, 51:6, 55:8, 58:3, 58:4, 59:21, 60:6, 60:20, 60:21, 60:22, 61:9, 64:4, 64:6, 64:10, 65:21, 67:7, 76:14, 76:18, 100:10, 116:20
**Available** [1] - 66:13
**average** [1] - 64:21
**aware** [7] - 29:25, 30:2, 54:13, 54:16, 57:4, 170:23, 173:6

**B**

**B-E-L-I-N-D-A** [1] - 197:13
**B-R-I-A-N** [1] - 24:24
**background** [5] - 129:18, 130:1, 131:10, 149:2
**bad** [2] - 156:12, 167:10
**bail** [1] - 8:6
**ballpark** [1] - 91:24
**Baltimore** [9] - 1:11, 1:24, 16:18, 156:24, 156:25, 157:3, 157:8, 159:14, 163:24
**banded** [1] - 29:1
**banding** [1] - 29:3
**bar** [2] - 47:25, 48:1
**bare** [1] - 129:17
**barely** [1] - 153:2
**bars** [1] - 49:3
**baseball** [1] - 157:10
**based** [22] - 5:14, 10:19, 20:8, 23:3, 96:10, 120:15, 121:21, 142:16, 142:22, 145:15, 146:9, 148:14, 150:9, 152:10, 154:9, 154:13, 175:11, 178:14, 190:6

**basement** [6] - 161:3, 161:4, 169:11, 169:18, 169:21
**basic** [3] - 31:21, 116:14, 150:13
**basis** [7] - 16:17, 99:13, 111:11, 121:23, 135:12, 137:15, 137:16
**bathroom** [15] - 178:23, 178:24, 179:1, 179:3, 179:4, 179:5, 179:8, 179:9, 179:11, 179:13, 200:6, 200:9, 200:16, 204:1, 209:14
**bathroom's** [1] - 179:9
**became** [2] - 30:2, 30:6
**become** [3] - 29:25, 54:13, 54:16
**becomes** [1] - 49:22
**bed** [4] - 172:16, 172:17, 172:18, 172:23
**bedroom** [10] - 160:20, 160:21, 160:22, 171:21, 172:10, 172:12, 172:14, 179:2, 208:10
**bedrooms** [3] - 160:20, 160:23, 160:25
**beginning** [10] - 57:24, 100:4, 139:2, 163:5, 172:3, 173:19, 175:8, 175:10, 175:11, 182:5
**beginnings** [1] - 163:3
**begrudge** [1] - 120:21
**Behalf** [2] - 1:16, 1:18
**behalf** [3] - 2:6, 2:10, 17:10
**behind** [12] - 24:25, 40:17, 43:24, 44:17, 44:19, 44:21, 52:7, 52:11, 124:3, 159:4, 159:24, 160:18
**believes** [1] - 23:2
**Belinda** [2] - 197:2, 197:13
**BELINDA** [2] - 197:7, 214:9
**belonged** [1] - 184:23
**belongs** [3] - 119:21, 140:5, 144:5
**below** [6] - 31:8, 31:9, 39:14, 39:24, 48:20, 65:19
**beneath** [1] - 65:16
**beneficiaries** [1] - 10:20
**beneficiary** [1] - 10:18
**benefit** [1] - 134:11
**benefits** [1] - 10:18
**Berkemer** [1] - 209:3
**best** [7] - 3:24, 4:21,

53:5, 108:11, 138:20, 201:16, 207:10
**better** [6] - 33:12, 36:22, 49:10, 56:8, 67:14, 68:19
**between** [17] - 23:23, 38:11, 40:23, 45:22, 52:25, 53:1, 73:3, 90:17, 90:24, 91:13, 95:3, 104:5, 107:5, 148:1, 148:4, 149:11, 153:16
**beyond** [1] - 140:11
**bias** [1] - 10:19
**big** [1] - 198:11
**bit** [13] - 6:13, 21:19, 47:17, 49:9, 67:24, 89:22, 113:25, 128:21, 133:24, 140:14, 168:21, 202:18, 207:8
**bits** [3] - 54:1, 101:15, 114:5
**black** [1] - 49:3
**blanche** [1] - 18:5
**block** [29] - 35:23, 53:24, 69:10, 69:25, 72:4, 72:15, 72:19, 72:21, 72:24, 73:18, 73:24, 74:20, 77:21, 88:14, 94:7, 97:6, 102:3, 104:6, 105:11, 105:16, 105:25, 106:1, 106:16, 106:17, 140:22, 140:24, 141:1, 141:2
**blocks** [77] - 44:24, 56:16, 57:12, 67:16, 68:24, 69:2, 69:19, 69:21, 70:10, 70:11, 70:12, 70:13, 70:15, 70:17, 70:18, 70:20, 71:4, 71:16, 71:19, 72:2, 72:5, 72:10, 73:17, 73:22, 96:11, 102:5, 103:19, 103:21, 104:2, 104:5, 104:7, 104:8, 104:13, 104:17, 104:18, 104:19, 105:7, 105:15, 105:18, 105:19, 105:20, 105:25, 106:2, 106:7, 106:23, 108:7, 108:8, 108:24, 120:2, 144:12, 144:13, 144:14, 144:15, 144:22, 144:25, 145:1, 145:18, 146:7, 146:21, 147:1, 147:2, 148:11, 148:13, 148:15, 150:8, 151:12, 151:13, 154:14, 155:12
**blue** [3] - 32:4, 50:7, 159:1
**blurry** [3] - 32:9, 33:10,

41:14
**board** [4] - 43:17, 46:8, 46:13, 51:13
**boards** [4] - 43:16, 56:18, 56:20, 108:19
**boil** [1] - 17:16
**bones** [1] - 129:17
**book** [1] - 104:16
**booked** [1] - 14:18
**books** [1] - 47:14
**bootstrap** [1] - 16:13
**borrow** [1] - 47:13
**bottom** [14] - 38:9, 38:15, 39:21, 48:6, 48:19, 49:7, 49:9, 49:11, 50:23, 50:24, 60:3, 108:21, 180:12
**box** [3] - 32:4, 34:14, 37:4
**break** [9] - 45:4, 51:25, 52:1, 69:16, 113:6, 123:2, 179:16
**breakfast** [1] - 160:18
**breaking** [1] - 80:12
**breaks** [3] - 44:23, 45:7, 178:20
**Breland** [1] - 12:6
**Brian** [4] - 22:19, 24:13, 24:23
**BRIAN** [2] - 24:17, 214:4
**briefly** [8] - 3:7, 14:21, 26:22, 28:7, 111:4, 114:18, 116:19, 117:12
**bright** [1] - 139:5
**bring** [5] - 30:22, 72:10, 188:14, 189:3, 189:7, 189:11, 189:12
**brings** [2] - 32:3, 146:16
**broken** [1] - 103:19
**brought** [3] - 164:12, 190:22, 208:9
**browse** [1] - 153:5
**browser** [4] - 31:10, 31:16, 38:17, 60:4
**browser's** [1] - 31:17
**Budlow** [7] - 1:16, 2:6, 14:20, 21:1, 21:17, 121:17, 156:18
**BUDLOW** [52] - 2:2, 14:16, 14:21, 21:18, 21:22, 24:6, 118:7, 121:18, 125:2, 128:23, 129:1, 129:9, 155:16, 156:12, 156:16, 156:20, 175:24, 176:2, 180:1, 180:15, 196:1, 196:23, 201:9, 205:20, 205:23, 208:22, 213:7, 213:11,

213:15, 214:7, 214:8,
214:10
 **build** [3] - 32:16, 110:4,
110:12
 **building** [1] - 33:6
 **built** [2] - 43:15, 109:14
 **bulletin** [6] - 43:16,
43:17, 46:8, 51:13,
56:18, 108:19
 **bunch** [1] - 117:20
 **burden** [1] - 205:24
 **burglary** [1] - 203:3
 **business** [3] - 137:11,
138:23, 201:5
 **button** [4] - 34:18,
43:22, 50:14, 50:22
 **buy** [1] - 136:7
 **BY** [26] - 25:3, 28:20,
42:12, 52:4, 59:15, 63:3,
80:18, 84:6, 114:17,
115:19, 156:20, 176:2,
180:1, 180:15, 184:16,
196:1, 197:17, 201:9,
214:4, 214:5, 214:5,
214:7, 214:7, 214:8,
214:9, 214:10

**C**

 **calculated** [1] - 131:4
 **calm** [5] - 163:12,
163:13, 202:14, 203:8,
209:10
 **calmed** [1] - 202:20
 **camped** [1] - 147:13
 **candid** [2] - 6:13, 6:19
 **candidly** [1] - 13:15
 **cannot** [6] - 39:22,
41:14, 145:20, 146:8,
146:14, 165:12
 **canons** [1] - 17:22
 **capture** [1] - 31:2
 **car** [2] - 158:11, 158:25
 **card** [4] - 164:23,
164:24, 165:2, 165:3
 **care** [2] - 5:13, 39:16
 **carefully** [4] - 111:15,
111:20, 112:4, 147:6
 **carried** [1] - 170:13
 **carry** [1] - 164:24
 **carte** [1] - 18:5
 **case** [132] - 3:2, 3:8,
3:12, 3:21, 4:11, 4:12,
5:3, 5:5, 5:10, 5:22, 6:1,
6:2, 6:4, 6:5, 6:8, 6:19,
7:6, 7:9, 7:18, 7:20,
7:25, 8:8, 8:11, 8:12,
8:13, 9:3, 9:4, 9:5, 9:7,
9:9, 9:14, 9:16, 9:17,

9:22, 10:4, 10:9, 10:15,
10:17, 10:19, 10:21,
11:7, 11:8, 11:10, 11:16,
12:2, 12:4, 12:6, 12:9,
12:10, 12:14, 12:25,
13:16, 15:6, 15:7, 15:20,
16:2, 16:15, 16:18,
16:23, 17:6, 17:24, 18:5,
20:14, 20:16, 23:11,
48:5, 49:15, 84:3, 111:3,
111:18, 114:2, 119:6,
119:9, 119:13, 119:16,
120:10, 120:25, 121:2,
121:14, 122:16, 122:22,
123:9, 123:13, 123:21,
124:2, 124:23, 127:22,
127:25, 129:23, 130:9,
131:13, 132:4, 132:15,
132:25, 133:14, 135:6,
136:22, 136:24, 137:3,
137:8, 137:19, 137:23,
137:25, 138:20, 139:3,
139:4, 139:20, 140:11,
143:7, 145:10, 147:5,
147:11, 149:10, 151:25,
153:12, 162:22, 165:1,
165:2, 175:3, 190:19,
190:20, 196:9, 196:18,
209:3, 209:6, 211:20
 **CASE** [1] - 1:5
 **Case** [1] - 215:5
 **cases** [39] - 3:4, 3:5,
3:6, 3:20, 3:21, 3:22,
3:24, 4:8, 6:23, 8:17,
8:19, 8:20, 8:23, 11:7,
12:19, 12:21, 14:9,
15:11, 15:13, 16:3,
16:21, 17:22, 19:9,
19:19, 20:10, 20:14,
130:3, 139:6, 140:13,
140:23, 141:3, 145:16,
151:16, 151:21, 164:1,
189:18, 211:1, 211:24
 **casual** [1] - 210:12
 **Cavanaugh** [7] - 2:24,
3:9, 14:11, 24:3, 120:12,
149:17, 151:17
 **ceased** [1] - 193:25,
207:18, 211:23
 **centered** [1] - 8:13
 **central** [2] - 70:8, 70:9
 **certain** [8] - 39:23,
76:22, 82:20, 88:22,
93:11, 149:9, 149:11,
212:12
 **certainly** [17] - 31:2,
74:14, 109:7, 118:16,
123:25, 125:24, 128:7,
128:15, 129:16, 132:9,
133:19, 137:10, 143:4,

147:23, 150:2, 200:10,
212:12
 **certainty** [1] - 129:20
 **CERTIFICATE** [1] -
215:1
 **certify** [2] - 215:3, 215:6
 **chair** [6] - 24:20,
172:19, 172:25, 173:9,
197:10
 **challenge** [1] - 10:23
 **challenging** [1] - 12:2
 **chambers** [2] - 213:12,
213:14
 **chance** [2] - 19:18,
134:9
 **change** [2] - 38:6, 42:21
 **changed** [2] - 38:2,
40:10
 **changes** [5] - 37:25,
40:9, 55:8, 55:10, 55:11
 **chapters** [2] - 104:16,
104:17
 **characteristics** [1] -
55:6
 **characters** [1] - 44:9
 **charge** [1] - 9:12
 **charged** [1] - 19:4
 **charges** [2] - 176:22,
210:17
 **Charges** [1] - 177:16,
177:17
 **chat** [1] - 196:4
 **check** [2] - 94:7, 94:8
 **checking** [1] - 124:8
 **Child** [1] - 93:21
 **child** [39] - 26:17,
54:14, 54:19, 55:4,
56:19, 57:5, 57:19,
92:25, 94:24, 95:4, 96:7,
96:18, 97:25, 98:4,
98:20, 104:2, 109:6,
109:14, 110:1, 125:12,
127:13, 128:6, 130:2,
130:4, 131:1, 131:6,
131:8, 131:19, 131:23,
132:5, 142:18, 143:15,
146:21, 155:10, 176:25,
178:12, 190:3, 190:7,
212:10
 **children** [1] - 177:2
 **Children** [3] - 84:11,
99:18, 164:3
 **Children's** [1] - 157:7
 **CHK** [2] - 49:16, 50:20
 **choice** [3] - 36:13,
127:3, 199:6
 **choose** [9] - 35:20,
37:8, 37:10, 39:6, 46:22,
66:5, 126:13, 127:3
 **chose** [2] - 126:14,

201:5
 **churn** [1] - 43:1
 **circled** [2] - 38:18,
39:14
 **circling** [4] - 35:7,
38:25, 47:6, 48:7
 **Circuit** [5] - 3:21, 4:7,
4:12, 4:13, 5:3, 5:4,
5:19, 8:12, 11:16, 11:17,
11:18, 11:22, 11:23,
12:10, 16:18, 20:15,
151:22
 **circuit** [5] - 6:23, 17:13,
17:19
 **Circuit's** [1] - 12:9
 **circuits** [1] - 20:14
 **circumstances** [6] -
15:8, 18:2, 208:14,
209:4, 209:18, 211:2
 **cite** [2] - 3:5, 10:5
 **cited** [14] - 3:4, 4:11,
9:14, 10:4, 11:9, 12:9,
15:6, 15:12, 15:13, 16:4,
19:19, 20:10, 20:16,
148:13
 **cites** [7] - 3:20, 8:17,
9:3, 9:16, 10:15, 11:7,
19:9
 **citizenry** [1] - 18:24
 **citizens** [4] - 20:3,
138:14, 142:14, 207:10
 **civilian** [2] - 185:5,
188:7
 **claim** [9] - 11:10, 14:2,
14:3, 14:8, 17:20, 127:6,
153:9, 193:17, 195:17
 **clarify** [2] - 32:1, 98:1
 **class** [10] - 10:22,
96:17, 98:2, 98:3, 98:4,
98:14, 98:15, 98:19,
143:17
 **classes** [7] - 25:21,
25:23, 33:22, 85:6,
96:15, 102:4, 143:14
 **clear** [16] - 2:23, 8:3,
17:6, 17:11, 23:8, 39:13,
41:14, 52:24, 83:2,
89:24, 95:16, 116:9,
125:18, 160:3, 160:4,
210:7
 **cleared** [3] - 161:13,
161:19, 162:21
 **clearer** [2] - 33:9, 122:5
 **clearing** [1] - 161:21
 **clearly** [6] - 15:12,
89:24, 199:12, 211:19,
212:14, 212:15
 **clerk** [1] - 117:10
 **CLERK** [9] - 24:15,
24:19, 24:25, 156:3,

156:7, 156:11, 197:5,
197:9, 197:15
 **Clerk** [1] - 174:8
 **click** [21] - 31:6, 31:9,
31:14, 31:24, 32:1, 32:5,
33:10, 34:14, 34:18,
35:11, 36:1, 36:23,
36:24, 37:17, 38:10,
43:22, 47:7, 48:22,
48:23, 50:14
 **clickable** [2] - 47:3,
51:11
 **clicked** [4] - 47:15,
48:5, 50:24, 127:3
 **clicking** [1] - 30:21
 **clicks** [3] - 38:5, 44:18,
52:7
 **cloak** [1] - 117:24
 **cloaked** [1] - 122:16
 **clock** [1] - 74:14
 **close** [3] - 35:22,
179:12, 181:14
 **close-up** [1] - 35:22
 **closed** [3] - 173:1,
173:2, 209:15
 **closer** [2] - 91:23, 211:9
 **closest** [1] - 172:25
 **closet** [1] - 172:17
 **cloud** [2] - 31:8, 32:2
 **Clyburn** [2] - 7:1, 8:3
 **CLYBURN** [1] - 7:2
 **co** [1] - 27:12
 **co-authors** [1] - 27:12
 **cobble** [1] - 87:19
 **code** [14] - 32:11,
32:16, 32:20, 32:21,
32:25, 33:4, 37:21, 40:7,
76:18, 80:2, 80:3, 80:5,
96:16
 **Coleman** [1] - 169:16
 **collect** [5] - 39:1, 45:12,
83:11, 110:1, 116:20
 **collected** [13] - 79:3,
82:11, 99:11, 99:16,
108:16, 114:6, 119:19,
119:23, 125:14, 125:20,
130:20, 131:3
 **collecting** [1] - 59:24
 **collection** [10] - 25:19,
27:10, 44:6, 49:21,
49:22, 49:25, 83:7,
103:12, 110:13, 125:13
 **collections** [2] - 43:11
 **collects** [2] - 83:16,
102:2
 **Colleen** [1] - 2:24
 **college** [1] - 33:20
 **College** [2] - 25:7,
25:17
 **colonial** [1] - 160:11

**comfortable** [3] - 88:19, 196:6, 211:5

**coming** [16] - 43:2, 92:19, 92:24, 96:1, 96:2, 96:4, 101:5, 105:2, 121:15, 136:2, 136:3, 147:15, 147:16, 188:22, 192:25, 198:3

**comma** [1] - 49:18

**comment** [4] - 79:23, 85:4, 211:7, 212:10

**commentary** [1] - 27:16

**comments** [2] - 27:16, 134:19, 159:20

**commit** [1] - 191:17

**Committee** [1] - 27:14

**common** [5] - 30:18, 33:19, 33:24, 133:1, 136:9

**communicant** [1] - 115:12

**Communication** [2] - 22:12, 133:18

**communication** [25] - 51:17, 71:7, 71:11, 71:19, 72:1, 72:9, 72:14, 72:17, 73:9, 73:10, 73:21, 74:1, 74:11, 74:19, 77:1, 77:17, 77:18, 77:23, 77:25, 92:24, 96:13, 115:12, 115:14, 140:24, 141:22

**communications** [12] - 10:25, 22:13, 65:25, 71:14, 82:11, 82:15, 93:9, 95:17, 98:19, 105:16, 153:15, 153:16

**Communications** [1] - 141:7

**community** [2] - 47:11, 47:13

**compared** [2] - 39:10, 39:24

**compelled** [1] - 200:1

**competitive** [1] - 148:2

**complete** [1] - 215:8

**completed** [2] - 51:19, 183:23

**completely** [10] - 14:18, 15:14, 89:12, 120:8, 122:2, 124:23, 127:8, 147:3, 161:6, 212:8

**complex** [1] - 176:24

**complicated** [12] - 10:6, 10:16, 20:5, 20:7, 120:14, 120:24, 122:4, 139:16, 149:15, 149:16, 150:2, 154:5

**complies** [1] - 105:20

**component** [3] - 69:17,

69:19, 73:10

**components** [1] - 82:7

**comprise** [9] - 68:24, 72:5, 73:22, 98:14, 106:23, 144:13, 144:15, 147:2, 148:11

**comprises** [2] - 86:4, 105:16

**computer** [79] - 20:8, 25:20, 25:25, 29:7, 29:10, 30:13, 30:15, 32:2, 34:9, 42:24, 43:4, 43:10, 43:20, 43:23, 45:6, 51:5, 53:14, 53:15, 54:5, 54:7, 55:16, 55:22, 55:24, 66:9, 71:20, 72:10, 72:18, 73:5, 77:17, 78:5, 78:25, 81:11, 81:12, 81:19, 82:4, 82:8, 83:14, 83:16, 87:15, 87:16, 87:24, 88:2, 88:16, 89:10, 90:22, 91:3, 99:17, 100:5, 101:6, 102:23, 102:24, 103:2, 115:13, 117:20, 120:10, 120:15, 124:3, 124:5, 125:25, 126:6, 126:19, 127:17, 128:1, 130:8, 144:20, 168:4, 169:13, 174:8, 174:15, 174:20, 174:23, 178:15, 181:20, 190:6, 190:11

**Computer** [2] - 25:8, 25:18

**computer's** [3] - 50:9, 52:19, 74:23

**computer-based** [3] - 20:8, 120:15, 190:6

**computerized** [1] - 77:10

**computers** [27] - 29:3, 40:23, 41:9, 53:1, 53:2, 73:3, 77:10, 77:11, 79:13, 81:19, 87:17, 87:20, 91:6, 91:7, 93:20, 124:12, 125:14, 127:19, 153:10, 153:16, 168:4, 168:5, 169:14, 169:15, 178:11, 196:16, 196:17

**concedes** [1] - 212:9

**concept** [1] - 68:6

**concerned** [2] - 77:20, 91:9

**concluded** [1] - 183:21

**conclusion** [9] - 5:1, 19:8, 24:5, 79:2, 105:2, 109:7, 179:24, 183:7, 213:21

**conclusions** [2] - 4:16,

5:15, 5:24

**conclusory** [8] - 3:23, 4:13, 151:18, 151:20, 151:24, 152:1, 152:6, 154:22

**conditions** [1] - 93:1

**conduct** [6] - 18:9, 128:9, 130:18, 143:10, 150:21, 157:21

**conducted** [2] - 121:7, 134:8

**conducting** [1] - 169:13

**confers** [2] - 113:10, 152:18

**confidential** [1] - 135:14

**configuration** [3] - 38:10, 38:13, 45:18

**configure** [1] - 46:23

**configured** [1] - 31:17

**confirm** [1] - 57:18

**confirmed** [1] - 176:5

**conflates** [1] - 128:22

**conflating** [1] - 16:6

**confused** [1] - 128:21

**confusing** [1] - 120:14

**connect** [11] - 35:6, 35:7, 39:8, 39:14, 40:1, 40:13, 58:17, 58:25, 59:2, 67:10

**connected** [40] - 41:12, 41:23, 41:24, 42:4, 42:5, 42:14, 42:15, 42:20, 42:22, 42:24, 52:20, 52:22, 53:19, 53:21, 55:21, 56:1, 56:5, 60:10, 66:20, 66:25, 67:3, 67:6, 67:13, 67:18, 67:22, 71:9, 71:11, 71:18, 71:22, 72:2, 72:3, 72:7, 74:14, 75:2, 78:4, 89:19, 94:24, 127:15, 128:2, 131:24

**connecting** [2] - 36:10, 58:22

**connection** [1] - 40:16

**connections** [2] - 40:20, 41:8

**connects** [1] - 40:25, 114:22

**conscious** [1] - 170:18

**consciously** [1] - 211:4

**conservative** [1] - 105:1

**consider** [6] - 4:2, 4:23, 27:8, 97:19, 124:5, 131:15

**consistent** [6] - 86:14, 136:4, 136:5, 136:12, 136:13, 174:12

**consists** [5] - 98:13,

104:1, 105:25, 106:1, 140:5

**constantly** [1] - 48:8

**constitute** [1] - 215:6

**constitutional** [1] - 137:13

**constructed** [4] - 62:9, 78:2, 110:20, 139:7

**construction** [1] - 110:24

**construed** [1] - 4:21

**contact** [10] - 67:11, 84:9, 84:10, 84:12, 84:17, 90:9, 90:14, 208:12, 213:12, 213:14

**contacted** [1] - 75:25

**contacting** [1] - 183:11

**contain** [8] - 54:19, 56:7, 98:19, 102:6, 149:22, 149:24, 151:5, 151:10

**contained** [4] - 19:16, 55:18, 131:19, 132:20

**contains** [7] - 53:23, 60:6, 73:18, 74:12, 102:4, 102:9, 117:11

**contemplated** [4] - 9:25, 10:2, 10:13, 19:22

**contemplation** [1] - 19:15

**content** [21] - 22:22, 44:10, 93:5, 93:7, 95:4, 97:7, 140:23, 141:2, 141:5, 141:7, 141:12, 141:13, 141:25, 142:4, 142:8, 142:17, 142:18, 144:7

**contents** [8] - 68:8, 68:10, 68:22, 68:24, 104:15, 104:16, 104:17, 131:15

**contest** [2] - 10:6, 15:15

**context** [4] - 7:1, 8:19, 8:20, 109:12

**continue** [5] - 35:12, 71:21, 72:6, 74:6, 183:25

**continues** [4] - 13:23, 29:24, 72:4, 72:9

**continuously** [1] - 38:20

**contraband** [2] - 129:21, 212:2

**contrast** [1] - 206:19

**convenience** [1] - 49:12

**conversation** [4] - 112:17, 171:11, 171:16, 211:6

**conversational** [5] - 164:18, 178:9, 180:20, 181:23, 209:11

104:1, 105:25, 106:1, 140:5

**conveys** [1] - 148:22

**cooperating** [1] - 8:6

**cooperative** [1] - 182:8

**copied** [4] - 92:10, 92:12, 94:2, 142:22

**copies** [1] - 94:23

**copy** [10] - 33:7, 50:8, 50:9, 94:18, 94:20, 117:9, 129:14, 175:20

**copying** [3] - 140:4, 142:11, 143:22

**Corn** [1] - 2:9

**corners** [5] - 16:16, 23:4, 122:13, 129:15, 133:7

**correct** [174] - 30:11, 31:25, 38:22, 41:2, 42:15, 46:1, 46:2, 58:1, 58:2, 58:19, 63:8, 63:13, 64:11, 64:17, 65:2, 65:10, 65:14, 65:17, 65:19, 65:21, 65:25, 66:3, 66:6, 66:7, 66:9, 66:20, 66:25, 67:1, 67:4, 67:7, 67:11, 67:22, 68:2, 68:4, 68:5, 68:15, 68:17, 68:22, 68:23, 68:25, 69:5, 69:10, 70:6, 70:12, 70:20, 70:23, 71:1, 71:2, 71:4, 71:15, 72:8, 72:12, 72:25, 73:2, 73:11, 73:14, 73:15, 73:17, 74:1, 76:2, 76:3, 76:7, 76:15, 76:16, 76:20, 76:23, 77:6, 77:7, 77:14, 77:18, 77:19, 77:21, 77:22, 77:23, 77:24, 78:1, 78:10, 78:13, 78:14, 78:15, 78:19, 79:19, 79:23, 80:2, 80:6, 80:21, 82:12, 83:18, 84:22, 85:16, 85:21, 85:24, 86:5, 86:17, 87:7, 87:8, 88:10, 88:11, 91:7, 91:8, 91:22, 92:3, 92:5, 92:21, 93:3, 93:4, 93:8, 94:2, 94:18, 94:19, 94:21, 94:22, 95:2, 95:10, 95:18, 95:19, 96:15, 98:7, 98:18, 101:24, 102:6, 102:7, 102:17, 102:18, 103:3, 103:20, 105:11, 112:19, 112:23, 113:21, 114:6, 114:9, 114:21, 114:22, 161:17, 175:15, 184:18, 185:11, 185:12, 185:18, 185:20, 186:13, 186:14, 186:19, 186:22, 187:1, 187:3, 187:12, 189:1,

189:16, 189:19, 189:24, 189:25, 190:8, 190:12, 190:17, 192:1, 192:17, 193:8, 193:9, 193:15, 193:18, 193:19, 193:25, 194:3, 194:6, 194:18, 195:15, 201:14, 202:25, 203:2, 203:7, 203:18

**corrected** [1] - 188:9

**correctly** [6] - 41:25, 63:19, 83:13, 101:3, 103:13, 179:3

**correlation** [1] - 60:9

**corresponds** [2] - 71:4, 72:19

**corroborate** [1] - 135:25

**corroborating** [1] - 191:17

**couch** [12] - 17:12, 161:25, 162:19, 168:14, 169:24, 171:17, 192:4, 192:19, 193:21, 195:1, 196:3, 211:3

**counsel** [3] - 2:7, 15:25, 114:24

**count** [4] - 74:5, 75:17, 75:18, 185:2

**country** [3] - 65:23, 138:14, 150:21

**County** [8] - 7:8, 16:18, 156:24, 157:1, 157:3, 157:8, 159:14, 163:24

**couple** [8] - 25:12, 30:20, 65:12, 112:2, 112:3, 140:2, 140:15, 196:2

**course** [12] - 27:12, 51:19, 56:9, 88:17, 91:25, 119:25, 125:12, 130:5, 155:22, 185:4, 209:9, 209:21

**courses** [1] - 130:3

**Court** [63] - 2:22, 3:10, 3:11, 3:12, 9:17, 10:2, 10:13, 12:13, 12:17, 12:20, 13:22, 14:2, 16:18, 19:20, 19:22, 20:1, 21:8, 21:23, 22:7, 24:9, 66:19, 80:12, 113:5, 117:12, 118:12, 120:13, 121:10, 121:19, 123:14, 124:5, 127:21, 132:9, 132:10, 133:13, 133:24, 134:2, 134:14, 135:1, 135:2, 138:25, 139:8, 139:10, 139:23, 141:9, 143:3, 143:22, 144:19, 150:17, 152:21, 152:25, 155:24, 165:13,

175:19, 208:19, 208:24, 209:3, 209:8, 210:2, 210:4, 210:23, 212:16, 215:15

**COURT** [83] - 1:1, 2:13, 14:13, 14:20, 18:19, 21:12, 21:21, 23:24, 24:10, 24:14, 28:13, 28:17, 28:19, 37:3, 42:7, 42:10, 52:1, 52:3, 59:13, 62:23, 63:1, 63:6, 80:13, 80:15, 80:17, 83:25, 84:2, 110:8, 113:7, 114:15, 115:17, 116:23, 116:25, 117:7, 117:10, 118:1, 118:5, 121:17, 122:25, 123:4, 123:7, 123:18, 124:11, 124:18, 125:9, 125:17, 126:20, 128:12, 128:17, 128:19, 128:21, 128:25, 129:7, 133:21, 135:4, 135:6, 136:16, 136:19, 137:2, 138:18, 139:12, 139:19, 152:15, 154:24, 155:22, 156:1, 156:15, 156:18, 175:23, 179:25, 184:14, 196:20, 196:22, 197:4, 205:18, 205:22, 206:6, 206:12, 212:21, 212:23, 213:10, 213:14, 213:20

**court** [42] - 2:24, 5:16, 5:17, 5:18, 5:19, 5:20, 6:6, 6:10, 6:21, 6:25, 7:4, 7:23, 9:3, 9:5, 9:8, 9:9, 9:11, 9:23, 9:25, 10:12, 13:18, 13:20, 16:7, 16:9, 17:7, 17:13, 17:19, 19:18, 19:21, 20:2, 20:12, 20:18, 24:22, 122:17, 151:4, 151:21, 151:24, 165:10, 179:17, 197:12

**court's** [1] - 9:2

**Court's** [11] - 17:25, 21:19, 24:1, 24:2, 24:4, 122:3, 137:22, 152:24, 155:21, 175:17, 213:16

**Courthouse** [1] - 1:23

**courtroom** [2] - 2:12, 157:24

**courts** [4] - 3:12, 6:24, 122:16, 124:25

**cover** [1] - 170:18

**covered** [3] - 122:2, 152:23, 170:16

**crazy** [1] - 53:12

**create** [3] - 36:20, 79:14, 96:21

**created** [9] - 76:13,

76:17, 76:20, 79:15, 89:18, 96:22, 108:16, 115:20, 175:13

**creating** [1] - 115:21

**credit** [3] - 155:1, 207:15, 213:1

**crime** [4] - 148:3, 164:7, 191:18, 212:8

**Crimes** [6] - 84:11, 93:21, 99:18, 157:6, 164:2

**crimes** [1] - 138:14

**criminal** [4] - 11:10, 191:16, 191:19, 203:3

**CRIMINAL** [1] - 1:5

**Criminal** [2] - 2:3, 2:8

**critical** [6] - 56:15, 61:16, 103:17, 144:12, 146:21, 154:15

**Cross** [2] - 11:9, 11:22

**CROSS** [6] - 63:2, 184:15, 201:8, 214:5, 214:7, 214:10

**cross** [11] - 12:10, 20:16, 63:1, 120:19, 121:4, 121:21, 122:4, 122:17, 122:25, 134:22, 134:25

**cross-case** [1] - 20:16

**cross-opinion** [1] - 12:10

**cuff** [1] - 90:19

**cuffs** [3] - 184:7, 184:8

**curious** [2] - 12:25, 112:5

**current** [4] - 56:9, 56:10, 74:15, 113:11

**cursory** [2] - 5:9, 7:16

**curtailed** [1] - 209:5

**custody** [17] - 173:10, 206:1, 206:10, 206:11, 206:13, 206:23, 207:4, 207:14, 207:25, 208:15, 208:25, 209:2, 209:19, 209:22, 210:3, 212:17, 212:24

**custom** [1] - 35:9

**cut** [2] - 50:16, 208:6

**cutting** [1] - 177:24

**CV** [2] - 27:23, 28:6

## D

**daily** [2] - 99:13, 135:12

**danger** [2] - 18:14, 18:23

**dark** [3] - 188:18, 198:6, 207:2

**darknet** [12] - 35:17,

36:19, 36:20, 38:25, 39:11, 39:20, 39:25, 59:6, 59:10, 59:11, 59:17, 115:1

**dash** [3] - 49:20, 50:22

**data** [97] - 45:21, 46:23, 69:8, 70:2, 70:14, 71:6, 79:2, 80:20, 80:25, 81:4, 81:7, 83:16, 88:16, 90:3, 90:4, 90:5, 92:12, 93:8, 94:2, 94:18, 96:13, 96:15, 96:17, 97:3, 98:2, 98:3, 98:13, 99:2, 99:4, 99:8, 99:9, 99:15, 99:19, 99:22, 100:6, 100:7, 100:15, 101:4, 101:7, 102:2, 102:9, 103:4, 103:12, 103:25, 104:1, 104:8, 114:12, 114:13, 119:4, 119:6, 119:7, 119:16, 119:20, 119:21, 119:23, 119:24, 120:6, 140:4, 140:5, 141:23, 141:24, 142:2, 142:10, 142:11, 142:13, 142:14, 142:15, 142:16, 142:19, 142:21, 142:22, 142:23, 143:1, 143:2, 143:7, 143:12, 143:13, 143:14, 143:17, 143:23, 143:24, 143:25, 144:2, 144:5, 149:9, 176:25

**data's** [1] - 97:7

**database** [7] - 108:14, 110:4, 110:12, 110:17, 110:19, 110:24, 114:5

**databases** [2] - 109:13, 109:18

**date** [29] - 54:1, 56:9, 64:5, 74:3, 74:10, 74:12, 74:17, 74:18, 74:22, 77:25, 88:13, 92:5, 93:10, 94:25, 101:10, 102:2, 119:17, 140:6, 144:20, 174:24, 174:25, 175:3, 175:5, 175:15, 181:13, 213:10, 213:11

**dated** [2] - 10:9, 10:10

**dates** [1] - 10:9

**daughter** [1] - 185:24

**days** [7] - 25:12, 94:10, 103:15, 106:17, 112:2, 112:3, 135:2

**deal** [3] - 15:13, 23:8, 113:23

**dealing** [1] - 124:24, 129:1

**dealt** [2] - 16:22, 23:19

**death** [1] - 199:10

**decade** [1] - 54:19

**decades** [2] - 62:13, 62:20

**December** [1] - 75:15

**decide** [2] - 53:5, 173:7

**decided** [1] - 194:13

**decision** [8] - 11:3, 14:12, 18:14, 133:1, 148:5, 170:18, 173:8, 194:16

**decisionmaking** [12] - 8:25, 9:7, 9:11, 9:20, 10:24, 11:3, 12:23, 14:11, 20:18, 21:6, 21:7, 138:2

**decisions** [2] - 10:8, 11:20

**deck** [1] - 198:3

**Decker** [2] - 5:3, 8:11

**declined** [1] - 213:3

**decrypt** [2] - 45:12, 70:16

**decrypting** [1] - 53:16

**decryption** [2] - 51:23, 70:16

**dedicated** [1] - 130:14

**Defendant** [2] - 1:7, 1:18

**defendant** [56] - 2:10, 7:2, 7:12, 11:10, 11:13, 20:4, 23:7, 23:13, 113:10, 129:4, 139:17, 152:18, 158:4, 159:16, 161:15, 161:22, 163:8, 165:17, 165:25, 166:18, 166:21, 167:22, 168:12, 168:17, 169:1, 169:22, 170:22, 171:1, 171:15, 172:2, 172:11, 172:24, 173:10, 173:18, 176:6, 179:18, 181:10, 181:24, 182:20, 182:25, 183:15, 184:2, 208:24, 209:14, 209:21, 209:25, 210:2, 210:5, 210:22, 211:3, 211:10, 211:22, 212:2, 212:7, 212:17

**DEFENDANT'S** [1] - 197:7

**defendant's** [10] - 9:13, 22:2, 124:5, 155:15, 155:17, 155:18, 168:2, 168:9, 170:22, 180:18

**defendants** [1] - 124:25

**defense** [24] - 7:7, 9:6, 9:10, 15:8, 18:2, 18:4, 21:10, 21:25, 22:1, 22:9, 22:14, 23:12, 51:24, 114:24, 116:4, 116:7, 118:10, 122:15, 123:9, 126:22, 128:16, 129:12,

132:23, 133:16
**defense's** [1] - 128:5
**deficiency** [1] - 4:5
**deficient** [1] - 133:10
**definitely** [5] - 43:14, 49:2, 90:17, 93:23, 200:7
**definition** [2] - 141:7, 141:10
**definitions** [3] - 130:14, 148:24, 148:25
**degree** [13] - 5:13, 9:13, 11:4, 21:2, 78:15, 78:24, 79:10, 79:11, 79:15, 107:1, 143:19, 209:5, 212:12
**demarcation** [1] - 143:25
**demeanor** [2] - 180:18, 181:21
**demeanors** [1] - 181:22
**demographic** [1] - 79:6
**demonstrated** [3] - 180:2, 209:21, 211:13
**demonstration** [1] - 48:1
**denote** [1] - 74:21
**denoted** [2] - 65:14, 68:6
**deny** [5] - 21:12, 154:24, 155:15, 212:23, 213:5
**denying** [1] - 212:16
**department** [1] - 159:2
**Department** [7] - 2:8, 9:21, 156:24, 157:1, 157:4, 157:9, 163:24
**deposed** [2] - 9:19, 11:1
**deprive** [1] - 14:1
**describe** [17] - 3:4, 52:10, 69:9, 117:12, 158:22, 160:10, 162:25, 167:16, 169:4, 172:14, 177:24, 178:6, 180:5, 180:18, 180:22, 181:21
**described** [12] - 13:6, 58:8, 59:23, 83:4, 116:17, 122:11, 131:15, 140:20, 159:11, 167:9, 182:8, 183:15
**describes** [4] - 60:19, 61:9, 61:14, 112:6
**description** [3] - 111:12, 111:13, 112:12
**descriptions** [1] - 3:5
**designed** [10] - 33:23, 82:6, 82:14, 87:5, 96:14, 138:17, 142:24, 143:18
**desire** [1] - 166:7
**detached** [18] - 3:11, 3:18, 4:2, 4:9, 4:15,

4:20, 5:2, 7:6, 7:14, 7:22, 8:16, 8:22, 13:2, 14:5, 16:25, 19:15, 148:4, 151:25
**detail** [2] - 45:7, 134:16
**detailed** [1] - 60:7
**details** [4] - 37:14, 62:17, 88:1, 89:16
**detect** [1] - 60:16
**detective** [12] - 17:1, 18:8, 140:25, 156:9, 157:11, 172:3, 172:21, 172:22, 176:3, 192:13, 213:1
**DETECTIVE** [2] - 156:5, 214:6
**Detective** [42] - 17:10, 23:15, 118:16, 118:24, 119:8, 121:2, 122:2, 122:10, 129:24, 132:9, 132:13, 133:5, 140:21, 141:16, 142:1, 146:9, 154:10, 155:18, 156:21, 163:24, 168:24, 169:16, 174:9, 174:14, 179:6, 179:16, 181:21, 184:12, 196:20, 202:10, 203:8, 204:12, 207:7, 207:14, 207:18, 207:19, 207:21, 208:8, 210:6, 210:13, 211:9, 213:1
**detectives** [7] - 159:4, 182:16, 183:16, 184:24, 185:5, 187:18, 188:13
**detectives'** [1] - 181:22
**detective's's** [1] - 122:18
**determination** [38] - 4:9, 9:2, 13:21, 19:13, 20:3, 61:15, 99:6, 99:22, 99:23, 103:7, 106:6, 107:1, 130:16, 132:5, 133:3, 143:8, 145:3, 146:5, 146:8, 146:10, 146:11, 146:14, 147:4, 147:9, 148:14, 148:23, 149:13, 150:6, 150:15, 151:6, 151:19, 152:4, 152:5, 154:8, 206:22, 207:4, 208:9
**determinations** [3] - 10:23, 88:9, 108:5
**determine** [26] - 5:6, 18:21, 20:20, 40:9, 57:21, 61:10, 61:25, 88:3, 88:5, 98:15, 99:5, 102:25, 103:1, 120:6, 121:15, 130:25, 131:5, 143:6, 144:16, 147:17, 147:20, 147:23, 152:6,

153:18, 196:15, 211:16
**determined** [3] - 93:11, 106:6, 131:22
**determines** [5] - 72:14, 72:18, 72:19, 150:9, 207:21
**determining** [2] - 11:20, 102:16
**develop** [5] - 95:12, 134:3, 134:9, 191:18, 191:25
**developed** [6] - 29:14, 29:15, 95:3, 119:1, 119:3, 153:20
**developer** [1] - 49:11
**developers** [4] - 29:19, 33:16, 48:18, 75:4
**development** [1] - 29:23
**device** [1] - 190:23
**devices** [2] - 132:6, 169:15
**diagram** [2] - 185:13, 185:14
**dialogue** [2] - 178:9, 178:10
**Dickerman** [2] - 6:2, 8:12
**difference** [3] - 104:5, 107:5, 176:17
**different** [24] - 4:21, 4:25, 12:14, 14:9, 15:14, 28:25, 35:18, 44:22, 47:17, 48:18, 62:8, 89:15, 108:12, 116:5, 123:9, 126:2, 127:2, 131:14, 136:13, 153:8, 157:1, 190:19, 192:14, 212:8
**difficult** [7] - 20:19, 65:24, 136:14, 150:12, 153:18, 205:2, 207:5
**difficulties** [1] - 11:19
**diffusely** [1] - 70:5
**digital** [1] - 132:6
**dining** [2] - 160:15, 167:23
**dinner** [1] - 136:12
**DIRECT** [6] - 25:2, 156:19, 197:16, 214:4, 214:7, 214:9
**direct** [5] - 23:23, 63:9, 112:15, 120:17, 122:5
**directed** [1] - 206:25
**directive** [1] - 199:5
**directives** [1] - 206:19
**directly** [10] - 32:20, 42:4, 42:5, 66:25, 67:11, 67:18, 71:22, 72:7, 115:8, 117:16

**disability** [4] - 10:16, 10:18, 10:20, 10:23
**discover** [2] - 39:18, 65:17
**discriminatory** [1] - 11:12
**discuss** [9] - 8:23, 17:12, 26:12, 114:3, 118:18, 121:13, 128:12, 134:10, 209:11
**discussed** [13] - 22:15, 48:8, 52:13, 67:23, 82:7, 93:9, 93:20, 103:5, 112:16, 114:25, 120:11, 120:16, 122:12
**discusses** [1] - 117:17
**discussing** [1] - 56:19
**discussion** [2] - 12:7, 116:4
**disobeying** [1] - 206:18
**display** [8] - 64:9, 66:11, 78:3, 172:11, 182:17, 212:2
**displayed** [10] - 41:10, 58:11, 58:12, 58:13, 63:10, 65:1, 66:18, 78:5, 170:13, 209:16
**displaying** [1] - 170:7
**disputes** [1] - 10:7
**disregard** [1] - 132:19
**distance** [1] - 74:3
**distinguish** [2] - 107:3, 149:11
**distinguishable** [1] - 124:23
**distinguishes** [1] - 95:3
**distinguishing** [1] - 142:16
**distributed** [3] - 44:25, 70:19, 153:14
**district** [4] - 5:18, 5:20, 6:24
**DISTRICT** [2] - 1:1, 1:1
**District** [9] - 6:3, 7:19, 8:12, 9:4, 11:8, 11:24, 12:1, 12:4, 13:16
**Division** [2] - 2:8
**division** [2] - 142:6, 163:25
**DIVISION** [1] - 1:2
**DNA** [2] - 18:7, 56:8
**doctor** [1] - 24:15
**Doctor** [1] - 63:4
**doctorates** [1] - 27:11
**Document** [2] - 21:25, 22:3
**document** [5] - 26:22, 28:4, 28:7, 65:13, 171:12
**documentation** [1] - 60:5

**documented** [3] - 171:7, 176:21, 177:16
**documents** [4] - 29:4, 49:25, 171:8, 177:25
**don** [1] - 138:7
**done** [9] - 34:11, 85:10, 119:7, 151:1, 182:2, 183:7, 192:15, 209:7, 210:11
**door** [17] - 158:12, 158:14, 158:21, 158:22, 158:24, 159:16, 172:25, 173:1, 173:3, 173:5, 179:12, 187:15, 187:20, 188:13, 189:9, 198:1, 209:15
**doors** [2] - 18:15, 202:22
**doubt** [9] - 120:13, 120:22, 120:24, 142:25, 177:9, 177:12, 194:25, 206:3, 210:11
**down** [37] - 17:7, 17:16, 17:20, 24:20, 39:12, 39:20, 48:19, 49:7, 55:11, 55:17, 55:18, 58:14, 61:10, 82:17, 83:3, 83:5, 83:6, 91:13, 142:19, 159:9, 159:24, 188:22, 190:16, 197:10, 198:8, 198:9, 198:10, 199:16, 201:13, 201:15, 201:24, 202:1, 202:7, 202:20, 209:10, 212:1
**download** [32] - 30:16, 30:17, 30:23, 31:6, 31:9, 31:10, 31:14, 31:16, 32:2, 32:4, 32:6, 32:13, 33:11, 44:12, 45:15, 46:11, 48:4, 48:12, 48:14, 50:13, 50:17, 50:22, 50:24, 51:7, 51:8, 51:19, 52:7, 55:23, 67:17, 70:23, 73:9, 125:12
**downloaded** [9] - 43:12, 64:10, 65:9, 104:10, 126:18, 131:18, 141:17, 141:21
**downloader** [1] - 73:6
**downloading** [6] - 34:6, 35:19, 47:20, 70:22, 97:22, 131:24
**downloads** [1] - 52:6
**downstairs** [4] - 184:6, 198:12, 201:13, 201:19
**Dr** [41] - 24:13, 25:4, 25:21, 26:20, 27:23, 28:4, 28:15, 28:21, 30:9, 33:10, 34:4, 36:23, 38:5,

39:9, 40:4, 40:12, 52:5, 54:16, 57:23, 62:18, 114:18, 115:20, 116:25, 118:25, 119:15, 126:10, 126:16, 129:2, 129:6, 131:4, 131:17, 133:25, 140:25, 142:24, 144:11, 145:1, 146:1, 149:4, 149:25, 154:4, 155:1
  **DR** [2] - 24:17, 214:4
  **draw** [3] - 48:6, 180:8, 192:13
  **dress** [1] - 138:5
  **drive** [5] - 45:17, 45:23, 169:14, 180:7, 211:15
  **drives** [3] - 45:15, 176:24, 178:11
  **driveway** [1] - 158:25
  **drug** [7] - 7:6, 7:20, 20:5, 135:15, 136:6, 147:11, 147:22
  **drugs** [2] - 136:7, 147:17, 180:24
  **duplicate** [3] - 34:3, 80:6, 105:13
  **duration** [2] - 106:18, 195:2
  **during** [24] - 31:19, 122:5, 136:6, 157:21, 161:18, 164:16, 165:12, 166:6, 168:12, 169:12, 170:20, 170:21, 173:10, 178:14, 178:19, 179:15, 179:18, 181:24, 195:6, 195:7, 199:19, 200:2, 211:12, 211:25
  **duties** [1] - 163:5
  **duty** [1] - 164:25

**E**

  **e-mail** [3] - 43:17, 46:8, 183:12
  **e-mailed** [1] - 51:12
  **early** [3] - 181:1, 181:12, 186:21
  **easier** [2] - 49:14, 116:15
  **easiest** [1] - 50:5
  **easily** [4] - 46:5, 108:22, 141:10
  **Eastern** [3] - 6:3, 8:12, 13:15
  **easy** [5] - 39:18, 43:21, 51:18, 65:16, 206:21
  **eat** [2] - 160:18, 167:25
  **eat-in** [2] - 160:18, 167:25
  **ECPA** [1] - 133:17

  **effects** [2] - 150:23, 150:25
  **efficacy** [1] - 87:23
  **effort** [1] - 177:4
  **efforts** [2] - 24:2, 117:24
  **eight** [9] - 11:25, 26:22, 27:2, 184:25, 185:5, 187:17, 187:18, 206:16, 206:24
  **eight-page** [1] - 26:22
  **Eighth** [4] - 5:2, 5:4, 5:19, 8:12
  **either** [8] - 37:15, 52:21, 83:10, 97:3, 97:12, 99:16, 110:25, 207:16
  **elapsed** [1] - 47:24
  **Electronic** [2] - 133:18, 141:7
  **Electronics** [1] - 22:12
  **element** [3] - 186:14, 186:17, 186:21
  **elements** [1] - 155:6
  **elicit** [2] - 195:14, 208:2
  **ELMO** [1] - 26:20
  **embedded** [2] - 74:20, 74:21
  **employed** [5] - 156:23, 156:24, 156:25, 157:3, 181:14
  **enable** [2] - 38:25, 39:7
  **enables** [1] - 45:11
  **encountered** [1] - 176:24
  **encouraged** [1] - 199:13
  **encrypted** [6] - 45:10, 69:2, 69:21, 70:15, 153:17, 211:15
  **encryption** [4] - 154:3, 180:6, 182:4, 211:14
  **encrypts** [1] - 45:8
  **end** [17] - 14:22, 19:11, 49:19, 50:21, 57:8, 74:22, 94:12, 107:14, 134:6, 172:18, 175:8, 182:12, 183:6, 183:14, 184:3, 184:4, 190:22
  **ended** [2] - 169:11, 181:25
  **endlessly** [1] - 103:5
  **enforcement** [98] - 13:5, 21:24, 22:11, 54:12, 54:17, 54:21, 54:24, 55:1, 55:4, 55:22, 56:2, 56:6, 56:15, 56:17, 57:10, 57:17, 58:14, 58:24, 59:3, 60:25, 61:3, 61:6, 61:7, 61:23, 61:24, 75:25, 80:21, 81:1, 81:5,

81:6, 81:23, 82:1, 83:17, 84:5, 84:8, 84:20, 85:6, 86:9, 87:4, 87:6, 88:2, 88:3, 88:15, 90:3, 90:4, 90:21, 91:11, 91:18, 93:12, 93:22, 93:24, 95:7, 95:20, 95:24, 96:24, 97:17, 97:19, 99:17, 100:16, 100:17, 100:19, 100:23, 100:25, 102:10, 104:10, 108:4, 109:21, 109:25, 110:22, 113:1, 114:2, 114:4, 116:1, 116:19, 117:17, 117:22, 120:9, 122:7, 122:11, 123:24, 125:14, 125:20, 127:4, 128:1, 130:1, 130:5, 130:17, 130:19, 131:16, 132:3, 144:22, 146:19, 195:11, 197:22, 203:6, 211:18
  **engage** [5] - 19:14, 150:1, 177:4, 211:5, 212:4
  **engaged** [2] - 148:2, 178:15
  **engaging** [2] - 21:3, 21:4
  **engineering** [2] - 27:6, 78:25
  **English** [2] - 18:12, 150:13
  **enormous** [1] - 60:6
  **ensure** [3] - 39:23, 97:23, 131:18
  **enter** [7] - 70:25, 160:3, 160:4, 160:11, 179:15, 186:4, 186:6
  **entered** [9] - 160:13, 181:1, 182:12, 188:6, 188:9, 188:16, 197:24, 199:20, 206:16
  **entering** [1] - 188:8
  **entire** [11] - 26:25, 68:25, 69:1, 73:7, 98:4, 131:12, 133:2, 142:15, 163:16, 164:4, 169:18
  **entirely** [4] - 20:12, 20:13, 20:17, 133:6
  **entirety** [1] - 133:2
  **entries** [1] - 101:1
  **entry** [2] - 182:16, 185:7
  **Enzo's** [1] - 47:5
  **equally** [1] - 194:24
  **equating** [1] - 141:11
  **equation** [1] - 151:12
  **errand** [1] - 193:4
  **error** [1] - 71:23
  **errors** [4] - 5:12, 5:14, 12:15

  **escort** [1] - 179:6
  **escorted** [4] - 179:5, 200:6, 200:13, 200:20
  **especially** [1] - 212:12
  **Esquire** [4] - 1:16, 1:17, 1:18, 1:19
  **essential** [4] - 54:1, 87:22, 105:6, 191:19
  **essentially** [22] - 14:7, 18:4, 22:6, 23:9, 29:1, 34:12, 43:15, 43:22, 44:25, 48:22, 52:16, 55:11, 57:7, 58:15, 82:17, 100:11, 101:18, 122:8, 123:9, 169:21, 170:16, 201:18
  **establish** [3] - 16:13, 148:16, 155:13
  **established** [2] - 3:12, 19:25
  **establishes** [1] - 143:6
  **estimate** [3] - 75:7, 75:17, 88:20
  **estimates** [3] - 47:25, 75:3, 75:5
  **estimating** [2] - 75:19, 90:19
  **estimation** [2] - 142:13, 146:1
  **ethics** [1] - 17:23
  **evaluate** [7] - 61:18, 62:9, 62:14, 139:11, 145:20, 149:10, 152:11
  **evaluated** [7] - 62:3, 62:4, 62:16, 107:22, 108:1, 130:25, 139:9
  **evaluating** [1] - 62:19
  **evaluation** [13] - 61:17, 61:21, 62:5, 111:8, 113:25, 145:13, 145:14, 145:22, 147:24, 149:12, 152:10, 154:13, 154:23
  **evening** [1] - 14:17
  **event** [11] - 17:9, 148:2, 153:25, 154:5, 184:18, 187:1, 187:7, 189:1, 198:20, 207:2, 207:12
  **eventually** [5] - 46:25, 51:4, 54:8, 71:24, 158:21
  **evidence** [25] - 5:17, 7:3, 7:13, 18:7, 21:23, 22:18, 24:7, 28:11, 59:9, 59:11, 121:25, 122:21, 126:16, 129:21, 132:15, 133:24, 155:15, 164:8, 189:23, 190:1, 193:14, 196:22, 196:23, 209:13, 213:18
  **evolving** [1] - 176:25
  **exact** [15] - 27:20,

53:23, 56:7, 56:8, 56:23, 58:20, 64:5, 75:19, 113:13, 161:2, 171:6, 171:25, 181:13, 199:4, 210:15
  **exactly** [21] - 14:23, 15:3, 31:13, 35:6, 38:9, 38:18, 38:25, 39:19, 47:6, 48:10, 50:18, 60:19, 78:9, 86:1, 96:16, 110:16, 127:24, 168:24, 176:22, 201:16, 201:18
  **exam** [1] - 178:14
  **examination** [4] - 120:19, 121:4, 122:5, 123:1
  **EXAMINATION** [16] - 25:2, 63:2, 114:16, 156:19, 184:15, 195:25, 197:16, 201:8, 214:4, 214:5, 214:5, 214:7, 214:7, 214:8, 214:9, 214:10
  **examine** [1] - 121:21, 122:18, 134:22, 134:25
  **example** [50] - 4:11, 5:2, 6:11, 7:1, 9:3, 11:22, 13:3, 15:19, 30:22, 31:3, 33:20, 41:11, 41:22, 42:20, 43:5, 44:4, 44:20, 45:3, 46:16, 47:4, 48:7, 48:14, 48:15, 48:16, 48:25, 50:2, 55:20, 56:22, 66:15, 77:1, 81:23, 82:20, 97:22, 97:25, 101:1, 103:13, 103:14, 105:24, 108:1, 108:20, 109:5, 124:21, 135:9, 137:1, 137:6, 139:16, 141:14, 145:24, 147:11, 148:23
  **examples** [2] - 49:13, 60:1
  **Excel** [2] - 101:1, 101:2
  **except** [2] - 132:18, 137:25
  **exception** [11] - 3:13, 3:14, 3:16, 3:19, 4:1, 4:18, 10:1, 16:8, 16:24, 132:11, 133:14
  **exceptions** [3] - 16:8, 16:13, 19:24
  **exchange** [2] - 37:14, 183:4
  **exclamation** [2] - 39:19, 65:17
  **exclude** [3] - 82:14, 151:17, 190:13
  **exclusionary** [2] - 3:13,

3:19
  **excuse** [1] - 131:2
  **execute** [1] - 167:12
  **executed** [8] - 22:3,
117:14, 126:25, 157:18,
158:6, 158:8, 175:3,
209:7
  **execution** [9] - 55:13,
157:15, 157:22, 159:13,
182:17, 184:17, 184:21,
190:4, 202:19
  **exemption** [5] - 4:3,
4:21, 10:1
  **exemptions** [3] - 3:14,
3:15, 19:24
  **exhibit** [15] - 28:11,
34:17, 49:5, 50:7, 56:22,
58:12, 63:10, 63:14,
64:21, 64:24, 66:13,
108:20, 117:4, 126:12,
180:10
  **Exhibit** [11] - 26:18,
28:3, 28:11, 30:25,
63:12, 63:21, 64:20,
66:12, 153:4, 175:19,
180:9
  **exhibits** [2] - 60:2,
117:3
  **exist** [4] - 47:14,
109:18, 110:20, 133:3
  **existed** [2] - 122:8,
147:5
  **existing** [3] - 58:21,
76:7, 76:14
  **exists** [6] - 115:22,
145:13, 145:21, 147:17,
148:5, 149:10
  **exit** [1] - 34:14
  **expect** [1] - 93:23
  **expectation** [15] -
123:11, 123:15, 123:22,
124:15, 125:22, 125:24,
127:11, 128:7, 128:8,
140:9, 141:4, 141:6,
144:6, 153:11, 155:4
  **expectations** [1] -
124:25
  **expected** [1] - 154:2
  **expecting** [1] - 200:3
  **expects** [2] - 18:23,
18:24
  **expedition** [1] - 18:5
  **experience** [6] - 28:8,
36:23, 136:5, 146:10,
175:14, 206:17
  **experimental** [1] -
39:22
  **experiments** [2] - 75:2,
75:11
  **expert** [2] - 28:15,

132:23
  **experts** [1] - 27:10
  **explain** [6] - 22:7,
121:12, 176:17, 178:22,
197:24, 212:3
  **explained** [13] - 122:1,
130:11, 130:12, 130:13,
130:19, 130:21, 130:23,
131:3, 131:7, 168:5,
183:8, 183:9, 210:14
  **explaining** [1] - 129:2
  **explanation** [2] - 130:7,
130:10
  **explicit** [1] - 18:9
  **explore** [10] - 9:6, 9:10,
10:24, 13:8, 13:23, 14:8,
18:21, 19:12, 20:24, 24:3
  **exploring** [1] - 14:10
  **expose** [1] - 18:24
  **exposed** [2] - 66:20,
187:1
  **expression** [1] - 140:21
  **extent** [1] - 154:25
  **external** [1] - 180:7
  **extra** [3] - 55:13, 190:7
  **extraordinary** [1] -
87:18
  **extremely** [2] - 111:15,
122:4
  **eyes** [1] - 198:11

# F

  **F.3d** [3] - 4:12, 5:3,
11:23
  **F.Supp** [4] - 7:2, 7:11,
11:9, 12:7
  **face** [4] - 24:16, 146:13,
151:10, 197:5
  **faced** [2] - 126:13,
127:3
  **facially** [1] - 133:10
  **fact** [28] - 6:14, 13:10,
15:11, 17:15, 22:21,
32:2, 47:23, 57:18,
60:22, 74:5, 86:8, 89:22,
119:24, 126:1, 126:5,
126:21, 130:2, 130:23,
132:25, 137:1, 138:22,
140:25, 141:6, 147:21,
161:14, 185:17, 203:8,
205:10
  **factor** [1] - 11:4
  **factors** [8] - 11:5,
22:22, 90:11, 211:16,
211:19, 211:20, 211:22,
212:14
  **facts** [29] - 3:6, 4:25,
5:24, 5:25, 6:15, 8:8,

8:14, 9:1, 9:24, 11:20,
13:6, 13:23, 14:6, 17:16,
17:20, 19:15, 20:24,
21:5, 21:7, 124:23,
129:18, 136:8, 136:14,
138:3, 138:15, 209:6
  **factual** [20] - 6:11, 6:20,
8:13, 11:5, 12:24, 12:25,
13:1, 13:7, 13:10, 14:7,
15:3, 15:14, 18:22, 19:6,
20:17, 24:2, 24:4,
121:23, 149:18, 210:2
  **factually** [2] - 20:7,
115:16
  **faculty** [1] - 25:19
  **failed** [2] - 4:10, 5:5
  **fair** [19] - 63:16, 68:9,
69:15, 71:11, 71:13,
72:1, 79:9, 91:16, 91:18,
91:19, 113:17, 129:21,
186:25, 187:7, 189:14,
189:23, 192:7, 194:18,
204:8
  **fairly** [9] - 78:10, 78:24,
79:8, 79:22, 183:19,
187:4, 187:7, 206:21,
209:8
  **faith** [14] - 3:12, 3:16,
3:19, 4:1, 4:18, 4:19,
10:1, 16:8, 16:9, 16:13,
17:9, 19:23, 132:11,
133:13
  **fake** [1] - 89:19
  **fall** [3] - 113:19, 113:21
  **false** [6] - 61:18, 61:20,
62:16, 132:18, 132:19
  **familiar** [16] - 13:3,
13:4, 13:12, 13:13,
15:20, 19:10, 63:14,
79:18, 79:21, 81:9,
85:18, 86:6, 86:10, 87:1,
117:19, 174:16
  **familiarity** [2] - 79:17,
79:22
  **family** [1] - 160:17
  **fancy** [2] - 47:2, 49:2
  **fanning** [1] - 192:16
  **far** [15] - 19:19, 19:20,
47:24, 53:25, 56:10,
67:17, 74:3, 74:7,
121:11, 159:11, 167:9,
169:25, 170:1, 172:18
  **fashion** [3] - 3:5,
101:23, 102:8
  **fault** [2] - 108:12,
110:11
  **favor** [3] - 211:19,
212:6, 212:15
  **favors** [1] - 105:2
  **Fayerweather** [1] - 10:4

**FBI** [1] - 2:9
  **FCRR** [1] - 1:22
  **feature** [2] - 46:13,
66:16
  **features** [1] - 37:24,
55:15
  **federal** [3] - 5:16, 6:10,
9:5
  **Fein** [20] - 1:18, 2:10,
2:16, 14:21, 15:13,
15:16, 16:1, 16:4, 16:6,
16:12, 17:11, 18:15,
21:13, 113:10, 118:1,
133:21, 152:18, 184:14,
205:22, 208:25
  **FEIN** [49] - 2:10, 2:18,
18:18, 18:20, 23:25,
28:18, 37:1, 42:2, 59:8,
63:3, 80:14, 80:16,
80:18, 84:6, 115:10,
116:24, 118:2, 118:4,
118:23, 126:15, 133:23,
135:5, 135:8, 136:18,
136:20, 137:4, 138:19,
139:15, 139:21, 140:19,
152:17, 152:19, 155:20,
155:23, 156:2, 179:23,
184:16, 196:25, 197:2,
197:17, 205:25, 206:9,
206:13, 212:22, 213:9,
213:16, 214:5, 214:7,
214:9
  **Fein's** [2] - 15:20, 16:22
  **felt** [7] - 201:4, 206:4,
206:15, 206:18, 206:23,
209:19
  **ferret** [1] - 148:3
  **few** [13] - 30:7, 33:11,
34:1, 52:13, 118:9,
120:19, 125:23, 176:15,
181:4, 198:18, 199:19,
202:13
  **fiefdom** [1] - 19:3
  **field** [8] - 27:7, 27:10,
28:15, 62:11, 62:12,
62:19, 62:21, 132:23
  **Fifth** [1] - 208:20
  **fifties** [1] - 181:12
  **figure** [1] - 146:15
  **figures** [1] - 85:10
  **file** [106] - 43:7, 43:20,
43:23, 44:2, 44:3, 44:12,
44:19, 44:21, 44:22,
44:23, 45:3, 45:4, 45:8,
45:13, 46:1, 49:21,
49:23, 49:24, 49:25,
50:3, 50:13, 50:17, 51:3,
51:5, 51:20, 52:6, 52:12,
53:15, 53:16, 54:18,
55:24, 57:17, 57:19,

60:11, 61:12, 67:17,
68:1, 68:2, 68:25, 69:1,
69:12, 69:16, 71:4,
71:15, 71:17, 72:5,
72:11, 72:18, 72:20,
73:10, 73:16, 73:23,
77:14, 97:23, 97:24,
104:12, 105:17, 105:20,
105:25, 106:24, 108:6,
108:7, 108:23, 109:4,
109:8, 109:9, 127:13,
127:16, 128:4, 131:1,
131:14, 131:16, 133:24,
134:15, 139:18, 139:22,
139:24, 141:9, 141:17,
141:18, 141:25, 142:8,
144:13, 144:14, 144:15,
144:22, 144:23, 144:25,
145:19, 146:21, 146:24,
147:2, 148:12, 150:9,
154:1, 154:14, 155:24,
156:1, 174:14, 174:15,
174:24, 175:6, 175:13,
175:14, 213:17
  **filed** [7] - 3:3, 5:6,
21:25, 22:1, 23:12,
177:17, 210:18
  **files** [41] - 28:24, 29:4,
29:6, 29:23, 43:7, 43:9,
43:19, 45:23, 46:3,
46:11, 47:12, 57:3,
60:17, 67:10, 67:12,
67:25, 92:11, 92:14,
94:7, 103:18, 109:14,
109:16, 110:15, 110:17,
110:20, 125:8, 128:6,
130:24, 131:14, 131:18,
131:21, 131:23, 131:25,
140:25, 145:4, 148:12,
150:11, 153:15, 174:16,
174:17
  **filter** [1] - 83:10
  **filtered** [2] - 47:5,
103:13
  **filtering** [4] - 82:19,
88:24, 106:16, 106:21
  **filters** [1] - 94:11
  **final** [1] - 34:11
  **finally** [1] - 49:19
  **fine** [3] - 68:20, 80:14,
120:20
  **finest** [1] - 137:7
  **fingerprint** [1] - 69:8
  **finish** [3] - 34:14, 34:18,
35:1
  **finished** [4] - 161:4,
161:5, 161:6, 168:21
  **fire** [2] - 198:4, 203:1
  **firearm** [1] - 188:2
  **firearms** [6] - 170:7,

170:14, 170:18, 182:18, 187:25, 206:24

**first** [71] - 2:13, 15:2, 21:23, 22:5, 29:15, 29:16, 29:20, 29:25, 30:16, 33:13, 34:20, 34:25, 35:4, 35:5, 36:14, 45:19, 46:21, 52:13, 53:15, 54:17, 55:3, 61:1, 61:6, 64:5, 88:12, 98:18, 101:22, 103:13, 108:23, 118:8, 120:25, 123:10, 124:5, 125:16, 129:1, 130:5, 132:16, 142:10, 142:12, 142:21, 143:14, 146:17, 150:18, 153:3, 153:4, 160:16, 163:10, 163:21, 164:22, 166:18, 171:21, 171:25, 172:10, 173:9, 174:15, 175:18, 175:22, 180:5, 186:15, 191:3, 192:3, 193:22, 198:9, 199:19, 205:23, 205:24, 205:25, 207:6, 208:23, 209:9

**firsthand** [2] - 65:11, 83:21

**fishing** [3] - 18:5, 121:25, 122:15

**five** [9] - 30:10, 103:15, 106:17, 148:12, 158:24, 186:12, 207:2, 211:16, 211:18, 211:20, 211:22, 212:14

**flashing** [1] - 159:1

**flashlights** [2] - 188:20, 198:11

**flip** [1] - 27:1

**flipped** [1] - 112:3

**Floor** [1] - 1:23

**floor** [1] - 160:16

**Florida** [2] - 11:24, 12:1

**focus** [9] - 17:3, 26:9, 34:20, 38:15, 81:24, 88:12, 98:9, 168:25, 169:9

**focused** [3] - 25:24, 177:4, 177:5

**focuses** [1] - 30:4

**focusing** [1] - 169:11

**folder** [2] - 162:22, 165:1

**folks** [1] - 42:21

**follow** [8] - 85:4, 85:13, 87:25, 97:20, 167:18, 171:23, 172:1, 172:12

**follow-up** [1] - 85:13

**followed** [2] - 167:20, 172:7

**following** [4] - 12:21,

30:5, 68:20, 208:14

**foot** [1] - 172:17

**FOR** [1] - 1:1

**force** [6] - 7:24, 7:25, 84:11, 93:21, 99:18, 209:16

**foreclose** [1] - 13:22

**forego** [1] - 153:10

**foregoing** [1] - 215:6

**foreman** [1] - 11:12

**forensic** [7] - 169:7, 169:9, 169:13, 169:17, 178:14, 185:6, 188:7

**Forensic** [1] - 169:16

**forensically** [1] - 55:4

**foreperson** [5] - 11:14, 11:21, 12:3, 12:16, 20:19

**forepersons** [1] - 12:12

**forever** [1] - 53:12

**forgive** [22] - 66:22, 73:21, 80:23, 84:7, 85:19, 92:17, 92:19, 94:15, 107:14, 108:10, 109:24, 110:9, 112:2, 140:19, 144:14, 146:22, 152:17, 152:20, 153:3, 186:9, 187:22

**form** [1] - 4:21

**formal** [1] - 209:5

**formally** [1] - 24:2

**format** [3] - 139:9, 178:7, 178:9

**former** [1] - 42:5

**formerly** [1] - 67:2

**forms** [1] - 162:12

**formula** [1] - 211:20

**forth** [3] - 18:12, 52:25, 130:7

**forum** [1] - 109:6

**forums** [3] - 108:17, 108:19, 109:1

**forward** [2] - 23:21, 24:6

**founded** [1] - 2:16

**four** [27] - 3:14, 4:1, 16:16, 19:24, 23:3, 103:11, 105:6, 122:13, 129:15, 132:14, 133:7, 160:25, 161:1, 176:23, 181:4, 184:24, 195:23, 203:9, 207:20, 210:11, 211:8, 211:9, 211:18, 212:5, 212:6, 212:15, 213:3

**four-page** [1] - 203:9

**fourth** [2] - 12:9, 212:6

**Fourth** [12] - 1:23, 3:21, 4:7, 4:12, 4:13, 14:1, 20:14, 121:5, 147:25, 150:15, 150:22, 151:22

**foyer** [1] - 160:11

**frame** [1] - 57:14

**Franks** [5] - 23:10, 23:11, 118:19, 121:18, 123:1

**Frederick** [1] - 1:12

**free** [15] - 32:10, 32:13, 65:23, 150:2, 169:25, 170:1, 193:5, 195:18, 201:4, 206:2, 206:4, 206:7, 206:15, 206:18, 207:3

**freedom** [2] - 182:11, 209:5

**freely** [1] - 55:8

**Freenet** [243] - 6:4, 13:3, 13:5, 22:20, 26:13, 26:14, 26:16, 26:17, 27:3, 29:11, 29:14, 29:25, 30:10, 30:12, 30:13, 30:14, 30:18, 30:19, 30:21, 30:22, 30:24, 31:2, 31:4, 31:18, 32:3, 32:4, 32:10, 32:24, 33:16, 34:6, 34:14, 34:16, 34:21, 35:2, 35:4, 35:6, 35:7, 35:14, 35:19, 36:1, 36:5, 36:7, 36:9, 36:14, 36:17, 36:20, 37:9, 37:12, 37:14, 37:18, 37:20, 38:8, 38:17, 38:20, 38:25, 39:1, 39:4, 39:7, 39:8, 39:9, 39:22, 40:4, 40:14, 40:23, 41:8, 41:10, 41:16, 41:19, 41:24, 41:25, 42:13, 42:17, 42:23, 43:6, 43:8, 43:12, 43:14, 43:16, 43:19, 43:21, 43:23, 44:15, 45:2, 45:4, 45:6, 45:15, 45:19, 45:20, 46:13, 46:18, 46:20, 46:21, 46:24, 47:1, 47:7, 47:8, 47:11, 47:20, 48:8, 48:11, 48:12, 48:18, 48:22, 49:1, 49:4, 50:3, 50:11, 50:13, 51:2, 51:9, 52:11, 54:13, 54:14, 55:5, 55:7, 55:16, 55:21, 55:23, 56:18, 58:11, 58:21, 59:24, 60:5, 60:8, 60:15, 61:7, 61:14, 61:20, 61:21, 62:10, 62:11, 62:15, 64:4, 64:10, 64:12, 65:9, 66:9, 66:12, 66:24, 68:4, 71:1, 73:3, 73:4, 75:1, 75:4, 75:8, 75:10, 75:12, 76:2, 76:7, 76:14, 78:2, 78:9,

78:12, 79:3, 79:4, 80:8, 81:21, 82:11, 82:13, 83:1, 83:2, 84:9, 84:14, 84:19, 85:10, 86:23, 87:3, 87:6, 87:10, 87:11, 87:17, 87:18, 87:22, 88:16, 89:6, 89:8, 90:2, 90:8, 90:22, 91:12, 91:18, 94:15, 94:16, 94:18, 94:21, 95:17, 95:20, 95:21, 96:11, 96:20, 102:1, 108:18, 108:22, 111:14, 112:7, 112:12, 112:16, 112:18, 112:20, 115:4, 115:23, 117:19, 117:23, 119:1, 119:2, 119:10, 119:15, 119:21, 121:14, 122:4, 124:4, 125:11, 126:1, 126:7, 126:8, 126:11, 126:17, 126:18, 126:24, 127:12, 130:5, 130:12, 130:13, 130:18, 131:11, 140:5, 142:3, 145:16, 146:2, 151:8, 153:5, 153:17, 153:19, 154:11, 155:2, 178:10

**Freenet's** [3] - 47:17, 87:22, 87:25

**frequency** [3] - 106:13, 136:11, 151:19

**fresh** [1] - 212:5

**freshman** [1] - 33:21

**friend** [1] - 46:8

**friendly** [1] - 44:16

**friends** [8] - 36:8, 36:10, 37:9, 37:11, 39:1, 39:15, 53:9

**frightening** [1] - 207:2

**front** [12] - 24:21, 36:3, 126:23, 129:14, 133:6, 147:14, 161:20, 175:2, 188:13, 191:25, 197:11, 212:3

**fruitfulness** [1] - 137:17

**fulfill** [1] - 4:10

**full** [5] - 24:21, 25:16, 134:3, 156:8, 197:11

**fully** [2] - 16:2, 155:5

**function** [2] - 95:10, 100:2

**functions** [8] - 90:8, 95:7, 111:14, 141:11, 149:4, 149:6, 149:7

**funding** [1] - 84:14

**furthest** [2] - 160:21, 173:9

# G

**gained** [1] - 13:14

**Gary** [2] - 7:11, 8:9

**gather** [1] - 142:21

**gathered** [2] - 95:23, 184:21

**gathering** [1] - 78:8

**general** [3] - 80:8, 97:2, 186:1

**General** [1] - 14:16

**General's** [2] - 14:14, 14:15

**generalized** [1] - 177:3

**generalizing** [1] - 177:6

**generally** [14] - 22:9, 29:10, 43:10, 59:11, 85:17, 88:20, 89:6, 110:22, 128:13, 169:4, 174:22, 174:24, 178:6, 210:13

**generated** [2] - 89:17, 89:20

**generating** [1] - 100:21

**gentleman** [1] - 153:21

**Georgia** [2] - 11:8, 12:4

**gigabyte** [1] - 45:22

**gigabytes** [1] - 45:22

**GitHub** [7] - 32:21, 37:22, 37:23, 40:8, 44:14

**given** [18] - 15:24, 23:13, 37:18, 45:1, 45:8, 89:9, 108:5, 108:6, 108:24, 111:18, 113:1, 114:2, 114:12, 114:13, 144:13, 144:16, 145:19, 210:21

**glean** [1] - 12:20

**Gnutella** [1] - 120:16

**goal** [1] - 131:7

**Google** [7] - 30:19, 30:20, 30:22, 31:4, 47:10

**governed** [2] - 150:21, 150:22

**government** [72] - 2:6, 2:20, 3:3, 3:20, 4:11, 6:9, 8:17, 9:16, 10:5, 10:15, 11:7, 12:5, 15:25, 18:20, 18:23, 19:5, 19:9, 19:19, 20:16, 22:5, 22:8, 22:18, 22:24, 23:1, 23:2, 23:9, 23:10, 23:16, 24:8, 24:12, 27:25, 28:10, 28:14, 66:17, 66:18, 67:24, 118:13, 119:12, 119:20, 119:23, 119:25, 120:3, 120:5, 120:18, 121:3, 121:19, 123:5, 126:4, 128:9, 132:25,

133:17, 134:6, 134:8, 138:9, 138:21, 138:23, 140:3, 141:20, 141:22, 142:9, 142:15, 143:21, 144:3, 145:7, 148:23, 150:1, 150:20, 151:16, 151:22, 153:23, 155:18, 212:9

**Government** [5] - 1:16, 26:18, 28:2, 28:11, 30:25

**Government's** [6] - 63:12, 63:21, 64:19, 66:11, 153:4, 175:19

**GOVERNMENT'S** [2] - 24:17, 156:5

**government's** [11] - 2:23, 8:7, 14:9, 17:6, 26:19, 28:4, 128:21, 132:7, 153:9, 174:8, 212:15

**graduate** [1] - 26:4

**grand** [7] - 11:11, 11:12, 11:21, 12:2, 12:12, 12:16, 20:19

**Grant** [3] - 10:15, 10:21, 10:22

**grant** [1] - 148:19

**granted** [2] - 2:22, 13:9

**granting** [2] - 2:14, 2:17

**great** [1] - 113:23

**greater** [1] - 89:22

**greatest** [1] - 138:13

**greatly** [1] - 39:1

**Greek** [1] - 6:14

**green** [1] - 48:1

**ground** [1] - 12:15

**grounds** [3] - 7:4, 12:14

**group** [14] - 43:17, 76:8, 76:10, 76:12, 80:22, 84:12, 84:16, 84:24, 84:25, 85:7, 165:19, 165:20, 173:25

**groups** [2] - 79:9, 96:6

**guarantee** [3] - 36:22, 39:2, 40:2

**guard** [1] - 179:11

**guess** [6] - 88:25, 137:21, 153:8, 154:1, 161:10, 183:22

**guest** [1] - 160:22

**guns** [1] - 170:16

# H

**H-A-L-L** [1] - 197:14

**habits** [1] - 10:25

**half** [2] - 151:11, 211:8

**HALL** [3] - 1:6, 197:7, 214:9

**hall** [73] - 13:22, 14:7, 19:1, 19:12, 20:23, 21:10, 64:7, 64:10, 65:9, 112:19, 112:23, 115:3, 117:12, 117:16, 121:6, 123:10, 123:22, 124:9, 125:11, 126:18, 126:23, 127:6, 127:13, 127:24, 128:6, 131:13, 131:22, 131:25, 134:12, 138:20, 152:19, 153:9, 154:3, 157:21, 158:21, 167:15, 167:22, 168:21, 177:4, 178:10, 178:23, 179:3, 179:7, 180:6, 188:22, 191:2, 191:11, 191:13, 193:3, 193:8, 193:11, 193:17, 194:25, 196:13, 197:18, 206:4, 206:16, 207:1, 207:12, 207:15, 207:22, 207:23, 208:2, 208:9, 208:11, 208:12, 208:13, 212:24, 212:25, 213:2

**Hall** [9] - 2:3, 2:11, 157:19, 157:24, 174:20, 176:11, 197:3, 197:13, 215:5

**hall's** [6] - 2:25, 66:8, 117:5, 185:20, 208:7, 208:20

**Halls** [1] - 192:19, 206:15, 206:23

**hand** [9] - 24:16, 44:1, 46:11, 52:17, 56:25, 61:15, 124:23, 156:4, 197:6

**handcuffed** [2] - 162:13, 184:10

**handcuffs** [2] - 162:11, 170:4

**handle** [1] - 110:5

**handled** [2] - 162:4, 164:1

**handles** [1] - 40:15

**happy** [4] - 133:19, 141:18, 205:23, 205:24

**harbored** [1] - 10:20

**hard** [11] - 41:20, 45:15, 45:17, 45:23, 50:18, 95:15, 169:13, 176:24, 178:11, 180:7, 211:15

**hash** [61] - 69:4, 69:7, 69:25, 70:2, 72:15, 72:20, 72:23, 73:16, 73:22, 73:25, 74:20, 77:20, 77:21, 88:14, 92:7, 92:21, 92:23, 93:2, 93:10, 93:12, 94:23, 95:4, 95:5, 96:7, 96:10,

96:17, 97:5, 98:3, 98:19, 101:10, 102:3, 102:4, 102:6, 102:10, 104:1, 108:13, 108:14, 108:15, 109:3, 109:16, 110:7, 110:13, 110:15, 110:25, 119:17, 120:1, 120:2, 140:12, 140:15, 140:20, 141:1, 141:11, 141:18, 141:24, 142:16, 142:17, 142:22, 143:15, 143:16, 144:23

**hashed** [2] - 69:23, 69:24

**head** [1] - 120:25

**hear** [5] - 42:8, 72:16, 119:5, 133:21, 204:17

**heard** [8] - 14:20, 14:23, 49:24, 118:25, 119:15, 176:3, 196:13, 202:12

**hearing** [12] - 2:5, 23:10, 23:11, 28:12, 29:11, 118:19, 121:20, 122:19, 134:15, 139:13, 139:18, 201:17

**Hearing** [1] - 1:10

**heart** [2] - 164:22, 164:23

**heaven** [4] - 48:21, 48:23, 49:20, 50:22

**heavily** [2] - 211:19, 212:6

**hectic** [1] - 163:11

**hedge** [1] - 105:3

**heightened** [1] - 153:6

**held** [6] - 58:13, 121:9, 124:25, 159:9, 211:1, 211:25

**help** [5] - 20:23, 60:6, 81:25, 144:16, 190:16

**helped** [1] - 96:21

**helpful** [6] - 48:12, 149:1, 149:3, 189:16, 189:18, 190:8

**hereby** [1] - 215:3

**hereunto** [1] - 215:9

**hesitating** [1] - 96:23

**hesitation** [1] - 172:11

**hidden** [1] - 117:23

**hide** [4] - 42:1, 42:17, 117:24, 126:8

**high** [16] - 35:8, 35:12, 35:17, 36:8, 36:16, 36:19, 36:24, 37:18, 38:6, 59:6, 59:12, 59:17, 61:19, 78:24, 79:10, 126:13

**highlight** [1] - 50:6

**highlighted** [2] - 50:8, 50:19

**highly** [1] - 144:1

**himself** [4] - 40:21, 124:9, 131:18, 142:1

**hits** [1] - 175:18

**hold** [3] - 15:7, 113:22, 138:3

**holding** [1] - 9:15

**holdings** [1] - 3:6

**holstered** [1] - 159:4

**home** [63] - 3:1, 29:2, 48:17, 124:19, 124:22, 135:15, 135:17, 135:19, 135:20, 135:21, 136:1, 136:2, 136:7, 136:10, 147:14, 147:15, 147:18, 147:21, 159:1, 160:2, 160:3, 160:4, 160:5, 160:9, 160:10, 160:11, 160:13, 161:7, 162:1, 162:2, 162:7, 162:14, 162:21, 166:10, 168:3, 168:4, 169:19, 185:11, 186:5, 186:6, 186:13, 186:19, 186:24, 187:9, 188:4, 188:6, 188:8, 188:9, 188:16, 191:2, 192:7, 192:16, 197:18, 197:22, 197:25, 198:13, 203:17, 204:8, 204:12, 205:3, 206:16, 206:23, 208:17

**honest** [1] - 198:3

**Honor** [98] - 2:2, 2:4, 2:11, 2:18, 14:17, 14:21, 15:13, 15:19, 18:1, 18:18, 21:11, 21:18, 23:21, 24:6, 24:11, 28:3, 28:10, 28:14, 37:1, 42:2, 51:24, 59:8, 62:22, 62:24, 63:4, 63:8, 80:11, 83:22, 84:1, 113:5, 114:14, 116:24, 117:1, 117:2, 117:8, 117:11, 118:7, 118:23, 123:5, 123:8, 123:19, 124:20, 125:2, 125:5, 125:23, 126:5, 126:12, 126:15, 126:21, 127:6, 128:5, 128:14, 128:23, 129:2, 129:14, 131:13, 132:3, 132:12, 133:7, 133:12, 133:16, 133:23, 135:9, 137:24, 140:1, 140:17, 140:19, 144:24, 152:16, 152:17, 154:5, 154:16, 155:16, 155:20, 156:2, 156:12, 158:4, 158:5, 175:17, 175:20, 179:23, 180:8, 184:12, 184:17, 195:24, 196:2, 196:19,

196:24, 196:25, 197:2, 201:7, 205:25, 208:22, 212:22, 213:8, 213:9, 213:11, 213:19

**honor** [1] - 208:8

**Honorable** [1] - 1:12

**honored** [4] - 208:7, 210:1, 210:25, 212:19

**hop** [1] - 53:11

**hoped** [2] - 9:6, 9:10

**hopefully** [2] - 190:25, 192:2

**hoping** [1] - 118:7

**hops** [12] - 56:11, 60:15, 74:2, 74:5, 74:21, 77:23, 88:14, 93:10, 95:1, 102:3, 119:17

**hops-to-live** [1] - 119:17

**hour** [6] - 178:4, 178:19, 186:19, 186:22, 211:2, 211:25

**hours** [20] - 23:23, 135:22, 169:6, 169:12, 170:21, 171:5, 176:23, 181:4, 195:5, 195:22, 201:3, 207:20, 208:18, 210:12, 211:8, 211:9, 212:5, 213:3

**house** [20] - 33:6, 33:7, 159:12, 160:16, 161:13, 161:18, 161:21, 169:10, 182:17, 185:13, 185:15, 185:18, 186:2, 192:8, 192:13, 193:6, 198:4, 199:21, 199:24, 202:13

**hum** [14] - 69:18, 92:8, 92:22, 93:18, 94:3, 94:17, 95:11, 98:21, 99:20, 101:25, 104:4, 112:14, 115:2, 186:7

**human** [1] - 97:14

**humanly** [1] - 120:19

**hundred** [2] - 90:17, 90:24

**hundreds** [2] - 90:19, 90:20

**husband** [13] - 198:9, 198:24, 199:11, 199:23, 200:10, 200:15, 201:13, 201:22, 202:12, 204:24, 205:7, 206:20, 207:4

# I

**ICAC** [4] - 84:10, 84:11, 93:23, 97:1

**icon** [2] - 31:8, 32:2

**idea** [2] - 13:16, 15:25,

65:8, 72:9, 77:6, 80:8, 90:8, 91:11, 99:15, 112:19, 114:10, 122:16, 126:17, 185:15, 186:1, 194:10, 194:12

**ideas** [1] - 88:19
**identifiable** [1] - 56:8
**identification** [1] - 164:25
**identified** [2] - 73:24, 114:19
**identifier** [4] - 44:10, 69:10, 93:3, 140:22
**identify** [2] - 57:3, 158:1
**identifying** [1] - 158:4
**identity** [5] - 39:18, 39:25, 41:5, 42:17, 65:17
**IEEE** [3] - 27:5, 27:6
**illegal** [1] - 110:15
**image** [1] - 41:15
**images** [13] - 18:8, 28:24, 29:8, 43:9, 43:11, 49:21, 49:22, 49:25, 110:12, 110:15, 110:17, 110:20, 125:12
**imagine** [2] - 34:15, 78:25
**immediately** [3] - 184:3, 184:4, 211:23
**impacts** [1] - 20:3
**implemented** [2] - 29:20, 29:22
**importance** [1] - 103:10
**important** [15] - 55:6, 92:16, 92:20, 105:7, 109:12, 126:21, 140:15, 145:8, 151:11, 152:3, 152:5, 152:20, 153:1, 154:12, 209:2
**importantly** [2] - 15:23, 151:6
**impossible** [2] - 147:4, 154:22
**impression** [2] - 199:23, 199:25
**improper** [4] - 12:22, 20:13, 22:11, 155:1
**improperly** [1] - 24:5
**improve** [1] - 36:9
**improved** [1] - 36:21
**improving** [1] - 39:2
**IN** [1] - 1:1
**inaccurate** [1] - 111:11
**inappropriate** [2] - 8:18, 20:21
**inappropriately** [1] - 13:25
**inclination** [1] - 139:24
**include** [6] - 73:16, 98:5, 123:23, 130:4,

142:7, 164:7
**included** [1] - 54:2
**includes** [8] - 73:13, 94:25, 96:17, 97:22, 108:1, 140:4, 141:24, 175:21
**including** [2] - 26:16, 187:17
**incoming** [1] - 33:21
**incorrect** [1] - 112:9
**incredible** [1] - 210:14
**incriminating** [2] - 195:14, 208:2
**indeed** [3] - 61:11, 134:18, 148:24
**independent** [12] - 111:8, 112:6, 145:12, 145:14, 145:22, 147:4, 147:24, 149:12, 150:14, 152:10, 154:13, 154:23
**independently** [2] - 145:20, 152:11
**INDEX** [1] - 214:1
**index** [3] - 47:5, 48:5
**India** [1] - 181:19
**indicate** [2] - 15:12, 146:23
**indicated** [13] - 2:18, 68:1, 68:22, 70:5, 75:25, 76:6, 141:20, 175:5, 187:11, 193:11, 194:5, 208:4, 210:14
**indicates** [2] - 20:17, 138:1
**indicating** [1] - 71:20
**indication** [1] - 74:2
**indicative** [1] - 147:21
**indicator** [2] - 92:23, 97:6
**indicia** [1] - 133:5
**individual** [27] - 8:6, 23:14, 58:8, 58:23, 67:2, 73:4, 77:13, 83:17, 85:15, 87:3, 93:22, 93:24, 114:10, 114:18, 115:12, 119:9, 124:15, 129:23, 135:20, 136:9, 144:16, 144:17, 146:5, 147:14, 157:18, 190:17, 191:7
**individual's** [1] - 206:1
**individually** [1] - 165:19
**individuals** [25] - 32:23, 41:4, 42:14, 46:4, 66:19, 66:25, 67:6, 67:16, 67:17, 67:20, 70:10, 72:2, 72:3, 77:9, 77:11, 80:4, 80:5, 98:14, 137:14, 140:8, 141:3, 143:15, 144:6, 153:20,

192:7
**indulgence** [3] - 17:25, 21:19, 175:17
**inevitably** [1] - 21:13
**infants** [1] - 56:19
**influence** [1] - 180:24
**informal** [1] - 69:9
**informant** [3] - 135:16, 135:18, 135:24
**information** [129] - 6:16, 13:17, 25:20, 31:19, 40:3, 40:17, 41:9, 53:19, 54:1, 55:12, 55:15, 55:18, 55:25, 56:12, 56:13, 57:7, 58:7, 58:8, 58:10, 59:3, 59:20, 59:23, 60:7, 61:3, 61:9, 61:15, 61:25, 76:23, 76:24, 77:2, 78:5, 78:8, 79:4, 82:9, 82:20, 83:3, 83:4, 83:7, 83:10, 83:11, 88:13, 92:21, 93:9, 93:17, 94:13, 94:20, 94:23, 98:6, 98:23, 101:13, 101:15, 102:4, 102:5, 102:15, 103:17, 106:4, 106:9, 107:13, 107:20, 107:21, 111:9, 114:4, 114:5, 115:6, 115:7, 115:9, 115:21, 115:23, 117:20, 119:19, 119:22, 120:7, 121:9, 121:16, 122:13, 122:19, 122:20, 125:14, 125:15, 125:20, 127:20, 127:21, 127:23, 128:2, 128:10, 129:18, 129:24, 129:25, 130:2, 130:19, 130:22, 130:23, 131:3, 131:11, 132:1, 132:4, 132:20, 133:8, 133:19, 136:1, 143:10, 143:17, 143:20, 145:9, 145:14, 145:19, 147:20, 148:14, 148:22, 149:12, 149:13, 149:22, 149:25, 150:6, 151:5, 151:7, 151:8, 151:10, 153:20, 153:22, 154:15, 155:3, 183:1, 203:14, 209:1
**Information** [2] - 25:8, 25:18
**information's** [1] - 56:12
**informed** [2] - 2:22, 51:24
**initial** [4] - 113:22, 168:17, 191:2, 202:18
**initiated** [2] - 171:10, 171:15

**initiative** [1] - 199:13
**innocently** [1] - 98:22
**insert** [2] - 44:3, 44:21
**inserted** [12] - 44:2, 45:24, 52:16, 53:15, 95:21, 103:18, 103:21, 104:6, 104:14, 104:18, 104:20, 108:23
**inside** [16] - 124:22, 162:7, 162:8, 162:14, 162:23, 162:25, 163:2, 163:7, 179:11, 191:2, 198:13, 199:16, 202:20, 202:21, 207:1, 209:15
**insofar** [1] - 137:25
**inspect** [2] - 32:17, 97:23
**Install** [2] - 34:6, 34:16
**install** [5] - 31:25, 38:3, 46:20, 48:22, 60:3
**installation** [3] - 31:17, 31:19, 34:21
**installed** [3] - 34:8, 34:13, 127:1
**installing** [2] - 35:3, 45:19
**instance** [5] - 3:18, 46:23, 94:9, 98:18, 193:22
**instead** [2] - 16:25, 39:5
**institutional** [2] - 137:5, 138:12
**instructions** [1] - 33:6
**insufficient** [8] - 3:23, 14:4, 16:23, 152:4, 152:6, 154:7, 154:8, 154:20
**insulate** [1] - 19:1
**insulated** [1] - 138:9
**intelligent** [1] - 139:5
**intend** [1] - 118:17
**intended** [10] - 53:7, 55:19, 57:15, 58:4, 74:13, 74:24, 76:24, 94:19, 115:11, 128:3
**intends** [1] - 118:10
**intent** [1] - 115:11
**intentionally** [6] - 115:8, 115:13, 123:12, 125:21, 127:18, 127:20
**interaction** [2] - 168:17, 191:2
**interactions** [1] - 207:10
**intercepted** [1] - 153:16
**intercepting** [1] - 22:13
**intercepts** [1] - 22:21
**interest** [26] - 11:2, 56:16, 57:2, 57:4, 57:19, 91:14, 92:11, 92:14,

93:12, 94:8, 96:9, 97:5, 97:24, 102:5, 102:6, 102:9, 102:10, 104:2, 104:11, 104:12, 108:15, 109:7, 120:3, 124:18, 124:22
**interested** [3] - 30:7, 93:6, 118:24
**interesting** [1] - 11:8
**interestingly** [1] - 210:8
**interests** [1] - 121:6
**internal** [3] - 47:11, 48:17, 87:25
**international** [3] - 27:6, 81:21, 177:1
**internationally** [1] - 81:20
**Internet** [6] - 38:23, 64:21, 84:11, 89:18, 93:21, 99:18
**internet** [22] - 20:8, 25:24, 28:23, 28:25, 29:2, 40:24, 44:23, 45:1, 47:18, 73:15, 76:15, 89:19, 109:22, 153:14, 166:17, 166:20, 167:7, 168:3, 176:8, 176:19, 177:10, 212:11
**internet-based** [1] - 20:8
**interposed** [1] - 148:1
**interpret** [1] - 210:23
**interpreted** [1] - 200:25
**interrogate** [2] - 207:13, 208:16
**interrogated** [3] - 206:10, 208:15, 208:16
**interrogation** [4] - 207:6, 207:14, 208:1, 208:20
**interruption** [1] - 125:3
**interview** [43] - 117:5, 117:14, 124:9, 126:5, 157:21, 168:10, 172:14, 173:11, 173:13, 173:16, 173:19, 173:23, 174:10, 175:12, 178:3, 178:4, 178:6, 179:2, 179:7, 179:15, 179:17, 179:18, 179:19, 180:19, 181:11, 181:22, 181:24, 181:25, 182:3, 182:9, 182:12, 183:4, 183:6, 183:7, 183:14, 183:21, 184:3, 184:4, 184:5, 207:6, 209:20, 211:12
**interviewed** [1] - 117:13
**interviews** [1] - 191:7
**introduce** [1] - 163:21
**introduction** [1] - 176:5

**invalid** [1] - 129:5
**investigates** [2] - 114:2, 127:5
**investigating** [1] - 26:17
**investigation** [47] - 3:2, 6:4, 6:5, 7:6, 7:12, 7:20, 8:5, 13:5, 13:6, 20:5, 21:24, 22:10, 54:12, 55:4, 81:2, 84:15, 90:5, 108:4, 108:6, 120:1, 120:15, 121:2, 121:4, 121:8, 121:14, 121:22, 122:18, 129:19, 131:7, 134:7, 135:11, 140:4, 140:11, 141:21, 151:8, 154:11, 155:1, 157:12, 176:25, 189:14, 191:16, 191:20, 203:6, 207:20, 212:13
**investigations** [6] - 76:2, 130:18, 136:6, 190:3, 190:6, 190:7
**investigative** [3] - 57:16, 62:9, 97:21
**investigator** [4] - 17:1, 55:11, 57:8, 83:3
**invite** [1] - 14:13
**invocation** [4] - 210:20, 210:24, 210:25, 212:19
**invoke** [2] - 210:6, 212:18
**invoked** [2] - 208:5, 211:17
**invoking** [2] - 210:9
**involved** [19] - 7:6, 8:2, 8:4, 9:17, 9:18, 10:5, 11:10, 11:14, 97:14, 110:13, 110:23, 110:24, 140:12, 144:13, 144:25, 145:18, 154:4, 155:10, 155:12
**involves** [1] - 6:4
**involving** [1] - 18:9
**IP** [44] - 41:11, 41:20, 41:22, 42:1, 42:4, 42:6, 42:15, 42:18, 53:22, 56:10, 66:19, 66:24, 67:3, 67:7, 67:20, 73:13, 74:19, 77:1, 77:8, 77:17, 78:3, 88:13, 90:9, 90:14, 90:20, 91:5, 91:20, 91:25, 92:19, 99:23, 117:23, 117:24, 119:18, 126:8, 130:24, 130:25, 131:24, 132:7, 140:7, 140:9, 144:21, 146:19, 146:23
**Ireland** [1] - 153:21
**issuance** [1] - 155:7

**issue** [36] - 2:14, 3:8, 3:9, 6:21, 8:9, 9:6, 10:1, 11:2, 14:10, 15:2, 15:15, 16:3, 16:4, 16:19, 16:20, 19:21, 22:14, 22:24, 22:25, 23:6, 23:16, 23:19, 29:11, 93:5, 118:6, 118:8, 118:11, 128:15, 133:20, 145:11, 149:16, 150:24, 153:1, 153:8, 212:25
**issued** [6] - 5:18, 13:25, 24:5, 151:3, 151:4, 154:17
**issues** [13] - 16:6, 19:8, 19:22, 22:6, 22:9, 23:17, 122:23, 129:4, 134:2, 152:22, 208:23, 209:24
**issuing** [9] - 3:17, 5:5, 5:22, 6:1, 8:2, 8:14, 9:21, 14:24, 18:3
**italicized** [1] - 39:17
**item** [1] - 92:25
**items** [2] - 3:1, 183:8
**itself** [12] - 12:5, 21:15, 27:21, 41:12, 41:16, 74:19, 84:18, 84:19, 87:21, 100:21, 138:13, 164:4

**J**

**J-A-N-E** [1] - 197:14
**J-O-S-H-U-A** [1] - 156:9
**Jane** [1] - 197:13
**January** [2] - 75:15, 75:16
**Jarvis** [2] - 7:18, 7:23
**Java** [19] - 32:19, 33:14, 33:18, 33:19, 55:9, 76:20, 79:17, 79:18, 79:21, 79:22, 79:25, 80:1, 80:5, 117:17, 117:18, 124:10, 181:18, 181:19
**jeans** [1] - 170:15
**JFM-16-469** [3] - 1:6, 2:4, 215:5
**job** [2] - 120:20, 142:25
**jobs** [2] - 26:2, 192:14
**John** [1] - 9:15
**JOHNSON** [1] - 152:16
**Johnson** [4] - 1:19, 2:11, 2:22, 152:15
**join** [2] - 58:4, 88:21
**joined** [1] - 95:22
**joining** [1] - 2:6
**Joshua** [3] - 23:15, 155:18, 156:9

**JOSHUA** [2] - 156:5, 214:6
**judge** [144] - 2:24, 3:10, 3:16, 3:17, 4:10, 4:14, 4:23, 5:1, 5:4, 5:5, 5:7, 5:8, 5:10, 5:18, 5:22, 5:23, 6:1, 6:6, 6:7, 6:9, 6:10, 6:11, 6:12, 6:16, 6:21, 6:22, 7:4, 7:7, 7:8, 7:9, 7:14, 7:15, 7:16, 7:21, 7:22, 7:24, 8:4, 8:10, 8:14, 8:15, 8:18, 8:21, 8:24, 9:5, 9:7, 9:9, 9:11, 10:6, 10:19, 10:20, 11:3, 11:14, 12:3, 12:22, 12:23, 13:2, 13:3, 13:4, 13:5, 13:15, 13:18, 13:21, 14:11, 14:24, 15:8, 15:10, 15:16, 15:17, 15:21, 15:22, 15:24, 15:25, 16:2, 16:18, 16:24, 17:13, 17:18, 17:19, 17:21, 17:23, 18:2, 18:3, 18:22, 19:13, 19:14, 20:3, 20:13, 20:24, 21:6, 21:9, 21:14, 120:21, 120:22, 134:23, 134:25, 135:7, 135:13, 136:23, 137:3, 137:10, 137:18, 137:25, 139:17, 145:10, 145:12, 145:14, 146:7, 147:4, 147:9, 147:20, 147:22, 147:24, 148:1, 148:7, 148:17, 149:17, 150:4, 150:5, 150:14, 151:4, 151:13, 151:24, 152:1, 152:9, 152:11, 154:8, 154:13, 154:17, 154:18, 154:21, 154:23, 155:11, 155:13
**Judge** [7] - 1:12, 3:9, 14:11, 24:3, 120:12, 135:14, 151:17
**judge's** [4] - 5:15, 10:23, 10:24, 14:4
**judges** [16] - 6:25, 9:24, 11:19, 11:25, 12:5, 12:10, 12:18, 16:4, 19:1, 20:15, 20:18, 136:24, 136:25, 137:7, 137:11, 138:15
**judgment** [1] - 202:5
**judicial** [1] - 17:22
**July** [2] - 128:22, 128:24
**jumpsuit** [1] - 158:3
**June** [2] - 157:5
**jurisdiction** [1] - 11:13
**jurisdictional** [1] -

81:24
**jurisdictions** [1] - 82:20
**jury** [7] - 11:11, 11:12, 11:21, 12:2, 12:12, 12:16, 20:19
**Justice** [1] - 2:9

**K**

**Kaylynn** [2] - 1:17, 2:7
**Keaton** [1] - 168:24
**keep** [5] - 53:12, 83:10, 120:21, 191:20, 196:5
**keeping** [1] - 142:18
**keeps** [2] - 37:25, 81:6
**kept** [1] - 199:9
**key** [23] - 50:2, 50:19, 60:14, 68:4, 68:8, 68:10, 68:11, 68:12, 68:13, 68:16, 68:17, 68:21, 69:12, 70:16, 70:23, 70:25, 71:4, 72:20, 73:6, 109:2, 211:14
**keys** [1] - 108:20
**kind** [16] - 43:17, 43:25, 44:17, 68:13, 86:3, 110:4, 120:14, 124:8, 138:16, 159:9, 160:23, 188:25, 189:14, 196:4, 196:17, 204:17
**kindly** [1] - 189:8
**kinds** [1] - 19:12
**king** [1] - 19:3
**kitchen** [13] - 160:17, 160:18, 160:19, 167:15, 167:17, 167:19, 167:21, 167:24, 167:25, 168:2, 191:11, 191:12
**knock** [3] - 158:7, 159:11, 189:9
**knocked** [3] - 158:12, 158:14, 159:3
**knowing** [2] - 79:21, 148:10
**knowledge** [5] - 32:18, 65:11, 83:21, 109:19, 178:15
**knowledgeable** [1] - 124:12
**known** [11] - 39:23, 57:10, 92:25, 94:24, 99:1, 104:2, 108:14, 120:9, 142:17, 143:21, 154:12
**knows** [8] - 3:11, 60:10, 75:5, 90:25, 96:2, 117:19, 141:18, 146:19
**Kyllo** [1] - 124:21

**L**

**L-E-V-I-N-E** [1] - 24:24
**label** [1] - 192:12
**labeled** [5] - 56:18, 59:17, 60:9, 66:12, 126:14
**lacking** [2] - 133:4, 151:9
**laid** [3] - 3:25, 130:3, 132:4
**land** [1] - 161:9
**language** [12] - 18:12, 32:19, 33:19, 33:21, 33:22, 76:20, 80:6, 124:10, 145:5, 150:13, 154:9, 154:22
**laptop** [1] - 169:13
**large** [6] - 32:4, 50:20, 60:7, 83:14, 161:7, 164:11
**largely** [5] - 5:15, 25:24, 29:21, 140:21, 149:4
**larger** [2] - 71:15, 160:9
**last** [16] - 16:20, 18:1, 30:7, 38:2, 40:11, 50:7, 57:14, 74:25, 112:2, 112:3, 113:14, 133:16, 135:21, 178:3, 180:8, 212:7
**lastly** [2] - 117:22, 133:9
**late** [1] - 144:4
**launch** [1] - 34:22
**launched** [1] - 34:12
**launching** [2] - 34:6, 46:21
**launder** [1] - 20:6
**laundering** [2] - 18:10, 20:6
**law** [113] - 13:4, 19:13, 20:3, 21:24, 22:10, 54:11, 54:17, 54:21, 54:24, 55:1, 55:3, 55:22, 56:2, 56:6, 56:15, 56:16, 56:17, 57:10, 57:17, 58:14, 58:24, 59:2, 60:25, 61:3, 61:6, 61:23, 61:24, 75:25, 80:21, 80:25, 81:5, 81:6, 81:23, 82:1, 83:17, 84:5, 84:8, 84:19, 85:5, 86:9, 87:3, 87:5, 88:2, 88:15, 90:2, 90:4, 90:21, 91:11, 91:17, 93:12, 93:22, 93:24, 95:7, 95:20, 95:23, 96:24, 97:17, 97:19, 99:17, 100:16, 100:17, 100:18, 100:23,

100:25, 102:10, 104:10, 108:4, 109:21, 109:25, 110:22, 113:1, 114:2, 114:3, 115:25, 116:19, 117:17, 117:22, 120:9, 121:19, 121:20, 122:7, 122:11, 123:23, 125:14, 125:20, 127:4, 127:22, 128:1, 130:1, 130:4, 130:17, 130:19, 131:16, 132:3, 132:25, 136:24, 137:6, 138:1, 139:3, 139:4, 144:22, 146:19, 153:12, 165:11, 195:11, 197:22, 203:6, 211:18, 211:20
**Law** [1] - 139:5
**laws** [1] - 150:22
**lawyer** [1] - 137:7, 165:11, 165:12, 165:13
**lay** [1] - 131:14
**layout** [1] - 186:1
**lead** [4] - 4:25, 12:16, 24:8, 157:11
**leads** [1] - 148:9
**league** [1] - 157:10
**learn** [3] - 41:5, 41:11, 56:23
**least** [11] - 38:24, 60:18, 60:22, 65:7, 121:13, 138:9, 150:19, 174:19, 188:13, 200:10, 210:17
**leave** [19] - 136:4, 154:16, 169:25, 170:1, 179:17, 182:14, 193:5, 193:6, 195:4, 199:21, 199:24, 201:4, 203:17, 206:2, 206:4, 206:7, 206:15, 207:3, 209:12
**leaving** [1] - 15:5
**led** [3] - 157:12, 177:7, 196:17
**left** [19] - 31:7, 35:5, 35:15, 35:23, 42:14, 50:25, 57:8, 74:21, 149:21, 160:13, 160:16, 160:21, 167:24, 171:22, 172:10, 195:18, 201:3, 211:7, 212:4
**leg** [1] - 159:9
**length** [2] - 141:19, 175:12
**Leon** [18] - 3:11, 3:25, 4:18, 8:19, 9:22, 10:1, 10:9, 16:7, 16:8, 16:10, 16:20, 16:21, 17:4, 19:23, 155:8
**less** [1] - 87:8
**letter** [3] - 128:22, 128:24, 142:4

**letters** [7] - 44:6, 44:10, 46:7, 49:17, 49:18, 50:20, 192:12
**LEV** [1] - 24:23
**level** [5] - 41:19, 80:9, 123:1, 134:25, 160:12
**levels** [1] - 38:16
**Levine** [45] - 22:19, 24:13, 24:23, 25:4, 25:21, 26:20, 27:23, 28:5, 28:15, 28:21, 30:9, 33:10, 34:4, 36:23, 38:5, 39:9, 40:4, 40:12, 52:5, 54:16, 57:24, 62:18, 114:18, 115:20, 116:25, 118:25, 119:15, 120:8, 126:10, 126:16, 129:2, 129:6, 131:4, 131:17, 133:25, 134:17, 140:25, 142:25, 144:11, 145:1, 146:1, 149:4, 149:25, 154:4
**LEVINE** [2] - 24:17, 214:4
**Levine's** [1] - 155:2
**liberty** [1] - 209:20
**libraries** [2] - 47:14, 109:18
**library** [3] - 47:13, 47:14
**lies** [1] - 191:19
**Lieutenant** [2] - 179:17, 195:9
**lieutenant** [2] - 168:16, 196:7
**light** [3] - 127:11, 159:1, 212:12
**likelihood** [1] - 118:14
**likely** [17] - 61:25, 64:13, 80:7, 101:19, 130:25, 131:5, 132:22, 150:10, 152:7, 186:18, 189:15, 189:20, 189:22, 195:14, 207:14, 208:2
**LimeWire** [1] - 120:16
**limine** [4] - 3:3, 3:4, 151:17, 151:22
**limited** [2] - 55:10, 138:15
**line** [5] - 38:2, 41:22, 96:16, 127:22, 161:11
**lines** [1] - 180:11
**link** [1] - 32:20
**links** [5] - 47:3, 47:7, 47:16, 134:1, 134:16
**list** [10] - 47:8, 48:16, 52:15, 53:3, 56:16, 57:3, 60:23, 68:24, 104:7, 108:24
**listed** [6] - 108:21,

130:5, 130:20, 131:14, 132:2, 148:13
**listen** [1] - 174:9
**listened** [2] - 126:10, 174:19
**listening** [1] - 147:12
**lists** [1] - 16:8
**literally** [2] - 165:2, 209:13
**litigate** [1] - 16:3
**live** [13] - 48:1, 65:23, 74:2, 74:21, 77:23, 88:14, 93:10, 95:1, 102:3, 119:17, 150:21, 185:15, 185:17
**lives** [1] - 147:14
**living** [15] - 117:18, 160:12, 160:14, 161:25, 162:17, 163:7, 167:21, 168:14, 169:1, 169:24, 171:17, 181:15, 184:6, 199:16
**local** [2] - 83:3, 96:24
**locate** [6] - 43:22, 46:4, 46:9, 51:2, 56:11, 72:10
**located** [4] - 81:13, 82:13, 131:21, 132:6
**location** [1] - 81:17
**lock** [2] - 173:3, 173:4
**locked** [1] - 173:5
**logged** [1] - 59:3
**logging** [1] - 124:8
**logs** [2] - 115:21, 115:23
**Lolita's** [4] - 48:20, 48:23, 49:20, 50:21
**Lolitas** [2] - 56:19, 56:20
**Lombard** [1] - 1:23
**look** [27] - 3:25, 16:25, 19:19, 31:6, 31:23, 34:2, 38:1, 44:5, 97:17, 111:5, 111:9, 112:4, 123:14, 126:4, 140:16, 140:20, 141:6, 141:14, 144:9, 144:11, 144:18, 146:17, 147:6, 148:24, 153:2, 153:13, 181:12
**looked** [10] - 31:4, 86:15, 89:11, 90:6, 111:6, 111:16, 112:8, 119:12, 126:12, 165:20
**looking** [20] - 16:16, 46:18, 51:10, 53:24, 56:7, 56:9, 56:13, 60:14, 72:2, 72:4, 72:20, 73:17, 73:23, 81:1, 129:15, 140:12, 164:8, 174:15, 175:2, 205:22
**looks** [7] - 41:21, 44:9,

47:2, 47:9, 49:1, 112:12, 114:8
**loosely** [1] - 30:5
**loud** [5] - 158:19, 163:12, 163:13, 163:15, 164:10
**Louis** [1] - 15:20
**low** [20] - 35:7, 35:12, 35:15, 35:25, 36:1, 36:4, 36:12, 36:24, 36:25, 37:7, 37:8, 37:10, 37:17, 38:5, 38:16, 38:19, 38:21, 39:6, 39:15, 40:13, 41:19, 48:9, 48:13, 59:6, 59:12, 59:17, 59:21, 60:4, 61:20, 65:14, 66:5, 90:18, 90:20, 91:16, 114:25, 126:13, 126:14, 127:3, 127:5, 159:7
**luck** [2] - 37:9, 37:15
**luncheon** [1] - 123:3

# M

**M-1** [6] - 31:1, 63:12, 63:21, 64:20, 66:12, 153:4
**M-2** [1] - 26:18
**M-6** [2] - 28:3, 28:11
**M-7** [3] - 117:8, 175:20, 180:9
**machine** [5] - 81:6, 81:8, 81:9, 81:10
**Madam** [1] - 174:8
**magistrate** [48] - 3:11, 3:16, 3:18, 4:3, 4:10, 4:15, 4:20, 5:2, 5:9, 5:11, 5:16, 5:17, 5:19, 6:10, 7:6, 7:9, 7:15, 7:22, 8:16, 8:22, 13:2, 14:24, 16:17, 17:18, 18:13, 18:17, 129:25, 130:2, 130:10, 130:15, 130:17, 130:19, 131:2, 131:15, 131:20, 132:4, 132:16, 132:21, 132:22, 133:2, 135:12, 136:17, 136:19, 136:20, 136:21, 147:12, 148:4, 151:25
**mail** [4] - 43:17, 46:8, 142:5, 183:12
**mailed** [1] - 51:12
**main** [7] - 26:2, 26:9, 30:4, 34:25, 62:4, 95:7
**maintains** [1] - 13:23
**major** [1] - 29:17
**majority** [4] - 26:10, 33:23, 195:5

**makeup** [1] - 79:6
**man** [1] - 153:9
**manage** [1] - 171:23
**manages** [1] - 41:8
**manifest** [6] - 68:11, 68:12, 68:16, 68:21, 104:9, 104:11, 108:20
**manipulate** [1] - 80:2
**manner** [3] - 5:9, 7:16, 215:8
**manslaughter** [1] - 9:13
**manually** [2] - 97:12, 101:21
**Mapp** [1] - 10:10
**Marc** [2] - 1:19, 2:11
**March** [2] - 157:4, 157:6
**marching** [1] - 48:3
**marijuana** [3] - 135:17, 135:19, 135:21
**mark** [1] - 74:14
**marked** [6] - 28:2, 117:8, 158:11, 158:25, 180:10, 188:5
**maroon** [1] - 158:2
**Martin** [6] - 2:3, 2:10, 157:19, 157:24, 174:20, 215:4
**MARTIN** [1] - 1:16
**Mary** [3] - 1:22, 215:3, 215:14
**MARYLAND** [1] - 1:1
**Maryland** [3] - 1:11, 1:24, 157:13
**Massachusetts** [7] - 25:9, 76:10, 76:11, 76:13, 80:23, 94:16, 96:21
**master** [2] - 160:20, 160:22
**material** [6] - 4:17, 92:9, 97:12, 138:7, 139:1, 147:2
**materials** [4] - 86:6, 86:10, 86:15, 111:18
**matter** [20] - 2:4, 9:5, 9:8, 9:18, 9:19, 10:8, 10:17, 19:11, 20:5, 24:8, 118:13, 120:24, 121:5, 139:6, 154:6, 199:6, 206:21, 215:4, 215:8
**matters** [22] - 6:20, 8:13, 9:20, 11:2, 12:24, 13:1, 14:7, 18:22, 19:2, 19:6, 19:13, 20:7, 20:17, 24:4, 63:9, 78:25, 135:1, 139:16, 152:2, 196:5, 206:5
**maximum** [4] - 39:4, 39:6, 39:21, 114:25
**McCarty** [1] - 209:3

**McDonald** [2] - 14:17, 15:7
**mean** [34] - 15:17, 37:11, 37:12, 57:12, 60:23, 62:4, 66:2, 67:12, 76:12, 79:24, 81:10, 84:7, 92:16, 95:6, 97:1, 98:8, 100:15, 100:21, 102:22, 104:13, 104:14, 106:11, 107:7, 132:24, 136:16, 138:8, 139:12, 148:9, 148:25, 155:12, 159:8, 160:4, 189:7, 212:23
**meaning** [4] - 29:22, 143:5, 161:13, 163:16
**meaningful** [6] - 134:10, 134:11, 134:13, 139:10, 139:11, 153:1
**meaningfully** [1] - 152:23
**means** [8] - 18:7, 32:13, 32:15, 42:3, 141:13, 147:10, 148:8
**meant** [1] - 82:17
**media** [1] - 174:16
**meeting** [2] - 113:7, 136:6
**member** [2] - 25:17, 195:11
**members** [5] - 27:13, 83:17, 158:9, 163:2, 184:23
**memorandum** [5] - 133:24, 134:15, 135:3, 139:18, 141:9
**memory** [3] - 50:10, 111:21, 174:12
**mental** [14] - 8:25, 9:10, 9:21, 12:22, 14:10, 15:3, 17:14, 21:2, 21:3, 21:4, 21:5, 21:14, 24:3, 138:1
**mention** [1] - 166:6
**mentioned** [30] - 25:17, 29:5, 31:3, 31:6, 31:23, 33:4, 33:14, 37:20, 37:21, 40:6, 41:1, 44:17, 45:25, 46:12, 47:16, 51:7, 51:12, 53:18, 55:7, 57:7, 57:24, 60:24, 61:5, 61:8, 67:25, 108:18, 115:25, 116:19, 118:16, 177:15
**menu** [3] - 34:9, 38:10, 38:13
**mercifully** [1] - 108:12
**merely** [1] - 61:13
**merit** [1] - 121:11
**merits** [1] - 14:9
**message** [9] - 46:13,

53:13, 54:9, 71:19, 71:20, 71:23, 71:25, 72:4, 74:3
**messages** [5] - 52:25, 55:13, 55:19, 60:15, 73:15
**messaging** [1] - 43:16
**met** [2] - 37:13, 193:21
**metadata** [6] - 140:6, 141:4, 142:3, 142:5, 144:8
**method** [11] - 26:16, 61:9, 61:23, 62:5, 62:7, 62:18, 82:7, 130:21, 131:11, 131:20, 131:21
**methods** [3] - 59:9, 62:8, 62:20
**Michele** [1] - 14:17
**microphone** [2] - 24:20, 197:10
**middle** [4] - 32:8, 35:8, 36:16, 158:2
**Middle** [2] - 11:8, 12:1
**might** [37] - 4:25, 6:17, 9:1, 9:2, 13:15, 36:23, 37:8, 39:5, 39:18, 43:3, 44:8, 45:3, 45:4, 51:16, 54:8, 67:3, 67:5, 74:22, 76:1, 77:7, 82:16, 89:7, 89:9, 90:14, 97:19, 105:25, 109:9, 118:9, 120:22, 120:23, 122:1, 186:13, 187:8, 190:1, 196:16, 207:21
**million** [1] - 106:2
**mind** [3] - 37:4, 177:9, 177:12
**minor** [2] - 18:10, 157:10
**minors** [2] - 48:20, 48:21
**minus** [2] - 92:2, 92:3
**minute** [3] - 15:5, 89:9, 175:22
**minute-47** [1] - 175:18
**minutes** [16] - 14:22, 118:10, 134:10, 136:3, 136:4, 141:19, 152:23, 160:9, 161:21, 168:10, 168:13, 168:22, 178:5, 178:19, 202:19, 211:9
**Miranda** [24] - 23:15, 23:17, 164:20, 164:21, 168:18, 173:18, 174:6, 194:13, 204:13, 204:14, 206:8, 206:9, 208:2, 209:22, 209:23, 209:24, 210:5, 210:21, 210:22, 211:12, 211:17, 212:5, 212:25

**mirrors** [1] - 101:2
**misleading** [1] - 134:21
**misled** [1] - 132:16
**Missouri** [3] - 6:4, 8:13, 13:16
**misstating** [1] - 126:16
**misunderstanding** [1] - 89:25
**mode** [27] - 35:23, 36:8, 36:19, 37:7, 37:10, 38:9, 38:19, 38:21, 39:1, 39:6, 39:7, 39:10, 39:11, 39:14, 39:16, 39:20, 39:25, 40:13, 46:22, 48:13, 59:7, 59:22, 60:5, 114:20, 114:23, 115:4
**moderate** [2] - 36:6, 79:11
**modes** [5] - 38:11, 39:8, 59:5, 59:16, 59:18
**modification** [10] - 55:6, 76:6, 76:14, 76:17, 76:25, 77:16, 79:14, 79:15, 116:14, 116:17
**modifications** [2] - 82:14, 116:13
**modified** [42] - 55:23, 58:7, 58:20, 59:18, 59:20, 59:21, 59:24, 78:12, 82:25, 84:8, 84:19, 87:3, 87:6, 87:10, 88:15, 89:5, 90:2, 90:22, 91:17, 95:20, 96:20, 107:6, 114:19, 114:22, 115:6, 115:20, 116:1, 116:6, 116:10, 118:25, 119:2, 119:9, 119:15, 120:9, 121:14, 130:18, 131:11, 142:2, 146:2, 153:17, 154:11
**modify** [12] - 32:18, 33:5, 33:7, 55:8, 57:25, 58:5, 58:21, 80:3, 80:4, 94:15, 94:16, 102:1
**moment** [18] - 2:12, 11:6, 16:1, 17:25, 18:22, 62:22, 70:22, 92:15, 125:2, 140:17, 145:24, 152:17, 167:4, 171:13, 177:15, 188:15, 196:25, 199:20
**moments** [4] - 176:15, 199:19, 202:9, 202:13
**money** [5] - 18:10, 20:6, 32:12, 164:12
**monitor** [1] - 65:24
**monitoring** [1] - 39:17
**month** [2] - 27:20, 111:24, 113:13
**months** [1] - 111:24

**moreover** [3] - 8:23, 141:13, 148:9
**Morgan** [2] - 9:17, 9:25
**morning** [24] - 2:5, 17:7, 24:11, 25:4, 25:5, 63:6, 63:7, 138:5, 138:8, 158:8, 168:20, 169:5, 171:6, 171:14, 181:1, 182:6, 182:20, 185:10, 197:18, 200:3, 200:4, 207:2, 208:3, 208:16
**most** [13] - 32:22, 33:22, 80:7, 90:16, 91:10, 91:23, 117:3, 151:11, 168:11, 168:12, 186:23, 188:5
**mother** [2] - 7:25, 8:1
**motion** [48] - 2:14, 2:15, 2:17, 2:23, 3:3, 3:4, 3:20, 14:19, 17:13, 17:17, 21:12, 21:23, 22:1, 22:4, 22:17, 23:12, 23:20, 24:7, 26:19, 28:4, 117:3, 117:16, 118:3, 118:22, 123:6, 123:10, 129:3, 132:24, 139:22, 139:24, 151:17, 151:22, 154:24, 155:15, 155:17, 155:24, 156:1, 196:22, 196:23, 212:16, 212:23, 213:5, 213:17, 213:18
**Motions** [1] - 1:10
**motions** [9] - 2:5, 2:19, 21:22, 28:12, 29:11, 121:20, 122:19, 139:13, 213:7
**Motz** [1] - 1:12
**mouse** [2] - 50:6, 50:8
**move** [6] - 2:16, 28:15, 86:12, 120:21, 155:16, 182:11
**moved** [4] - 7:2, 7:12, 120:3, 191:10
**movement** [1] - 209:14
**movies** [3] - 28:24, 43:9, 43:11
**moving** [3] - 23:21, 24:6, 142:12
**MR** [82] - 2:2, 2:10, 2:18, 14:16, 14:21, 18:18, 18:20, 21:18, 21:22, 23:25, 24:6, 28:18, 37:1, 42:2, 59:8, 63:3, 80:14, 80:16, 80:18, 84:6, 115:10, 116:24, 118:2, 118:4, 118:7, 118:23, 121:18, 125:2, 126:15, 128:23, 129:1, 129:9, 133:23, 135:5, 135:8, 136:18,

136:20, 137:4, 138:19, 139:15, 139:21, 140:19, 152:16, 152:17, 152:19, 155:16, 155:20, 155:23, 156:2, 156:12, 156:16, 156:20, 175:24, 176:2, 179:23, 180:1, 180:15, 184:16, 196:1, 196:23, 196:25, 197:2, 197:17, 201:9, 205:20, 205:23, 205:25, 206:9, 206:13, 208:22, 212:22, 213:7, 213:9, 213:11, 213:15, 213:16, 214:5, 214:7, 214:7, 214:8, 214:9, 214:10
**MS** [32] - 24:11, 25:3, 28:14, 28:20, 42:12, 52:4, 59:15, 62:22, 62:24, 83:22, 114:17, 115:19, 117:2, 117:8, 117:11, 118:3, 123:5, 123:8, 123:19, 124:13, 124:20, 125:5, 125:10, 125:18, 126:21, 128:14, 128:18, 128:20, 129:11, 133:22, 214:4, 214:5
**muddier** [1] - 97:1
**multiple** [12] - 5:11, 7:3, 91:5, 116:5, 126:1, 126:2, 130:3, 135:18, 169:15, 190:10, 209:16
**multiplied** [1] - 91:21
**multiply** [2] - 91:4, 91:6
**multitude** [1] - 178:13
**murder** [1] - 9:13
**must** [3] - 145:14, 210:1, 211:21
**mutual** [1] - 178:9

**N**

**name** [8] - 24:21, 24:23, 34:10, 79:22, 129:24, 144:23, 156:8, 197:11
**named** [4] - 56:20, 144:22, 157:19, 174:20
**names** [2] - 27:13, 175:14
**narcotics** [3] - 7:12, 135:11, 135:17
**narrow** [1] - 190:16
**nationally** [3] - 81:20, 86:24, 91:6
**natural** [1] - 43:1
**nature** [1] - 15:10
**near** [2] - 39:21, 48:19
**necessarily** [3] - 22:6, 140:8, 153:23

**necessary** [3] - 123:18, 123:20, 209:23
**need** [33] - 25:1, 51:25, 70:23, 97:24, 98:1, 103:7, 105:19, 106:3, 106:8, 106:12, 106:13, 106:15, 106:19, 106:22, 107:25, 108:6, 108:13, 124:11, 124:14, 124:15, 125:15, 125:22, 128:9, 134:9, 146:6, 147:1, 149:11, 149:25, 150:3, 150:5, 175:21, 178:7, 191:22
**needed** [7] - 71:16, 134:18, 139:2, 150:7, 150:20, 154:7, 194:6
**needs** [3] - 53:4, 139:8, 150:14
**nefariously** [1] - 98:23
**neighbors** [2] - 90:23, 104:24
**nerdageddon** [1] - 47:6
**net** [37] - 35:16, 35:25, 36:4, 39:7, 39:10, 39:14, 39:16, 40:12, 41:17, 48:9, 59:6, 59:10, 59:17, 59:22, 65:21, 66:5, 66:10, 114:20, 114:23, 115:4, 127:5
**Net** [1] - 66:13
**network** [34] - 25:25, 26:12, 28:16, 29:12, 29:21, 40:14, 41:19, 43:1, 43:3, 43:7, 43:8, 44:21, 44:25, 45:24, 52:15, 52:17, 55:14, 56:25, 88:21, 95:21, 103:22, 104:14, 120:16, 122:11, 124:7, 124:24, 125:8, 127:8, 141:18, 144:21, 149:3, 153:14
**networking** [2] - 25:24, 28:16
**networks** [11] - 25:25, 26:8, 26:11, 28:21, 28:23, 29:6, 30:3, 30:6, 54:18, 125:1, 153:18
**neutral** [18] - 3:11, 3:18, 4:2, 4:9, 4:15, 4:20, 5:2, 7:5, 7:14, 7:21, 8:16, 8:22, 13:2, 14:4, 16:24, 19:15, 148:3, 151:25
**neutrality** [1] - 10:23
**never** [17] - 67:6, 81:17, 82:24, 89:11, 90:6, 116:16, 134:21, 134:24, 187:1, 199:22, 199:25, 200:24, 201:6, 201:11, 203:19, 204:4, 209:10

**nevertheless** [1] - 17:2
**New** [2] - 9:4, 66:12
**next** [27] - 32:6, 34:1, 48:4, 50:25, 53:6, 54:5, 57:16, 57:20, 57:21, 60:24, 61:11, 97:15, 102:24, 104:21, 116:18, 118:9, 155:17, 159:23, 161:22, 164:19, 166:9, 167:14, 167:15, 169:5, 183:21, 199:8, 199:14
**nice** [2] - 33:1, 57:8
**nicely** [1] - 189:11
**nine** [5] - 12:5, 28:7, 65:3, 65:5, 188:9
**nine-page** [1] - 28:7
**NO** [1] - 1:5
**nobody** [5] - 6:15, 15:23, 161:14, 161:15, 211:3
**nobody's** [3] - 190:1, 209:11, 209:12
**nodes** [2] - 75:12, 87:16
**noise** [1] - 202:18
**non** [3] - 3:23, 141:5, 196:5
**non-conclusory** [1] - 3:23
**non-content** [1] - 141:5
**non-substantive** [1] - 196:5
**none** [5] - 8:18, 8:19, 132:15, 132:18, 199:7
**normal** [8] - 41:19, 55:12, 65:19, 65:23, 66:6, 114:25, 180:25, 202:21
**normal's** [1] - 65:21
**normally** [2] - 196:4, 211:5
**north** [1] - 26:5
**NORTHERN** [1] - 1:2
**Northern** [2] - 7:19, 12:4
**not-found** [3] - 53:13, 54:9
**notably** [1] - 9:22
**note** [1] - 12:1
**noted** [5] - 4:7, 9:9, 11:17, 11:23, 12:10
**notes** [3] - 140:17, 144:22, 148:23
**nothing** [15] - 13:14, 20:22, 53:12, 112:8, 121:11, 122:15, 122:22, 137:9, 137:17, 137:25, 138:3, 179:10, 201:10, 209:7
**notice** [3] - 136:10, 170:4, 170:20

**noticeably** [1] - 202:20
**noticed** [1] - 174:22
**notion** [3] - 40:18, 53:24, 56:10
**November** [4] - 75:15, 113:20
**nowhere** [2] - 20:22, 148:12
**nude** [2] - 48:20, 48:21
**Number** [6] - 2:3, 26:18, 28:3, 28:11, 31:1, 146:18
**number** [88] - 3:4, 29:18, 42:21, 46:9, 50:20, 55:5, 57:13, 60:13, 74:2, 74:5, 74:6, 74:7, 74:21, 75:3, 75:18, 87:18, 88:22, 88:23, 90:11, 90:23, 91:2, 91:4, 91:6, 91:7, 91:17, 91:20, 93:15, 95:6, 100:9, 102:1, 103:16, 103:21, 104:13, 104:19, 104:20, 104:21, 104:22, 105:7, 105:9, 105:10, 105:12, 105:13, 105:18, 105:19, 105:20, 106:7, 106:22, 106:23, 108:7, 111:24, 113:23, 135:15, 135:17, 135:20, 138:12, 144:8, 144:9, 144:25, 145:1, 145:4, 145:17, 145:18, 146:6, 146:7, 146:10, 146:14, 146:22, 147:1, 147:2, 147:6, 147:7, 148:10, 148:11, 148:13, 148:15, 148:20, 150:8, 151:12, 154:13, 154:14, 155:12, 161:2, 192:6
**Number(s** [1] - 215:5
**numbers** [11] - 44:6, 44:10, 46:6, 49:17, 49:18, 50:20, 63:14, 85:8, 89:21, 91:9, 91:24

**O**

**oath** [2] - 177:20, 210:18
**object** [12] - 20:2, 24:2, 24:4, 37:1, 42:2, 59:8, 115:10, 118:14, 126:15, 155:21, 179:23, 213:16
**objected** [1] - 6:9
**objection** [6] - 28:18, 42:10, 83:22, 115:14, 118:2, 118:4
**objective** [4] - 124:17, 140:9, 154:10, 193:14
**objectively** [6] - 123:17, 127:10, 154:20, 206:2,

206:3, 206:14
**objects** [1] - 23:9
**observations** [1] - 75:11
**observe** [2] - 111:11, 114:7
**observed** [2] - 144:20, 146:19
**obtain** [1] - 150:5
**obtained** [1] - 21:23
**obtaining** [1] - 133:18
**obvious** [3] - 5:12, 194:21, 194:24
**obviously** [5] - 49:3, 178:10, 196:16, 200:5, 207:19
**occasion** [2] - 137:7, 185:1
**occasionally** [1] - 116:11
**occasions** [2] - 4:8, 135:18
**occupant** [2] - 135:17, 135:19
**occur** [2] - 160:6, 196:9
**occurred** [7] - 74:3, 123:21, 157:15, 161:22, 168:1, 169:5
**October** [1] - 113:20
**OF** [2] - 1:1, 1:4
**offer** [3] - 28:10, 45:17, 117:6
**offered** [2] - 37:24, 133:25
**offering** [1] - 47:4
**Office** [2] - 14:14, 14:15
**office** [4] - 8:4, 160:13, 169:11, 169:15
**Officer** [2] - 146:4, 149:23
**officer** [55] - 7:25, 84:8, 84:20, 86:9, 87:1, 87:4, 88:2, 88:3, 88:15, 90:3, 90:21, 91:14, 92:19, 93:22, 97:17, 100:4, 100:23, 100:25, 101:18, 101:21, 111:12, 114:8, 114:10, 120:9, 130:1, 131:16, 135:13, 135:23, 145:21, 145:23, 146:12, 147:8, 147:12, 147:13, 147:23, 148:1, 148:18, 151:7, 154:10, 154:21, 158:11, 184:10, 185:6, 187:18, 187:24, 188:1, 188:12, 193:20, 194:2, 199:1, 208:6, 208:15, 212:2
**officer's** [1] - 99:17
**officers** [31] - 4:3, 4:16,

5:16, 5:24, 7:24, 85:1, 85:15, 86:23, 91:12, 91:17, 100:10, 116:1, 135:12, 148:2, 161:13, 170:6, 170:12, 187:9, 187:15, 192:10, 192:16, 192:23, 198:13, 201:3, 204:9, 205:6, 206:5, 206:16, 206:24, 209:9, 211:2
**official** [1] - 215:7
**Official** [1] - 215:15
**often** [6] - 99:9, 99:11, 112:25, 190:3, 190:10
**old** [3] - 47:2, 181:8, 181:10
**omitting** [1] - 145:8
**once** [14] - 33:3, 40:12, 40:15, 40:25, 48:3, 48:22, 51:19, 68:1, 111:22, 114:3, 143:20, 169:20, 200:10
**one** [157] - 3:14, 3:15, 13:17, 14:6, 15:6, 15:14, 16:12, 17:25, 21:16, 21:23, 21:25, 22:10, 22:11, 22:18, 24:12, 26:2, 26:9, 27:6, 30:3, 31:11, 32:7, 32:11, 35:9, 35:11, 37:24, 38:15, 41:13, 43:19, 46:17, 47:15, 48:5, 48:21, 50:5, 51:12, 51:16, 53:6, 54:8, 55:21, 56:17, 59:12, 59:18, 60:8, 61:1, 61:2, 61:12, 62:22, 64:13, 66:17, 70:10, 71:19, 73:18, 74:25, 81:8, 81:9, 85:4, 85:19, 85:20, 87:9, 87:10, 89:19, 90:13, 90:22, 91:3, 92:20, 93:1, 93:20, 94:9, 95:6, 95:14, 95:18, 95:19, 97:5, 102:1, 103:14, 105:7, 105:9, 105:24, 106:1, 106:2, 106:16, 114:20, 115:3, 115:12, 115:13, 116:6, 116:10, 117:4, 118:16, 118:23, 120:3, 120:16, 122:3, 122:7, 123:10, 123:15, 123:23, 126:14, 127:4, 127:25, 129:4, 130:5, 131:14, 135:10, 135:15, 135:17, 135:20, 138:12, 140:16, 143:7, 144:8, 145:6, 145:19, 151:21, 152:17, 160:23, 160:24, 165:13, 165:20, 179:8, 179:11,

180:12, 182:4, 182:5,
185:6, 186:18, 187:18,
188:7, 188:13, 189:15,
193:14, 193:24, 195:7,
196:7, 196:25, 197:2,
198:19, 199:12, 207:5,
207:13, 208:23, 210:17,
210:19, 210:23, 211:2,
211:25, 212:7, 212:9,
212:14, 213:2
  **One** [2] - 110:8, 147:14
  **one's** [1] - 189:23
  **ones** [1] - 64:14
  **ongoing** [4] - 8:5,
108:4, 183:22, 183:24
  **online** [1] - 37:15
  **open** [38] - 18:15,
20:18, 32:10, 32:15,
32:25, 33:3, 35:15,
35:25, 36:3, 37:20,
37:22, 39:7, 39:10,
39:14, 39:16, 40:12,
41:17, 48:9, 51:20, 55:7,
57:25, 59:6, 59:10,
59:17, 59:22, 65:21,
66:5, 66:10, 76:18,
114:20, 114:23, 114:25,
115:4, 122:16, 122:17,
127:5, 173:1
  **Open** [1] - 66:13
  **open-net** [3] - 114:20,
114:23, 115:4
  **open-source** [2] -
32:10, 32:15
  **opening** [1] - 101:1
  **operate** [6] - 68:21,
80:5, 81:19, 81:20, 84:4,
84:15
  **operates** [3] - 68:8,
119:2, 119:3
  **operating** [4] - 35:3,
73:4, 81:16, 83:8
  **operation** [1] - 13:4
  **operational** [4] - 35:23,
40:13, 59:5, 59:16
  **opinion** [2] - 12:10,
161:8
  **opinions** [1] - 20:11
  **opportunity** [6] - 13:23,
121:13, 122:17, 140:13,
150:18, 174:9
  **opposed** [6] - 8:25, 9:1,
24:3, 143:9, 143:20,
146:6
  **opposite** [1] - 15:12
  **option** [13] - 35:5, 35:8,
35:15, 35:17, 36:11,
36:13, 36:16, 38:8, 40:2,
58:23, 61:12, 126:13
  **options** [6] - 34:24,

34:25, 35:10, 35:12,
35:14, 66:10
  **order** [5] - 75:6, 79:14,
108:4, 115:25, 143:6
  **ordinarily** [4] - 78:2,
78:4, 78:13, 82:11
  **ordinary** [6] - 78:9,
79:4, 120:15, 137:24,
138:4, 142:14
  **organizes** [1] - 85:8
  **original** [17] - 29:19,
45:13, 53:14, 53:16,
54:10, 61:25, 71:20,
71:25, 72:1, 97:22,
104:25, 125:7, 125:10,
131:8, 134:7, 143:24,
146:24
  **originally** [4] - 10:6,
58:16, 104:14, 104:20
  **originator** [2] - 77:5,
102:21
  **ostensibly** [1] - 208:11
  **otherwise** [2] - 134:8,
205:10
  **ought** [2] - 115:15,
138:7
  **ourselves** [1] - 18:25
  **out-of-state** [1] - 97:19
  **outcome** [2] - 55:3,
148:10
  **outcomes** [2] - 54:25,
61:5
  **outline** [1] - 21:20
  **outlines** [1] - 119:14
  **output** [1] - 114:4
  **outset** [6] - 121:8,
134:18, 140:3, 150:20,
154:7, 154:18
  **outside** [27] - 11:18,
82:15, 82:20, 159:17,
159:22, 159:25, 162:1,
162:2, 162:6, 162:21,
168:9, 188:12, 188:13,
188:14, 189:3, 189:6,
189:7, 189:8, 189:10,
189:13, 192:23, 192:24,
198:23, 199:15, 205:2,
206:25
  **overall** [1] - 22:17
  **overlap** [3] - 91:8, 92:2,
92:3
  **overly** [1] - 152:8
  **overruled** [4] - 37:3,
42:7, 42:10, 59:13,
115:17, 179:25
  **overview** [2] - 157:1,
169:4
  **own** [7] - 36:20, 45:6,
82:5, 97:2, 97:20, 208:8,
208:9

## P

  **P-to-P** [1] - 36:5
  **p.m** [5] - 123:3, 156:17,
213:21
  **page** [17] - 26:22, 28:7,
31:7, 32:3, 32:6, 32:7,
32:8, 37:17, 38:22,
39:13, 47:20, 48:7,
48:15, 60:6, 153:4, 203:9
  **Page** [18] - 30:25,
34:17, 35:22, 38:12,
41:13, 45:16, 46:16,
47:15, 49:6, 50:15,
50:25, 140:20, 141:14,
144:19, 146:17, 148:24,
149:2, 153:13
  **PAGE** [1] - 214:3
  **pages** [10] - 26:23,
27:2, 34:1, 48:17, 155:9,
163:19, 164:5, 164:6,
180:8, 215:6
  **Pages** [4] - 5:3, 11:23,
31:22, 180:10
  **pants** [1] - 138:4
  **paper** [19] - 15:11, 18:4,
26:15, 27:9, 27:11,
27:13, 27:15, 27:16,
61:7, 62:5, 62:17, 75:22,
89:16, 89:22, 100:17,
101:3, 102:13, 108:1,
113:24
  **paper's** [1] - 27:17
  **papers** [2] - 150:23,
150:25
  **paragraph** [3] - 38:23,
39:14, 146:17
  **Paragraph** [3] - 140:20,
146:18, 153:13
  **paragraphs** [2] - 60:8,
145:6
  **Paragraphs** [1] - 145:5
  **parentheses** [1] - 48:2
  **parked** [1] - 158:25
  **part** [36] - 27:16, 30:6,
40:6, 45:20, 49:4, 56:15,
57:3, 61:16, 63:12,
64:19, 66:11, 74:23,
80:20, 88:7, 88:12,
96:11, 97:16, 98:17,
104:1, 105:7, 105:16,
106:15, 106:20, 108:23,
111:15, 111:18, 113:24,
120:8, 134:24, 145:18,
145:19, 163:16, 163:18
  **participate** [2] - 173:13,
183:25
  **participation** [1] - 61:6
  **particular** [48] - 3:8,

5:4, 5:10, 6:1, 6:24,
7:20, 9:9, 10:17, 10:21,
11:4, 11:12, 13:10, 19:8,
26:14, 27:8, 32:18, 38:1,
43:20, 52:12, 55:10,
57:11, 58:23, 60:8,
61:12, 70:12, 70:17,
70:18, 73:24, 75:5,
76:17, 81:19, 82:25,
84:19, 104:9, 109:1,
113:18, 119:5, 129:22,
140:22, 143:10, 144:20,
146:8, 147:5, 149:8,
159:10, 169:10, 178:4
  **particularly** [3] - 97:24,
186:25, 190:6
  **parties** [4] - 29:22,
39:17, 127:21, 127:23
  **parts** [4] - 44:22, 45:23,
69:17, 69:19, 73:10,
87:22, 144:22
  **party** [5] - 37:24, 38:1,
60:16
  **passed** [3] - 74:7,
211:25, 213:3
  **passing** [2] - 62:1,
134:20
  **passively** [1] - 124:8
  **password** [31] - 43:25,
44:1, 44:4, 44:11, 45:11,
45:25, 46:5, 46:11,
50:12, 50:16, 51:9,
51:14, 52:12, 56:3, 56:4,
56:24, 57:2, 57:12,
60:11, 68:1, 68:3, 68:14,
69:13, 104:9, 104:12,
108:24, 109:2, 180:6,
180:16, 182:5
  **password-type** [1] -
44:4
  **passwords** [12] - 46:4,
46:9, 46:14, 46:17,
49:12, 51:8, 51:12,
51:15, 56:21, 108:21,
108:25, 116:19
  **past** [6] - 30:10, 135:24,
135:25, 160:14, 160:16,
167:24
  **paste** [3] - 50:9, 50:12,
50:16
  **patch** [10] - 76:6, 76:13,
76:17, 76:22, 76:25,
77:16, 80:19, 82:10,
83:2, 84:18
  **patrol** [3] - 157:4,
187:24, 188:12
  **Paul** [2] - 1:16, 2:6
  **pause** [5] - 113:10,
125:4, 140:18, 152:18,
197:1

  **peer** [64] - 25:24, 26:3,
26:5, 26:8, 26:11, 26:12,
26:16, 27:4, 27:5, 27:9,
27:19, 28:16, 28:21,
28:23, 29:6, 29:12,
29:18, 30:2, 30:3, 30:6,
45:1, 45:20, 45:21,
54:12, 54:18, 58:6,
58:11, 61:8, 61:16,
82:13, 124:2, 124:4,
124:7, 124:24, 125:1,
125:8, 127:8, 130:11,
130:12, 153:14
  **peer-review** [1] - 27:9
  **peer-reviewed** [10] -
26:3, 26:5, 26:16, 27:4,
27:5, 27:19, 29:18, 30:2,
61:8, 61:16
  **peer-to-peer** [24] -
25:24, 26:8, 26:11,
26:12, 28:16, 28:21,
28:23, 29:6, 29:12, 30:3,
30:6, 45:20, 54:12,
54:18, 124:2, 124:4,
124:7, 124:24, 125:1,
125:8, 127:8, 130:11,
130:12, 153:14
  **peers** [15] - 40:14,
40:16, 40:25, 41:17,
41:18, 54:8, 88:22,
88:23, 90:17, 91:2,
104:21, 123:12, 123:23,
125:13, 128:3
  **Peers** [1] - 66:13
  **pending** [3] - 6:3,
21:22, 91:1
  **Pending** [1] - 213:8
  **Pennsylvania** [7] -
81:14, 81:15, 82:18,
83:9, 83:14, 99:19, 101:6
  **people** [69] - 29:6, 33:1,
38:24, 40:1, 41:25,
43:15, 45:6, 45:24,
46:10, 47:12, 48:18,
54:13, 62:21, 71:21,
72:7, 74:25, 75:8, 75:10,
79:8, 79:10, 85:9, 89:18,
95:6, 98:5, 98:19, 98:22,
98:23, 119:24, 120:19,
136:2, 136:5, 136:10,
137:23, 137:24, 138:4,
147:15, 147:19, 153:21,
158:22, 158:25, 160:5,
163:5, 170:15, 179:9,
184:25, 185:1, 185:2,
185:8, 185:15, 185:17,
186:4, 186:23, 186:25,
187:4, 187:8, 187:17,
187:22, 188:9, 188:14,
188:16, 189:1, 189:3,

190:10, 190:13, 191:17, 196:2, 196:7, 211:5
**people's** [2] - 45:15, 127:19
**per** [4] - 89:7, 90:16, 164:20, 164:21
**perfect** [1] - 28:14
**perfected** [1] - 113:12
**perfecting** [1] - 113:24
**perfectly** [3] - 6:18, 13:13, 135:25
**performance** [2] - 39:4, 39:6
**perhaps** [14] - 3:24, 5:9, 32:6, 49:9, 49:13, 99:18, 119:18, 121:7, 136:12, 136:13, 142:6, 188:16, 188:23, 190:11
**period** [3] - 166:6, 170:20, 211:24
**permission** [8] - 200:6, 200:11, 200:12, 200:18, 200:23, 204:1, 204:4, 204:6
**permitted** [4] - 6:10, 6:22, 7:9, 9:24
**person** [23] - 5:25, 6:20, 13:17, 41:23, 42:25, 45:9, 62:1, 77:4, 83:23, 85:5, 86:18, 104:23, 116:12, 124:12, 150:11, 152:10, 186:13, 188:7, 206:2, 206:3, 206:14, 206:22, 209:18
**person's** [2] - 105:2, 186:18
**personally** [12] - 37:13, 37:15, 84:4, 85:3, 93:16, 94:4, 95:13, 99:12, 110:18, 111:1, 114:7, 116:16
**persons** [1] - 28:23
**perspective** [2] - 154:19, 154:20
**persuaded** [1] - 155:11
**Philippines** [1] - 181:19
**phone** [5] - 2:21, 200:2, 200:5, 203:20, 203:23
**photograph** [1] - 185:23
**photographs** [1] - 185:17
**photos** [2] - 48:20, 48:21
**phrase** [3] - 111:9, 115:11, 146:22
**phrased** [2] - 66:22, 67:14
**physical** [2] - 180:22, 180:23

**physically** [1] - 162:4
**pick** [4] - 91:16, 91:20, 180:11, 199:20
**pictures** [3] - 51:11, 163:4, 192:12
**piece** [12] - 15:11, 18:4, 45:1, 45:8, 45:10, 52:19, 52:21, 53:4, 53:16, 53:23, 54:6, 56:7, 56:8, 57:2, 92:23, 94:24, 95:9, 96:14, 96:25, 143:10, 154:15, 193:14
**pieces** [24] - 44:24, 45:5, 45:12, 45:14, 45:23, 52:15, 52:18, 53:1, 53:3, 54:4, 56:3, 56:24, 57:1, 67:12, 92:20, 96:24, 101:13, 103:17, 105:6, 127:16, 128:6, 130:24
**place** [22] - 8:19, 8:20, 32:22, 32:25, 38:12, 39:9, 45:5, 52:10, 63:21, 65:2, 65:3, 65:8, 103:13, 129:22, 135:15, 148:4, 163:4, 168:18, 172:15, 179:2, 183:11
**placed** [1] - 47:12
**places** [6] - 32:23, 47:8, 122:2, 126:2, 133:11, 169:19
**placing** [1] - 37:6
**plain** [1] - 18:12
**plaintiff** [1] - 10:21
**plan** [2] - 23:1, 186:4
**planned** [1] - 184:18
**planning** [2] - 23:16, 156:13
**plans** [2] - 22:18, 22:24
**play** [4] - 175:18, 175:19, 180:12, 180:13
**playing** [2] - 175:24, 176:1, 180:14
**plea** [3] - 9:8, 9:12
**plenty** [1] - 132:4
**plot** [1] - 161:9
**plumber** [1] - 200:3
**plus** [1] - 195:5
**point** [55] - 2:22, 19:25, 38:15, 39:19, 53:10, 54:9, 56:12, 56:17, 57:6, 62:4, 65:17, 75:25, 78:12, 86:2, 94:1, 97:14, 98:10, 99:1, 99:21, 109:13, 118:24, 125:16, 136:23, 137:21, 137:22, 145:10, 146:16, 149:21, 150:15, 151:15, 153:19, 153:21, 154:1, 158:1, 175:19, 176:22, 177:3,

179:6, 184:2, 191:10, 192:24, 193:25, 195:17, 195:19, 195:21, 195:23, 198:14, 200:2, 203:1, 206:13, 207:9, 207:13, 207:18, 208:6
**pointed** [3] - 151:16, 151:21, 159:9
**points** [1] - 186:18
**Police** [7] - 156:24, 157:1, 157:4, 157:9, 158:13, 158:14, 163:24
**police** [18] - 158:11, 158:25, 159:2, 176:21, 177:16, 184:10, 185:6, 186:23, 187:15, 187:18, 187:20, 188:1, 203:16, 204:9, 205:6, 210:17, 211:2
**political** [1] - 153:22
**pool** [2] - 99:2, 99:8
**poorly** [1] - 66:22
**popular** [4] - 32:21, 32:22, 32:23, 32:25
**population** [1] - 80:8
**populous** [1] - 79:10
**pornography** [39] - 26:17, 54:14, 54:19, 55:5, 56:19, 57:5, 57:19, 92:25, 94:24, 95:4, 96:7, 96:18, 97:25, 98:4, 98:20, 104:3, 109:6, 109:14, 110:1, 125:12, 127:13, 128:7, 130:3, 130:4, 131:1, 131:6, 131:9, 131:19, 131:23, 132:5, 142:18, 143:16, 146:21, 151:10, 177:1, 178:13, 190:3, 190:7, 212:10
**portion** [4] - 45:17, 49:7, 69:8, 93:11
**portions** [3] - 117:5, 117:14, 117:21
**portray** [1] - 18:9
**position** [9] - 13:24, 132:7, 146:12, 154:10, 159:6, 159:7, 206:4, 206:14, 206:22
**positive** [6] - 61:18, 61:19, 61:21, 62:14, 62:16
**possesses** [1] - 44:11
**possession** [5] - 5:25, 6:15, 6:20, 14:6, 177:1
**possibility** [1] - 38:7
**possible** [6] - 5:21, 43:22, 54:4, 78:8, 96:3, 120:20
**possibly** [1] - 51:11,

177:1, 188:17
**post** [3] - 46:7, 134:15, 139:18
**post-hearing** [2] - 134:15, 139:18
**postal** [1] - 142:6
**posted** [3] - 46:10, 46:15, 109:6
**potential** [3] - 120:12, 190:14, 191:17
**pounding** [2] - 198:1, 202:22
**practiced** [1] - 137:6
**pre** [6] - 10:9, 10:10, 22:10, 129:6, 155:1
**pre-dated** [2] - 10:9, 10:10
**pre-dates** [1] - 10:9
**pre-search** [2] - 22:10, 129:6
**pre-warrant** [1] - 155:1
**precinct** [1] - 184:11
**precisely** [1] - 77:8
**predate** [1] - 19:21
**predates** [1] - 9:22
**predicates** [1] - 109:7
**predominantly** [1] - 181:19
**preface** [1] - 189:21
**prefer** [1] - 76:9
**preliminarily** [1] - 134:2
**preparation** [1] - 184:21
**preparing** [2] - 168:9, 170:6
**present** [7] - 2:11, 157:19, 158:10, 161:14, 161:16, 197:18, 204:9
**presentations** [1] - 85:10
**presented** [5] - 100:16, 100:17, 100:18, 101:18, 139:8
**presenting** [1] - 53:17
**presents** [2] - 87:21, 209:8
**preside** [1] - 19:2
**presiding** [1] - 19:3
**pressures** [1] - 137:5
**presumably** [4] - 51:10, 108:13, 146:3, 154:11
**presume** [4] - 99:13, 99:14, 113:4, 141:16
**pretend** [2] - 87:14, 88:1
**pretends** [1] - 88:2
**pretty** [3] - 135:9, 148:19, 156:14
**prevail** [1] - 200:25
**prevailed** [1] - 197:25

**prevalence** [1] - 79:3
**previous** [3] - 35:2, 50:19, 58:12
**previously** [9] - 46:19, 52:16, 57:4, 60:2, 119:24, 141:17, 141:20, 141:21, 176:5
**primary** [1] - 66:18
**printed** [2] - 18:3, 41:14
**privacy** [19] - 27:6, 123:11, 123:15, 123:22, 124:16, 124:18, 124:22, 125:1, 125:22, 125:25, 127:11, 128:7, 128:8, 140:9, 141:4, 141:6, 144:7, 153:11, 155:4
**Privacy** [1] - 133:18
**private** [7] - 10:25, 84:13, 124:2, 126:3, 127:8, 144:6, 155:3
**probabilistic** [4] - 99:5, 99:23, 108:5, 148:10
**probability** [10] - 102:17, 102:19, 103:7, 106:5, 107:2, 119:5, 129:21, 143:9, 143:19, 150:10
**probable** [49] - 3:24, 4:6, 16:11, 16:14, 17:5, 17:8, 17:9, 17:17, 18:13, 22:16, 120:7, 129:13, 129:16, 129:20, 130:15, 131:12, 132:5, 132:8, 133:3, 133:5, 133:8, 133:12, 143:6, 145:2, 145:7, 145:8, 145:12, 145:13, 145:16, 145:16, 145:20, 145:22, 146:14, 147:5, 147:17, 148:5, 148:17, 148:22, 149:10, 150:15, 151:6, 151:9, 152:3, 152:5, 154:8, 154:23, 155:6, 155:10, 155:14
**probe** [2] - 138:1, 138:16
**probing** [1] - 55:14
**problem** [2] - 134:7, 145:25
**procedure** [6] - 82:1, 159:13, 163:4, 167:11, 173:22, 173:24
**proceeded** [1] - 178:6
**Proceedings** [1] - 213:21
**proceedings** [7] - 2:1, 21:16, 125:4, 140:18, 197:1, 215:4, 215:7
**process** [59] - 8:25, 9:7, 9:11, 9:20, 10:25, 11:3,

11:11, 11:14, 12:6, 12:11, 12:15, 12:23, 14:11, 17:14, 20:4, 20:18, 21:2, 21:3, 21:4, 21:7, 21:10, 27:9, 34:5, 52:5, 54:11, 56:2, 57:16, 58:21, 67:10, 67:25, 69:13, 69:16, 71:3, 73:1, 74:4, 77:12, 80:19, 94:5, 94:6, 94:12, 94:14, 94:16, 94:18, 95:3, 97:12, 97:13, 97:21, 98:17, 100:1, 106:16, 106:21, 112:12, 114:3, 120:8, 138:2, 168:5, 169:7, 183:10

**processes** [10] - 8:25, 9:10, 9:21, 12:22, 13:8, 14:10, 15:3, 21:5, 24:3, 67:23

**produce** [1] - 26:2

**producing** [1] - 26:4

**productively** [1] - 118:9

**professional** [2] - 27:7, 32:24

**professionals** [1] - 27:11

**professor** [8] - 25:7, 25:10, 25:11, 25:15, 25:16, 55:2, 78:18

**professors** [1] - 27:10

**proffer** [5] - 118:12, 118:18, 118:20, 121:22, 122:21

**program** [19] - 31:18, 32:17, 32:18, 33:16, 34:6, 34:8, 34:16, 35:1, 35:3, 37:25, 38:2, 40:21, 41:10, 41:12, 43:21, 87:21, 127:1, 127:11, 146:2

**Program** [1] - 27:14

**programmer** [5] - 79:25, 80:1, 117:18, 124:10, 126:6

**programmers** [3] - 32:24, 33:2, 126:7

**programming** [9] - 32:16, 33:4, 33:14, 33:19, 33:21, 33:22, 37:21, 117:18, 181:20

**programs** [1] - 40:22

**progress** [4] - 40:19, 47:25, 48:1, 51:3

**project** [3] - 37:21, 37:22, 58:5

**projects** [1] - 32:24

**promised** [1] - 183:3

**promises** [2] - 183:3, 209:15

**promoted** [2] - 25:15

**prong** [2] - 4:18, 16:21

**pronounceable** [2] - 44:8, 46:6

**proof** [1] - 121:24

**propagate** [1] - 72:6

**proper** [1] - 20:12

**properly** [2] - 17:2, 84:15

**proportion** [1] - 60:13

**proposes** [1] - 22:8

**proposition** [1] - 133:1

**proprietary** [1] - 12:18

**prosecution** [1] - 8:7

**prosecutor** [1] - 112:17

**prosecutors** [1] - 111:19

**protect** [1] - 137:13

**protected** [1] - 127:23

**Protection** [2] - 64:20, 141:8

**provide** [23] - 21:19, 27:25, 29:1, 29:4, 31:18, 38:20, 62:5, 76:1, 84:18, 84:19, 84:24, 85:4, 134:13, 135:2, 138:25, 141:9, 152:21, 152:25, 153:19, 166:21, 175:20, 180:16, 183:1

**provided** [16] - 22:2, 23:15, 40:1, 40:4, 44:11, 49:12, 80:21, 82:10, 85:1, 85:3, 85:9, 86:7, 86:11, 126:5, 126:11, 130:10

**provider** [7] - 166:17, 166:20, 167:7, 176:9, 176:20, 177:10, 212:11

**provides** [4] - 32:20, 33:1, 84:25, 85:5

**providing** [4] - 23:17, 134:11, 146:7, 183:4

**proxy** [1] - 141:24

**public** [5] - 26:3, 76:18, 84:13, 108:17, 108:19

**publication** [2] - 29:16, 29:18, 61:17

**publications** [7] - 26:1, 26:4, 26:6, 26:7, 26:11, 27:3, 29:19

**publicly** [1] - 27:18, 40:7, 46:9, 46:15, 56:21, 58:3, 58:4, 60:20, 60:21, 61:8, 62:5, 76:15, 116:20

**published** [3] - 26:13, 26:15, 102:13

**pull** [2] - 24:20, 165:2

**punctuation** [4] - 44:7, 49:17, 49:19, 50:21

**purchase** [1] - 32:12

**purchased** [2] - 135:16, 135:19

**purpose** [4] - 48:11, 98:8, 145:23, 208:12

**purposes** [2] - 134:20, 207:11

**pursue** [2] - 14:1, 121:23

**pursued** [1] - 119:13

**put** [15] - 14:24, 20:23, 21:6, 21:9, 26:19, 36:15, 37:22, 49:4, 60:2, 73:6, 87:17, 129:24, 138:4, 174:23, 208:1

**puts** [1] - 21:3

**putting** [2] - 37:4, 41:13

## Q

**qualifications** [1] - 28:17

**qualify** [1] - 28:15

**quarrel** [2] - 140:7, 150:3

**quarters** [1] - 161:10

**quash** [3] - 2:14, 2:23, 23:20

**quashes** [1] - 13:25

**queen** [1] - 19:3

**questioned** [4] - 138:7, 195:6, 195:7, 212:8

**questioning** [6] - 165:12, 165:14, 207:18, 208:6, 211:23, 212:1

**questions** [49] - 6:11, 11:5, 13:7, 13:11, 13:20, 15:10, 18:6, 18:25, 20:22, 21:6, 21:9, 28:17, 31:20, 31:21, 31:24, 34:7, 65:12, 83:23, 85:23, 114:14, 133:15, 165:14, 165:15, 168:6, 173:14, 176:12, 176:18, 178:17, 178:18, 179:21, 180:3, 182:6, 183:8, 183:10, 193:12, 194:12, 194:14, 194:15, 195:10, 195:13, 195:24, 196:11, 201:7, 207:17, 208:1, 208:4, 209:17, 210:13, 213:2

**quick** [1] - 14:23

**quickly** [2] - 23:25, 136:5

**quite** [11] - 39:18, 51:4, 59:9, 65:16, 89:5, 90:1, 108:22, 134:5, 134:12, 138:21, 138:24

**quote** [3] - 37:8, 141:16,

144:19

**quoting** [1] - 177:4

## R

**R-E-E-S** [1] - 156:10

**Rachel** [1] - 2:9

**raise** [3] - 24:16, 156:3, 197:6

**raised** [2] - 122:24, 134:2

**raises** [2] - 22:9, 22:14

**ran** [10] - 75:13, 75:14, 89:17, 89:20, 113:22, 113:23, 120:9, 121:2, 121:4, 121:14

**random** [2] - 44:9, 58:18

**randomly** [4] - 44:25, 45:1, 45:5, 70:19

**ranging** [1] - 32:23

**RAR** [3] - 49:21, 49:25, 50:22

**rate** [7] - 61:18, 61:19, 61:21, 62:14, 62:16, 147:15

**rather** [6] - 2:21, 4:2, 10:6, 10:16, 11:11, 145:8

**Raut** [1] - 169:16

**raw** [1] - 91:9

**re** [2] - 45:12, 213:3

**re-advised** [1] - 213:3

**re-collect** [1] - 45:12

**reach** [1] - 212:25

**reached** [1] - 54:21

**read** [52] - 5:6, 5:8, 5:10, 5:13, 5:23, 6:12, 7:15, 7:16, 8:10, 13:11, 15:23, 32:17, 33:1, 33:4, 36:21, 36:25, 37:4, 38:4, 49:19, 50:18, 55:8, 111:21, 133:2, 134:23, 136:17, 136:19, 136:20, 136:21, 136:23, 136:25, 149:18, 153:2, 163:9, 163:15, 164:4, 164:10, 164:16, 164:23, 165:3, 165:7, 165:16, 176:6, 191:3, 193:21, 194:21, 203:9, 204:12, 204:13, 207:12, 208:3

**readable** [1] - 44:7

**reading** [1] - 163:10

**reads** [1] - 207:22

**ready** [3] - 46:24, 123:5, 159:7

**real** [5] - 18:23, 39:25, 61:21, 107:19, 122:21

**realize** [1] - 14:13

**really** [31] - 17:24, 18:15, 29:7, 29:9, 30:9, 34:25, 35:4, 35:9, 35:10, 40:16, 41:9, 44:10, 44:14, 61:16, 81:22, 82:3, 82:21, 88:12, 89:11, 99:24, 106:15, 106:18, 108:25, 109:9, 113:24, 113:25, 120:23, 149:7, 152:20, 152:22, 209:7

**realtime** [1] - 97:9

**reason** [15] - 47:9, 66:18, 78:8, 96:23, 125:18, 137:9, 137:18, 137:19, 138:13, 186:12, 186:15, 199:9, 209:23, 212:9

**reasonable** [22] - 17:1, 17:18, 18:13, 79:2, 123:17, 137:15, 137:16, 140:8, 141:4, 141:5, 144:6, 146:12, 149:16, 154:9, 154:20, 206:2, 206:3, 206:14, 206:22, 209:18

**reasonably** [4] - 4:4, 132:10, 132:13, 154:9

**reasoned** [1] - 148:5

**reasons** [6] - 66:17, 124:4, 125:23, 138:12, 140:16, 208:21

**reassemble** [1] - 53:15

**reassembling** [1] - 53:16

**reboot** [1] - 127:16

**rebuild** [2] - 127:12, 128:4

**receipt** [1] - 43:25

**receive** [2] - 27:15, 44:3, 60:12, 60:13, 84:14

**received** [16] - 2:19, 2:21, 15:24, 25:14, 57:13, 76:24, 77:3, 78:5, 82:9, 83:4, 83:8, 85:15, 85:16, 85:17, 118:22, 146:18

**receiving** [1] - 74:13, 86:3

**recent** [2] - 64:14, 112:2

**recently** [2] - 111:25, 112:1

**recess** [5] - 52:2, 123:3, 156:13, 156:15, 156:17

**recipient** [3] - 53:7, 72:14, 72:17, 74:13, 74:22, 74:24, 76:24, 76:25, 77:16, 94:19

**recipients** [1] - 55:19

**recited** [1] - 19:9

**reckless** [1] - 132:18
**recognizable** [1] - 44:8
**recognize** [10] - 4:4, 26:23, 28:4, 64:21, 66:13, 66:16, 154:17, 154:18, 154:21
**recognizes** [1] - 72:23
**recollection** [4] - 30:1, 89:16, 171:9, 201:16
**recommend** [1] - 45:22
**reconsider** [9] - 2:17, 21:8, 21:13, 139:23, 139:24, 154:1, 155:24, 156:1, 213:17
**reconstitute** [1] - 45:12
**reconstituted** [1] - 72:11
**reconstruct** [1] - 71:17
**record** [25] - 6:5, 24:1, 57:6, 57:8, 77:1, 77:16, 80:19, 81:6, 88:16, 95:16, 115:7, 119:16, 134:20, 155:20, 156:8, 158:1, 158:4, 171:8, 190:25, 191:3, 191:7, 191:8, 207:10, 213:16
**recordation** [6] - 76:22, 82:7, 88:13, 97:11, 98:18, 142:11
**recorded** [41] - 22:2, 59:3, 81:4, 92:9, 93:11, 93:17, 93:19, 93:20, 93:23, 96:18, 96:20, 97:3, 97:7, 97:9, 98:2, 98:3, 98:13, 99:16, 100:5, 100:6, 101:8, 103:25, 104:1, 119:6, 119:20, 120:4, 122:12, 122:13, 141:22, 141:23, 142:2, 142:9, 142:10, 173:16, 193:15, 193:18, 215:3
**recorder** [4] - 98:19, 174:25, 207:9, 208:10
**recording** [16] - 59:20, 60:12, 82:9, 90:3, 90:4, 90:5, 142:18, 174:10, 174:19, 175:9, 175:15, 176:3, 176:11, 176:17, 190:22, 210:11
**recordings** [1] - 174:23
**records** [3] - 40:9, 115:6, 119:16
**recreate** [2] - 33:6, 69:1
**recreated** [1] - 10:22
**recreating** [1] - 62:10
**recross** [1] - 116:23
**red** [3] - 39:13, 159:1, 161:25
**redirect** [1] - 114:15

**REDIRECT** [4] - 114:16, 195:25, 214:5, 214:8
**reduced** [1] - 9:12
**redundant** [1] - 78:11
**Rees** [38] - 17:10, 23:15, 118:16, 118:25, 119:8, 120:10, 121:2, 121:9, 122:2, 122:10, 129:24, 132:9, 132:13, 134:22, 140:21, 141:16, 142:1, 146:4, 146:9, 149:23, 154:10, 155:19, 156:9, 156:21, 163:24, 174:9, 184:12, 202:10, 203:8, 204:12, 207:7, 207:18, 207:19, 207:21, 210:6, 210:13, 211:9, 213:1
**REES** [2] - 156:5, 214:6
**Rees's** [3] - 133:5, 207:15, 208:9
**refer** [4] - 35:14, 76:9, 161:1, 185:2
**reference** [2] - 174:14, 210:12
**referenced** [3] - 75:22, 102:14, 141:17
**referred** [2] - 26:24, 35:15, 48:10
**referring** [11] - 31:7, 31:12, 38:13, 38:14, 49:14, 50:16, 75:24, 77:9, 112:18, 116:7, 170:21
**refers** [2] - 68:4, 106:18
**refined** [2] - 144:1
**reflect** [3] - 115:15, 175:2, 175:14
**refresh** [1] - 171:9
**refuse** [1] - 182:6
**refused** [1] - 210:22
**refusing** [1] - 210:13
**regard** [1] - 79:13
**regarding** [4] - 8:24, 26:7, 26:14, 130:14
**regularly** [1] - 167:11
**reinitiate** [2] - 211:2, 211:18
**reinitiated** [1] - 208:11
**reinstalled** [1] - 127:2
**Reisterstown** [1] - 157:13
**relate** [14] - 21:7, 95:4, 96:7, 96:18, 98:4, 99:24, 104:2, 104:8, 117:16, 139:6, 142:17, 143:15, 145:7
**related** [11] - 3:1, 92:11, 92:14, 92:25, 95:4, 98:20, 102:5, 102:20,

109:6, 144:7, 151:10
**relates** [10] - 22:15, 68:16, 97:16, 109:3, 121:5, 121:6, 121:9, 122:23, 140:24, 154:22
**relating** [15] - 9:20, 16:7, 22:1, 22:17, 22:20, 22:22, 22:25, 23:7, 23:18, 122:19, 122:20, 130:4, 131:13, 176:19, 182:4
**relation** [2] - 167:21, 179:2
**relative** [1] - 7:24
**relatively** [5] - 3:7, 5:12, 40:1, 51:17, 65:23
**relaxed** [1] - 181:23
**relayed** [2] - 82:18, 105:7
**relayer** [16] - 77:1, 77:4, 77:5, 88:5, 88:9, 102:21, 102:22, 103:2, 104:24, 105:3, 105:4, 143:9, 143:20, 144:17, 146:6, 149:11
**relayers** [5] - 98:6, 98:14, 99:24, 107:3, 119:22
**relaying** [3] - 61:13, 98:22, 115:14
**relays** [2] - 83:9, 117:22
**relevance** [2] - 17:24, 37:2
**relevant** [9] - 6:21, 9:1, 9:2, 12:7, 13:1, 22:14, 122:22, 138:6, 139:4
**reliable** [2] - 135:24, 135:25
**reliance** [5] - 4:17, 5:17, 7:3, 7:13, 133:5
**relied** [4] - 5:15, 5:23, 132:10, 152:1
**relies** [1] - 132:13
**rely** [5] - 103:8, 131:16, 147:20, 151:13, 155:13
**relying** [1] - 148:17
**remain** [16] - 77:23, 88:15, 124:2, 126:3, 127:8, 161:18, 165:9, 169:18, 204:14, 208:5, 210:1, 210:6, 210:9, 210:20, 210:24, 212:18
**remained** [4] - 169:1, 169:21, 199:15, 211:3
**remaining** [2] - 74:7, 93:23
**remains** [1] - 207:8
**remarkable** [1] - 142:25
**remember** [21] - 27:20, 63:16, 75:19, 113:13,

165:22, 171:25, 179:3, 188:22, 198:19, 199:1, 199:4, 199:9, 200:2, 201:16, 201:17, 201:18, 203:21, 203:24, 204:6, 209:2
**reminded** [1] - 152:19
**reminds** [1] - 60:4
**remote** [3] - 45:9, 59:1, 59:2
**removed** [1] - 67:17
**render** [1] - 133:5
**rendered** [1] - 154:22
**repeated** [2] - 145:5, 212:1
**repetitive** [1] - 152:8
**rephrase** [4] - 59:14, 86:12, 89:7, 167:11
**replace** [1] - 43:1
**replete** [1] - 155:9
**replicants** [1] - 119:18
**replications** [1] - 119:19
**reply** [1] - 53:8
**report** [5] - 29:17, 176:21, 177:16, 185:2, 210:17
**Reported** [1] - 1:22
**reported** [2] - 11:23, 12:6
**REPORTER** [1] - 110:8
**Reporter** [1] - 215:15
**REPORTER'S** [1] - 215:1
**represent** [2] - 34:4, 137:14
**representation** [1] - 28:8
**represents** [1] - 101:3
**repressed** [1] - 153:22
**reproduce** [1] - 107:8
**reproduced** [1] - 41:21
**request** [34] - 22:5, 32:12, 51:15, 53:14, 53:23, 53:25, 54:2, 57:1, 58:6, 61:13, 62:1, 71:14, 73:18, 73:24, 77:14, 92:24, 93:13, 94:9, 102:20, 102:21, 103:14, 103:15, 106:18, 115:22, 123:16, 125:21, 128:1, 128:2, 128:3, 133:19, 146:23, 147:7, 165:13, 182:21
**requested** [19] - 47:20, 57:20, 77:21, 94:7, 105:8, 105:18, 106:23, 118:20, 144:15, 144:21, 145:1, 145:18, 147:1, 148:11, 148:15, 150:8,

150:11, 151:12, 154:14
**requester** [31] - 54:10, 57:1, 57:10, 60:17, 61:11, 62:1, 71:25, 88:4, 88:5, 88:9, 98:10, 99:6, 101:20, 102:19, 102:22, 103:2, 104:22, 104:25, 131:1, 131:6, 131:23, 143:9, 143:19, 144:17, 145:3, 146:5, 146:24, 149:11, 152:7, 153:18
**requesters** [9] - 98:6, 98:9, 98:14, 98:16, 99:24, 107:3, 119:21, 120:7, 131:8
**requesting** [9] - 56:2, 60:11, 72:17, 73:16, 98:23, 105:16, 105:24, 106:1, 146:20
**requests** [43] - 56:3, 56:4, 56:6, 57:9, 57:14, 60:13, 71:16, 87:25, 88:23, 89:6, 89:9, 94:10, 98:5, 103:16, 104:7, 104:20, 105:9, 105:10, 105:12, 105:13, 105:14, 105:15, 106:14, 108:7, 114:19, 115:8, 121:15, 123:11, 123:22, 124:1, 124:16, 125:8, 125:13, 126:3, 127:7, 127:14, 127:25, 128:6, 130:20, 130:24, 146:18
**require** [5] - 107:9, 107:12, 118:12, 129:20, 150:12
**required** [5] - 51:23, 56:12, 101:13, 107:11, 149:13
**requires** [5] - 19:14, 79:15, 79:17, 129:21, 147:25
**reread** [1] - 112:4
**rerun** [3] - 100:11, 100:19, 107:23
**research** [9] - 26:3, 26:10, 30:4, 30:6, 55:2, 76:8, 76:9, 76:12, 84:16
**researchers** [1] - 75:4
**residence** [4] - 132:1, 132:2, 132:6, 157:19
**residential** [4] - 117:13, 125:7, 126:25, 129:12
**resides** [1] - 166:10
**resolve** [1] - 118:8
**resolved** [1] - 10:7
**resources** [3] - 33:2, 36:6, 87:18
**respect** [17] - 17:3, 22:4, 22:17, 22:23,

22:25, 23:6, 23:22,
23:25, 24:6, 73:22,
77:20, 78:24, 108:6,
118:22, 129:3, 161:22,
213:18
 **respectfully** [1] -
204:10
 **respond** [4] - 2:15,
165:25, 166:2, 167:18
 **response** [10] - 26:19,
118:22, 166:12, 166:14,
166:21, 167:1, 167:6,
177:10, 177:13, 177:25
 **responses** [2] - 195:14,
208:2
 **rest** [3] - 97:20, 138:5
 **restrained** [4] - 162:2,
162:11, 170:2, 182:11
 **restraint** [1] - 162:12
 **restriction** [1] - 81:24
 **restrictions** [1] - 209:13
 **restroom** [1] - 51:25
 **result** [4] - 4:16, 30:20,
30:22, 101:19
 **resulting** [1] - 30:7
 **results** [4] - 30:20,
97:18, 107:8, 119:4
 Resume [3] - 52:2,
123:3, 156:17
 **resume** [1] - 123:2
 **retained** [1] - 27:9
 **retract** [1] - 20:6
 **retrieval** [1] - 67:9
 **retrieve** [13] - 44:1,
46:1, 50:3, 51:21, 52:15,
52:18, 53:4, 54:3, 57:17,
68:10, 71:4, 105:12,
127:13
 **retrieving** [4] - 46:3,
67:10, 67:12, 108:23
 **return** [5] - 30:20, 67:9,
68:12, 72:24, 101:19
 **returned** [2] - 43:24,
135:18
 **returning** [1] - 67:16
 **reveals** [1] - 141:25
 **reversal** [1] - 12:17
 **reversed** [2] - 12:13,
12:14
 **review** [10] - 27:9, 28:7,
94:1, 94:4, 94:13, 97:15,
111:15, 111:17, 111:20,
111:23
 **reviewed** [14] - 26:3,
26:5, 26:16, 27:4, 27:5,
27:15, 27:19, 29:18,
30:2, 61:8, 61:16, 99:9,
111:2, 111:16
 **reviewers** [1] - 27:14
 **reviewing** [3] - 9:2,

142:13, 146:18
 **reviews** [1] - 97:11
 Reviews [1] - 139:5
 **ridiculous** [1] - 137:23
 **rights** [34] - 23:15,
137:14, 164:20, 164:21,
164:22, 165:16, 165:18,
165:23, 165:24, 168:19,
173:18, 173:23, 174:2,
174:6, 176:6, 191:3,
193:21, 194:13, 194:21,
194:25, 204:13, 204:14,
206:8, 206:10, 207:12,
207:23, 207:24, 208:3,
208:20, 209:24, 211:12,
211:23, 213:1, 213:4
 **ringing** [1] - 200:2
 **rise** [1] - 123:1
 **risks** [1] - 39:24
 **Ritch** [1] - 10:4
 **road** [2] - 17:7, 142:20
 **robe** [1] - 138:8
 **ROBERT** [1] - 1:6
 **Robert** [2] - 2:3, 215:5
 **role** [17] - 3:10, 3:17,
4:10, 4:15, 4:24, 5:1,
7:5, 7:14, 7:21, 8:15,
8:21, 13:2, 13:22, 14:5,
132:22, 151:24, 151:25
 **room** [20] - 160:12,
160:14, 160:15, 160:18,
161:25, 162:17, 163:7,
167:21, 167:23, 168:14,
169:1, 169:24, 171:17,
172:18, 173:9, 179:15,
184:6, 199:16
 **rooms** [1] - 192:12
 **roster** [1] - 85:8
 **Roth** [4] - 9:3, 9:9, 9:14,
9:15
 **rough** [2] - 75:18,
161:10
 **roughly** [11] - 14:22,
75:2, 160:8, 168:8,
168:19, 169:5, 175:22,
176:23, 178:19, 180:12,
181:1
 **routed** [1] - 153:17
 **routine** [4] - 159:13,
167:10, 209:8, 211:6
 **routing** [3] - 62:10,
88:1, 146:20
 **RPR** [1] - 1:22
 **rubber** [2] - 132:21,
132:24
 **rubberstamp** [1] -
16:25
 **rule** [7] - 3:13, 3:19,
4:18, 4:19, 9:22, 19:24,
21:16

 **rules** [2] - 20:2, 150:21
 **ruling** [7] - 20:1, 20:12,
21:8, 21:13, 24:1,
155:21, 213:17
 **run** [36] - 31:18, 32:16,
36:14, 37:9, 39:8, 59:18,
77:11, 82:5, 87:2, 87:4,
87:5, 87:14, 87:24,
89:13, 94:10, 94:11,
100:7, 101:14, 101:16,
101:17, 101:20, 101:23,
103:4, 105:21, 106:3,
106:8, 106:10, 106:12,
106:20, 106:25, 107:12,
113:1, 113:3, 113:17,
193:3, 195:18
 **running** [40] - 34:16,
37:13, 40:15, 40:23,
42:23, 45:1, 45:6, 45:19,
46:10, 48:11, 53:2,
55:16, 55:23, 56:3,
56:25, 58:7, 58:11,
58:24, 73:3, 75:12, 87:3,
87:6, 87:9, 87:16, 87:18,
88:6, 88:15, 89:5, 89:8,
90:21, 91:3, 91:6, 91:7,
91:17, 95:9, 108:22,
119:9, 126:23, 143:24,
144:20
 **runs** [4] - 59:21, 100:16,
102:8, 120:5

# S

 **safe** [1] - 40:1
 **safer** [1] - 36:5
 **Sanders** [1] - 7:8
 **sat** [7] - 124:3, 162:19,
172:19, 172:25, 173:7,
173:9, 211:6
 **satisfies** [1] - 100:18
 **satisfy** [1] - 155:6
 **save** [1] - 145:24
 **saved** [1] - 92:10
 **savvy** [1] - 212:12
 **saw** [22] - 27:12, 35:2,
46:21, 46:22, 50:7,
53:21, 56:22, 58:11,
60:1, 60:3, 63:15,
108:19, 112:19, 112:20,
126:10, 135:21, 136:1,
136:2, 136:3, 147:14,
170:6
 **scan** [1] - 48:19
 **scared** [5] - 199:10,
199:11, 201:12, 205:4,
205:7
 **scary** [2] - 198:1, 209:9
 **scattered** [1] - 52:16

 **scenario** [2] - 9:23,
209:8
 **scenarios** [4] - 3:15,
3:25, 4:1, 15:14
 **scene** [4] - 162:25,
163:11, 178:15, 202:14
 **scenes** [2] - 40:17,
43:24, 44:18, 44:19,
44:21, 52:7, 52:11
 **scheduled** [1] - 2:4
 **Sciences** [2] - 25:8,
25:18
 **sciences** [1] - 25:20
 **scientific** [1] - 27:7
 **screen** [15] - 31:23,
33:9, 34:21, 36:15,
38:12, 41:13, 42:19,
45:18, 46:25, 50:11,
51:1, 60:2, 60:4, 65:15,
175:2
 **screenshots** [1] - 46:19
 **scroll** [1] - 49:7
 **scrupulously** [5] -
208:7, 208:8, 210:1,
210:25, 212:19
 **scrutiny** [3] - 19:1,
19:4, 138:9
 **search** [119] - 2:25,
3:17, 5:18, 6:7, 15:9,
16:7, 16:16, 16:22, 17:2,
18:6, 18:16, 19:17, 20:4,
21:24, 22:3, 22:4, 22:10,
22:15, 22:21, 23:4, 23:7,
23:14, 30:19, 99:4,
111:2, 111:10, 117:13,
118:11, 121:7, 122:20,
122:24, 123:18, 123:20,
123:21, 124:11, 124:14,
124:15, 125:7, 126:24,
126:25, 128:9, 128:12,
128:18, 129:1, 129:3,
129:5, 129:6, 129:7,
129:12, 129:13, 129:14,
129:15, 129:16, 129:17,
129:24, 132:2, 132:17,
142:19, 142:21, 143:5,
143:7, 143:11, 143:12,
143:14, 143:25, 144:2,
144:5, 145:23, 150:1,
150:19, 150:23, 157:12,
157:18, 157:22, 158:5,
158:7, 158:10, 158:13,
158:14, 159:13, 159:21,
160:5, 163:3, 163:5,
163:9, 163:10, 163:15,
163:17, 163:18, 164:4,
164:8, 164:10, 164:13,
164:17, 167:12, 169:8,
169:9, 175:3, 176:23,
182:17, 183:22, 183:23,

183:24, 183:25, 184:17,
184:21, 184:25, 186:24,
189:21, 189:23, 190:4,
196:3, 196:16, 196:17,
203:9, 209:6, 209:10
 **searched** [8] - 22:11,
71:24, 133:11, 142:24,
143:17, 151:1, 179:10
 **searches** [1] - 20:8,
130:7
 **searching** [5] - 143:4,
143:5, 192:7, 192:9,
192:11
 **seat** [4] - 24:19, 156:7,
161:24, 197:9
 **seated** [5] - 2:13, 158:2,
163:8, 169:24, 195:1
 **second** [16] - 9:13,
9:14, 21:25, 23:12,
31:11, 35:8, 35:17, 61:2,
61:7, 88:7, 89:7, 92:12,
128:15, 143:16, 160:12,
174:2, 186:16, 208:19
 **second-degree** [1] -
9:13
 **secondly** [1] - 24:4
 **seconds** [6] - 47:24,
47:25, 51:3, 141:19,
175:22
 **Secretary** [2] - 9:18,
9:19
 **section** [4] - 60:7,
129:1, 130:13, 131:12
 **secure** [1] - 59:11
 **security** [56] - 25:25,
28:16, 35:7, 35:8, 35:12,
35:15, 35:17, 35:25,
36:2, 36:4, 36:8, 36:9,
36:12, 36:16, 36:19,
36:21, 36:24, 36:25,
37:7, 37:8, 37:10, 37:18,
38:5, 38:6, 38:16, 38:21,
39:2, 39:6, 39:21, 39:23,
40:13, 41:19, 46:22,
48:9, 48:13, 59:6, 59:7,
59:9, 59:10, 59:17,
59:18, 59:22, 60:4,
63:17, 63:20, 64:9,
126:13, 126:14, 127:4,
127:5, 153:6
 **Security** [2] - 10:16,
10:24
 **see** [83] - 15:22, 21:20,
23:20, 26:20, 27:1, 31:4,
32:6, 34:5, 34:11, 34:13,
34:16, 34:19, 34:21,
34:24, 35:5, 35:8, 36:3,
36:18, 38:10, 38:22,
39:12, 39:15, 39:20,
40:3, 40:18, 41:15,

41:17, 41:20, 41:21,
42:4, 42:6, 42:15, 42:19,
45:18, 47:4, 47:16,
47:23, 48:4, 48:11,
48:16, 48:19, 49:1, 49:8,
49:15, 49:16, 50:18,
50:19, 50:21, 50:24,
51:1, 51:2, 51:13, 51:20,
56:21, 63:10, 65:15,
65:18, 65:20, 66:1, 66:2,
66:24, 81:25, 87:6,
92:20, 104:25, 113:9,
120:13, 120:24, 124:9,
133:7, 136:10, 141:9,
153:25, 157:24, 166:7,
169:22, 170:24, 170:25,
175:5, 181:13, 208:23

**seeking** [1] - 93:7

**seeks** [2] - 19:1, 20:4

**seem** [10] - 88:19,
106:2, 123:1, 134:12,
137:16, 137:19, 138:16,
138:25, 181:5, 198:18

**sees** [1] - 127:16

**segregates** [1] - 102:3

**seize** [2] - 183:9, 190:1

**seized** [6] - 4:17, 5:17,
7:3, 7:13, 133:11, 150:25

**seizure** [10] - 3:1, 6:8,
121:7, 142:13, 142:23,
143:12, 143:23, 144:5,
150:19, 150:23

**seizures** [3] - 20:8,
130:8, 150:2

**select** [3] - 40:21, 45:21

**selected** [3] - 36:16,
40:20, 45:1

**selecting** [3] - 12:12,
20:19, 34:13

**selection** [6] - 11:11,
11:14, 12:2, 12:6, 12:15

**selects** [2] - 40:12,
40:22

**self** [1] - 100:21

**self-generating** [1] -
100:21

**send** [13] - 52:19,
55:24, 71:7, 71:8, 71:10,
72:1, 73:10, 73:21,
125:13, 127:14, 127:18,
127:20

**sender** [2] - 77:3, 142:7

**sending** [7] - 54:5,
71:6, 95:17, 114:18,
115:12, 125:7, 126:3

**sense** [7] - 79:5, 81:22,
88:5, 133:1, 139:9,
201:19, 207:3

**sent** [23] - 53:13, 54:9,
57:10, 57:14, 58:6,

58:10, 71:19, 71:25,
77:17, 89:6, 96:25,
115:8, 123:12, 123:16,
123:23, 125:21, 127:7,
127:25, 128:1, 128:6,
142:5, 142:14

**sentence** [3] - 50:7,
146:22, 147:6

**sentences** [1] - 40:10

**separate** [8] - 112:22,
118:6, 142:22, 191:13,
191:15, 191:20, 199:10,
208:10

**separated** [3] - 94:10,
96:6, 119:25

**separates** [3] - 96:15,
102:2, 143:14

**separation** [1] - 143:25

**September** [6] - 113:20,
127:1, 157:15, 158:9,
165:8, 197:19

**sequence** [3] - 49:17,
49:18, 103:16

**sergeant** [1] - 184:24

**series** [6] - 10:21,
12:21, 31:24, 34:3, 44:9,
46:6

**serious** [1] - 154:6

**serve** [1] - 134:12

**server** [7] - 70:8, 70:9,
82:18, 83:9, 83:10,
96:25, 97:1

**service** [8] - 29:2,
158:10, 166:17, 166:20,
167:7, 176:20, 189:21,
212:11

**services** [1] - 29:4

**set** [14] - 18:12, 27:14,
29:1, 33:1, 37:23, 40:5,
105:1, 130:7, 131:12,
141:23, 142:9, 164:12,
174:25, 212:5

**setting** [16] - 6:25, 35:1,
35:18, 35:20, 35:23,
35:25, 36:2, 36:4, 36:20,
65:13, 142:3, 142:11,
142:16, 142:19, 143:23

**settings** [5] - 35:9,
59:10, 63:17, 63:20, 66:8

**seven** [10] - 40:11, 65:3,
65:5, 65:7, 131:14,
131:18, 148:12, 188:15,
206:16

**several** [5] - 3:20, 8:17,
60:1, 137:6, 160:20

**sexual** [1] - 177:2

**sexually** [1] - 18:9

**Shalala** [1] - 10:15

**shame** [1] - 86:22

**share** [3] - 153:15,

153:20, 153:22

**sharing** [2] - 54:18,
153:24

**Shaw** [1] - 141:17

**shield** [1] - 198:10

**shields** [1] - 159:4

**shirt** [2] - 170:16,
170:17

**shirts** [1] - 170:16

**shocking** [4] - 187:7,
188:25, 198:20, 206:17

**Shoop** [4] - 1:17, 2:7,
24:7, 175:18

**SHOOP** [32] - 24:11,
25:3, 28:14, 28:20,
42:12, 52:4, 59:15,
62:22, 62:24, 83:22,
114:17, 115:19, 117:2,
117:8, 117:11, 118:3,
123:5, 123:8, 123:19,
124:13, 124:20, 125:5,
125:10, 125:18, 126:21,
128:14, 128:18, 128:20,
129:11, 133:22, 214:4,
214:5

**Shoop's** [1] - 129:9

**shortcuts** [1] - 34:13

**show** [16] - 28:2, 30:25,
31:22, 33:11, 34:1,
34:17, 35:22, 45:16,
46:16, 47:7, 47:15, 49:6,
50:25, 117:20, 186:12,
186:16

**showed** [4] - 15:24,
34:4, 78:3, 114:24

**showing** [2] - 50:15,
64:19

**shows** [3] - 46:20, 47:1,
212:12

**side** [6] - 105:3, 120:3,
142:12, 160:14, 160:15,
172:22

**signal** [17] - 52:20,
53:7, 53:13, 53:18,
53:20, 53:23, 53:24,
54:5, 54:7, 55:24, 72:6,
73:12, 73:13, 73:18,
73:19, 74:12, 77:3

**signaling** [1] - 55:14

**signals** [14] - 40:22,
53:1, 71:8, 71:16, 73:3,
95:19, 95:20, 95:23,
95:25, 96:1, 96:4, 96:6,
127:19

**signature** [1] - 215:10

**signed** [6] - 2:25, 6:7,
7:5, 15:8, 125:11, 132:13

**significance** [5] - 106:5,
107:2, 107:19, 107:20,
108:13

**significant** [24] -
103:11, 116:13, 146:23,
146:25, 147:7, 147:8,
147:10, 147:16, 147:19,
148:6, 148:7, 148:8,
148:10, 148:16, 148:22,
149:23, 151:14, 151:19,
152:6, 152:11, 152:13,
153:6, 211:24

**significantly** [1] -
101:19

**signing** [1] - 4:14

**silence** [1] - 211:6

**silent** [9] - 165:9,
204:15, 208:5, 210:1,
210:6, 210:9, 210:21,
210:24, 212:18

**similar** [3] - 12:2, 44:12,
211:1

**simple** [11] - 13:7, 19:6,
21:9, 29:9, 32:13, 43:12,
43:13, 55:6, 134:5,
138:21, 138:25

**simply** [42] - 4:15, 5:23,
6:11, 9:15, 9:25, 11:2,
11:5, 13:10, 17:14,
18:21, 19:9, 19:20,
20:24, 21:6, 30:21,
42:24, 55:17, 58:14,
78:12, 79:21, 81:20,
98:6, 99:24, 115:10,
123:13, 134:3, 134:14,
136:6, 136:24, 137:8,
137:21, 138:7, 138:19,
144:7, 145:11, 148:17,
150:18, 152:1, 206:19,
207:10, 208:17

**simulate** [1] - 87:5

**simulation** [6] - 62:9,
87:15, 87:16, 87:24, 88:4

**simulations** [11] -
61:20, 87:2, 87:5, 87:9,
87:14, 89:13, 89:15,
89:17, 113:17, 113:22,
113:23

**single** [5] - 49:23,
81:15, 90:21, 90:22,
132:23

**singular** [1] - 73:19

**sister** [1] - 20:14

**sisters** [1] - 6:24

**sit** [4] - 172:24, 192:3,
199:16, 200:7

**site** [4] - 37:24, 47:8,
51:10, 124:2

**sites** [1] - 48:5

**sitting** [6] - 77:13,
99:19, 100:5, 177:9,
196:3, 212:5

**situation** [4] - 10:12,

11:25, 125:6, 125:16

**situations** [4] - 124:21,
132:14, 132:15, 176:24

**six** [5] - 30:10, 38:4,
61:21, 62:15, 63:24,
63:25, 64:2, 64:3,
148:12, 158:24

**size** [2] - 45:21, 161:9

**sketch** [2] - 161:1,
192:13

**slide** [5] - 34:11, 50:20,
63:15, 114:24, 197:10

**slides** [2] - 33:11, 34:3

**slightly** [1] - 139:16

**slow** [3] - 47:19, 47:21,
51:4

**slower** [1] - 47:18

**slowly** [1] - 67:24

**small** [5] - 2:19, 20:6,
20:7, 44:24, 116:13

**smaller** [2] - 45:5,
160:22

**SO** [1] - 201:10

**Social** [2] - 10:16, 10:24

**societies** [2] - 27:7,
153:22

**software** [75] - 30:16,
30:18, 30:24, 31:10,
31:16, 31:19, 32:10,
32:15, 32:16, 32:25,
33:3, 35:13, 36:5, 40:9,
41:8, 41:16, 42:25,
44:20, 46:10, 52:14,
52:17, 53:2, 53:3, 53:4,
54:12, 55:7, 55:12,
55:16, 56:3, 56:25, 57:2,
57:6, 57:25, 58:13,
58:18, 58:22, 58:23,
58:25, 59:1, 61:10, 64:6,
71:1, 71:3, 71:7, 71:8,
72:13, 72:18, 75:12,
76:14, 78:25, 84:18,
88:20, 95:9, 95:21,
96:14, 99:5, 114:23,
116:6, 116:8, 116:10,
116:11, 116:14, 120:10,
121:15, 124:4, 126:1,
126:18, 126:24, 130:11,
130:12, 130:14, 144:21

**software's** [2] - 13:4,
40:15

**sold** [1] - 147:17

**solely** [1] - 12:15

**someone** [21] - 30:14,
31:4, 37:13, 38:5, 43:3,
43:7, 45:11, 51:13,
59:25, 76:8, 87:4, 94:12,
96:14, 96:21, 99:21,
108:17, 136:7, 144:10,
152:12, 189:9, 211:17

**sometime** [3] - 168:21, 171:5, 171:13
**sometimes** [7] - 4:20, 4:22, 4:25, 116:15, 189:23, 190:5, 196:8
**somewhat** [2] - 135:24, 150:2
**somewhere** [2] - 26:5, 45:2
**son** [1] - 185:22
**soon** [1] - 183:11
**sophisticated** [1] - 153:9
**sophistication** [9] - 78:24, 79:10, 79:11, 79:12, 79:16, 80:9, 117:21, 124:6, 125:25
**sorry** [24] - 42:8, 50:1, 59:1, 70:3, 70:14, 72:16, 78:22, 84:7, 85:25, 89:3, 89:4, 89:25, 91:1, 95:14, 100:3, 107:14, 112:11, 125:2, 136:18, 170:10, 177:24, 180:12, 205:20
**sort** [8] - 23:20, 49:12, 51:17, 105:3, 106:20, 198:10, 203:3
**sorts** [3] - 9:20, 11:1, 141:3
**sought** [4] - 10:22, 10:24, 11:13, 193:24
**sound** [2] - 43:9, 55:4
**sounded** [1] - 198:3
**sounds** [2] - 80:14, 101:23
**source** [19] - 32:10, 32:11, 32:15, 32:20, 32:21, 32:25, 33:3, 37:20, 37:22, 40:6, 40:7, 55:7, 57:25, 76:18, 80:2, 80:3, 80:4, 135:14
**Southern** [2] - 9:4, 11:24
**space** [1] - 172:17
**speaking** [3] - 170:22, 170:24, 170:25
**speaks** [1] - 21:15
**Special** [1] - 2:9
**special** [5] - 18:8, 55:15, 109:25, 137:25, 138:4
**specialize** [1] - 25:20
**specific** [5] - 131:12, 145:7, 145:8, 193:18, 210:10
**specifically** [8] - 8:19, 26:7, 161:22, 163:7, 180:2, 180:11, 199:1, 203:24
**speculate** [1] - 88:18

**speculating** [4] - 81:17, 81:21, 81:22, 89:12
**speculation** [1] - 83:24
**spell** [3] - 24:21, 156:8, 197:11
**spreadsheet** [10] - 100:10, 100:12, 100:14, 100:20, 100:24, 100:25, 101:2, 101:4, 101:21
**spring** [1] - 113:23
**squad** [3] - 163:2, 170:15, 184:24
**St** [2] - 9:15, 15:20
**Stable** [1] - 66:12
**staff** [1] - 55:2
**stage** [2] - 57:16, 123:25
**stairs** [4] - 159:24, 160:11, 160:17, 188:22
**stake** [1] - 19:8
**stamp** [6] - 74:10, 74:12, 102:2, 132:21, 132:24, 174:24
**stamps** [1] - 119:17
**stand** [9] - 11:19, 14:25, 24:16, 120:22, 123:4, 136:25, 188:9, 197:3, 198:23
**standard** [9] - 62:11, 62:18, 62:20, 73:15, 173:22, 173:24, 208:25, 209:1, 209:6
**standing** [2] - 196:13, 198:24
**stands** [2] - 84:10, 179:11
**start** [17] - 25:11, 31:10, 31:18, 32:2, 32:5, 34:9, 34:14, 49:15, 50:13, 53:6, 57:14, 78:21, 78:23, 103:15, 110:12, 140:3, 175:15
**started** [3] - 29:15, 46:19, 192:8
**starting** [3] - 103:12, 192:12, 192:15
**state** [25] - 2:24, 5:18, 6:6, 7:4, 7:23, 9:5, 9:7, 9:8, 9:11, 13:18, 21:14, 24:21, 97:19, 97:20, 115:3, 133:10, 134:25, 149:17, 151:4, 156:8, 180:25, 188:22, 196:13, 197:11
**statement** [22] - 5:15, 22:2, 23:13, 23:14, 23:18, 151:18, 151:20, 155:18, 176:22, 177:3, 186:25, 189:16, 189:20, 190:25, 191:22, 202:16,

202:17, 207:24, 208:11, 208:12, 210:8, 210:17
**Statement** [2] - 177:16, 177:17
**statements** [10] - 3:22, 22:1, 152:1, 152:2, 152:3, 152:4, 189:18, 190:7, 213:5, 213:19
**States** [13] - 2:2, 6:2, 7:1, 7:11, 7:18, 8:3, 8:9, 75:1, 75:8, 82:15, 83:17, 96:2, 124:21
**STATES** [2] - 1:1, 1:4
**statistical** [16] - 88:8, 98:12, 99:22, 100:11, 102:16, 102:17, 102:19, 103:6, 103:7, 106:5, 107:2, 112:25, 119:4, 143:8, 143:19, 150:9
**statistically** [2] - 99:5, 120:7
**status** [2] - 158:23, 159:12
**stay** [5] - 102:22, 136:4, 188:13, 194:25, 200:1
**stays** [2] - 188:12, 196:7
**stenographically** [1] - 215:4
**step** [16] - 24:15, 30:16, 60:24, 92:18, 95:14, 97:15, 101:22, 102:1, 159:17, 159:22, 159:25, 162:1, 189:8, 189:10, 206:25
**stepped** [1] - 2:12
**still** [21] - 3:23, 35:10, 36:17, 36:21, 39:2, 48:12, 63:6, 63:7, 88:12, 101:16, 118:22, 120:25, 132:14, 150:21, 157:7, 179:7, 183:22, 183:24, 190:1, 192:23, 195:17
**stop** [9] - 53:11, 56:13, 77:8, 103:23, 121:12, 165:15, 181:25, 205:12, 205:13
**stopped** [2] - 182:3, 199:12
**stops** [1] - 57:22
**store** [5] - 29:9, 32:25, 45:21, 45:23, 96:13
**stored** [15] - 29:7, 31:20, 37:21, 37:23, 43:10, 45:14, 70:5, 70:14, 96:13, 99:16, 99:17, 99:19, 108:16, 119:20, 119:23
**storing** [6] - 70:10, 70:11, 70:13, 70:15,

70:16, 70:18
**story** [3] - 89:15, 191:19, 191:25
**straight** [3] - 94:14, 160:12, 160:23
**straightforward** [1] - 135:9
**stranger** [21] - 41:11, 41:22, 52:20, 52:21, 53:6, 53:11, 54:5, 54:8, 56:1, 57:20, 60:10, 60:12, 61:11, 74:13, 102:20, 102:22, 102:23, 104:21, 104:23
**Stranger** [1] - 64:20
**strangers** [32] - 38:23, 39:8, 39:15, 40:16, 41:1, 41:6, 41:9, 42:24, 52:22, 53:5, 53:10, 53:19, 53:22, 55:21, 55:22, 56:5, 56:11, 58:17, 58:22, 59:1, 59:2, 71:8, 71:11, 71:24, 78:4, 88:24, 90:18, 104:22, 104:24, 123:13, 123:16, 127:15
**streamlined** [1] - 116:15
**streams** [4] - 71:6, 93:9, 130:24, 142:17
**Street** [5] - 1:23, 135:16, 135:18, 135:20, 147:14
**string** [5] - 3:5, 10:5, 19:9, 44:6, 46:6
**string-cite** [1] - 3:5
**strong** [1] - 27:8
**structured** [1] - 138:10
**stuck** [1] - 112:8
**student** [1] - 26:4
**studied** [1] - 30:9
**studying** [2] - 54:13, 54:18
**style** [2] - 47:2, 160:11
**subject** [8] - 18:16, 97:5, 118:13, 118:21, 120:19, 121:3, 133:15, 209:10
**subjective** [6] - 123:15, 124:17, 125:24, 127:11, 140:9, 153:10
**submission** [1] - 140:14
**submit** [2] - 207:9, 208:19
**submitted** [4] - 19:16, 27:9, 27:12, 27:21
**subpoena** [5] - 2:23, 13:24, 15:24, 24:1, 24:5
**subpoenaed** [2] - 6:6,

131:25
**subsequent** [8] - 10:7, 29:19, 97:11, 99:4, 120:5, 142:10, 144:1, 151:3
**subsequently** [4] - 12:13, 27:17, 98:15, 141:21
**substance** [1] - 168:1
**substantive** [2] - 196:5, 212:8
**subtle** [1] - 212:3
**successful** [1] - 51:5
**successfully** [1] - 48:14
**sufficient** [14] - 12:16, 16:17, 23:5, 94:10, 94:11, 146:13, 147:22, 148:6, 148:16, 150:5, 151:5, 152:12, 155:5, 155:7
**sufficiently** [1] - 208:5
**suggest** [2] - 8:17, 12:21
**suggested** [1] - 8:15
**suggestion** [1] - 143:22
**suggests** [6] - 3:22, 115:11, 119:8, 121:3, 132:23, 134:6
**suit** [1] - 10:17
**summary** [1] - 54:25
**summer** [1] - 114:1
**sums** [1] - 164:11
**Sumter** [1] - 7:8
**supervisor** [2] - 185:6, 188:7
**Supervisor** [1] - 169:16
**supplied** [1] - 13:7
**supply** [1] - 150:4
**support** [8] - 3:23, 4:5, 5:6, 19:16, 21:15, 133:1, 134:17, 153:12
**supported** [5] - 43:14, 129:13, 129:16, 132:8, 133:12
**supporting** [2] - 129:18, 133:8
**suppose** [5] - 100:4, 135:12, 136:17, 136:19, 136:20
**supposed** [3] - 145:11, 145:12, 183:11
**suppress** [13] - 7:3, 7:13, 21:23, 22:1, 22:4, 24:7, 132:14, 154:25, 155:15, 155:17, 213:5, 213:18, 213:19
**suppressed** [1] - 5:17
**suppression** [2] - 4:16, 151:23
**Supreme** [11] - 3:12,

9:17, 10:2, 10:13, 12:13, 12:17, 14:2, 19:20, 19:21, 127:21, 209:3
**surprise** [6] - 54:20, 119:11, 186:14, 186:17, 186:21, 188:23
**surprised** [1] - 186:23
**surrounding** [1] - 8:14
**surveilled** [2] - 136:1, 136:2
**susceptible** [1] - 19:4
**suspect** [1] - 190:17
**suspect's** [1] - 209:4
**suspected** [1] - 146:21
**sweeping** [1] - 142:15
**sweeps** [1] - 141:10
**switch** [2] - 38:11, 174:8
**SWORN** [3] - 24:17, 156:5, 197:7
**symbol** [1] - 49:16
**synopsis** [1] - 14:23
**system** [32] - 35:3, 41:1, 70:6, 70:19, 71:1, 71:21, 72:4, 72:13, 73:7, 74:23, 77:10, 81:15, 81:19, 82:4, 82:8, 82:19, 82:23, 83:14, 83:16, 89:10, 95:21, 96:11, 98:8, 99:17, 99:21, 104:6, 115:14, 138:16, 139:13, 139:15, 142:15, 153:20
**systems** [5] - 43:17, 43:18, 130:8

**T**

**T-shirt** [1] - 170:16
**T-shirts** [1] - 170:16
**table** [11] - 2:7, 24:20, 68:8, 68:10, 68:21, 68:24, 104:15, 104:17, 158:2, 197:10
**tag** [1] - 144:23
**tainted** [1] - 191:21
**talks** [2] - 126:5, 154:2
**tape** [2] - 194:18, 211:11
**target** [3] - 58:23, 131:8, 190:16
**task** [5] - 7:24, 7:25, 84:11, 93:21, 99:18
**teach** [3] - 25:21, 25:23, 33:21
**teaches** [3] - 117:18, 126:6, 181:19
**teaching** [2] - 181:18, 183:11
**team** [3] - 184:20,

184:23, 195:11
**tech** [1] - 29:17
**technical** [3] - 84:12, 150:12, 178:11
**technically** [2] - 106:19, 113:20
**technique** [4] - 60:19, 61:17, 62:3, 154:12
**techniques** [2] - 60:9, 62:19
**technologically** [1] - 79:9
**tedious** [1] - 95:15
**ten** [3] - 127:2, 136:3, 168:22
**tens** [1] - 88:6
**tenure** [1] - 25:14
**tenured** [1] - 25:13
**term** [2] - 30:19, 68:5
**terminate** [1] - 209:20
**terms** [16] - 18:10, 76:1, 90:8, 115:15, 116:14, 138:3, 141:11, 142:4, 152:2, 155:5, 159:11, 162:6, 168:18, 178:7, 196:15, 206:25
**territory** [1] - 152:23
**test** [5] - 94:9, 94:10, 94:11, 98:12, 206:1
**testable** [1] - 88:25
**tested** [2] - 89:22, 107:22
**testified** [31] - 5:8, 5:24, 6:17, 6:25, 8:1, 8:7, 11:25, 12:3, 12:11, 15:17, 16:4, 63:9, 65:13, 112:15, 126:16, 129:6, 131:4, 131:17, 137:1, 141:1, 144:11, 154:4, 176:15, 176:18, 193:20, 202:10, 203:22, 205:3, 206:17, 210:15
**testify** [30] - 6:10, 6:22, 7:8, 7:9, 7:17, 7:22, 7:23, 8:24, 9:24, 10:7, 11:15, 11:19, 12:5, 12:18, 12:22, 12:24, 15:16, 15:21, 20:15, 20:18, 22:8, 22:20, 126:10, 134:1, 134:4, 137:1, 137:8, 138:6, 202:12
**testifying** [2] - 16:1, 129:3
**testimony** [19] - 5:21, 6:9, 6:13, 15:21, 18:17, 23:22, 23:23, 57:24, 63:19, 64:23, 122:22, 133:25, 134:1, 134:16, 140:2, 149:8, 155:2,

207:1
**tests** [5] - 88:6, 89:13, 89:15, 89:20, 100:11
**text** [2] - 38:2, 49:19
**texts** [1] - 110:14
**THE** [107] - 1:1, 1:1, 2:13, 14:13, 14:20, 18:19, 21:12, 21:21, 23:24, 24:10, 24:14, 24:15, 24:18, 24:19, 24:23, 24:25, 28:13, 28:17, 28:19, 37:3, 42:7, 42:8, 42:10, 42:11, 52:1, 52:3, 59:13, 59:14, 62:23, 63:1, 63:6, 80:13, 80:15, 80:17, 83:25, 84:1, 84:2, 84:3, 110:8, 113:7, 114:15, 115:17, 115:18, 116:23, 116:25, 117:1, 117:7, 117:10, 118:1, 118:5, 121:17, 122:25, 123:4, 123:7, 123:18, 124:11, 124:18, 125:9, 125:17, 126:20, 128:12, 128:17, 128:19, 128:21, 128:25, 129:7, 133:21, 135:4, 135:6, 136:16, 136:19, 137:2, 138:18, 139:12, 139:19, 152:15, 154:24, 155:22, 156:1, 156:3, 156:6, 156:7, 156:9, 156:11, 156:15, 156:18, 175:23, 179:25, 184:14, 196:20, 196:21, 196:22, 197:4, 197:5, 197:8, 197:9, 197:13, 197:15, 205:18, 205:22, 206:6, 206:12, 212:21, 212:23, 213:10, 213:14, 213:20
**themselves** [8] - 57:18, 69:2, 86:9, 100:11, 100:19, 104:22, 138:5, 148:4
**theory** [7] - 119:2, 119:3, 119:11, 121:23, 121:24, 121:25, 135:7
**thereafter** [1] - 183:12
**therefore** [2] - 24:5, 56:6
**therein** [1] - 3:1
**they've** [8] - 29:2, 53:8, 65:3, 71:23, 85:14, 119:12, 122:23, 211:17
**thinking** [1] - 80:12
**thinks** [1] - 121:11
**third** [15] - 4:17, 22:14, 22:25, 23:19, 29:22, 35:9, 37:24, 38:1, 39:17, 41:22, 60:16, 127:21,

127:23, 128:14, 133:4
**thorough** [1] - 130:7
**thousand** [2] - 45:4, 104:18
**thousands** [1] - 88:6
**threatened** [1] - 182:25
**threats** [1] - 209:15
**three** [27] - 22:6, 22:9, 27:15, 34:24, 38:24, 60:18, 60:22, 63:23, 64:2, 94:10, 105:25, 123:9, 161:10, 163:20, 164:6, 169:6, 169:12, 170:21, 171:5, 180:11, 195:5, 195:21, 203:9, 207:20, 208:17, 208:23
**three-plus** [1] - 195:5
**three-quarters** [1] - 161:10
**threshold** [2] - 206:10, 206:21
**throughout** [10] - 70:5, 70:19, 83:17, 169:19, 180:18, 181:22, 182:8, 182:20, 195:1, 200:25
**thumbnails** [1] - 51:11
**timestamp** [2] - 140:6, 180:13
**timestamps** [2] - 92:5, 119:17
**timing** [7] - 106:13, 106:15, 106:18, 146:22, 147:7, 151:18, 156:13
**tips** [1] - 97:19
**titled** [1] - 64:20
**today** [25] - 9:23, 10:12, 18:14, 19:21, 21:20, 26:13, 29:12, 29:24, 30:18, 35:16, 64:23, 66:14, 75:6, 77:21, 114:3, 116:17, 127:6, 133:25, 134:1, 134:17, 135:1, 139:13, 154:16, 157:24, 177:9
**toddlers** [1] - 56:19
**together** [9] - 29:1, 29:3, 37:22, 74:18, 87:19, 165:19, 165:20, 191:18, 192:1
**ton** [1] - 133:7
**tone** [4] - 158:15, 158:18, 164:16, 209:11
**tons** [1] - 129:24
**took** [8] - 23:14, 62:15, 80:11, 160:9, 162:22, 172:14, 194:2, 194:5
**tool** [3] - 55:3, 55:5, 56:15
**top** [7] - 30:19, 30:20, 38:22, 43:15, 47:1, 47:4,

47:19
**topic** [2] - 108:12, 208:17
**topics** [2] - 178:7, 178:14
**topologies** [2] - 89:18, 89:20
**total** [20] - 104:13, 104:19, 105:17, 105:20, 106:7, 106:23, 140:24, 144:14, 144:15, 144:25, 145:4, 145:18, 146:6, 147:1, 148:11, 148:13, 148:15, 150:8, 151:12, 154:14
**totality** [1] - 209:4
**totally** [1] - 72:16
**towards** [1] - 10:20
**trace** [2] - 36:6, 36:12
**track** [2] - 37:25, 81:6
**trade** [5] - 28:24, 29:6, 29:8, 29:23, 54:14
**trading** [1] - 29:4
**traditional** [1] - 36:5
**traffic** [3] - 61:22, 62:15, 147:21
**trafficking** [5] - 26:17, 54:19, 55:5, 57:5, 212:10
**trained** [4] - 4:4, 85:9, 85:14, 85:18, 85:21, 86:5, 86:9, 91:14, 146:2, 151:7, 154:11
**trainer** [1] - 85:6
**training** [30] - 28:8, 84:13, 84:15, 84:16, 84:23, 84:24, 84:25, 85:1, 85:5, 85:8, 85:11, 85:15, 85:16, 85:17, 85:19, 85:20, 86:2, 86:4, 86:6, 86:7, 86:10, 86:11, 86:14, 86:18, 87:2, 91:14, 116:2, 130:1, 146:9
**trans** [1] - 117:14
**transcribed** [2] - 117:15, 215:7
**transcript** [11] - 15:21, 117:5, 117:21, 126:4, 126:22, 134:16, 175:21, 180:10, 194:22, 215:7
**transcripts** [1] - 119:12
**transmitted** [1] - 89:9
**transparency** [1] - 18:24, 121:5, 207:11
**transport** [1] - 184:11
**travel** [4] - 2:21, 74:3, 177:1, 178:12
**traveled** [3] - 53:25, 56:11, 60:16
**travels** [1] - 181:18

**treat** [1] - 187:4
**treated** [3] - 183:16, 183:19, 204:10
**treatment** [1] - 187:6
**triage** [5] - 168:5, 169:7, 169:9, 169:13, 169:17
**trial** [4] - 2:7, 122:18, 213:10, 213:11
**Trial** [1] - 2:8
**trickery** [1] - 212:4
**tried** [3] - 114:3, 125:12, 208:16
**tries** [6] - 43:21, 54:3, 88:3, 88:4, 88:8, 120:6
**true** [12] - 20:10, 21:2, 61:18, 61:19, 62:14, 74:16, 77:15, 137:22, 141:3, 193:8, 207:4, 208:13
**truly** [4] - 122:22, 124:1, 127:7, 149:17
**trust** [4] - 40:1, 145:21, 202:3, 202:5
**trusting** [1] - 145:22
**try** [9] - 52:17, 71:3, 98:15, 100:7, 137:13, 183:12, 211:5, 212:3, 213:12
**trying** [18] - 16:12, 17:12, 33:9, 43:23, 48:4, 51:20, 67:17, 73:9, 82:3, 88:12, 90:1, 102:25, 103:1, 107:3, 122:25, 138:19, 196:15, 198:5
**turn** [9] - 32:6, 42:24, 43:4, 54:11, 68:16, 127:22, 131:5, 197:5
**turned** [3] - 128:2, 168:25, 194:18
**turns** [1] - 144:19
**TV** [1] - 204:17
**twice** [2] - 169:20, 212:25
**two** [51] - 11:1, 15:22, 21:22, 22:11, 23:23, 27:7, 34:24, 35:10, 35:11, 35:14, 38:11, 52:25, 53:2, 54:25, 59:5, 59:16, 60:25, 61:5, 62:8, 66:10, 73:3, 94:10, 96:6, 96:15, 96:24, 102:2, 102:3, 113:14, 118:11, 122:2, 123:14, 124:4, 126:24, 128:22, 129:4, 134:19, 135:1, 136:4, 138:12, 143:14, 144:9, 144:12, 147:6, 159:4, 160:23, 180:8, 181:21, 186:18, 188:13, 211:8
**twofold** [1] - 124:17

---

**type** [10] - 25:21, 29:6, 29:12, 30:19, 43:7, 44:4, 107:1, 108:14, 130:12, 187:1
**types** [4] - 43:16, 163:25, 164:7
**typical** [2] - 20:5, 31:19, 34:5, 34:7, 34:15, 47:18, 49:2, 81:23, 184:25
**typically** [5] - 16:24, 43:9, 51:22, 189:3, 196:2
**typing** [2] - 52:24, 54:6

---

**U**

**U.S** [2] - 1:23, 193:10
**ultimate** [1] - 154:21
**ultimately** [2] - 157:21, 208:24
**um-hum** [14] - 69:18, 92:8, 92:22, 93:18, 94:3, 94:17, 95:11, 98:21, 99:20, 101:25, 104:4, 112:14, 115:2, 186:7
**umpire** [1] - 157:10
**unambiguous** [3] - 210:8, 210:20, 210:24
**unambiguously** [2] - 211:17, 212:18
**unaware** [3] - 8:1, 27:13, 82:19
**unclarity** [1] - 42:3
**unclear** [1] - 207:8
**uncommon** [2] - 139:17, 139:19
**under** [22] - 3:15, 4:1, 4:17, 15:7, 18:1, 29:23, 39:21, 135:6, 155:7, 177:20, 180:24, 199:23, 199:25, 208:14, 209:3, 209:4, 209:11, 209:18, 209:24, 210:18, 211:1, 211:17
**undercover** [1] - 146:19
**underlined** [1] - 39:19
**underlines** [1] - 47:7
**underlying** [1] - 11:20
**understandable** [1] - 33:24
**understatement** [1] - 16:5
**understood** [18] - 6:12, 6:18, 13:14, 15:10, 19:7, 63:19, 149:18, 151:9, 165:18, 165:23, 177:7, 194:24, 203:1, 203:10, 204:21, 204:24, 211:12, 211:23
**unencrypted** [1] - 51:6

---

**unequivocally** [1] - 210:5
**unfinished** [1] - 161:5
**unholstered** [1] - 159:5
**uniform** [4] - 157:4, 187:23, 187:24, 188:5
**uniformed** [7] - 158:11, 184:10, 185:6, 187:18, 187:24, 188:1, 188:12
**uninstalled** [1] - 127:1
**unique** [5] - 69:8, 69:10, 93:2, 105:18, 140:22
**uniquely** [2] - 56:8, 57:3
**Unit** [2] - 157:6, 157:7
**unit** [2] - 158:9, 185:5
**United** [13] - 2:2, 6:2, 7:1, 7:11, 7:18, 8:3, 8:9, 75:1, 75:8, 82:15, 83:17, 96:2, 124:21
**UNITED** [2] - 1:1, 1:4
**universe** [1] - 190:13
**University** [8] - 25:8, 76:10, 76:11, 76:13, 80:23, 94:16, 96:21, 119:1
**university** [6] - 25:13, 25:19, 25:22, 26:2, 33:20, 87:4
**unknown** [2] - 92:3, 119:22
**unlawful** [1] - 110:2
**unless** [5] - 5:24, 106:6, 145:3, 148:17, 213:12
**unlike** [1] - 211:4
**unmodified** [1] - 115:24
**unprepared** [1] - 185:11
**unpronounceable** [1] - 50:12
**unreasonable** [4] - 106:17, 127:9, 127:10, 133:6
**unsettled** [1] - 187:5
**unsettling** [1] - 187:3
**unsophisticated** [1] - 79:8
**untouchable** [1] - 19:2
**untrusted** [1] - 41:18
**unusual** [5] - 20:5, 20:9, 137:9, 209:7, 211:7
**up** [42] - 2:14, 11:16, 15:25, 24:15, 24:20, 31:4, 35:1, 35:22, 38:22, 45:7, 48:11, 48:25, 60:18, 69:16, 85:4, 85:13, 87:17, 89:8, 90:24, 91:13, 91:20, 103:19, 126:16, 142:15, 160:12, 167:18, 167:20, 168:22, 169:11, 171:25,

---

172:16, 172:18, 177:7, 180:11, 181:5, 186:12, 186:16, 191:19, 193:3, 196:5, 197:10, 199:20
**update** [2] - 64:14, 116:11
**updates** [1] - 64:12
**updating** [1] - 66:15
**upheld** [1] - 151:23
**uphold** [1] - 121:19
**upload** [11] - 43:7, 43:8, 43:9, 43:12, 43:19, 43:21, 43:23, 44:18, 67:24, 67:25, 77:14
**uploader** [1] - 73:6
**uploading** [1] - 69:12
**uploads** [1] - 68:1
**upstairs** [23] - 160:20, 160:21, 160:23, 160:25, 169:20, 169:22, 171:21, 172:1, 172:7, 172:9, 172:12, 194:3, 194:5, 194:8, 194:10, 194:15, 194:17, 194:19, 195:2, 195:14, 207:22, 208:9, 211:20
**URL** [2] - 44:12, 44:15
**USA** [1] - 215:4
**useful** [2] - 33:25, 149:9
**user** [59] - 30:12, 30:13, 31:23, 34:5, 34:7, 34:18, 35:6, 35:7, 35:11, 35:19, 36:16, 36:17, 36:23, 37:17, 40:12, 40:16, 40:18, 40:20, 40:25, 41:16, 41:17, 41:24, 42:20, 43:6, 43:19, 43:25, 44:1, 44:16, 44:18, 45:25, 47:19, 50:24, 51:20, 52:6, 52:7, 52:11, 52:24, 53:17, 53:18, 54:3, 58:12, 58:17, 60:4, 61:13, 66:5, 66:24, 67:2, 67:6, 67:16, 73:9, 78:6, 89:8, 115:23, 124:7, 125:11, 127:16, 131:5, 153:6, 153:15
**user's** [1] - 42:17
**user-friendly** [1] - 44:16
**users** [36] - 34:15, 35:10, 36:1, 37:19, 38:20, 39:10, 40:4, 40:14, 40:25, 42:4, 42:5, 42:21, 42:23, 45:16, 48:8, 51:15, 53:1, 59:24, 60:6, 64:6, 64:13, 65:21, 67:10, 67:12, 67:18, 79:4, 80:9, 87:22, 89:7, 90:16, 95:17, 119:21, 140:5, 154:3, 190:14

---

**uses** [2] - 65:10, 168:4
**utilize** [2] - 116:1, 125:1
**utilized** [1] - 124:3

---

**V**

**vacated** [2] - 12:14, 12:15
**vague** [1] - 79:22
**validity** [1] - 22:15
**valuable** [1] - 106:11
**valuables** [2] - 164:11, 164:17
**value** [31] - 69:7, 69:25, 70:2, 72:15, 72:21, 72:23, 73:16, 73:22, 73:25, 74:20, 77:21, 88:14, 92:21, 92:23, 93:2, 93:10, 93:12, 94:23, 97:6, 101:10, 102:3, 105:1, 108:13, 109:3, 119:17, 119:18, 141:1, 141:11, 141:18, 141:24
**valueless** [1] - 78:10
**values** [31] - 69:4, 92:7, 95:4, 95:5, 96:7, 96:10, 96:17, 98:3, 98:20, 102:5, 102:6, 102:10, 104:1, 107:25, 108:14, 108:15, 109:16, 110:7, 110:13, 110:15, 110:25, 120:1, 120:2, 140:12, 140:15, 140:20, 142:16, 142:17, 142:22, 143:15, 143:16
**variables** [4] - 103:8, 103:10, 103:11, 151:11
**variety** [1] - 25:23
**various** [13] - 3:25, 16:6, 16:9, 22:22, 59:9, 59:10, 63:17, 67:25, 73:10, 73:17, 75:4, 89:7, 98:5
**vast** [3] - 26:10, 33:22, 109:18
**vastly** [2] - 36:21, 36:22
**vehicle** [1] - 162:22
**verb** [1] - 189:12
**verbally** [1] - 167:18
**verbose** [1] - 33:23
**version** [45] - 37:5, 55:23, 58:7, 58:14, 58:20, 59:19, 59:20, 59:21, 59:24, 61:7, 64:7, 64:12, 64:13, 65:9, 82:25, 87:10, 87:11, 88:16, 88:20, 89:6, 90:2, 90:22, 95:20, 96:20,

102:1, 113:11, 113:18,
114:19, 114:22, 115:6,
115:20, 115:24, 116:1,
116:6, 116:10, 119:1,
119:2, 119:9, 122:7,
122:8, 122:9, 122:11,
130:18, 131:11, 142:3
**Version** [1] - 66:12
**versions** [4] - 116:5,
116:6, 116:7, 116:12
**versus** [2] - 2:3, 62:1
**vest** [4] - 162:22,
187:11, 187:19, 187:21
**vests** [6] - 163:3,
187:14, 187:16, 188:5,
206:24
**via** [1] - 53:6
**video** [2] - 141:18,
174:16
**videos** [2] - 29:5, 29:8
**view** [3] - 35:23, 40:8,
62:6
**viewed** [1] - 18:9
**viewing** [3] - 51:6,
63:21, 142:12
**violated** [1] - 133:17
**violation** [2] - 22:12,
213:4
**violative** [1] - 208:20
**Violent** [1] - 157:5
**Virginia** [1] - 7:19
**virtue** [4] - 97:5, 143:22,
143:24
**visit** [4] - 56:20, 108:17,
108:19, 108:25
**visited** [3] - 56:17,
81:17, 82:23
**visitor** [1] - 136:12
**visualize** [1] - 66:19
**visually** [2] - 57:18,
97:23
**VLC** [2] - 174:15,
174:16
**voice** [6] - 158:16,
158:18, 164:16, 201:17,
202:21, 203:8
**voices** [1] - 198:9
**voluntarily** [7] - 12:11,
123:12, 127:22, 128:2,
210:22, 211:11, 211:15
**voluntariness** [1] -
23:17
**voluntary** [1] - 179:19
**volunteer** [1] - 58:5
**volunteering** [1] - 46:24
**volunteers** [3] - 29:1,
37:23, 58:4
**vulnerabilities** [2] -
60:8, 112:15
  **vulnerability** [1] - 60:23

# W

**wait** [2] - 38:14, 51:4
**waiting** [2] - 34:20,
48:11
**waive** [1] - 211:11
**waived** [3] - 208:13,
210:22, 211:15
**waives** [1] - 207:24
**walk** [1] - 163:10
**walked** [2] - 173:9,
179:7
**walking** [2] - 169:19,
206:19
**wall** [2] - 172:16, 172:17
**wallet** [1] - 164:24
**wants** [14] - 14:24,
17:12, 17:20, 18:15,
18:25, 84:8, 120:18,
121:19, 138:23, 150:1,
209:25
**warn** [4] - 36:1, 36:17,
59:24, 198:5
**warned** [1] - 126:1
**warning** [10] - 15:24,
36:4, 37:17, 38:3, 38:4,
38:16, 39:20, 41:18,
48:8, 60:3
**warnings** [9] - 37:19,
38:21, 39:12, 40:5, 40:6,
63:20, 65:1, 65:4, 126:11
**warns** [2] - 39:10, 155:2
**warrant** [155] - 2:25,
3:17, 4:5, 4:17, 5:6, 5:9,
5:10, 5:11, 5:13, 5:18,
5:23, 6:7, 7:3, 7:5, 7:13,
7:15, 8:2, 13:9, 13:10,
13:24, 14:3, 15:9, 15:23,
16:7, 16:16, 16:17,
16:19, 16:22, 17:2, 18:6,
18:16, 19:17, 20:4,
21:15, 21:24, 22:3, 22:5,
22:10, 22:16, 23:4, 23:8,
23:14, 111:2, 111:10,
114:9, 117:13, 118:11,
120:23, 122:24, 123:18,
123:20, 124:11, 124:14,
124:15, 125:7, 125:15,
125:22, 126:25, 128:10,
128:13, 128:18, 129:2,
129:3, 129:6, 129:8,
129:12, 129:13, 129:14,
129:15, 129:17, 129:25,
132:2, 132:8, 132:13,
132:17, 133:2, 133:9,
133:10, 133:12, 133:15,
134:18, 135:13, 139:1,
140:16, 141:23, 142:9,
143:4, 143:21, 144:3,

144:9, 145:11, 145:23,
145:25, 146:13, 147:13,
148:2, 149:14, 149:15,
150:4, 150:5, 150:20,
150:23, 151:2, 151:3,
151:4, 151:23, 153:7,
154:6, 154:17, 154:19,
155:1, 155:7, 157:12,
157:16, 157:18, 157:22,
158:5, 158:7, 158:8,
158:10, 158:13, 158:15,
159:13, 159:22, 163:3,
163:6, 163:9, 163:11,
163:15, 164:4, 164:10,
164:17, 167:12, 175:3,
176:23, 182:17, 184:17,
184:21, 184:25, 186:24,
189:21, 190:4, 196:3,
196:16, 196:18, 202:19,
203:9, 204:13, 209:7,
209:10
**warrant's** [1] - 129:5
**warrantless** [1] - 121:8
**warrants** [1] - 136:25
**wasting** [1] - 137:11
**watch** [1] - 136:10
**water** [1] - 24:25
**ways** [6] - 46:3, 46:9,
50:5, 51:7, 61:1, 67:25
**weapon's** [1] - 159:3
**weapons** [4] - 158:23,
159:5, 159:13, 170:7
**wear** [2] - 170:15, 212:1
**wearing** [6] - 158:2,
158:23, 170:17, 187:11,
187:14, 187:15, 187:19,
187:20
**website** [27] - 27:18,
30:17, 30:21, 30:23,
31:2, 32:3, 37:23, 37:25,
38:2, 40:3, 40:8, 44:13,
46:18, 47:2, 48:15,
48:25, 49:2, 49:3, 49:7,
49:11, 60:5, 60:21,
61:14, 108:21, 112:18,
112:20
**websites** [8] - 29:8,
43:12, 43:13, 46:13,
48:17, 108:18, 109:1
**Wednesday** [1] - 1:10
**Weeks** [1] - 10:10
**weeks** [2] - 61:21, 62:16
**weigh** [3] - 211:19,
211:21, 212:14
**weight** [2] - 11:4, 13:9
**well-trained** [1] - 4:4
**Wellman** [2] - 3:21, 4:22
**West** [2] - 1:23, 7:19
**Westlaw** [1] - 7:18
**whatsoever** [4] - 17:24,

23:2, 79:12, 209:14
**Whereof** [1] - 215:9
**who've** [1] - 187:1
**whole** [6] - 29:8, 38:8,
98:8, 134:23, 152:24,
153:19
**Wiedeck** [4] - 168:16,
179:17, 195:9, 196:7
**wife** [13] - 132:1,
159:24, 161:16, 161:23,
163:8, 165:17, 166:2,
167:6, 168:2, 168:18,
170:22, 185:20, 208:10
**Wilhelm** [2] - 4:12,
151:21
**William** [1] - 7:8
**window** [3] - 106:18,
172:19, 172:20
**Windows** [3] - 32:5,
34:9, 35:3
**windows** [2] - 35:2,
46:20
**wire** [1] - 22:13
**wireless** [1] - 130:8
**Wiretap** [1] - 133:17
**wise** [1] - 207:21
**wish** [2] - 3:8, 33:7
**wished** [1] - 164:12
**wishes** [1] - 23:7
**withdraw** [1] - 196:18
**Witness** [1] - 215:9
**WITNESS** [20] - 24:17,
24:18, 24:23, 42:8,
42:11, 59:14, 84:1, 84:3,
115:18, 117:1, 156:5,
156:6, 156:9, 196:21,
197:7, 197:8, 197:13,
214:4, 214:6, 214:9
**witness** [20] - 5:7, 7:7,
8:18, 9:6, 16:2, 17:23,
22:18, 22:23, 24:12,
24:15, 83:23, 118:6,
118:19, 118:21, 118:23,
120:12, 121:24, 137:12,
191:20, 197:2
**witnesses** [9] - 22:7,
23:1, 23:2, 23:23,
118:11, 118:15, 121:21,
191:17, 205:21
**woken** [1] - 181:5
**wonderful** [1] - 33:1
**wondering** [1] - 21:18
**wood** [1] - 161:11
**word** [8] - 68:19, 116:5,
141:7, 148:17, 188:5,
189:12, 211:3, 211:4
**wording** [1] - 210:15
**words** [15] - 15:11,
18:3, 48:17, 71:7,
141:15, 142:1, 148:20,

148:25, 171:25, 199:4
**workings** [1] - 22:20
**works** [12] - 62:7,
62:11, 76:8, 87:12,
87:13, 117:19, 119:16,
122:6, 122:9, 127:12,
130:2, 139:14
**workshop** [5] - 26:16,
27:5, 27:6, 27:8, 27:21
**workshop's** [1] - 27:18
**world** [6] - 45:2, 75:12,
82:12, 82:13, 96:1,
181:18
**worldwide** [1] - 75:10
**worry** [1] - 47:21
**write** [7] - 55:11, 55:17,
55:18, 83:3, 83:5, 87:21,
150:18
**writes** [2] - 58:14, 61:10
**writing** [5] - 83:5,
134:12, 152:21, 152:25,
154:1
**written** [8] - 15:11,
75:22, 82:17, 135:2,
139:1, 139:5, 139:9,
140:14
**wrote** [6] - 27:12, 83:2,
96:16, 97:1, 178:1,
210:14

# Y

**year** [7] - 25:12, 26:15,
27:20, 27:22, 78:21,
78:23, 113:14
**years** [22] - 9:23, 10:9,
10:10, 10:11, 25:23,
30:7, 30:10, 38:3, 38:4,
40:11, 60:18, 60:22,
63:23, 63:24, 63:25,
65:3, 65:6, 78:18, 78:23,
122:8, 126:24, 137:6
**yell** [1] - 205:14
**yelling** [1] - 198:2
**yesterday** [5] - 2:20,
14:17, 100:6, 135:19
**yield** [2] - 20:22, 119:4
**York** [1] - 9:4
**yourself** [14] - 79:11,
86:5, 97:18, 97:23,
106:8, 106:12, 106:25,
107:4, 107:6, 107:8,
107:12, 107:23, 163:21,
187:17

# Z

**Zajac** [3] - 1:22, 215:3,
215:14

**zip** [1] - 49:24
**zoom** [1] - 49:9
**zoomed** [1] - 37:5
**zoomed-in** [1] - 37:5
**zooming** [1] - 36:19